⚠ Caution
As of: January 19, 2026 6:50 PM Z

# Browning v. Town of Hollywood Park

United States District Court for the Western District of Texas, San Antonio Division

December 22, 2023, Decided; December 22, 2023, Filed

SA-23-CV-01485-XR

**Reporter**
2023 U.S. Dist. LEXIS 234886 *; 2023 WL 9503457

BONNIE KAY BROWNING, SCOTT S. TROEN, CHAMPAGNE CAMPAIGN L.L.C., Plaintiffs -vs- TOWN OF HOLLYWOOD PARK, TEXAS, Defendant

**Counsel:** [*1] For Champagne Campaign L.L.C., Bonnie Kay Browning, Scott S. Troen, Plaintiffs: David M. Gottfried, LEAD ATTORNEY, Tara Gillespie, Gottfried Alexander Law Firm, Austin, TX USA; J. Patrick Sutton, LEAD ATTORNEY; 1505 West 6th Street, USA, Austin, TX.

For Town of Hollywood Park, Texas, Defendant: Michael S. McCann , Jr., Ryan Henry, LEAD ATTORNEYS, Law Offices of Ryan Henry, PLLC, San Antonio, TX USA.

**Judges:** XAVIER RODRIGUEZ, UNITED STATES DISTRICT JUDGE.

**Opinion by:** XAVIER RODRIGUEZ

## Opinion

### ORDER

On this date, the Court considered Plaintiffs' Motion for Preliminary Injunction (ECF No. 2), Defendant's response brief (ECF No. 9), Plaintiffs' reply brief (ECF No. 10), and the parties' oral arguments held on December 19, 2023. For the reasons discussed at the preliminary injunction hearing and set out more fully below, the Court **GRANTS** the motion.

## BACKGROUND

This action arises out of Defendant Town of Hollywood Park, Texas ("the Town") passing Ordinance No. 2045 ("the Ordinance"), which amends the Town's zoning code to prohibit "short-term rentals" anywhere in the Town. ECF No. 2 at 4. Passed into law on November 14, 2023, the Ordinance defines short-term rentals as any rental of a residential property for less than thirty [*2] consecutive days. *Id.* The Ordinance also provides, "[s]hort-term rentals in existence and under contract at the time this Article becomes effective [November 14, 2023] have six months from the date of the signing of the ordinance to come into compliance with this Article." ECF No. 2-1 at 2. Ordinance violations can trigger fines of up to $2,000 per day for each offense. ECF No. 2 at 4.

Plaintiffs interpret this Ordinance to mean that "no new rentals may be booked after November 14, 2023," but that the "Town will not prosecute property owners for completing rentals booked prior to November 14, 2023, and completed in the next six months [by May 14, 2024]." ECF No. 2 at 4. However, at the preliminary injunction hearing held on December 19, 2023, Defendant objected to Plaintiffs' interpretation of the Ordinance. Defendant insisted that the Ordinance permits residents who offered short-term rentals *before* November 14, 2023 to continue offering new short-term rentals until May 14, 2024, so long as the new

rental contracts ended by May 14, 2024.[1]

Plaintiffs Bonnie Kay Browning and Scott S. Troen purchased a home located at 335 Donella Drive in the Town on August 17, 2021. ECF No. 2-3 at 1. [*3] Plaintiffs divide their time between the Town and another home in Virginia. ECF No. 2-3 at 1. Plaintiffs decided to market their property in the Town as a short-term rental on dates when they reside in Virginia, and, in an effort to increase the desirability of the property, Plaintiffs made substantial investments in the property. ECF No. 2-3 at 1. Specifically, Plaintiffs purchased new furnishings, decorations, windows, and doors; installed a water softener and reverse osmosis system; and cut down several trees on the property. ECF No. 2-3 at 1. Beginning in January 2023, Plaintiffs began leasing out the property in the Town on a short-term basis, with all but one lease being booked for under 30 days. ECF No. 2-3 at 1.

Plaintiff Champagne Campaign LLC, an entity owned and managed by Abby Argo, purchased 205 Mecca Drive in the Town in February 2021. ECF No. 2-2 at 1. Argo divides her time between this property and one located in Austin, prompting her to begin offering short-term rentals on the property in March 2022. ECF No. 2-2 at 1. Like Browning and Troen, Argo made substantial investments in her property to enhance its rental desirability, including installing a new HVAC system, [*4] new plumbing, a new septic tank, lighting in exterior

trees, and a privacy fence around the perimeter of the backyard. ECF No. 2-2 at 1.

Neither Plaintiffs nor their guests have ever received a nuisance complaint or citation from the Town. ECF No. 2-2 at 1; ECF No. 2-3 at 1. Further, when they purchased their properties and initiated improvements, the Town did not impose any restrictions on short-term rentals. *Id.* Plaintiffs provided affidavits affirming that, but for the Ordinance, they would continue to rent out their respective homes on a short-term basis. ECF No. 2-2 at 1; ECF No. 2-3 at 2.

On December 4, 2023, Plaintiffs filed a motion for preliminary injunction, requesting that the Court enjoin the Town from enforcing the Ordinance against them during this litigation. ECF No. 2.

## DISCUSSION

## I. Legal Standard

To secure a preliminary injunction, the movants must demonstrate by a clear showing: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movants; and (4) that the injunction will not undermine the public [*5] interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). The Court looks to substantive law to determine the movants' likelihood of success on the merits. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir. 1985).

## II. Analysis

## A. Substantial Likelihood of Success on the Merits

---

[1] In support of this argument, Defendant introduced a letter dated December 13, 2023 from City Secretary of the Town, Patrick Aten, that was mailed to all individuals believed to be operating short-term rentals. *See* ECF No. 10-4 at 2. This letter provides, "[i]ndividuals who are currently engaged in the operation of short-term rentals in the Town of Hollywood Park, have six months from the date of the signing of the ordinance, November 14, 2023, to come into compliance." ECF No. 10-4 at 2. The letter continues that this provision's "purpose is to allow these individuals engaged in the operation of short-term rentals prior to November 14, 2023, to continue operation of those short-term rentals until Tuesday May 14, 2023." ECF No. 10-4 at 2. The "property must already have been utilized as a short-term rental prior to" November 14, 2023 in order for Town residents to continue offering short-term rentals until May 14, 2023. ECF No. 10-4 at 2.

Plaintiffs assert that the Ordinance—as a retroactive law—violates Article 1, Section 16 of the Texas Constitution, which provides that "[n]o bill of attainder, ex post facto law, retroactive law, or any other law impairing the obligation of contracts shall be made." TEX. CONST. ART. I, § 16. "A retroactive statute is one which gives preenactment conduct a different legal effect from that which it would have had without the passage of the statute." Union Carbide Corp. v. Synatzske, 438 S.W.3d 39, 60 (Tex. 2014). The Texas Supreme Court established a three-part test for determining whether a retroactive law is unconstitutional, directing courts to consider: "[1] the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; [2] the nature of the prior right impaired by the statute; and [3] the extent of the impairment." Robinson v. Crown Cork & Seal Co., 335 S.W.3d 126, 145 (Tex. 2010).

Under the first factor, the Town asserts numerous public interest justifications for the Ordinance. Specifically, the Ordinance seeks to address the "increases in traffic, public nuisances, parking, noise, litter, and the influx of strangers into residential areas" that [*6] allegedly result from permitting short-term rentals. ECF No. 2-1 at 1. Further, the Ordinance states that the Town found this short-term rental ban necessary to "safeguard and protect the public health, safety, and welfare" of the Town and to "protect the beauty and integrity of [the Town's] residential ambiance." ECF No. 2-1 at 1.

However, there are no legislative factual findings in the record to support the conclusion that a ban on short-term rentals would resolve these concerns. Indeed, at the preliminary injunction hearing, the City Secretary for the Town, Patrick Aten, testified that he was not aware of the Town's police department or city council having performed any studies analyzing the difference between the number of police calls for long-term rentals versus short-term rentals. Likewise, Aten only testified to generalized discussions at public City Council

meetings regarding the Ordinance, not any express findings by the City Council in support of the Ordinance. Further, Aten testified that an existing law, Ordinance 1020, empowered the Town to issue citations and fines to residents committing nuisance-generating violations.[2] Accordingly, this factor weighs in favor of granting [*7] a preliminary injunction. See Zaatari v. City of Austin, 615 S.W.3d 172, 189-90 (Tex. App.—Austin 2019, pet. denied) (finding that a ban on short-term rentals "cannot be considered compelling" where nothing in the record indicated that the ban would prevent the city's stated concerns and the city passed other ordinances banning the nuisances at issue).

Under the second Robinson factor, Plaintiffs assert that property owners in Texas who "purchase property prior to the enactment of a short-term rental ban have a[n] 'established' property right" to engage in short-term rentals "subject to protection under Article 1, Section 16." ECF No. 2 at 8. Here, Plaintiffs submitted affidavits confirming that when they purchased their respective properties and made substantial investments for the purpose of generating additional short-term rental income, the Town did not restrict short-term rentals. ECF Nos. 2-2 at 1; ECF No. 2-3 at 1.

Several recent federal court decisions confirm that this argument will likely succeed. For instance, in Anding v. City of Austin, the Western District of Texas evaluated a 2016 short-term rental ordinance limiting short-term rental licenses in certain zoning districts to properties where the owner resided on the premises (the "homestead requirement"). No.

---

[2] As Defendant correctly notes, Aten also identified deficiencies in Ordinance 1020, including that it required the police to issue multiple citations within a certain timeframe before a property could be designated a "nuisance-generating property." ECF No. 12 at 3. But Aten also testified that the police department relied on informal warnings rather than formal citations, undercutting Defendant's argument that Ordinance 1020 required the issuance of a burdensome number of citations before it could achieve its aims. Further, Plaintiffs direct the Court's attention to additional nuisance-type ordinances available to the Town in its reply. ECF No. 12 at 3.

1:22-CV-01039-DAE, 2023 U.S. Dist. LEXIS 132883, 2023 WL 4921530, at *2 (W.D. Tex. Aug. 1, 2023). There, because the plaintiffs [*8] had purchased their property in 2014—two years before the passage of the homestead requirement that would have prohibited them from engaging in short-term rentals—the court concluded that the plaintiffs "had a settled and reasonable expectation of a right to rent their property for short-terms when they purchased it in 2014" and the challenged ordinance was "unconstitutionally retroactive." 2023 U.S. Dist. LEXIS 132883, [WL] at *10; see also Txi Operations, LP v. City of McKinney, No. 4:20-cv-353, 2023 U.S. Dist. LEXIS 5100, 2023 WL 161942, at *22 (E.D. Tex. Jan. 11, 2023) (finding that a city's rezoning and amortization of plaintiff's property violated plaintiff's reasonable and settled expectation to use its property as a concrete batch plant, where plaintiff "spent a significant amount of time and money investing in its property for the purpose of using it as a concrete batch plant, a use that was lawful when [plaintiff] invested its time and money").

Several recent state court opinions also affirm that Plaintiffs will likely be able to articulate a prior right impaired by the Ordinance. See Zaatari (finding "Austinites have long exercised their right to lease their property by housing short-term tenants"); City of Grapevine v. Muns, 651 S.W.3d 317, 345 (Tex. App.—Fort Worth 2021, pet. filed) (enjoining ordinance after finding that plaintiffs adequately pleaded a zoning ordinance impaired their right to "lease their properties on a short-term [*9] basis"). Given this line of federal and state court cases, the Court finds that Plaintiffs have demonstrated a substantial likelihood of success in alleging that the Ordinance impaired a prior right.[3]

Under the third Robinson factor concerning the extent of the impairment of the right, Plaintiffs have also demonstrated a substantial likelihood of success. Here, Plaintiffs argue that the Ordinance eliminates a settled right. Where an ordinance eliminates a right, "there is no disputing that the extent of the impairment is 'significant.'" Anding, 2023 U.S. Dist. LEXIS 132883, 2023 WL 4921530, at *9.[4]

Accordingly, the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits.

## B. Irreparable Harm

Plaintiffs have also demonstrated a substantial threat of irreparable harm if the injunction is not granted. At the preliminary injunction hearing, Plaintiffs testified that the passage of the Ordinance was financially devastating. Indeed, Plaintiff Browning testified that she would have to sell her home if she was not permitted to offer short-term rentals. Likewise, Argo represented that some of her renters book her property at least six months in advance for the more lucrative summer months. Consequently, without a preliminary [*10] injunction, Plaintiffs would suffer substantial financial injury.

The Fifth Circuit has found that such financial injury is sufficient to demonstrate irreparable harm where "the costs are likely unrecoverable." Wages & White Lion Invs., L.L.C. v. United States FDA, 16 F.4th 1130, 1142 (5th Cir. 2021) (finding irreparable injury where federal agency enjoyed

---

[3] Although the Court finds that Plaintiffs have demonstrated a likelihood of success in arguing that short-term rentals were an established practice and a historically permissible use in the Town for purposes of a retroactivity claim at the preliminary injunction stage, the Court reaches no final conclusion as to Plaintiff's ultimate success on this argument and, as always, will continue to evaluate this claim at the merits stage based on the evidence submitted by the parties.

[4] Defendant argues in its response brief that a grace period can cure retroactivity concerns and alleviate the impairment of rights. ECF No. 9 at 3. But Defendant has not pointed the Court to any evidence indicating that the six-month period prior to the Ordinance's enforcement provides Plaintiffs with a reasonable period to recoup their investments. Cf. TXI Operations, 2023 U.S. Dist. LEXIS 5100, 2023 WL 161942, at *22-23 (finding "whether the amortization period was reasonable depends on facts and circumstances that have not been fully developed").

sovereign immunity from any monetary damages). Because the Town's sovereign immunity likely precludes any subsequent financial recovery in this case, the Court finds that Plaintiffs have sufficiently demonstrated irreparable harm. *See St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 762-63 (5th Cir. 2023) ("Sovereign immunity protects Texas and its political subdivisions—including municipalities . . . from suits for money damages.").

## C. Threatened Injury Outweighs Harm from Injunction

The Court finds that Plaintiffs have also sufficiently demonstrated that the threatened injury to Plaintiffs outweighs any harm from granting the preliminary injunction. The harm of granting a preliminary injunction in this matter will be minimal. Plaintiffs seek a preliminary injunction forbidding the Town from enforcing the challenged Ordinance against the Plaintiffs alone during the course of this litigation. As Plaintiffs' affidavits and testimony at the preliminary injunction hearing affirm, neither they [*11] nor their guests have ever received any nuisance complaints from the police or neighbors. *See* ECF Nos. 2-2 at 1, 2-3 at 1.

## D. Public Interest

Finally, the Fifth Circuit permits district courts to issue a preliminary injunction if issuance "will not be adverse to public interest." *Star Satellite, Inc. v. Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986). Nothing in the record before the Court indicates that permitting two homeowners who have never received any warnings or complaints from the Town to continue renting their properties on a short-term basis for the duration of this litigation would harm the public interest. Accordingly, the Court finds this factor weighs in favor of granting the injunction.

## CONCLUSION

It is therefore **ORDERED** that Plaintiffs' Motion for Preliminary Injunction (ECF No. 2) is hereby **GRANTED**.

Defendant Town of Hollywood Park, Texas is hereby **ENJOINED** from enforcing the prohibition on short-term rentals contained in Ordinance 2045 against Plaintiffs pending final resolution of this case.

It is so **ORDERED**.

**SIGNED** this 22nd day of December, 2023.

/s/ Xavier Rodriguez

XAVIER RODRIGUEZ

UNITED STATES DISTRICT JUDGE

---

**End of Document**

 Caution
As of: January 20, 2026 3:49 AM Z

# City of Dallas v. Dall. Short-Term Rental All.

Court of Appeals of Texas, Fifth District, Dallas

July 18, 2025, Opinion Filed

No. 05-23-01309-CV

**Reporter**
2025 Tex. App. LEXIS 5127 *; 2025 LX 292298; 2025 WL 2022063

CITY OF DALLAS, Appellant v. DALLAS SHORT-TERM RENTAL ALLIANCE, SAMMY AFLALO, VERA ELKINS, DANIELLE LINDSEY, AND DENISE LOWRY, Appellees

**Subsequent History:** [*1] On Appeal from the 95th District Court, Dallas County, Texas. Trial Court Cause No. DC-23-16845

Petition for review filed by, 10/16/2025

**Prior History:** City of Dallas v. Dall. Short-Term Rental All., 2025 Tex. App. LEXIS 743, 2025 WL 428514 (Feb. 7, 2025)

**Counsel:** For City of Dallas, Appellant: James B. Pinson, Nicholas D. Palmer, Ryan T. Crocker, Stacy Jordan Rodriguez, Andrew G. Spaniol.

For Dallas Short-Term Rental Alliance, et al., Appellee: Michael K. Hurst, David S. Coale.

**Judges:** Before Justices Smith, Garcia and Rodriguez.[1] Opinion by Senior Justice Rodriguez.

**Opinion by:** YVONNE T. RODRIGUEZ

# Opinion

## MEMORANDUM OPINION ON REHEARING

Opinion by Senior Justice Rodriguez

On February 7, 2025, this Court issued its memorandum opinion affirming the trial court's order granting appellees' application for a temporary injunction and enjoining the City of Dallas from enforcing two ordinances concerning short-term rentals within the city limits. On February 24, 2025, the City filed a motion for en banc reconsideration. On the Court's own motion, we withdraw our February 7 memorandum opinion and vacate our judgment issued the same day. This is now the opinion of the Court. We affirm the trial court's order in part and reverse in part in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

## *Background*

The City enacted ordinance numbers 32482 and 32473 in 2023 after studying the proliferation of short-term housing rentals [*2] in the Dallas market. Ordinance 32482 banned short-term rentals in areas zoned for "single-family residential" use while ordinance 32473 regulated the remaining short-term rentals and provided the process through which owners could acquire the necessary permits to operate a short-term rental in Dallas. The Dallas Short-Term Rental Alliance—joined by Sammy Aflalo, Vera Elkins, Danielle Lindsey, and Denise Lowry—challenged the constitutionality of these two ordinances and requested injunctive and declaratory relief. After an evidentiary hearing, the trial court granted appellees' application for a temporary injunction and found (1) appellees met their burden to establish they have a probable right of recovery on their cause of action against the City of Dallas and (2) without injunctive relief, appellees faced a substantial risk of probable,

---

[1] The Hon. Yvonne T. Rodriguez, Senior Justice, Assigned.

imminent, and irreparable injuries.

### Issues on Appeal

In four issues on appeal, the City contends the trial court abused its discretion when it (1) granted appellees' application, (2) concluded appellees satisfied their extraordinary burden to prove their probable right to relief, (3) concluded appellees satisfied their extraordinary burden to prove [*3] a probable, imminent, and irreparable injury, and (4) granted equitable relief despite the Alliance's allegedly unclean hands. More specifically, the City argues the ordinances are not preempted by House Bill 2127 (which it argues is unconstitutional), the trial court erred when it granted equitable relief to the Alliance's members despite it being "likely (if not certain) that some portion of [its] members have not registered or paid [hotel occupancy tax] on their [short-term rental] properties," and the trial court erred when it found appellees are likely to prevail on their arguments concerning due course of law, equal protection, regulatory takings, retroactivity, and the Zoning Enabling Act.

### Temporary Injunctions and the Standard of Review

The purpose of a temporary injunction is to preserve the status quo of the subject matter of the litigation pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). We examine each aspect of the trial court's injunction for an abuse of discretion. *Tex. Educ. Agency v. Hous. Indep. Sch. Dist.*, 660 S.W.3d 108, 116 (Tex. 2023). A trial court abuses its discretion when it misapplies the law to established facts or when the evidence does not reasonably support the trial court's determination of probable injury or probable right of recovery. *City of Dallas v. Brown*, 373 S.W.3d 204, 208 (Tex. App.—Dallas 2012, pet. denied). Under [*4] this standard, we defer to the trial court's factual findings if the evidence supports them, but we review legal determinations

de novo. *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024). We view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and defer to the trial court's resolution of conflicting evidence. *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 922 (Tex. App.—Dallas 2022, no pet.).

To obtain a temporary injunction, an applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. The applicant has the burden of production to offer some evidence on each of these elements. *See In re Tex. Nat. Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002) (orig. proceeding). At the hearing for a temporary writ of injunction, the trial court is not determining the ultimate rights of the parties; instead, the only question before the trial court is whether applicants demonstrated their entitlement to preservation of the status quo pending trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) (citing *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981)); *Keystone Life Ins. Co. v. Mktg. Mgmt., Inc.*, 687 S.W.2d 89, 93 (Tex. App.—Dallas 1985, no pet.) ("[T]he only question before the trial court was whether to maintain the status quo—not to determine the ultimate rights of the parties.").

The City's brief does not attack appellees' pleading or [*5] proof of a cause of action against it under the Declaratory Judgment Act. Thus, we focus our analysis on appellees' proof of a probable right to the relief sought and a probable, imminent, and irreparable injury in the interim. *See* TEX. R. APP. P. 47.4 ("If the issues are settled, the court should write a brief memorandum opinion no longer than necessary to advise the parties of the court's decision and the basic reasons for it.").

### Findings

In its order granting injunctive relief against the ordinances, the trial court found (1) appellees introduced evidence the individual appellees had invested hundreds of thousands of dollars, excluding mortgages which exceed millions of dollars, into the short-term rental industry in Dallas, (2) the City intended to enforce the zoning ordinance as soon as December 13, 2023, (3) appellees presented evidence that the City relied on a June 2023 study when it enacted the ordinances at issue, (4) appellees presented evidence that said study "is not conclusive" and "overestimates the associated concerns with [short-term rentals] that the City claims are the basis for its governmental interests," (5) appellees presented evidence that the ordinances "do not rationally relate to the claimed governmental [*6] interests based on any available data," and (6) appellees established that the registration ordinance "imposes several oppressive regulations on those few remaining [short-term rentals]" after the effects of the zoning ordinance are realized. The City does not challenge any of these findings on appeal. Cf. *Badger Tavern LP v. City of Dallas*, No. 05-23-00496-CV, 2024 Tex. App. LEXIS 2264, 2024 WL 1340397, at *3 (Tex. App.—Dallas Mar. 29, 2024, no pet.) (mem. op.) ("Findings of fact and conclusions of law embedded in a trial court's temporary injunction order may be helpful, but are not binding, in reviewing the court's exercise of its discretion.") (citing *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 884 (Tex. App.—Dallas 2003, no pet.)).

## Analysis

### A. Probable right to relief

In its second issue, the City argues the trial court erred when it concluded appellees "satisfied their extraordinary burden to prove a probable right to relief sufficient to enjoin enforcement of the [o]rdinances." In support of this contention, the City cites *Thompson v. City of Palestine*, 510

S.W.2d 579 (Tex. 1974), for the proposition that, "When the requested injunction would prevent enforcement of a municipal ordinance, the burden of proof is 'extraordinary.'" The City is mistaken; *Thompson* did not involve a temporary injunction and the supreme court did not require applicants for temporary injunctions against municipal ordinances to meet an "extraordinary" burden of proof. *See id.* at 581.[2]

Similarly, the City cites *Mayhew v. Town of Sunnyvale* for the proposition that, "To overcome this presumption [of an ordinance's validity], plaintiffs have the burden to prove that a challenged ordinance 'has no foundation in reason and is a mere arbitrary or irrational exercise of power.'" *See* 964 S.W.2d 922, 938 (Tex. 1998). Again, the City is mistaken. Instead, *Mayhew* (which does not contain the words "enjoin" or "injunction") says,

> A court should not set aside a zoning determination *for a substantive due process violation* unless the action has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, [*8] the public safety or the public welfare in its proper sense.

*Id.* (cleaned up and emphasis added). Thus, both Thompson and Mayhew are inapposite.

Properly construed, the probable right to relief element requires an applicant to present some evidence supporting every element of at least one

---

[2] Instead, Thompson says:

We have also held [*7] that an 'extraordinary burden' rests on the party attacking the ordinance to show that no conclusive or even controversial issuable facts or conditions exist which would authorize the City Council to exercise the discretion confided to it, and that if reasonable minds may differ as to whether or not a particular zoning ordinance has a substantial relationship to the public health, safety, morals or general welfare, no clear abuse of discretion is shown and the ordinance must stand as a valid exercise of the city's police power.

**510 S.W.2d at 581**.

valid legal theory that raises a *bona fide* issue as to their right to ultimate relief. *See Young Gi Kim v. Ick Soo Oh*, No. 05-19-00947-CV, 2020 Tex. App. LEXIS 3929, 2020 WL 2315854, at *2 (Tex. App.—Dallas May 11, 2020, no pet.) (mem. op.). A party can prove their probable right of recovery by alleging the existence of a right and presenting evidence tending to show that the right is being denied. *Bureaucracy Online, Inc. v. Schiller*, 145 S.W.3d 826, 829 (Tex. App.—Dallas 2004, no pet.). State law creates and defines property rights. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).

## 1. The zoning ordinance

Appellees' pleading alleges they enjoy the right to lease their properties under Texas law. *See Calcasieu Lumber Co. v. Harris*, 77 Tex. 18, 13 S.W. 453, 454 (1890) ("The ownership of land, when the estate is a fee, carries with it the right to use the land in any manner not hurtful to others; and the right to lease it to others, and therefore derive profit, is an incident of such ownership."); *Severance v. Patterson*, 370 S.W.3d 705, 709 (Tex. 2012) (op. on reh'g) ("Private property rights have been described 'as fundamental, natural, inherent, inalienable, not derived from the legislature[,] and as pre-existing even constitutions.'"); *see also City of Grapevine v. Muns*, 651 S.W.3d 317, 346-47 (Tex. App.—Fort Worth 2021, pet. denied) ("The right to lease is a stick within a property owner's [*9] metaphorical bundle of rights.") (citing Emily M. Speier, Comment, *Embracing Airbnb: How Cities Can Champion Private Property Rights Without Compromising the Health and Welfare of the Community*, 44 Pepp. L. Rev. 387, 395-97 (2017)). The Texas Constitution provides: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of law of the land." Tex. Const. art. I, § 19. Appellees have "a vested right to lease their properties and this right is sufficient to support a viable due-course-of law claim." *City of Grapevine,*

651 S.W.3d at 347.

Under the circumstances, we conclude appellees Dallas Short Term-Rental Alliance, Sammy Aflalo, Vera Elkins, and Denise Lowry proved their probable right to relief against the City's zoning ordinance under their due-course-of-law argument because they alleged they possessed well-established rights to lease their property and presented evidence tending to show that the City would deny them those rights by enforcing the zoning ordinance at issue. *See Bureaucracy Online, Inc.*, 145 S.W.3d at 829; *see also Young Gi Kim*, 2020 Tex. App. LEXIS 3929, 2020 WL 2315854, at *2 (requiring "some evidence supporting every element of at least one valid legal theory" to demonstrate a probable right to recovery). Thus, the trial court did not abuse its discretion when it concluded these appellees met their burden to establish that they have a probable right of recovery on a cause of action concerning the zoning ordinance against [*10] the City of Dallas. *See Grapevine*, 651 S.W.3d at 346; *see also* Tex. R. App. P. 47.4; *cf. Brown*, 373 S.W.3d at 208 (a trial court abuses its discretion if the evidence does not reasonably support the trial court's determination of probable injury or probable right of recovery). Thus, we overrule the City's second issue concerning the zoning ordinance with respect to the Dallas Short-Rental Alliance, Sammy Aflalo, Vera Elkins, and Denise Lowry.

## 2. The registration ordinance

The City contends "the Registration Ordinance itself includes no provision indicating that it incorporates, depends on, or is subordinate to the Zoning Ordinance." We disagree. Instead, the registration ordinance refers to the City's efforts concerning the zoning ordinance at least nine times. *See Arredondo v. City of Dallas*, 79 S.W.3d 657, 660 n.5 (Tex. App.—Dallas 2002, pet. denied) (examining recitals in a city resolution); *accord Draper v. City of Arlington*, 629 S.W.3d 777, 792 (Tex. App.—Fort Worth 2021, pet. denied)

(examining recitals in a city ordinance); *Elizabeth Benavides Elite Aviation, Inc. v. City of Laredo*, No. 04-19-00717-CV, 2020 Tex. App. LEXIS 3604, 2020 WL 2044678, at *3 (Tex. App.—San Antonio Apr. 29, 2020, no pet.) (mem. op.) (same); *cf. Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 837 (Tex. 2000) (examining recitals in an ordinance passed by a school board).

The standard of review for as-applied substantive due course challenges to economic regulation enactments analyzes whether an enactment's effect as a whole is so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest. *See Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 87 (Tex. 2015). Appellees argue the burdens imposed by the [*11] City's registration ordinance include (1) excessive fees, (2) limits on maximum occupancy, (3) day limit, (4) parking restrictions, (5) density restrictions, and (6) the homestead exemption. Here, our analysis focuses on the maximum occupancy limitation. *See Young Gi Kim*, 2020 Tex. App. LEXIS 3929, 2020 WL 2315854, at *2 (applicants for injunctive relief must produce some evidence supporting every element of at least one valid legal theory); *see also* TEX. R. APP. P. 47.1.

In support of its argument that the registration ordinance's restriction on maximum occupancy in short-term rentals is constitutional, the City relies upon (1) appellees' response to an interrogatory, (2) an appendix to recommendations from the Dallas Task Force, and (3) the testimony of Andrea Gilles, the City's Interim Director of the Planning and Urban Design Department at the time of the hearing on appellees' application for a temporary injunction. The City first argues the response and appendix constitute a concession that the City has a legitimate governmental interest in enforcing a limit of three people to a bedroom in short-term rentals. Neither document, however, supports the City's position; the former shows the Task Force discussed limits on occupancy and that it previously agreed to [*12] maximum occupancy levels while the latter includes Task Force

recommendations. Neither the interrogatory response nor the appendix constitutes an admission concerning the government's interests that we can attribute to any specific appellee—much less all of them—and neither shows appellees' specific positions on any relevant issue. Further, the City's citations to Ms. Gilles's testimony do not address the three people per bedroom limitation. *See* TEX. R. APP. P. 38.1(i).

Thus, we conclude the trial court did not abuse its discretion when it concluded appellees have demonstrated a probable right to relief with respect to the registration ordinance because the City has failed to both (1) attack the trial court's findings and (2) point us to evidence showing its legitimate governmental interests associated with restricting maximum occupancy in short-term rentals. Therefore, we cannot conclude the trial court abused its discretion when it concluded appellees are likely to prevail on their request for declaratory relief because the registration ordinance is likely unconstitutionally oppressive in light of the alleged but presently unsupported governmental interest in limiting the maximum occupancy of short-term [*13] rentals. *See Patel*, 469 S.W.3d at 87; *Tex. Educ. Agency*, 660 S.W.3d at 116; *cf. Walling*, 863 S.W.2d at 58 ("[T]he only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits."). We overrule the City's second issue concerning the registration ordinance with respect to the Dallas Short Term-Rental Alliance, Sammy Aflalo, Vera Elkins, and Denise Lowry.

### 3. Danielle Lindsey

Appellee Danielle Lindsey, is differently situated because—according to appellees' petition—she "runs a business that provides cleaning, maintenance, and other such support services to rental properties." We assume without deciding this constitutes an occupational property interest. *See Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 655 (Tex. 2022) (citing *Tex.*

*S. Univ. v. Villarreal*, 620 S.W.3d 899, 908 (Tex. 2021)). To be constitutionally protected, a property interest must be "vested." *Id.* (citing *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018)). Interests are not vested when they are predicated upon the anticipated continuance of an existing law and subordinate to the Legislature's right to change the law and abolish the interest. *Id.* Appellees have not briefed whether the Legislature—or the Dallas City Council—has the right to change the law or abolish Lindsey's interest. *See* TEX. R. APP. P. 38.1(i). Therefore, we reverse the trial court's judgment with respect to appellee Danielle Lindsey because she has failed [*14] to show a probable right to relief concerning either ordinance.

## B. Irreparable injury

While the City's brief purports to assign error concerning the trial court's findings that enforcement of the ordinances exposed appellees to irreparable injury, its arguments are restricted to (1) "A regulatory-taking claim necessarily implies that the purported harm is readily compensable with money damages," and (2) "injunctive relief is inappropriate if a plaintiff has stated a viable regulatory takings claim." The City cites no authority in support of the former and quotes *Patel v. City of Everman* in support of the latter. *See* 179 S.W.3d 1, 13 (Tex. App.—Tyler 2004, pet. denied) ("[Where] a party seeks monetary damages, he seeks a legal remedy, not an equitable one.").

Appellees did not make a regulatory-taking claim and their petition does not seek monetary damages. Instead, appellees sought injunctive and declaratory relief based on the alleged unconstitutionality of the City's ordinances. *See Wilburn v. Dacus*, No. 05-16-00522-CV, 2017 Tex. App. LEXIS 5209, 2017 WL 2464679, at *2 (Tex. App.—Dallas June 7, 2017, pet. denied) (mem. op.) ("It is an appellant's burden to discuss his or her assertions of error, and appellate courts have no duty—or even the right—to perform an independent review of the record and

the applicable law to determine whether there was error. . . . 'We [*15] will not do the job of the advocate.'") (quoting *Happy Harbor Methodist Home, Inc. v. Cowins*, 903 S.W.2d 884, 886 (Tex. App.—Houston [1st Dist.] 1995, no writ)). We recognize the City extensively briefed the viability of appellees' regulatory-taking claim, that appellees alleged the zoning ordinance is a taking, and that the City apparently perceived appellees' allegation to constitute a regulatory-taking claim. We disagree; instead of requesting monetary relief, appellees' allegation supported their argument for injunctive relief.

Additionally, the record contains both ordinances, both of which state they "take effect immediately from and after [their] passage and publication in accordance with the provisions of the Charter of the City of Dallas with enforcement action being taken no earlier than six months" from and after passage. This evidence supports the trial court's finding that without injunctive relief, appellees—other than Danielle Lindsey—would suffer probable, imminent, and irreparable injury to their vested property rights. *See City of Grapevine*, 651 S.W.3d at 347 (concluding homeowners had "a vested right to lease their properties and that this right is sufficient to support a viable due-course-of law claim."); *cf. State v. Morales*, 869 S.W.2d 941, 943-44 (Tex. 1994) (to overcome prohibition against civil challenge to penal statute, litigant must allege that penal [*16] statute is unconstitutional and "threatens irreparable injury to vested property rights"). Finally, the record contains at least some evidence supporting the trial court's effectively unchallenged finding that appellees would suffer irreparable injury without injunctive relief. Thus, we overrule the City's third issue.

## C. Irrelevance of House Bill 2127

In its first issue, the City argues the trial court abused its discretion when it granted appellees' request for injunctive relief. Here, the City does not address whether appellees pled or proved a cause of

action against the defendant, a probable right to the relief sought, or a probable, imminent, or irreparable injury in the interim. *See Butnaru*, 84 S.W.3d at 204. Instead, the City argues that its ordinances are not pre-empted by House Bill 2127 (which it argues is unconstitutional). The City also expressly argues that "to determine whether the trial court abused its discretion in granting the [temporary injunction application], it is necessary to address the merits of [appellees'] statutory pre-emption claim."

Assuming *arguendo* that House Bill 2127 does not preempt the City's ordinances, the constitutionality thereof is irrelevant to our review of the trial [*17] court's order for an abuse of discretion concerning appellees' due-course-of-law point. *See* TEX. R. APP. P. 47.1. Thus, we overrule the City's first issue on appeal.

**D. Hotel occupancy taxes**

In its fourth issue, the City argues the trial court erred when it enjoined the City from enforcing the two ordinances at issue because (1) at least 40% of existing short-term rental properties in Dallas have not registered or paid their hotel occupancy taxes, (2) it is more likely than not that some portion of the Alliance's members have not registered or paid their hotel occupancy taxes, and (3) the Alliance therefore sought equitable relief with unclean hands. However, the City cites no cases—and we have found none—in which the payment or nonpayment of hotel occupancy taxes by short-term rental owners prevents the granting of a temporary injunction where an applicant has proven a cause of action against the defendant, a probable right to the relief sought, and a probable, imminent, and irreparable injury in the interim. *See Butnaru*, 84 S.W.3d at 204. Further, the City has failed to show that the Alliance has a duty to pay such taxes or enforce the payment of such taxes amongst its members. Finally, while there is evidence that appellee Elkins [*18] was not current on her hotel occupancy tax payments at one time, there is also

evidence she has paid it "faithfully since learning of her obligation to do so"; there is no other evidence in the record regarding non-payment of the hotel occupancy tax by any other appellee. We therefore conclude the City has not shown the trial court abused its discretion and overrule the City's fourth issue.

**Conclusion**

The only question before the trial court was whether appellees demonstrated their entitlement to preservation of the status quo pending trial on the merits. *See Walling*, 863 S.W.2d at 58. We conclude appellees—other than Danielle Lindsey—pled and proved a cause of action against the City, a probable right to the relief sought, and a probable, imminent, and irreparable injury in the interim. *See Butnaru*, 84 S.W.3d at 204. We therefore reverse the trial court's order with respect to Danielle Lindsey, overrule the City's four issues on appeal with respect to the Dallas Short-Term Rental Alliance, Sammy Aflalo, Vera Elkins, and Denise Lowry, and affirm the trial court's order.

/s/ Yvonne T. Rodriguez

YVONNE T. RODRIGUEZ

JUSTICE

**JUDGMENT**

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED IN PART** and [*19] **REVERSED IN PART**.

We **REVERSE** the portion of the trial court's December 6, 2023 temporary injunction concerning Danielle Lindsey.

We **AFFIRM** the trial court's December 6, 2023 temporary injunction in all other respects.

It is **ORDERED** that appellees DALLAS SHORT-TERM RENTAL ALLIANCE, SAMMY

AFLALO, VERA ELKINS, AND DENISE LOWRY recover their costs of this appeal from appellant CITY OF DALLAS and that DANIELLE LINDSEY bear the costs of her own appeal.

Judgment entered this 18th day of July 2025.

---

**End of Document**

⚠ Caution
As of: February 25, 2026 11:14 PM Z

# City of Grapevine v. Muns

Court of Appeals of Texas, Second District, Fort Worth

December 23, 2021, Delivered

No. 02-19-00257-CV

**Reporter**

651 S.W.3d 317 *; 2021 Tex. App. LEXIS 10133 **; 2021 WL 6068952

CITY OF GRAPEVINE, Appellant v. LUDMILLA B. MUNS, RICHARD MUELLER, KARI PERKINS, KEVIN PERKINS, PAMELA HOLT, AND A-1 COMMERCIAL AND RESIDENTIAL SERVICES, INC., Appellees

**Subsequent History:** Petition for review denied by City of Grapevine v. Muns, 671 S.W.3d 675, 2023 Tex. LEXIS 571, 2023 WL 4035802 (Tex., June 16, 2023)

**Prior History:** [**1] On Appeal from the 348th District Court, Tarrant County, Texas. Trial Court No. 348-303736-18.

City of Grapevine v. Muns, 2021 Tex. App. LEXIS 6364 (Tex. App. Fort Worth, Aug. 5, 2021)

**Counsel:** For Holt, Pamela, Muns, Ludmilla B., Mueller, Richard, A-1 Commercial and Residential Services, Inc., Perkins, Kari, Perkins, Kevin, Appellees: William R. 'Butch' Korb, Jr.; J. Patrick Sutton.

For City of Grapevine, Appellant: Matthew C.G. Boyle; David E. Keltner.

**Judges:** Before Sudderth, C.J., and Kerr, J.[1] Opinion on Rehearing by Justice Kerr.

**Opinion by:** Elizabeth Kerr

---

[1] Justice Lee Gabriel was a member of the original panel but has since retired. Because they agree on the judgment, the two remaining justices decided the case. See Tex. R. App. P. 41.1(b).

# Opinion

[*325] **OPINION ON REHEARING**

After considering Appellant City of Grapevine's motion for en banc reconsideration and Appellees Ludmilla B. Muns, Richard Mueller, Kari Perkins, Kevin Perkins, Pamela Holt, and A-1 Commercial and Residential Services, Inc.'s response, we withdraw our August 5, 2021 opinion and judgment on our own motion and substitute the following.[2]

## I. Introduction

This appeal arises from a challenge to the City of Grapevine's municipal ordinance banning short-term rentals (STRs).[3] Ludmilla B. Muns, Richard Mueller, Kari and Kevin Perkins, Pamela Holt, and A-1 Commercial and Residential Services, Inc. (collectively, "the Homeowners") own residential properties in Grapevine that they lease to others on a short-term basis. In September 2018, [**2] the City of Grapevine passed an ordinance expressly prohibiting STRs in the City (the "STR Ordinance"). As a result, the Homeowners sued the

---

[2] Our withdrawal of the August 5, 2021 opinion and judgment renders the motion for en banc reconsideration moot. See Kennamer v. Est. of Noblitt, 332 S.W.3d 559, 561-62 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (op. on reh'g). Nevertheless, the court has declined to consider this appeal en banc. See Tex. R. App. P. 19.1(b), 41.1(a), 41.2(c).

[3] An STR is a home lease for fewer than 30 days.

City, requesting declarations that the STR Ordinance violates their substantive-due-course-of-law rights, is preempted, and is unconstitutionally retroactive. The Homeowners also asserted a regulatory-takings claim and sought injunctive relief.

The City moved for summary judgment and filed a plea to the jurisdiction arguing that the trial court lacks subject-matter jurisdiction over this case because (1) the Homeowners failed to exhaust their administrative remedies; (2) the Homeowners are seeking an advisory opinion on the STR Ordinance because they have not challenged the City's existing zoning ordinance under which STRs are not a permitted use in the first place; (3) the Homeowners' regulatory-takings claim is invalid; and (4) governmental immunity bars the Homeowners' claims for declaratory and injunctive relief. The trial court disagreed and denied the City's motion and plea. The City has filed this interlocutory appeal,[4] [*326] contending in five issues that the trial court lacked jurisdiction and thus erred by denying the City's jurisdictional plea. [**3] [5] We will reverse and render in part and affirm in part.

## II. Background

In 1982, the City adopted a comprehensive zoning ordinance (the "Zoning Ordinance") that prohibits the use of a building within the City's limits for any purpose except those uses that the ordinance specifically authorizes: "no *use* of any building, structure[,] or land . . . shall hereafter be established, altered, moved, divided[,] or maintained, in any manner *except as authorized by the provisions of this ordinance*." *See* Grapevine,

Tex., Code of Ordinances, app. D, §§ 1, 6.C (2020) (emphases added). The Zoning Ordinance defines "use" as "the purpose or activity for which a piece of land or its buildings is designed, arranged, or intended, or for which it is occupied or maintained." *Id.* § 12.A.426.

In the two zoning districts in which the Homeowners' properties are located, the Zoning Ordinance authorizes "single-family detached dwellings" as a principal permitted use. *Id.* §§ 15.A.1, 16.A.2. A "single-family detached dwelling" is "an enclosed building having accommodations for and occupied by only one family, which building must of itself meet all the lot area, front yard, side yard, rear yard, height[,] and [**4] other zoning requirements." *Id.* § 12.A.394. A "family" is "any number of individuals living together as a single housekeeping unit interdependent upon one another."[6] *Id.* § 12.A.140.

In 2000, the City amended the Zoning Ordinance to allow bed and breakfasts in certain areas of Grapevine.[7] *See* Grapevine, Tex., Ordinance 2000-47 (Apr. 18, 2000). This amendment defined "bed and breakfast facility" as "an accessory use to a single-family dwelling unit in which no more than twelve (12) rooms in the principal residential structure are set aside for guest clients; . . . [the] length of stay of guest clients ranges from one (1) to thirty (30) days; and the owner/operator of the principal structure resides on-site." *Id.* sec. 2.A (codified at Grapevine, Tex., Code of Ordinances, app. D, § 12.A.29a). The amendment excluded from "[b]ed and breakfast homestay[s] . . . uses such as motels, hotels, community residential homes, boarding or lodging houses, apartment dwellings, guest cottages or single-family dwelling transient rental." *Id.* The amendment did not define "single-family dwelling transient rental." *See id.*

The City contends that because the Zoning Ordinance does not expressly allow STRs,

---

[4] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (providing for interlocutory appeal from the grant or denial of a plea to the jurisdiction filed by a governmental unit).

[5] In addition to the parties' briefs, we have received an amicus brief supporting the Homeowners from the Texas Association of Realtors. *See* Tex. R. App. P. 11.

[6] The Zoning Ordinance does not define "single housekeeping unit."

[7] None of the Homeowners' properties are in those areas.

they [**5] have never been a permitted use in the City. But for several years before the STR Ordinance's 2018 passage, the Homeowners had rented out their Grapevine properties on a short-term basis without interference from the City. In fact, when some of the Homeowners contacted the City's Planning and Zoning Department to ask about any restrictions on STRs, City employees told them that the City had no restrictions, regulations, or permit requirements for STRs. Based on these representations and the existing Zoning Ordinance, the Homeowners invested money to purchase or to improve Grapevine homes for use as furnished STRs.[8] Some of the Homeowners paid [*327] short-term-occupancy taxes to the City, without incident and with the City apparently happy to accept them.[9]

More recently, however, Grapevine's STR market has exploded because websites like Airbnb, Homeaway, and Vrbo have made it easier for property owners to market their STRs to prospective renters. For some permanent residents who live near STRs, this uptick has created problems such as noise disturbances, increased vehicle traffic, and street-parking problems. For the City's police department, STRs have generated increased complaints from residents [**6] involving STR guests: criminal mischief, domestic disputes, parking violations, alarm calls, and noise disturbances. But the City has never issued a citation for short-term renting in violation of the Zoning Ordinance.[10]

Because of the increase in STRs and the associated complaints, the Grapevine City Council began a ten-month study and observation period in November 2017 concerning how STRs affect residential neighborhoods. In early September 2018, the city council held a public hearing on the STR issue. At the beginning of the hearing, the City's Assistant Attorney, Matthew Boyle, stated that—despite what the Homeowners had been led to believe—the Zoning Ordinance had always prohibited STRs:

> And at the outset as to where we are now, I want to make it clear that the short-term rentals are not [a] permitted use in the [C]ity of Grapevine and they have never been listed as a permitted use under the zoning ordinance and as such they are currently and have been since at least 2000 prohibited in the [C]ity of [G]rapevine.

After hearing citizens' comments, the city council passed the STR Ordinance, which (1) defines a "single-family dwelling transient rental" as "[t]he rental or offer for [**7] rental of any dwelling or any portion of a dwelling for a period of less than 30 days"[11] and (2) expressly prohibits them in the City. Grapevine, Tex., Ordinance No. 2018-065 (Sept. 4, 2018) (codified at Grapevine, Tex., Code of Ordinances, ch. 14, art. VI, §§ 14-150, -151). According to the City, the STR Ordinance did not really amend the Zoning Ordinance but simply clarified and affirmed that the Zoning Ordinance did not allow STRs.

Immediately after the STR Ordinance's enactment, Scott Williams, the City's Building Official and Director of Development Services, prepared and mailed identical notice letters to all Grapevine's known STR owners and operators. The notice—which each of the Homeowners received—stated,

---

[8] According to the Homeowners, none of them rent out individual rooms, have employees staffing their properties, maintain a front desk or concierge service, or otherwise operate a business on their STR properties.

[9] Homeowner Holt, for example, has paid roughly $32,000 in such taxes to the City, which the City has kept. At the public-hearing portion of the city-council meeting at which the City adopted the STR Ordinance, one STR owner testified—to "hopefully get a little humor in this room tonight," as he said—"I have been paying hotel occupancy taxes for over a year and a half, and I don't think you guys have ever sent those back to me, so just saying."

[10] *Cf. Zaatari v. City of Austin*, 615 S.W.3d 172, 189 (Tex. App.—Austin 2019, pet. denied) (noting that "the City has not initiated a

single proceeding to remove a property owner's short-term rental license in response to complaints about parties").

[11] Single-family dwelling transient rentals do not include traditional residential leaseback arrangements associated with some real-estate transactions. *See* Grapevine, Tex., Code of Ordinances, ch. 14, art. VI, § 14-150.

[*328] Be advised that short term/transient rentals ("STR's") are prohibited in the City of Grapevine. STR's are not listed as a permitted use in any Zoning classification in the City, and as such, are not allowed. . . . Following the [September 2018] Public Hearing, the City Council approved [the STR Ordinance] that affirmed the prohibition on STR's in Grapevine. Single family dwelling transient rentals (aka STR's) are defined as "the rental or offer for rental of any dwelling or [**8] any portion of a dwelling for a period of less than 30 days.["] The complete Ordinance is attached.

The notice informed STR owners that they would be allowed a 45-day conditional grace period to allow them a "reasonable time to honor commitments that have already been made, and/or to market their home(s) for other, permitted uses." The notice warned that after the grace period expired, "any person found to be in violation of the Zoning Ordinance regarding STR's [would] be issued a citation, and upon conviction thereof [would] be fined in a sum not to exceed $2,000.00." The notice further warned that ordinance violations during the conditional grace period would "result in an order to immediately cease the STR" and would "result in prosecution as described above."[12]

In October 2018, the Homeowners sued the City, seeking declarations that the STR Ordinance is unconstitutional because it (1) is a regulatory taking of their property without compensation;[13] (2) violates their due-course-of-law rights under the Texas Constitution;[14] (3) is impliedly preempted by Chapter 156 of the Texas Tax Code alone or in combination with Chapter 92 of the Texas Property Code;[15] and (4) deprives [**9] the Homeowners of their vested rights to continue their STRs, in violation of Chapter 245 of the Texas Local Government Code.[16] The Homeowners also sought to enjoin the City from enforcing the STR Ordinance.

The trial court granted the Homeowners' request for temporary injunctive relief.[17] The City filed a plea to the jurisdiction and brief in support with attached evidence challenging the Homeowners' pleadings and the existence of jurisdictional facts, arguing that

• the Homeowners had failed to allege a justiciable controversy because the STR Ordinance was not a "new ban" on STRs—that is, the unchallenged [*329] existing Zoning Ordinance already banned STRs—and thus a ruling on the STR Ordinance would not change anything;
• the Homeowners had failed to exhaust their administrative remedies under Chapter 211 of the Texas Local Government Code because they did not appeal to the City's Board of Adjustment the City's determination in the notice that the Zoning Ordinance already prohibited STRs;

---

[12] That this forward-looking communication informed the recipients of what *might* happen to them, and thus was an inchoate suggestion of possible future enforcement, is consistent with Boyle's September 2018 remarks to the City Council in response to a councilmember's asking, during the nonpublic discussion, whether "there will be a communication and a period of time to help the people that have these [STRs] to sort of understand that we are *going to enforce* a law that has been on the books for a while and so that there is some communication?" [Emphasis added.] Boyle assured the council that "the ordinance itself includes a clause directing staff to do just that[,] . . . [w]hich is an education first campaign followed then by an enforcement campaign." The meeting minutes also show that "[c]ouncil directed staff to determine an appropriate grace period for education and enforcement."

[13] *See* U.S. Const. amend. V; Tex. Const. art. I, § 17(a).

[14] *See* Tex. Const. art. I, § 19.

[15] *See id.* art. XI, § 5(a); Tex. Prop. Code Ann. §§ 92.001-.355 ("Residential Tenancies"); Tex. Tax Code Ann. §§ 156.001-.252 ("Hotel Occupancy Tax").

[16] *See* Tex. Loc. Gov't Code Ann. §§ 245.001-.007 ("Issuance of Local Permits").

[17] The Homeowners state in their brief that the trial court granted them temporary injunctive relief, although the trial court's order is not in the record.

651 S.W.3d 317, *329; 2021 Tex. App. LEXIS 10133, **9

• governmental immunity bars the Homeowners' claims, and Grapevine's governmental immunity had not been waived; and

• the Homeowners' request for declaratory relief was invalid because it mirrored [**10] their takings claim.

The trial court denied the City's plea, and the City did not appeal.

The Homeowners amended their petition to seek additional declaratory relief—that the STR Ordinance is unconstitutionally retroactive[18]—and to add a regulatory-takings claim for compensation or for a specific recoupment period.[19] In response, the City moved for summary judgment, arguing in relevant part that the Homeowners' suit should be dismissed for lack of subject-matter jurisdiction because the Homeowners' "causes of action amount to nothing more than a request for an advisory opinion" and because they failed to exhaust their administrative remedies. The City further argued that the Homeowners' takings claim failed as a matter of law and that their requests for declaratory relief were invalid because the STR Ordinance was not retroactive in that it did not take away or impair the Homeowners' vested rights and because the Homeowners failed to cite a state law that clearly preempted the STR Ordinance.

Contemporaneously with filing its summary-judgment motion, the City filed an amended jurisdictional plea that reurged the grounds from its original plea. The plea also incorporated its summary-judgment [**11] motion.

The day before the hearing on the amended jurisdictional plea and the summary-judgment motion, the Homeowners nonsuited their regulatory-takings and Chapter 245 requests for declaratory relief. After a hearing, the trial court denied the City's amended jurisdictional plea and

its summary-judgment motion.

The City has appealed, claiming that the trial court erred by denying its amended jurisdictional plea.[20]

## III. Governmental Immunity and Standard of Review

Unless the state consents to suit, sovereign immunity deprives a trial court [*330] of jurisdiction over lawsuits against the state or certain governmental units. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004) (op. on reh'g). Cities are political subdivisions of the state and, absent waiver, are similarly entitled to governmental immunity. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006) (op. on reh'g).

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject-matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both. *Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). Whether a court has subject-matter jurisdiction is a legal question, and we review de novo a trial court's ruling on a plea to the jurisdiction. *Miranda*, 133 S.W.3d at 226, 228.

---

[18] *See* Tex. Const. art. I, § 16.

[19] *See* U.S. Const. amend. V; Tex. Const. art. I, § 17(a).

[20] The Homeowners do not suggest that the City's earlier jurisdictional plea limits our jurisdiction to review jurisdictional challenges raised in the City's amended plea that reurge or overlap with those raised in the City's original plea. *See City of Houston v. Est. of Jones*, 388 S.W.3d 663, 666-67 (Tex. 2012) (holding that an appellate court does not have interlocutory jurisdiction over an amended plea to the jurisdiction that was substantively a motion to reconsider the original plea because the amended plea did not assert a new immunity ground). Because the Homeowners amended their petition to add additional claims after the trial court denied the City's original plea and because the amended plea relied on additional evidence, we conclude that the amended plea is sufficiently different from the original one. *See City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, 533 S.W.3d 297, 301 (Tex. 2017) (explaining that "[u]nder *Jones*, the touchstone of our analysis [is] whether the later plea to the jurisdiction [is] a new and distinct motion or a mere motion to reconsider").

When a plea challenges the pleadings, we determine if [**12] the plaintiff has alleged facts that affirmatively demonstrate the trial court's jurisdiction. *Id.* at 226. We construe the pleadings liberally in the plaintiff's favor and look to the plaintiff's intent. *Id.* If the pleadings are insufficient to establish jurisdiction but do not affirmatively demonstrate an incurable defect in jurisdiction, the plaintiff should be given the opportunity to amend. *See id.* at 226-27. But if the pleadings affirmatively negate the existence of jurisdiction altogether, then a jurisdictional plea may be granted without allowing a (necessarily futile) chance to amend. *See id.* at 227.

When a plea to the jurisdiction challenges the existence of jurisdictional facts, our review mirrors that of a traditional summary-judgment motion. *Mission Consol. ISD v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012); *see* Tex. R. Civ. P. 166a(c). We take as true all evidence favorable to the plaintiff, and we indulge every reasonable inference and resolve any doubts in the plaintiff's favor. *Miranda*, 133 S.W.3d at 228. The defendant carries the initial burden of establishing that the trial court lacks jurisdiction. *Garcia*, 372 S.W.3d at 635. If the defendant meets that burden, the plaintiff must then demonstrate that a disputed material fact exists regarding the jurisdictional issue. *Id.* If a fact issue exists, the trial court should deny the plea. [**13] *Id.* But if the evidence is undisputed or the plaintiff fails to raise a fact question on the jurisdictional issue, the plea must be granted as a matter of law. *See id.*

Overarching all these principles is that "the plea should be decided without delving into the merits of the case." *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000).

## IV. Failure to Exhaust Administrative Remedies

In its first issue, which if successful would end the Homeowners' lawsuit right off the bat, the City argues that the trial court erred by not dismissing the Homeowners' claims altogether because they failed to exhaust their administrative remedies by not appealing Boyle's and Williams's decisions that the existing Zoning Ordinance already prohibited STRs. The City contends that Chapter 211 of the Texas Local Government Code and the Zoning Ordinance required the Homeowners to appeal these decisions to the City's Board of Adjustment before suing the City. According to the City, because the Homeowners did not do so and thus failed to exhaust their administrative remedies, the trial court lacks subject-matter jurisdiction over all the Homeowners' claims.

## A. Applicable Law

The Local Government Code authorizes a municipality to promulgate zoning regulations [*331] and to establish [**14] a board of adjustment with the power to "hear and decide an appeal that alleges error in an order, requirement, decision, or determination made by an administrative official in the enforcement of [zoning ordinances]." Tex. Loc. Gov't Code Ann. § 211.009(a)(1); *see id.* §§ 211.003, .008; *see also* Grapevine, Tex., Code of Ordinances, app. D, § 68.H.1. Any person aggrieved by an administrative official's decision may appeal to the board of adjustment within a reasonable time as determined by the board's rules.[21] Tex. Loc. Gov't Code Ann. § 211.010(a)(1), (b). Consistent with the Local Government Code, the Zoning Ordinance provides that an appeal to the City's board of adjustment may be taken by "any person aggrieved" by "any decision of the building inspector or other administrative officer of the city relative to the zoning ordinance" and that appeal must "be taken within 15 days after the date of the decision of the

---

[21] The legislature amended Local Government Code Section 211.010 effective September 1, 2019, nearly a year after Boyle's statements at the September 2018 council meeting and Williams's 2018 letter. *See* Act of May 22, 2019, 86th Leg., R.S., ch. 820, H.B. 2497, §§ 2, 4. We cite the version that was in effect at the time of those events. *See id.* § 3(b).

building inspector or other administrative officer has been rendered." Grapevine, Tex., Code of Ordinances, app. D, § 68.G.

The adjustment board "may reverse or affirm, in whole or in part, or modify the administrative official's order, requirement, decision, or determination from which an appeal is taken and make the correct order, requirement, decision, or [**15] determination, and for that purpose the board has the same authority as the administrative official." Tex. Loc. Gov't Code Ann. § 211.009(b); see Grapevine, Tex., Code of Ordinances, app. D, § 68.I. An aggrieved person may then appeal the board of adjustment's decision by filing, within ten days of that decision, a verified petition in a district court, county court, or county court at law stating that the board's decision "is illegal in whole or in part." Tex. Loc. Gov't Code Ann. § 211.011(a)(1), (b).

Generally, a party must exhaust the administrative remedies available under Chapter 211 of the Local Government Code before seeking judicial review of an administrative official's decision. See City of Grapevine v. CBS Outdoor, Inc., No. 02-12-00040-CV, 2013 Tex. App. LEXIS 11868, 2013 WL 5302713, at *4 (Tex. App.—Fort Worth Sept. 19, 2013, pet. denied) (mem. op. on reh'g) (citing cases). The administrative-exhaustion requirement compels a party to "pursue all available remedies within the administrative process before seeking judicial relief." Lazarides v. Farris, 367 S.W.3d 788, 798 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (quoting Larry Koch, Inc. v. Tex. Nat. Res. Conservation Comm'n, 52 S.W.3d 833, 839 (Tex. App.—Austin 2001, pet. denied)). "Unless the party has exhausted all administrative remedies, the trial court lacks subject[-]matter jurisdiction." CBS Outdoor, 2013 Tex. App. LEXIS 11868, 2013 WL 5302713, at *4 (citing City of Paris v. Abbott, 360 S.W.3d 567, 572 (Tex. App.—Texarkana 2011, pet. denied)); see Tex. Gov't Code Ann. § 311.034 ("Statutory prerequisites to a suit . . . are jurisdictional requirements in all suits against a governmental entity.").

## B. Analysis

Here, the City contends that although the Homeowners' suit has been brought as a constitutional challenge to [**16] the 2018 STR Ordinance, the source of their complaint is the City's determination that the Zoning Ordinance has always prohibited STRs. Thus, it argues, because the [*332] Homeowners were aggrieved by Williams's and Boyle's decisions to that effect, the Homeowners were required to appeal those decisions to the City's board of adjustment before suing the City. The Homeowners acknowledge that they did not appeal to the board of adjustment but counter that neither Boyle's comments during the city-council meeting nor Williams's statements in the notice triggered Section 211.011's administrative procedures. The Homeowners further contend that they were not required to exhaust their administrative remedies before filing suit because they are challenging the STR Ordinance's constitutionality, which the board of adjustment lacked the authority to determine. See Brennan v. City of Willow Park, 376 S.W.3d 910, 916 (Tex. App.—Fort Worth 2012 pets. denied) (identifying exception to exhaustion-of-administrative-remedies requirements "when certain constitutional issues are involved").

In the trial court, the City had the initial burden of establishing that the Homeowners had to exhaust their administrative remedies but failed to do so. See Garcia, 372 S.W.3d at 635; Risoli v. Bd. of Adjustment of City of Wimberley, No. 03-17-00385-CV, 2017 Tex. App. LEXIS 9851, 2017 WL 4766724, at *5 (Tex. App.—Austin Oct. 20, 2017, no pet.) (mem. op.). As noted, the board of adjustment's authority includes [**17] the power to hear and to decide an appeal that alleges error in a decision or determination made by an administrative official in the enforcement of a zoning ordinance. Tex. Loc. Gov't Code Ann. § 211.009(a)(1); see Grapevine, Tex., Code of Ordinances, app. D, § 68.H.1.

The Local Government Code does not define "enforcement." Our objective in construing the Local Government Code is to discern the legislature's intent. *See Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). In doing so, we look first to the plain meaning of the text, using any definitions provided. *See id.* When, as here, no definition is given, we give a word its common, ordinary meaning. *See id.* And to determine a term's common, ordinary meaning, we look to dictionary definitions. *See id.*

In ordinary usage, "enforcement" is the "act or process of compelling compliance with a law, mandate, command, decree, or agreement." *Enforcement*, Black's Law Dictionary (11th ed. 2019). "Compel" means "[t]o cause or bring about by force, threats, or overwhelming pressure." *Compel*, Black's Law Dictionary (11th ed. 2019). Assuming that Boyle's and Williams's statements that the Zoning Ordinance has always prohibited STRs rose to the level of being decisions or determinations made by an administrative official, building inspector, [**18] or other administrative officer, those decisions or determinations were not "made in the enforcement" of the Zoning Ordinance because they were not made in the act or process of compelling compliance with the ordinance. Both statements are purely informational,[22] essentially [*333] telling the

Homeowners how the City had recently decided to interpret the Zoning Ordinance, with Williams's notice detailing the penalties for violating it and stating that the City would start enforcing the Zoning Ordinance 45 days in the future, even though the City had not enforced it thus far.[23]

The City devotes most of its motion for en banc reconsideration to challenging our exhaustion-of-remedies holding. Specifically, the City argues that our holding in CBS Outdoor should have compelled us to reverse because "[t]he facts are almost identical." We disagree. In that case, CBS Outdoor made a written request to the City for permission to shift the face of its billboard. *CBS Outdoor*, 2013 Tex. App. LEXIS 11868, 2013 WL 5302713, at *1. The Assistant City Attorney notified CBS Outdoor by letter that its request was denied and that the sign was "currently nonconforming under the applicable City codes" and could not "be moved, altered, or adjusted under [**19] the current conditions." 2013 Tex. App. LEXIS 11868, [WL] at *2. We concluded that the City's decision that CBS Outdoor could not move, alter, or adjust its sign triggered Section 211.011's administrative procedures. *See* 2013 Tex. App. LEXIS 11868, [WL] at *5. That is, by altering the billboard (which CBS later did) without first appealing the City's decision to the board of adjustment, CBS Outdoor ignored the no-alteration decision at its administrative-exhaustion peril. Here, in contrast, as we have explained, the City's statements were informational, not actual

---

[22] The trial court viewed Williams's letter the same way, stating during a hearing that the letter was "informational" and questioning the City's attorney, "Where does it say that your conduct is in violation of the ordinance? . . . Where does it say that the City has determined that you are in violation of the ordinance and you are being advised to stop?" The trial court pressed further, remarking that the Homeowners "didn't fail to exhaust if they weren't given a -- a ruling, were they? . . . I don't see in that letter, based upon my review, where a particular homeowner is being told: You are in violation of this provision. . . . This is informational. Where are they told, 'You,' this homeowner, 'are doing this activity in violation of this ordinance'?" The trial court made several more runs at this point, including asking the City's attorney, "[H]ow are [the Homeowners] supposed to know they're aggrieved by [a decision or a determination of a building official] if someone hasn't said that it's your -- 'You're in violation'?" The City's attorney responded with his view that the very fact of being "here in the middle of this lawsuit" was a "clear enough message . . . that they were aggrieved by the

decision." The trial court rejected that argument out of hand: "No. It can certainly be *fear of being held in violation of it*." [Emphasis added.]

[23] Indeed, as we noted earlier, City employees had explicitly assured some of the Homeowners that the City had no restrictions, regulations, or permit requirements for STRs, and the City took in and kept short-term-occupancy taxes proffered by some of the Homeowners. It is not a stretch to wonder whether the reason the City insisted that the STR Ordinance was neither new nor an amendment to the Zoning Ordinance—Boyle immediately corrected one councilmember who called it an "amendment," saying that the STR Ordinance "is not an amendment to the zoning ordinance in any[ ]way"—was to undercut any possible retroactivity and takings claims.

determinations made in the act or process of compelling a property owner's compliance with a City ordinance.[24]

Moreover, we agree with the Homeowners that they were not required to exhaust their administrative remedies before filing suit because their claims in this suit are challenging the STR Ordinance's constitutionality and would not have been mooted by an administrative decision. Generally, administrative bodies do not have authority to rule on the constitutionality of statutes and ordinances. *See City of Dallas v. Stewart*, 361 S.W.3d 562, 568 (Tex. 2012) (op. on reh'g) (citing *Cent. Power & Light Co. v. Sharp*, 960 S.W.2d 617, 618 (Tex. 1997)). "The supreme court has held that administrative agencies lack the ultimate power of constitutional construction." *City of Richardson v. Bowman*, 555 S.W.3d 670, 686 (Tex. App.—Dallas 2018, pet. denied) (citing *Stewart*, 361 S.W.3d at 568). "No Texas agency has been granted the power to engage in constitutional [**20] [*334] construction, and any such attempt by the legislature to vest such power would raise serious and grave issues of a separation of powers violation." *Id.* (quoting *Stewart*, 361 S.W.3d at 568). The adjustment board thus lacked the power to declare whether either the Zoning Ordinance or the STR Ordinance violates the Texas Constitution.

As the City points out, though, just because a claim is based on the Texas Constitution does not necessarily mean that a plaintiff can proceed directly to filing suit without first exhausting his administrative remedies. *See Garcia v. City of Willis*, 593 S.W.3d 201, 210-12 (Tex. 2019). Claims based on the Texas Constitution are not "globally exempted" from "statutory exhaustion-of-

remedies requirements." *Clint ISD v. Marquez*, 487 S.W.3d 538, 552 n.9 (Tex. 2016). If the administrative proceeding could have obviated the need for a plaintiff to file suit because the proceeding had the potential to moot that claim, then the plaintiff must have pursued his administrative remedies. *See, e.g., Garcia*, 593 S.W.3d at 211-12; *Watson v. City of Southlake*, 594 S.W.3d 506, 522 (Tex. App.—Fort Worth 2019, pet. denied).

Here, it is immaterial whether the administrative proceeding could have resolved the Homeowners' claims, so long as the adjustment board could "render relief that would have mooted those claims." *Watson*, 594 S.W.3d at 522 (citing *Garcia*, 593 S.W.3d at 211-12). In other words, "[t]he question . . . is not whether an administrative hearing could have resolved *all* [**21] of [the plaintiff's] claims, constitutional or otherwise." *Garcia*, 593 S.W.3d at 211. The proper inquiry is whether the administrative proceeding—here, appealing to the adjustment board—could have rendered the Homeowners' claims moot. *See id.*; *Stewart*, 361 S.W.3d at 579; *see also City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 236-37 (Tex. 2011) (holding that property owner was barred from bringing constitutional-takings claim where owner failed to pursue administrative remedy that could have mooted claim through return of property or just compensation).

Here, Boyle's statement and Williams's letter informed the Homeowners that the Zoning Ordinance has always prohibited STRs. Although the meaning of the Zoning Ordinance is a component of the Homeowners' claims, the target of their suit is the STR Ordinance's express STR ban. Had the Homeowners appealed Boyle's and Williams's interpretation of the Zoning Ordinance to the adjustment board, the board's decision regarding that interpretation would not have obviated the need for the Homeowners to bring their takings claim and constitutional challenges to the STR Ordinance because the STR Ordinance

---

[24] At the hearing we have already quoted from, in discussing the notion that the Homeowners disagreed with the City's foundational position that the Zoning Ordinance had always prohibited STRs, the trial court asked two questions that we find sensible: "But why should [the Homeowners] challenge something that they contend didn't prohibit it in the first place?" and "So if some City official announces an interpretation of a zoning ordinance, that's a trigger to challenge it?"

would have remained in place.[25] In other words, a board determination that Boyle and Williams were correct—that is, that STRs are not a permitted use under the Zoning Ordinance—would not have avoided the need for the Homeowners to bring their takings claim and their challenge to the STR Ordinance's constitutionality. [**22] The same would be true if the board [*335] had determined that Boyle and Williams were wrong—that STRs *are* a permitted use under the Zoning Ordinance— because the STR Ordinance expressly banning STRs would still be in place.[26] Accordingly, we overrule the City's first issue.

## V. The Zoning Ordinance

Because whether the existing Zoning Ordinance allowed STRs informs our analysis of the City's remaining issues, we must address whether STRs were in fact allowed in the City before the STR Ordinance expressly banned them.

We construe ordinances and statutes using the same rules. *Bd. of Adjustment of the City of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002); *Town of Annetta S. v. Seadrift Dev., L.P.*, 446 S.W.3d 823, 825 (Tex. App.—Fort Worth 2014, pets. denied)*. The construction of an ordinance is thus a

legal question. *Powell v. City of Houston*, 628 S.W.3d 838, 842 (Tex. 2021). Our objective in construing the Zoning Ordinance is to discern the City's intent. *See Town of Annetta S.*, 446 S.W.3d at 825. "In giving effect to the . . . ordinance as a whole, we should not assign a meaning to a provision that would be inconsistent with other provisions of the . . . ordinance." *Id.* (citing *Wende*, 92 S.W.3d at 430). Ordinances regulating land use are in derogation of the common law and are thus strictly construed against the municipality and the landowner's favor. *See id.* at 825-26; *City of Kermit v. Spruill*, 328 S.W.2d 219, 223 (Tex. App.—El Paso 1959, writ ref'd n.r.e.); *Thomas v. Zoning Bd. of Adjustment of City of Univ. Park*, 241 S.W.2d 955, 957 (Tex. App.—Eastland 1951, no writ).

As noted, the zoning districts in which the Homeowners' properties are located allow "single-family detached dwellings" as a principal [**23] permitted use. *See* Grapevine, Tex., Code of Ordinances, app. D, §§ 15.A.1, 16.A.1. A "single-family detached dwelling" is "an enclosed building having accommodations for and occupied by only one family," and a "family" is "any number of individuals living together as a single housekeeping unit interdependent upon one another." *Id.* §§ 12.A.394, 12.A.140.

The City argues that STRs do not fit within the definition of a "single-family detached dwelling" because STRs are not occupied by a single family but are occupied by groups of people—some family, some not—in quick succession. Relying on out-of-state cases, the City further argues that STR tenants—"whose stays can be as temporary as one day"—"are not living at the properties as a single housekeeping unit" because the phrase "single housekeeping unit" is a "commonly used term in zoning ordinances[,] and courts throughout the country agree that the term requires an element of permanency and stability, rather than transiency."[27]

---

[25] As noted, the board of adjustment's authority includes the power to "hear and decide an appeal that alleges error in an order, requirement, decision, or determination made by an administrative official in the enforcement of" a zoning ordinance. Tex. Loc. Gov't Code Ann. § 211.009(a)(1). In exercising that authority, the adjustment board "may reverse or affirm, in whole or in part, or modify the administrative official's order, requirement, decision, or determination from which an appeal is taken and make the correct order, requirement, decision, or determination, and for that purpose the board has the same authority as the administrative official." *Id.* § 211.009(b). The City does not contend that the adjustment board could have done away with the STR ban altogether.

[26] The City does not contend that the Homeowners were required to appeal Williams's statement that the STR Ordinance simply affirmed the Zoning Ordinance's prohibition on STRs. But even if the City had so argued, we do not see how the adjustment board's review of that statement could have obviated the need for the Homeowners' takings claim and claims challenging the STR Ordinance's constitutionality.

[27] *See, e.g., Plan. & Zoning Comm'n of the Town of Westport v. Synanon Found., Inc.*, 153 Conn. 305, 216 A.2d 442, 443 (Conn.

But we are of [*336] course not bound by out-of-state authorities, and the City cites no Texas cases that directly support this interpretation of "single housekeeping unit."

As the Zoning Ordinance defines the [**24] word, "family" does not require that the people living as a "single housekeeping unit" be related by blood or marriage. Moreover, neither "single-family detached dwelling" nor "living together as a single housekeeping unit interdependent upon one another" has any occupancy-duration requirements, and neither phrase addresses leasing, whether short- or long-term. We decline to add occupancy-duration restrictions when none are there. *Cf. Schack v. Prop. Owners Ass'n of Sunset Bay*, 555 S.W.3d 339, 350 (Tex. App.—Corpus Christi-Edinburg 2018, pet. denied) (holding that phrase "living as a single household unit" in a restrictive covenant did not prohibit short-term rentals). We thus conclude that the term "single-family detached dwelling" as defined in the Zoning Ordinance does not prohibit STRs in the two zoning districts in which the Homeowners' properties are located, so long as the renters meet the Zoning Ordinance's definition of "family." *See id.*

―――――――――――

1966) (concluding that "ever-changing" group of individuals who slept, cooked, ate, worked, and carried on activities in a dwelling did not come within the meaning of the word "family"); *Open Door Alcoholism Program, Inc. v. Bd. of Adjustment of City of New Brunswick*, 200 N.J. Super. 191, 491 A.2d 17, 22 (N.J. Sup. Ct. 1985) ("[I]n order for a group of unrelated persons living together as a single housekeeping unit to constitute a single family in terms of a zoning regulation, they must exhibit a kind of stability, permanency and functional lifestyle which is equivalent to that of the traditional family unit."); *City of White Plains v. Ferraioli*, 34 N.Y.2d 300, 313 N.E.2d 756, 758, 357 N.Y.S.2d 449 (N.Y. Ct. App. 1974) ("So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance."); *Slice of Life, LLC v. Hamilton Twp. Zoning Hearing Bd.*, 652 Pa. 224, 207 A.3d 886, 899 (Pa. 2019) (noting that the Pennsylvania Supreme Court has adopted the common definition of "single housekeeping unit," used by courts throughout the country, as requiring the person or persons residing in the home to function as a family and to be "sufficiently stable and permanent" and not "purely transient" and holding that, by defining "family" as requiring "a single housekeeping unit," the ordinance "clearly and unambiguously excluded, in pertinent part, purely transient uses of property in Zoning District A").

The City next contends that an STR is more in line with a "business service," which is not a permitted "accessory use" in either of the two zoning districts. Grapevine, Tex., Code of Ordinances, app. D, §§ 15.B, 16.B. An "accessory use" is "a use subordinate to and incidental to the principal use." *Id.* § 12.A.A2a. A "principal use" is "a use which, in comparison [**25] with another use occurring on the same property, has the greatest effective producing power." *Id.* § 12.A.327. Relevant here, a "business service" is "a commercial use, other than retail sales and professional services, devoted to . . . [t]he providing of temporary abodes for transient persons, such as a hotel or motel." *Id.* § 12.A.36(c). "Commercial" in turn means "any business, other than a customary home occupation or manufacturing business, which involves the exchange of goods or services for *the remuneration of a person occupying the premises upon which the transaction or part thereof takes place*." *Id.* § 12.A.64 (emphasis added). Because the Homeowners do not simultaneously occupy the STRs, their STRs are not a commercial use and thus not a "business service."

The City also argues that the city council's amendment to the Zoning Ordinance in 2000 to allow bed and breakfasts as permitted accessory uses for "single-family dwelling units" but to specifically exclude "single-family dwelling transient rentals" from the definition of bed and breakfasts indicated that the City did not intend for STRs to be included within the definition of "single-family detached dwelling." The City contends [**26] that although the phrase "single-family dwelling transient rentals" was undefined, its meaning is "clearly different" from that of "a single-family detached [*337] dwelling." The Zoning Ordinance's language, however, does not support this interpretation. If the City intended to exclude "single-family dwelling transient rental" from the definition of "single-family detached dwelling," it could have amended the Zoning Ordinance to reflect that intent.

Accordingly, we conclude as a matter of law that

STRs were a permitted use under the existing Zoning Ordinance.

## VI. Advisory Opinion

In its second issue, the City argues that any order declaring the STR Ordinance unconstitutional and enjoining the City from enforcing it would be an advisory opinion because the existing Zoning Ordinance does not allow STRs. Because the Homeowners have not directly challenged the Zoning Ordinance, so the argument goes, any order declaring the STR Ordinance unconstitutional and enjoining its enforcement would be advisory because the City could continue to enforce its STR ban through the Zoning Ordinance. In other words, the declaratory and injunctive relief the Homeowners seek—that the STR Ordinance is unconstitutional—would [**27] not affect the Homeowners' ability to operate STRs in the City because STRs are not a permitted use under the Zoning Ordinance. For this reason, the City contends that the trial court lacks subject-matter jurisdiction over the Homeowners' claims.

Subject-matter jurisdiction requires that the case be justiciable. *State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994). A "justiciable controversy" is a real and substantial controversy involving a genuine conflict of tangible interests and not just a theoretical dispute. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). "[F]or a controversy to be justiciable, there must be a real controversy between the parties that will be actually resolved by the judicial relief sought." *Gomez*, 891 S.W.2d at 245. Without a justiciable controversy, a trial court must dismiss a case for lack of subject-matter jurisdiction. *Transp. Ins. v. W.H. Cleaners, Inc.*, 372 S.W.3d 223, 227 (Tex. App.—Dallas 2012, no pet.).

Here, the Homeowners admit that they are not directly challenging the Zoning Ordinance: "It is quite true that the Homeowners contend that the prior ordinances did not ban STR's. But that is not

the *objective* of their suit; it is a required element of their constitutional claims." The Homeowners contend that, to a certain extent, whether they succeed on their claims hinges on whether the Zoning Ordinance allowed STRs. We agree with the Homeowners that their [**28] retroactivity, due-course-of-law, and takings claims turn on whether the existing Zoning Ordinance allowed STRs. Because we have determined that it did, the Homeowners' failure to expressly challenge the Zoning Ordinance does not render their suit a request for an advisory opinion.[28] We thus overrule the City's second issue.

## VII. Article I, Section 17 of the Texas Constitution (Regulatory Takings)

In its third issue, the City asserts that the trial court erred by not dismissing the Homeowners' regulatory-takings claim under the Texas Constitution.[29] Through that claim, the Homeowners [*338] seek monetary compensation or a "specific recoupment period." *See* Tex. Const. art. I, § 17(a) ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . ."). Citing the Supreme Court's opinion in *Penn Central* and the Texas Supreme Court's *Sheffield* opinion, the Homeowners pleaded that the STR Ordinance unreasonably interferes with their right to use and enjoy their properties by eliminating their ability to generate short-term rental income from their properties and interfering with their reasonable investment-backed expectations in buying and

---

[28] In other words, because the Homeowners' argument partially hinges on—and thus necessarily includes—the proposition that the Zoning Ordinance allows STRs, we cannot ignore it.

[29] A regulatory-takings claim is a type of inverse-condemnation claim. *Edwards Aquifer Auth. v. Bragg*, 421 S.W.3d 118, 134 (Tex. App.—San Antonio 2013, pets. denied) (op. on reh'g). "A compensable regulatory taking can occur when [the] government[ ] . . . . imposes restrictions that either deny a property owner all economically viable use of his property or unreasonably interfere[ ] with the owner's right to use and enjoy the property." *City of Dallas v. Blanton*, 200 S.W.3d 266, 271 (Tex. App.—Dallas 2006, no pet.).

improving their properties to use as STRs. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S. Ct. 2646, 2659, 57 L. Ed. 2d 631 (1978); *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 672 (Tex. 2004). The City argues that [**29] the regulatory-takings claim is invalid because (1) the Homeowners have no vested right to a particular use of their property; (2) the City's action did not cause a taking; and (3) the value of the Homeowners' properties has increased. The City thus contends that its immunity is not waived. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 491 (Tex. 2012) (holding that trial court did not have jurisdiction over dispute because property owner did not plead and prove sufficient facts to establish a viable inverse-condemnation claim); *City of Carrollton v. Hamrla*, No. 02-15-00119-CV, 2016 Tex. App. LEXIS 157, 2016 WL 93031, at *2 (Tex. App.—Fort Worth Jan. 7, 2016, pet. denied) (mem. op.) ("Governmental immunity is waived for *valid* takings claims." (emphasis added)).

Before we discuss whether the Homeowners pleaded a *Penn Central* claim, we must first address the City's vested-rights and causation arguments, which—if meritorious—would obviate the need for a *Penn Central* analysis.

The City maintains that because the Homeowners do not have a vested right to use their properties in a certain way without restriction—specifically, as STRs—their regulatory-takings claim fails as a matter of law. Although a property owner generally has no vested right to use his property in a certain way without restriction, *see FLCT, Ltd. v. City of Frisco*, 493 S.W.3d 238, 271 (Tex. App.—Fort Worth 2016, pet. denied), the Homeowners do have a property interest in the properties themselves, *see Stratton v. Austin ISD*, 8 S.W.3d 26, 29 (Tex. App.—Austin 1999, no pet.) ("A person's [**30] property interests include actual ownership of real estate, chattels, and money." (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571-72, 92 S. Ct. 2701, 2706, 33 L. Ed. 2d 548 (1972))). "In a regulatory taking, it is the passage of the ordinance that injures a property's value or usefulness." *Lowenberg v. City of Dallas*, 168 S.W.3d 800, 802 (Tex. 2005). Because the Homeowners have a vested property interest in the properties themselves and claim that the City has unreasonably interfered with their rights to use and enjoy their properties by passing the STR Ordinance, we conclude that they have identified a property right sufficient at this stage to allege a regulatory-takings claim. We further note the unremarkable and well-established notion that private-property ownership is a fundamental right, *see Hearts Bluff*, 381 S.W.3d at 476, that embraces [*339] such "essential attributes" as "the right to use, lease[,] and dispose of it for lawful purposes," *Terrace v. Thompson*, 263 U.S. 197, 215, 44 S. Ct. 15, 17-18, 68 L. Ed. 255 (1923).

Next, we address causation. "Proximate cause is an essential element of a takings case." *Hearts Bluff*, 381 S.W.3d at 483. "[W]ithout causation, there is no 'taking.'" *Id.* (quoting *Tarrant Reg'l Water Dist. v. Gragg*, 43 S.W.3d 609, 615 (Tex. App.—Waco 2001), *aff'd*, 151 S.W.3d 546 (Tex. 2004)). "Causation is intrinsic to a takings claim. The governmental entity sued must have taken direct governmental action, or have been the proximate cause, of the harm." *Id.* at 484. "[O]wners of inversely condemned property cannot recover damages the government did not cause." [**31] *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 539 (Tex. 2013); *see Hearts Bluff*, 381 S.W.3d at 483 (noting "the governmental entity must be the cause of the harm").

For the first time on appeal,[30] the City claims that

---

[30] We consider this argument even though the City did not raise it in the trial court. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 94-97 (Tex. 2012) (holding defendants may bring—and courts must address—immunity-based jurisdictional challenges that are raised for the first time on appeal, even in the context of an interlocutory appeal); *see also Dall. Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 41 (Tex. 2013) ("Under *Rusk*, an appellate court must consider all of a defendant's immunity arguments, whether the governmental entity raised other jurisdictional arguments in the trial court or none at all.").

the STR Ordinance was not the cause in fact of any alleged taking of the Homeowners' properties because STRs are not a permitted use under the existing Zoning Ordinance. The Homeowners respond that this argument fails because the Zoning Ordinance allowed "leasing unrestricted by duration." We agree, having concluded above that the Zoning Ordinance permitted STRs. We thus conclude that the Homeowners have sufficiently raised a fact issue about whether the STR Ordinance's passage caused an alleged taking under the *Penn Central* factors, to which we now turn.

Under the *Penn Central* test, a regulatory taking can occur when government action unreasonably interferes with a landowner's use and enjoyment of the property. *Sheffield, 140 S.W.3d at 671-72*; *FLCT, 493 S.W.3d at 272*. It is an ad hoc, fact-intensive inquiry rather than a formulaic test. *Sheffield, 140 S.W.3d at 672-73*. Guiding considerations under the *Penn Central* test include (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." [**32] *Id.* at 672; *see Hearts Bluff, 381 S.W.3d at 477-78*. The inquiry focuses on whether the regulation has gone "too far" so as to constitute a taking. *Sheffield, 140 S.W.3d at 671-72*. The extent of the governmental intrusion may be a question for the trier of fact, but whether the facts alleged constitute a taking is a question of law. *Id.* at 673.

The City argues that the Homeowners' takings claim is invalid because the STR Ordinance did not unreasonably interfere with their rights to use and enjoy their properties under two of the three *Penn Central* factors: (1) the STR Ordinance's economic impact on the Homeowners' properties is insufficient to amount to a taking and (2) the STR Ordinance does not interfere with the Homeowners' reasonable investment-backed expectations. The City contends that the evidence before the trial court conclusively established both factors in its favor.

[*340] The first factor—the regulation's economic impact on the property owner—"compares the value that has been taken from the property with the value that remains in the property." *Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 935-36 (Tex. 1998)*. Contrary to the City's assertion, lost profits are a relevant factor to consider in assessing the property's value and the severity of the economic impact on a property owner. *Sheffield, 140 S.W.3d at 677*; *see City of Sherman v. Wayne, 266 S.W.3d 34, 45 (Tex. App.—Dallas 2008, no pet.)* ("While it is true that government is [**33] not an insurer of the profitable use of property, it is incorrect to say that profit is not a consideration in determining the value of property."). Relevant here, a property owner's inability to continue renting his property on a short-term basis due to a city ordinance can constitute evidence of economic impact. *See Vill. of Tiki Island v. Ronquille, 463 S.W.3d 562, 579 (Tex. App.—Houston [1st Dist.] 2015, no pet.)*.

The City points out that the Homeowners can always lease their properties on a long-term basis and have admitted that at the time of the jurisdictional inquiry their properties were worth more than when purchased. The City's expert—a certified general appraiser—confirmed that each affected property's market value had increased since the Homeowners bought them. Further, according to the Tarrant County Appraisal District's Chief Appraiser, the market value of each property had increased from 2016 through 2019.

But the Homeowners did not base their economic-impact allegations on decreased market value. They pleaded that STRs "generate higher average rent than long-term leases, even after expenses" and that the STR Ordinance prevents them from "participating in an active, lucrative market for [STRs]." The Homeowners' evidence supports this assertion. All the Homeowners testified [**34] that they were earning rental income from their STRs and that renting out their properties on a short-term basis generates higher revenues than long-term leasing does. Additionally, the Homeowners' expert—a certified general-real-estate appraiser—

opined that over a ten-year period, the combined potential gross-rental differential between typical market rents for long-term versus short-term leases for the Homeowners' properties exceeded $4.2 million.

The City admits that lost profits are "one relevant factor" to consider in assessing a property's value and the severity of an ordinance's economic impact on a landowner. *See Sheffield*, 140 S.W.3d at 677. But, the City argues, the Homeowners' lost-profit allegations do not in and of themselves show a sufficient economic impact on which to base a regulatory-takings claim. The Homeowners did not simply *plead* lost profits, though; they presented supporting evidence—evidence of the type that a trial court can consider in a regulatory-takings claim. *See Vill. of Tiki Island*, 463 S.W.3d at 579. We thus conclude that it is some evidence of the STR Ordinance's economic impact on the Homeowners' property. *See id.*

As for the second *Penn Central* factor—the extent to which the regulation interferes with the property [**35] owner's distinct investment-backed expectations—a property's existing and permitted uses constitute the affected property owner's "primary expectation." *Mayhew*, 964 S.W.2d at 936. The supreme court has noted that "[h]istorical uses of the property are critically important when determining the reasonable investment-backed expectation of the landowner." *Id.* at 937. Regulations at the time of purchase should be considered in determining whether the later, challenged regulation interferes with investment-backed expectations. *Id.* at [*341] 937-38. And knowledge of existing regulations "is to be considered in determining whether the regulation interferes with investment-backed expectations." *Id.* at 936. "The purpose of the investment-backed[-]expectation requirement is to assess whether the landowner has taken legitimate risks with the reasonable expectation of being able to use the property, which, in fairness and justice, would entitle him or her to compensation." *Edwards Aquifer Auth.*, 421 S.W.3d at 142.

The Homeowners pleaded that they had reasonable investment-backed expectations in purchasing and improving their properties for use as STRs based on the existing Zoning Ordinance and on City employees' representations that STRs were allowed under the Zoning Ordinance. *Cf. Sheffield*, 140 S.W.3d at 677-78 (noting that Sheffield's [**36] expectations of being able to develop property were "certainly reasonable" based on zoning in place when Sheffield acquired the property and on assurances received from city officials in response to inquiries). The City contends that the Homeowners' expectations were not reasonable because the existing Zoning Ordinance did *not* allow STRs—an argument we have rejected.[31]

The City also argues that because only one of the Homeowners originally bought properties for use as STRs, the others had no investment-backed expectations when they purchased their properties. Contrary to that argument, the evidence reveals that five of the six Homeowners (Holt, the Perkinses, Muns, and A-1 Commercial) purchased their properties intending to use them as STRs. And as the evidence also shows, all the Homeowners invested significant sums to improve their properties so that they could be used as STRs. Because the existing Zoning Ordinance permitted STRs, we conclude that the evidence suffices to create a fact issue about whether the Homeowners had reasonable investment-backed expectations in purchasing and improving their properties for use as STRs.

Although whether facts amount to a taking is ultimately a [**37] legal question, the trial court must resolve disputed fact issues about the extent of the governmental intrusion on the property. *See id. at 673*. Here, fact issues exist regarding the STR Ordinance's economic impact on the Homeowners' properties and the reasonableness of the

---

[31] The City also argues that the Homeowners' investment-backed expectations were not reasonable because it is not bound by the statements its employees made to the Homeowners regarding STRs. We need not address this argument because we have determined that the existing Zoning Ordinance allowed STRs.

Homeowners' investment-backed expectations. *See Vill. of Tiki Island*, 463 S.W.3d at 578, 582 (holding that plaintiff adequately alleged and presented evidence that ordinance prohibiting STRs met the *Penn Central* factors). Accordingly, we conclude and hold that the trial court did not err by denying the City's amended jurisdictional plea attacking the Homeowners' takings claim. We thus overrule the City's third issue.

## VIII. The Homeowners' Declaratory-Judgment Claims

In its fourth issue, the City asserts that its governmental immunity is not waived for the Homeowners' three declaratory-judgment claims (preemption, retroactivity, and due-course-of-law) because the Homeowners have not pleaded facially valid claims.

The declaratory-judgments act ("the Act") allows a person whose "rights, status, or other legal relations are affected by a . . . municipal ordinance" to "have [*342] determined any question of construction or validity arising under the . . . ordinance" and to "obtain [**38] a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). The Act thus provides a limited governmental-immunity waiver for declaratory-judgment claims against municipalities challenging an ordinance's validity. *See City of New Braunfels v. Carowest Land, Ltd.*, 432 S.W.3d 501, 530 (Tex. App.—Austin 2014, no pet.); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 37.006(b). Governmental immunity is waived when a party seeks a declaration that an ordinance is invalid based on constitutional grounds. *City of N. Richland Hills v. Home Town Urb. Partners, Ltd.*, 340 S.W.3d 900, 911 (Tex. App.—Fort Worth 2011, no pet.) (op. on reh'g); *see Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 & n.3 (Tex. 2011). But a city's governmental immunity is waived only to the extent that a party has pleaded viable or valid constitutional claims. *See Hous. Firefighters' Relief & Ret. Fund v. City of Houston*, 579 S.W.3d 792, 800 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (citing *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 8, 13, 14 (Tex. 2015)).

### A. Preemption

The Homeowners requested a declaratory judgment that the STR Ordinance is unconstitutional because it is impliedly preempted by Chapter 156 of the Texas Tax Code either alone or in combination with Chapter 92 of the Texas Property Code. The City argues that because neither statute reflects the legislature's clear and unmistakable intent to preempt local regulation of STRs, the Homeowners' preemption claim is facially invalid, and the trial court thus erred by denying the City's amended jurisdictional plea as to this claim.

The City of Grapevine is a home-rule city, deriving its power from Article XI, Section 5 of the Texas Constitution. *See* Tex. Const. art. XI, § 5; *S. Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678 (Tex. 2013). As a home-rule city, the City has the full power [**39] of self-government and looks to the legislature not for grants of power but only for limits on its powers. *See S. Crushed Concrete*, 398 S.W.3d at 678; *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490-91 (Tex. 1993). But a home-rule city cannot enact an ordinance containing a provision inconsistent with Texas's constitution or general laws. *See* Tex. Const. art. XI, § 5(a) (mandating that no city ordinance "shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State"); *see also BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 7 (Tex. 2016); *Dall. Merch.'s*, 852 S.W.2d at 490-91. A home-rule-city ordinance is thus unenforceable to the extent that it is inconsistent with a state statute preempting that particular subject matter. *BCCA Appeal Grp.*, 496 S.W.3d at 7; *Dall. Merch.'s*, 852 S.W.2d at 491.

"A statutory limitation on local laws may be express or implied." *City of Laredo v. Laredo Merchs. Ass'n*, 550 S.W.3d 586, 593 (Tex. 2018). Either way, the legislature's intent to impose a limitation must appear with "unmistakable clarity." *See id.; BCCA Appeal Grp.*, 496 S.W.3d at 7. The legislature's simply enacting a law addressing a particular topic does not automatically result in preemption. *See City of Richardson v. Responsible Dog Owners of Tex.*, 794 S.W.2d 17, 19 (Tex. 1990) ("[T]he mere fact that the legislature has enacted a law addressing a subject does not mean that the subject matter is completely preempted."); *City of [*343] Brookside Vill. v. Comeau*, 633 S.W.2d 790, 796 (Tex. 1982) (stating that "[t]he entry of the state into a field of legislation . . . does not automatically preempt that field from city regulation"). Local regulation is "acceptable" [**40] if it is "ancillary to and in harmony with the general scope and purpose of the state enactment." *Brookside Vill.*, 633 S.W.2d at 796.

Here, the Homeowners pleaded that the STR Ordinance—which doesn't just regulate STRs but bans them altogether—is implicitly preempted by Chapter 156 of the Tax Code and Chapter 92 of the Property Code. The Homeowners alleged that (1) because STRs are subject to mandatory state and local hotel-occupancy taxes, *see Tex. Tax Code Ann. §§ 156.001(b), .051(a), .101, 351.001(4), .002(a), (c)*, and (2) because STRs are not banned or restricted by landlord—tenant law, *see Tex. Prop. Code Ann. §§ 92.001, .002, .010, .152*, the Tax Code—either alone or in combination with the Property Code—implicitly preempts the STR Ordinance. In short, the Homeowners contend that the Tax Code and Property Code tacitly preempt the STR Ordinance because allowing cities to ban STRs undermines the legislature's intent to generate tax revenue from them and is inconsistent with the legislature's "evident desire to allow such rentals without restriction."

But the Homeowners did not point to any provision in either the Tax Code or the Property Code that implies that the legislature meant to limit or forbid local regulations banning STRs. *See Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 645 (Tex. 1975) (op. on reh'g) (stating that a statutory limitation on local laws will not [**41] be implied unless the general law's provisions are "clear and compelling to that end" (quoting *Glass v. Smith*, 150 Tex. 632, 244 S.W.2d 645, 649 (Tex. 1951))). The statutory provisions that the Homeowners have cited do not show with "unmistakable clarity" that the legislature intended to limit local regulation of STRs. *Id.* (stating that the legislature's intention to limit the power of home-rule cities by general law must "appear with unmistakable clarity" (quoting *City of Sweetwater v. Geron*, 380 S.W.2d 550, 552 (Tex. 1964))). Without such an indication, the Homeowners have failed to plead a viable preemption claim. And without such legislative intent, the Homeowners' pleadings affirmatively demonstrate incurable defects in jurisdiction that cannot be fixed by repleading. *See Miranda*, 133 S.W.3d at 226-27. We thus sustain this part of the City's fourth issue.

## B. Article I, Section 16 of the Texas Constitution (Retroactivity)

The Homeowners also wanted a declaration that the STR Ordinance is unconstitutionally retroactive because it takes away their "fundamental and settled" vested property rights under both the Zoning Ordinance and Texas common law to lease their property on a short-term basis.[32] As part of its

---

[32] In support of their retroactivity claim, the Homeowners pleaded that "the property right owned by Plaintiffs was a vested property right. By taking away this fundamental and settled property right, the Grapevine STR Ban operates retroactively." Earlier in their pleading, the Homeowners alleged that "short-term renting of a home as allowed under prior law" is a vested right and that leasing is a "basic, sacrosanct property right" under the Texas common law. Construing the Homeowners' pleadings liberally, as we must, we conclude that they are claiming a settled right under both the Zoning Ordinance and Texas common law. As we will explain, courts have essentially scrapped the "impossible" task of "defin[ing] a vested right" in the retroactivity context, *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 142 (Tex. 2010), and look instead to whether a right is

fourth issue, the City [*344] argues that because the Homeowners have no vested right to use their properties as STRs, their retroactivity claim is facially invalid, and the trial [**42] court thus erred by denying the City's amended jurisdictional plea as to this claim.

Article I, Section 16 of the Texas Constitution prohibits the creation of retroactive laws. *See* Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). "A retroactive law is one that extends to matters that occurred in the past." *Tenet Hosps. Ltd. v. Rivera, 445 S.W.3d 698, 707 (Tex. 2014)*; *see Subaru of Am., Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212, 219 (Tex. 2002)* (defining a retroactive law as "a law that acts on things which are past"); *R.R. Comm'n of Tex. v. Pend Oreille Oil & Gas Co., 817 S.W.2d 36, 47 (Tex. 1991)* ("A retroactive law is one that affects acts or rights which accrued before it became effective."). But not all retroactive laws are unconstitutional. *See Robinson, 335 S.W.3d at 139* (stating that "mere retroactivity" is insufficient to invalidate a statute).

No bright-line test exists for determining whether a law is unconstitutionally retroactive. *Id.* at 145. To resolve that issue, a court considers three factors in light of the prohibition's objectives of protecting reasonable, settled expectations and of preventing legislative abuses: (1) "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings;" (2) "the nature of the prior right impaired by the statute;" and (3) "the extent of the impairment." *Id.*

The City asserts that the STR Ordinance [**43] is not unconstitutionally retroactive because the Homeowners do not have a vested right to use their properties as STRs. The City thus contends that the Homeowners have "pleaded no vested property right that has been impaired or taken away by the [STR] Ordinance because they have no absolute

right to use their property for a particular purpose—such as an STR." But the Texas Supreme Court has "expressly rejected the vested-rights test, explaining that '[w]hat constitutes an impairment of vested rights is too much in the eye of the beholder to serve as a test for unconstitutional retroactivity,'" and announced that courts should instead assess the three factors listed above. *In re Occidental Chem. Corp., 561 S.W.3d 146, 161 (Tex. 2018)* (orig. proceeding) (quoting *Robinson, 335 S.W.3d at 143*); *see Union Carbide Corp. v. Synatzske, 438 S.W.3d 39, 56 (Tex. 2014)* (explaining that in Robinson, the supreme court "determined that classifying a right or interest as 'vested' in order to determine whether it has been retroactively diminished or impaired in violation of the constitution has not yielded an efficient and predictable framework"). When analyzing "the nature of the prior right [impaired by the statute under the second factor], we consider not whether the impaired right was 'vested,' but the extent to which that right was 'settled.'" *Zaatari, 615 S.W.3d at 190* (citing [**44] *Robinson, 335 S.W.3d at 142-43, 147, 149*); *see, e.g., Robinson, 335 S.W.3d at 147, 148-49* (concluding that plaintiffs had a settled expectation that their right to recover on their already-filed common-law claims would not be altered by subsequent legislation and noting "[t]he presumption is that a retroactive law is unconstitutional without a compelling justification that does not greatly upset settled expectations").

Implicit in the Texas Supreme Court's rejection of the vested-rights test [*345] is that a settled right is not equivalent to a vested right. Here, the Homeowners pleaded that the STR Ordinance impaired their settled property rights under the common law and under the Zoning Ordinance to lease their properties on a short-term basis: "By taking away this fundamental and settled property right, the Grapevine STR Ban operates retroactively." The City does not contend that the Homeowners have failed to plead settled rights or that the rights they have asserted are not settled. Because the Homeowners' retroactivity claim hinges on settled rather than vested rights and the

"settled," *Zaatari, 615 S.W.3d at 190*.

City has not argued that the Homeowners' pleaded rights are not settled, we conclude that the Homeowners have pleaded a facially valid retroactivity claim. *See Zaatari*, 615 S.W.3d at 191 (concluding, in analyzing [**45] retroactivity claim on its merits, that property owners had a "settled interest" in their right to lease their properties short term and that the issue is not about the "property owners' right to use their property in a certain way," but about the owners' "retaining their well-settled right to lease their property"). We thus overrule this part of the City's fourth issue.[33]

## C. Article I, Section 19 of the Texas Constitution (Due Course of Law)

The Homeowners further sought a declaration that the STR Ordinance violates their substantive-due-course-of-law rights under Article 1, Section 19 of the Texas Constitution. *See* Tex. Const. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."). Specifically, the Homeowners allege that the City's STR Ordinance is unconstitutional because (1) the STR Ordinance's purpose is not rationally related to a legitimate governmental interest and (2) when considered as a whole, the STR Ordinance's real-world effect as applied to them could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest. *See Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 87 (Tex. 2015).

But before any substantive-due-process rights attach, a party must have [**46] a liberty or property interest that is entitled to constitutional protection. *Klumb, 458 S.W.3d at 15*. In the substantive-due-process context, this constitutionally protected right must be a vested right. *Id.* A vested right "has some definitive, rather than merely potential existence," *City of LaMarque v. Braskey, 216 S.W.3d 861, 864 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)* (quoting *Tex. S. Univ. v. State St. Bank & Tr. Co., 212 S.W.3d 893, 903 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)* (op. on reh'g)), and is "something more than a mere expectancy based upon an anticipated continuance of an existing law," *Klumb, 458 S.W.3d at 15* (quoting *City of Dallas v. Trammell, 129 Tex. 150, 101 S.W.2d 1009, 1014 (Tex. 1937)*). The City asserts that the Homeowners have no vested right to use their properties as STRs. It contends that the Homeowners' due-course-of-law claim is thus facially invalid and that the trial court therefore erred by denying the City's amended jurisdictional plea as to this claim.

[*346] Here, the Homeowners pleaded that "Texas common law enshrines leasing as a basic, sacrosanct property right" and that the Zoning Ordinance had allowed STRs. They also pleaded that the STR Ordinance will cause them to lose the money they invested in purchasing and improving their STRs. In support of their due-course-of-law claim, the Homeowners pleaded that "[p]roperty owners in this state have historic, basic protection for their leasing rights" and that the Homeowners have a "right to rent out their homes [**47] for any particular duration." They further pleaded that the STR Ordinance denies them rental income from their STRs and denies their "own property use and enjoyment" because the STR Ordinance would force them to "leave their properties vacant when they are not using them." Construing the Homeowners' pleadings liberally in their favor, we conclude that they have pleaded that they have a vested right to use their properties as STRs under both the Zoning Ordinance and the common law.[34]

---

[33] In a footnote in its motion for en banc reconsideration, the City urges us to construe its brief liberally and reconsider our holding on this issue. *See Anderson v. Durant, 550 S.W.3d 605, 617 (Tex. 2018)*. But even construing the City's briefing as encompassing an argument that the Homeowners do not have a settled right to lease their property on a short-term basis, we nevertheless conclude that the Homeowners have pleaded a facially valid retroactivity claim. *See Zaatari, 615 S.W.3d at 191.*

[34] On appeal, the Homeowners assert they have a fundamental right to lease their properties that encompasses the right to lease their

We disagree with the Homeowners that they had such a vested right under the Zoning Ordinance. "[P]roperty owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made." *City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972); *see, e.g., Mbogo v. City of Dallas*, No. 05-17-00879-CV, 2018 Tex. App. LEXIS 4912, 2018 WL 3198398, at *8 (Tex. App.—Dallas June 29, 2018, pet. denied) (mem. op. on reh'g); *CBS Outdoor*, 2013 Tex. App. LEXIS 11868, 2013 WL 5302713, at *8. And as noted, a vested right is "something more than a mere expectancy based upon an anticipated continuance of an existing law." *Klumb*, 458 S.W.3d at 15. Thus, although the Homeowners have a vested right in their properties,[35] they do not have a vested right under the Zoning Ordinance to use them as STRs. *See id.; Benners*, 485 S.W.2d at 778.

Nevertheless, although the Homeowners do not have a vested right arising under the Zoning Ordinance to use their properties as STRs, we conclude [**48] that they have a fundamental leasing right arising from their property ownership. Private property ownership is a fundamental right. *Hearts Bluff*, 381 S.W.3d at 476 (citing *Severance v. Patterson*, 370 S.W.3d 705, 709 (Tex. 2012) (op. on reh'g)); *Severance*, 370 S.W.3d at 709 ("Private property rights have been described 'as fundamental, natural, inherent, inalienable, not derived from the legislature[,] and as pre-existing even constitutions.'" (quoting *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977))). Property ownership includes the right to lease to others. *See Calcasieu Lumber Co. v. Harris*, 77

Tex. 18, 13 S.W. 453, 454 (Tex. 1890) ("The ownership of land, when the estate is a fee, carries with it the right to use the land in any manner not hurtful to others; and the right to lease it to others, and therefore derive profit, is an incident of such ownership."); *see also Terrace*, 263 U.S. at 215, 44 S. Ct. at 17-18 (noting that "essential attributes of property" include "the right to use, lease[,] and dispose of it for lawful [*347] purposes"). The right to lease is a stick within a property owner's metaphorical bundle of rights. *See* Emily M. Speier, Comment, *Embracing Airbnb: How Cities Can Champion Private Property Rights Without Compromising the Health and Welfare of the Community*, 44 Pepp. L. Rev. 387, 395-97 (2017).

Given the nature of real-property rights, we conclude that the Homeowners have a vested right to lease their properties and that this right is sufficient to support a viable due-course-of [**49] law claim. *Cf. Zaatari*, 615 S.W.3d at 191 (concluding that, in analyzing retroactivity claim, property owners had a "settled interest" in their right to lease their properties short term and that the issue is not about the "property owners' right to use their property in a certain way," but about the owners "retaining their well-settled right to lease their property"); *Vill. of Tiki Island*, 463 S.W.3d at 587 (holding that, in analyzing whether an STR owner had proved an irreparable injury to a vested right necessary to support an order temporarily enjoining an ordinance banning STRs, STR owner had a narrow vested right to continue operating existing STR after city passed ordinance banning STRs but grandfathering in existing STRs).

In its motion for en banc reconsideration, the City asks us to reconsider our holding that Texas property owners have a vested right to lease their homes on a short-term basis. This overstates our holding. To be clear, we hold that a property owner has a vested right to lease his property. Whether the durational restrictions imposed by the STR Ordinance violate the Homeowners' due-course-of-law rights regarding their right to lease goes to the case's merits, an altogether improper inquiry at this

---

properties on a short-term basis. They also state that their due-course-of-law claim "stems from a broader, more fundamental vested right," implying that they are not claiming a vested right under the Zoning Ordinance. But construing the Homeowners' pleadings liberally in their favor, we conclude that they are also claiming a vested right under the Zoning Ordinance.

[35] "A person's property interests include actual ownership of real estate, chattels, and money." *Stratton*, 8 S.W.3d at 29.

stage of the case.

Because [**50] the Homeowners have pleaded a viable due-course-of-law claim, we overrule this part of the City's fourth issue.

## IX. The Homeowners' Injunctive-Relief Request

The Homeowners pleaded for temporary and permanent injunctive relief against the City, asking the trial court to enjoin the City from enforcing the STR Ordinance. In the City's fifth issue, the City argues that its immunity has not been waived as to the Homeowners' requests for injunctive relief because (1) the Homeowners have not pleaded a valid cause of action and (2) the City has immunity from claims for injunctive relief based on allegations that government officials are violating the law or exceeding their powers under the law. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) (concluding that suits complaining of ultra vires acts cannot be brought against a governmental unit but must be brought against the allegedly responsible government actor in his official capacity); *see also Tex. Dep't of Ins. v. Reconveyance Servs., Inc.*, 306 S.W.3d 256, 258-59 (Tex. 2010) (concluding that when a plaintiff's claims are substantively ultra vires claims, they must be brought against the appropriate government official in his official capacity).

Governmental immunity does not bar suits challenging an ordinance's constitutionality and seeking equitable relief. *See [**51] Patel*, 469 S.W.3d at 75-76. First, as discussed above, the Homeowners have pleaded valid claims challenging the constitutionality of the STR Ordinance. Second, contrary to the City's assertion, the Homeowners have not alleged that any City officials are violating the law or exceeding their powers under the law nor are the Homeowners' claims substantively ultra vires claims. *See id.* at 77 ("[B]ecause the [plaintiffs] challenge the validity of the cosmetology [*348] statutes and regulations, rather than complaining that officials acted illegally or failed to act, the ultra vires exception does not apply."). The City is thus not immune from the Homeowners' requests for injunctive relief. *See id.* We overrule the City's fifth issue.

## X. Conclusion

Having determined that the Homeowners failed to plead a facially valid preemption claim, we reverse the part of the trial court's order denying the City's amended plea to the jurisdiction as to that claim and render judgment dismissing it. We affirm the remainder of the trial court's order.

/s/ Elizabeth Kerr

Elizabeth Kerr

Justice

Delivered: December 23, 2021

---

**End of Document**



Neutral

As of: February 25, 2026 5:57 PM Z

# Hignell-Stark v. City of New Orleans

United States Court of Appeals for the Fifth Circuit

October 7, 2025, Filed

No. 24-30160

**Reporter**

154 F.4th 345 *; 2025 U.S. App. LEXIS 26061 **; 2025 LX 427469; 2025 WL 2832636

SAMANTHA HIGNELL-STARK; WHITE SPIDER RENTAL CONCIERGE, L.L.C.; RUSSELL FRANK; SAMANTHA MCRANEY; BOB MCRANEY; JIMMIE TAYLOR; KURT KLEBE; GARETT MAJOUE; ZACHARY BENNETT; SUMMIT NOLA III, L.L.C., Plaintiffs—Appellants, versus CITY OF NEW ORLEANS, Defendant—Appellee,KURT KLEBE, ZACHARY BENNETT, Plaintiffs—Appellants, versus CITY OF NEW ORLEANS, Defendant—Appellee.

**Subsequent History:** Rehearing denied by, En banc, Rehearing denied by Hignell-Stark v. City of New Orleans, 2025 U.S. App. LEXIS 31137 (Dec. 1, 2025)

**Prior History:** [**1] Appeal from the United States District Court for the Eastern District of Louisiana. USDC Nos. 2:19-CV-13773, 2:22-CV-2991.

Hignell v. City of New Orleans, 2024 U.S. Dist. LEXIS 34030, 2024 WL 838217 (Feb. 27, 2024)

**Counsel:** For Samantha Hignell-Stark, White Spider Rental Concierge, L.L.C., Russell Frank, Samantha McRaney, Bob McRaney, Jimmie Taylor, Kurt Klebe, Garett Majoue, Zachary Bennett, Summit NOLA III, L.L.C., Plaintiffs - Appellants: Dawn Adams Wheelahan, New Orleans, LA.

For City of New Orleans, Defendant - Appellee: Sherri L. Hutton, Esq., Corwin M. St. Raymond,

City of New Orleans, New Orleans, LA; Donesia D. Turner, Attorney, City Attorney's Office, New Orleans, LA.

For Texas Public Policy Foundation, Amicus Curiae: Chance Weldon, Austin, TX; Christian G. Townsend, Pacific Legal Foundation, Arlington, VA.

**Judges:** Before ELROD, Chief Judge, JONES, and STEWART, Circuit Judges.

**Opinion by:** EDITH H. JONES

# Opinion

[*350]  EDITH H. JONES, *Circuit Judge*:

Appellants are homeowners and rental-property supervisors in New Orleans. They challenge the City of New Orleans's regulation of short-term rentals ("STRs")—the City's term for lodging offered for less than thirty days. The City's regulations reduce the proliferation of STRs and control their use. A homeowner must obtain a permit to use a home as an STR, as must "operators," [**2] who must reside at the property and oversee guests. Once permitted, the City's scheme regulates what owners and operators may and must do, from their advertising to the required response time to neighbor complaints.

Many of the City's STR regulations fall squarely within its broad authority to regulate its neighborhoods. But some do not. We conclude that the STR scheme (1) prohibits "business entities"

from obtaining an owner and operator permit in violation of the Equal Protection clause, (2) unduly restricts STR advertisements contrary to the First Amendment, and (3) prohibits out-of-state residents from obtaining and then maintaining an operator permit in violation of the dormant Commerce Clause. The district court's judgment [*351] is accordingly AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.

I.

With the advent of online platforms like Airbnb and Vrbo, short-term rentals in cities large and small across the country have become ubiquitous. New Orleans is familiar with this phenomenon. Before these types of rentals became common, the City forbade property owners in residential neighborhoods from renting their homes for less than thirty days, or less than sixty days in the French Quarter.

In 2017, the City began to offer [**3] licenses for property owners to offer STRs, and a new licensing regime went into effect. One year later, a City commissioned study found that the rapid spread of STRs caused a host of deleterious consequences to local communities. For example, anecdotal evidence showed that transient guests cared little about the surrounding residential community during their stay—guests were loud, created trash, and threw parties. Without a permanent resident or owner present, STRs allegedly caused a "loss of neighborhood character." Anecdotal evidence from the study also revealed that the proliferation of STRs reduced the amount of affordable housing. As a result, the City revised and curtailed STR licensing in 2019. Among other requirements, the new regulations barred a homeowner from receiving a permit to use his property as an STR unless the property was the owner's primary residence.

Appellants challenged the City's 2019 regime and eventually came before this court. In *Hignell-Stark v. City of New Orleans (Hignell-Stark I)*, 46 F.4th 317, 326 (5th Cir. 2022), this court held that "the

City d[id] not offer permits for STRs in residential neighborhoods unless the STR [was] 'located on the same lot of record as the owner's primary residence' . . . [and] only residents of the City [could] [**4] enter the market for STRs in residential neighborhoods." *Id.* The residency requirement therefore "discriminate[d] on its face against out-of-state property owners" when reasonable nondiscriminatory alternatives existed to advance the City's interest in "preventing nuisances, promoting affordable housing, and protecting neighborhoods' residential character." *Id.* at 326, 328. The court concluded that this discrimination violated the dormant Commerce Clause.

Following *Hignell-Stark I*, the City amended its City Code ("Code") and Comprehensive Zoning Ordinance ("CZO"), which together regulate STRs in New Orleans. The Code defines an STR as "the use and enjoyment of a dwelling unit, or any portion thereof, by guests for a period of less than 30 consecutive days, in exchange for money, commodities, fruits, services, or other performances." The new regulations are comprehensive, from the "clean towels, washcloths, and bed linens" STRs must provide to the taxes and fees that must be remitted to the City. Three aspects of the regulations are relevant to the present appeal.

First, the Code's owner-permitting scheme regulates which homeowners may receive an STR permit. Permits are limited to homeowners who are "natural persons." [**5] "Ownership, in whole or in part, by a business entity . . . is prohibited."

Second, the Code's operator-permitting scheme requires that an "operator" reside at the STR. The City replaced the owner-residency requirement held unconstitutional in *Hignell-Stark I* with this "operator" requirement. Each STR must be "operated by a natural person . . . holding a short-term rental operator permit." The operator must supervise short-term residents [*352] and ensure compliance with the various requirements of the Code. To receive a permit, an individual must provide "evidence of recorded ownership or a

current residential lease, as well as at least two other forms of documentation with a matching address . . . establishing that the operator resides on the premises being operated as a short-term rental." An operator has an independent legal duty to "[r]eside on the property being used for a non-commercial short-term rental."

Third, the Code's advertising restrictions regulate how STRs may be advertised and what the advertisements must include and exclude. Each STR advertisement may list only one dwelling unit and must include certain information like the owner and operator permit number, wheelchair accessibility, [**6] and the number of available guest bedrooms. The Code prohibits advertisements for non-permitted STRs and advertisements that exceed the legally available STR density, guest bedroom, and occupancy limits.

Following the City's publication of its updated STR regulations, Appellants amended their complaint, and both parties moved for summary judgment. Appellants raised a variety of arguments under state-law, the First Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and the dormant Commerce Clause to support their claim that the regulations are unconstitutional. The district court rejected Appellants' arguments on the systemic constitutionality of the regulations, save for one provision no longer at issue.

On appeal, Appellants contend that the district court erred for several reasons: (1) the City does not have the authority under state law to enact STR regulations; (2) the STR regulations violate the Due Process Clause because they (a) regulate the duration of use of property, (b) prohibit businesses from qualifying for an STR owner or operator permit, (c) cap the number of permits per city block, and (d) are based on allegedly questionable evidence; (3) the STR regulations violate the Equal Protection Clause because they (a) prohibit business entities from qualifying for an STR owner [**7] or operator permit and (b)

discriminate among homeowners based on the length of time they rent out their property; (4) the advertising regulations violate the First Amendment; and (5) the operator-residency requirement violates the dormant Commerce Clause. We address each of these challenges in turn.

II.

"A district court's judgment concerning a statute's constitutionality is reviewed *de novo*. To the extent relevant to the constitutional question, subsidiary facts are reviewed for clear error." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007) (citations omitted).

III.

A.

First, the City has the authority under state law to regulate STRs. In Louisiana, municipalities may regulate and restrict "the location and use of the buildings, structures, and land for trade, industry, residence, or other purposes." La. Revised Stat. § 33:4721. Appellants argue this language does not permit the City to zone based on the duration of an individual's stay on a property. But the STR ordinances plainly fall within the City's broad authority to regulate the "use of [a] . . . residence" for short-term rentals, which are defined temporally by the length of a guest's stay. *Id.*; *see also Deslonde v. St. Tammany Parish*, 391 So.3d 706, 716 (La. App. 1st Cir. 2024). Appellants cite no authority to support [*353] their counter-textual interpretation of the statute. Instead, "[i]t is well settled that [**8] the City has the authority to initiate legislation and enforce zoning ordinances" for short-term rentals. *Chaumont v. City of New Orleans*, 302 So.3d 39, 53 (La. App. 4th Cir. 2020). The City may regulate STRs under state law.

B.

Second, Appellants have not established a protected property interest necessary for their due-process claims. To prevail under the Due Process Clause,

Appellants must first "allege a deprivation of a constitutionally protected right." *Mikeska v. City of Galveston*, 451 F.3d 376, 379 (5th Cir. 2006). "The Constitution does not create property interests; 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Schaper v. City of Huntsville*, 813 F.2d 709, 713 (5th Cir. 1987) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972)). "The nature of the property interest therefore must be determined by [Louisiana] law." *Simi Inv. Co., Inc. v. Harris County*, 236 F.3d 240, 250 (5th Cir. 2000). Appellants have not met their burden to show that they held a constitutionally protected property right under Louisiana law implicated by the permitting scheme.

Appellants assert "the fundamental right to lease their private homes." But they cannot rely on an alleged fundamental right to engage in STRs. Even though such a property right exists as an essential incident of home ownership, *see, e.g., Terrace v. Thompson*, 263 U.S. 197, 215, 44 S.Ct. 15, 17-18, 68 L.Ed. 255 (1923), Louisiana courts reasonably view short-term rentals with transient guests as a commercial use of property distinct from a traditional [**9] residential lease. *See Deslonde*, 391 So.3d at 716 ("[T]he act of renting property on a short-term basis is a strictly commercial use."); *Edwards v. Landry Chalet Rentals, L.L.C.*, 246 So.3d 754, 758 (La. App. 2d Cir. 2018); *Craig v. City of New Orleans Bd. of Zoning Adjustments*, 903 So.2d 530, 537 (La. App. 4th Cir. 2005) (describing stays on a nightly or weekly basis, rather than monthly, as "fully commercial lodging, catering exclusively to tourists visiting New Orleans for very short periods of time"). Renting a home to transient guests is more analogous to a hotel operation than a traditional residential lease. *Compare Craig*, 903 So.2d at 537, *with Terrace*, 263 U.S. at 211-12, 44 S.Ct. at 16. Because renting a home for mere days or weeks is not a residential lease under state law, reliance on an alleged "right to lease" is misplaced.

Appellants elsewhere argue they "want to use their existing homes for the residential use they are already zoned for." But they make no attempt to show that a commercial short-term rental has ever been recognized as a permissible "residential" use in Louisiana. Before 2017, it was categorically unlawful to rent a residential home in the city for fewer than thirty days (or fewer than sixty days in the French Quarter). Before the permitting scheme at issue was enacted, Appellants had no right to operate their properties as an STR. The current iteration of the CZO makes this clear because nothing "shall be construed to authorize [**10] the continued use of any property as a short term rental in the event the City modifies its short-term rental permitting regulations in a manner that limits or prohibits the issuance of a short-term rental permit." Thus, Appellants' premise for claiming a constitutionally protected property interest is false; residential homes are not "already zoned for" short-term usage.

[*354] We do not doubt that, properly framed, a homeowner may be able to articulate a constitutionally protected property interest implicated by the City's zoning ordinance. *See City of New Orleans v. Elms*, 566 So.2d 626, 632 (La. 1990). But that situation is distinguishable because Appellants essentially claim a right to operate an unlicensed commercial business from their homes. *See Chaumont*, 302 So. 3d at 53 ("[O]perating a short-term rental is a privilege, not a right."). Because Appellants have not alleged a protected property interest under Louisiana law, their due-process claims fail.

C.

Third, Appellants contend that the ordinances violate the Equal Protection Clause because they irrationally prohibit business entities from receiving an owner or operator permit.[1] The Code specifies

_____

[1] Appellants' second equal-protection argument—that the ordinances unconstitutionally discriminate between people "who want to lease their private homes for less than thirty days" and those "who rent for

that "[o]nly natural persons . . . may own a property used as a non-commercial short-term rental. Ownership, in whole or in part, by a business [**11] entity . . . is prohibited." The Code further defines an "operator" as "a natural person possessing a short-term rental operator permit." We agree that the permitting restrictions on both owners and operators violate the Equal Protection Clause.[2]

To establish an equal-protection claim, Appellants must first prove that "similarly situated individuals were treated differently." *Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020) (citations omitted). "Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws." *Id.* at 272-73 (quoting *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 932 (5th Cir. 1988)). To determine whether disparately treated groups are similarly situated, a court must consider "the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant" when making the classification. *Stratta v. Roe*, 961 F.3d 340, 360 (5th Cir. 2020). Further, the "plaintiff's and comparators' relationships with the ordinance at issue will generally be a relevant characteristic for purposes of the similarly-situated analysis." *Id.* (citation omitted).

Natural persons and business entities are equated for purposes of the Equal Protection Clause. In federal law, the term [**12] "person" includes "corporations, companies, associations, firms, partnerships, societies and joint stock companies, as well as individuals." 1 U.S.C. Sec. 1 (the

Dictionary Act). Louisiana law recognizes two types of persons: natural and juridical. La. Civ. Code art. 24. Juridical persons include any kind of business or other legally recognized association. *Id.*; *see also Wimsatt v. Jaber*, No. 24-30366, 2025 U.S. App. LEXIS 5180, 2025 WL 711120, at *4 (5th Cir. Mar. 5, 2025) (describing a partnership as a juridical person under Louisiana law that is "distinct from its partners" (quoting La. Civ. Code. art. 2801)); [*355] *Ogea v. Merritt*, 130 So.3d 888, 894-95 (La. 2013) ("Therefore, as a general proposition, the law considers an LLC and the member(s) comprising the LLC, as being wholly separate persons."). But juridical persons have legal "personality." La. Civ. Code art. 24.

Yet, the City's homeowner-permit requirement initially discriminates against business entities that own homes by preventing them from being licensed for STRs. Even absent a corporate form, Louisiana permits property to be jointly owned by multiple individuals. *See, e.g., de Klerk v. de Klerk*, 174 So.3d 205, 209 (La. App. 4th Cir. 2015). Nothing suggests that Appellant Summit NOLA III LLC, a two-member limited liability corporation that owns a home in New Orleans, is meaningfully different from two individuals who own a home jointly. A corporation or business entity "is simply a form of organization used by human [**13] beings to achieve desired ends." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706, 134 S.Ct. 2751, 2768, 189 L. Ed. 2d 675 (2014). Business homeowners and natural-person homeowners are similarly situated.

Likewise, the City's operator-permit scheme discriminates between two classes of prospective operators. Both a business that operates through "human beings to achieve desired ends" and a natural person may seek to provide the same STR "operator" service, in the same community, under an otherwise identical set of regulations. *Id.* at 706, 134 S.Ct. at 2768. The legal identity of the operating permitholder does not change the permitholder's relationship to the regulations' various requirements. *See Stratta*, 961 F.3d at 360.

---

thirty-one days, or more"—was raised untimely in the district court and is therefore not properly before this court. *Bailey v. Ramos*, 125 F.4th 667, 679 n.42 (5th Cir. 2025) (citation omitted).

[2] The district court also held that these provisions are irrational to the extent they prohibit individuals who possess usufructuary or trust beneficiary status from obtaining owner permits for STRs. The City did not cross-appeal this point.

154 F.4th 345, *355; 2025 U.S. App. LEXIS 26061, **13

These classes are similarly situated for purposes of the Equal Protection Clause.

The business bans can therefore be upheld only "'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Greater Hou. Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, 239 (5th Cir. 2011) (quoting *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 2642, 125 L. Ed. 2d 257 (1993)). But a "necessary corollary to and implication of rationality as a test is that there will be situations where proffered reasons are not rational." *Id.* (internal quotation omitted). For example, "the relationship of the classification to its goal [may be] so attenuated as to render the distinction arbitrary or irrational." *Stefanoff v. Hays County*, 154 F.3d 523, 526 (5th Cir. 1998). "[W]e have made clear that 'rational' still must be actually [**14] rational, not a matter of fiction." *Hines*, 982 F.3d at 273 (citations omitted). To that end, "we will examine the State['s] rationale informed by the setting and history of the challenged rule." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). While the City bears no burden under rational-basis review, there must be *something* to suggest that the business ban is rationally related to the City's legitimate interests or to allow the court to create a rational post hoc justification for the regulation. *See Mikeska*, 451 F.3d at 381.

Turning to the City's justifications for discriminatory treatment, it rests on this: a "concern for livability and quality of life in residential neighborhoods forms the essential, rationally conceivable basis for the natural person requirement." The City's research noted "accounts of large parties all through the day and night inside and outside of STRs," and increased "noise [and] trash" associated with STR guests. A municipality's concern for its residential neighborhoods is legitimate. *See Nordlinger v. Hahn*, 505 U.S. 1, 12, 112 S.Ct. 2326, 2333, 120 L. Ed. 2d 1 (1992) (noting "legitimate interest[s] in local neighborhood preservation, continuity, and [*356] stability").

And there is a legitimate basis to regulate the deleterious effect on residential neighborhoods caused by transient guests. But the City's legitimate concern with [**15] the effect of property *guests* says nothing about property *owners* or how the legal identity of the homeowner will ameliorate issues caused by transient guests.

The Code does not ban "businesses" from owning homes in residential neighborhoods. It bans homes *already* owned by a "business entity" from receiving an STR permit. Our inquiry therefore turns on whether there is a rational basis to suggest that allowing STRs at a property owned by a natural person affects the "livability and quality of life in residential neighborhoods" differently from STRs at a property owned by a natural person through a business entity. "[T]here is nothing in the record before us to suggest" such a conclusion. *Mikeska*, 451 F.3d at 381. Nothing suggests that having a juridical person as *homeowner* will adversely affect the operation of the STR, either by itself or in comparison with a natural-person homeowner. In fact, for many individual homeowners who desire to engage in STRs, the only practical way to do so may be through the formation of a juridical entity as a liability shield. Creating a business entity erects a paper barrier, albeit an important one, while compliance with the City's regulations still resides with one person [**16] or small group. Moreover, under the Code, a defining characteristic of a short-term rental is that the home *need not* be occupied by the homeowner. Banning a class of homeowners from the STR market is therefore fundamentally unrelated to the City's sole expressed concern about STRs—the guests.

In the absence of anything in the record, and in presence of common sense, we cannot infer that ownership of an STR by natural persons through a business entity will negatively influence a neighborhood's "livability and quality of life." Nothing in the City's STR Study, or the City's briefing in the district court, identifies a plausible connection between an STR homeowner's juridical

status and the behavior of STR guests. The City's attempt to explain its reasoning in this court is conclusional. Instead, the City's 2018 STR study discusses a prohibition on "corporate ownership" only in the context of barring "out-of-state owners" and "requiring a homestead exemption," provisions that this court held unconstitutional in *Hignell-Stark I*. *See Castille*, 712 F.3d at 222 ("mere economic protection" is not a legitimate state interest). Banning non-natural person homeowners from receiving an STR permit is "so attenuated" from [**17] livability and quality-of-life concerns caused by guests as to render the distinction between business-owned and individual-owned homes arbitrary. *Stefanoff*, 154 F.3d at 526.

Although not mentioned by the City on appeal, the City Planning Commission Staff Report in response to *Hignell-Stark I* noted the City's concern for the "proliferation or over concentration of STRs in a particular neighborhood." To assuage that concern, the City intended to set "limits on the parties that can receive STR permits" by "prohibit[ing] any companies from obtaining residential STR license[s]." But preventing businesses from obtaining STR licenses has nothing to do with minimizing the proliferation of STRs in neighborhoods because the ordinances already regulate the concentration of STRs. Under the Code, only one STR permit "may be issued within each city block." Further, "[n]o person may own, in whole or in part, more than one property used" as an STR. And "[n]o person may be the operator of more than one" STR. The permitting scheme belies any alleged concern that businesses will cause the proliferation STRs to the [*357] detriment of local neighborhoods. The business-entity ban is therefore irrational.[3]

As to the operator restriction, [**18] nothing in the briefs or record hints at why only "natural person" operators would further the City's interest in maintaining the character of residential neighborhoods. A business holding an operator permit may satisfy the operator's oversight requirements, like being "accessible by telephone" and "resolv[ing] complaints within one hour," only through the presence of a natural person. Abstract notions of the corporate form have no bearing on effectuating the operator requirement. Again, a business entity "is simply a form of organization used by human beings to achieve desired ends." *Burwell*, 573 U.S. at 706, 134 S.Ct. at 2768.

The City offers no independent justification for the ban on business entities as STR operators. The Code's legislative purpose states the City's broad desire to "mitigate disruptive effects that unmonitored STRs can have on neighborhoods." At oral argument, the City claimed the operator requirement is intended to ensure that "someone [is at the STR] keeping order." But nothing suggests restrictions based on the legal identity of the *permitholder* will advance the City's interest in STR oversight. The regulations explicitly contemplate the hiring of third-party operators who are not the homeowner. Whether [**19] a "natural person" or a "business" receives an operator permit, both must provide the same service through an in-person presence. And both must ensure that an STR is not unmonitored. A natural person will be working as an operator either way.

In short, "there is a disconnect" between the City's concern with unmonitored STRs and its decision to prevent an entire class of entities from being licensed to operate STRs. *Castille*, 712 F.3d at 225. Without some rationale for its differentiation, we cannot find that the Code's prohibition on business-held operator permits advances the City's interest in STR oversight. *See id.* at 226.

The district court offered two additional rationales to support the ban on business entities as owners or operators. First, it held that "[i]t is reasonable to conceive that a natural person owner and/or operator would have more desire, interest, and

---

[3] For the same reason, the business ban does not further the City's interest articulated in the Code's legislative purpose "to seek preservation of permanent housing stock, balance economic opportunity, reduce negative effects on availability of affordable housing, [and] create a level playing field."

accessibility to address neighborhood concerns arising readily and directly from STR operations within the mandated one-hour period for addressing complaints than corporate entities." As the regulations would apply equally regardless of the owner or operator, it is not rational to infer lackadaisical compliance or lack of incentive simply based on ownership [**20] status. Second, the district court held that "changes in interests, policies, ownership, or control of a corporate entity during or after the permitting process would likely have lengthy administrative, regulatory, and potential legal consequences that unnecessarily lead to overwhelming costs and fees." Whatever this means, we cannot conceive of any administrative, regulatory, or legal consequence in the record or elsewhere unique to non-natural persons that might create overwhelming costs and fees under some circumstances. This hypothetical rationale, therefore, cannot stand to support the business ban. *See Castille*, 712 F.3d at 223.

The City's ban on business-held STR licenses and permits is too attenuated to [*358] any legitimate state interest to be considered anything other than "arbitrary or irrational." *Stefanoff*, 154 F.3d 526. It must fall under the Equal Protection Clause of the Fourteenth Amendment.

D.

Fourth, Appellants challenge two parts of the Code's advertising regulations. First, Sections 26-618(b)(1)-(4) prohibit advertisements for an "illegal," or unlicensed, STR or advertisements that would exceed the Code's restrictions on STR density, guest bedrooms, or guest occupancy. Second, Section 26-618(a)(3) requires "that each short-term rental listing advertises only one dwelling unit" and discloses information about the [**21] STR like the owner and operator permit number and the number of available guest bedrooms.

The first group of restrictions under Sections 26-618(b)(1)-(4) does not involve protected speech because it does not concern lawful activity under

the Code. The subsections prohibit "illegal" advertisements and advertisements for STRs that would exceed the "legally available" limits. No commercial speech proposing such illegal activity is protected by the First Amendment. *See Cocroft v. Graham*, 122 F.4th 176, 180 (5th Cir. 2024).

In addition, Section 26-618(a)(3), for the most part, simply requires advertising disclosures as to the owner and operator permit numbers, Americans with Disabilities Act compliance and wheelchair accessibility, the number of available guest bedrooms, and the maximum available occupancy. Such disclosure requirements do not violate the First Amendment. "[A]n advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651, 105 S.Ct. 2265, 2282, 85 L. Ed. 2d 652, 17 Ohio B. 315 (1985). *Zauderer* applies when the compelled speech is (1) purely factual, (2) uncontroversial, (3) justified by a legitimate state interest and (4) not unduly burdensome. *R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 877 (5th Cir. 2024). Here, the required disclosures are "purely factual" and "uncontroversial." *See id.* Further, the City has a "legitimate state interest" in ensuring customers [**22] only interact with legitimate STR advertisements and are fully apprised of what they are renting. *See id.* at 882-83. Finally, the required disclosures are "not unduly burdensome." *Id.* at 885-86. And they impart only "somewhat more information than [owners and operators] might otherwise be inclined to present." *Zauderer*, 471 U.S. at 650, 105 S.Ct. at 2281.

In contrast, Section 26-618(a)(3)'s requirement that each listing advertise "only one dwelling unit" violates the First Amendment. "Unlike rational-basis review, the *Central Hudson* standard does not permit [a court] to supplant the precise interests put forward by the [City] with other suppositions." *Edenfield v. Fane*, 507 U.S. 761, 768, 113 S.Ct. 1792, 1798, 123 L. Ed. 2d 543 (1993). The asserted

154 F.4th 345, *358; 2025 U.S. App. LEXIS 26061, **22

governmental interest in restricting each advertisement to only one dwelling unit must be "substantial," the regulation must "directly advance[] the governmental interest asserted," and it must not be "more extensive than is necessary to serve that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Svc. Comm'n*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L. Ed. 2d 341 (1980). The "scope [must be] in proportion to the interest served," and the "cost . . . carefully calculated." *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 283 (5th Cir. 2024) (citations omitted), *aff'd*, 606 U.S. 461, [*359] 145 S.Ct. 2291, 222 L.Ed.2d 643 (2025).

The City offers no argument to justify its one-unit-per-advertisement restriction. It only mentions the City's general interest "in protecting guests and ensuring properties listed are properly licensed and operating within their permits." [**23] (citing district court opinion; *see also* City's Motion for Summary Judgment). Accordingly, the City does not attempt to explain how the regulation "directly advances" any "governmental interest." *Cent. Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351. Because we cannot "supplant the precise justifications put forward by the [City]" and rationalize its regulation with "mere speculation or conjecture," Section 26-618(a)(3)'s requirement that "each short-term rental listing advertises only one dwelling unit" lacks the justification necessary to survive First Amendment scrutiny. *Edenfield, 507 U.S. at 768, 770, 113 S.Ct. at 1798*.

E.

Fifth, Appellants assert that because the Code requires an STR operator to "reside[] on the premises being operated as a short-term rental," Section 26-619 and Section 26-620(a)(1)(e), it violates the dormant Commerce Clause. This court previously held that the City's owner-residency requirement violated the dormant Commerce Clause when it required an STR to be "located on the same lot of record as the owner's primary residence." *Hignell-Stark I, 46 F.4th at 326*.

The Code places two requirements on operators. First, to be eligible for an STR operator permit, Section 26-619 of the Code currently requires

> evidence of recorded ownership or a current residential lease, as well as at least two other forms of documentation with a matching address, including without limitation a utility bill, driver's license or state [**24] ID, or bank or credit card statement, establishing that the operator resides on the premises being operated as a short-term rental.

Second, Section 26-620(a)(1)(e) of the Code further states that "[t]he operator shall . . . [r]eside on the property being used for a non-commercial short-term rental." "Failure to reside on the premises as required by law" is unlawful.

The parties dispute the meaning of these provisions. Appellants argue that the Code creates a permanent residency requirement. The City insists, however, that "[n]othing in the ordinance requires the permanence suggested by Appellants." The City defends the district-court opinion, which found that "the operator is not required to be a permanent resident of the City, but only a temporary resident of the STR they are hired to operate during stays by STR guests." Further, the City averred during oral argument that the Code "doesn't require a residency, it just requires that an operator, an employee, somebody be present, sort of like if you had a hotel, and you had somebody at the front desk, that's there to like answer questions or direct people or to take care of things."

"Federal courts must accept a reasonable narrowing construction of a state law [**25] to preserve its constitutionality." *City of El Cenizo v. Texas*, 890 F.3d 164, 182 (5th Cir. 2018). As the Supreme Court has explained, "[t]he canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Jennings v. Rodriguez, 583 U.S. 281, 296, 138 S.Ct. 830, 842, 200 L. Ed. 2d 122 (2018)* (quoting *Crowell v. Benson, 285 U.S. 22,*

62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932)). Louisiana, it appears, is even more open to [*360] accepting a narrowing interpretation. It holds that "a court may avoid constitutional problems by adopting a narrowing construction of the statute as long as that interpretation remains consistent with the overall purpose behind the legislation." *State v. Interiano*, 868 S.2d 9, 13 (La. 2004).

The operator provisions of the City Code are "readily susceptible" to the City's construction. We therefore accept the City's interpretation and its judicial admission that the Code does *not* require an operator to reside at the property permanently but rather only requires an operator be present at the property while guests are present. While both Sections 26-619 and 26-620(a)(1)(e) use the term "reside," they require an individual to reside at the property "being operated as a short-term rental" or "being used for a non-commercial short-term rental." There are two potential interpretations of this language. First, the relevant property could be "used [**26] for" or "operated as" a short-term rental when it is permitted for an STR, and therefore, an operator must reside at the property year-round regardless of guest occupancy. Alternatively, the relevant property could be "used for" or "operated as" a short-term rental only *as it is being used* as an STR and therefore only when guests are present. The first interpretation would implicate the dormant Commerce Clause because such a requirement would discriminate against out-of-state individuals who want to work as operators wholly separate from any guest-oversight function they must provide. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369, 143 S.Ct. 1142, 1152, 215 L. Ed. 2d 336 (2023).

Appellants contend that the Code's requirements "exclude operators who wish to maintain residence out-of-state—or even in other homes locally—but work as STR operators while in New Orleans." By the City's own interpretation, however, the Code merely requires individuals to work as STR operators while the home is occupied. This interpretation makes sense in light of an operator's

prescribed duties. Because the Code's language is "readily susceptible" of the City's interpretation, we conclude that the Code's language requires that an operator reside on the STR property only while it is actively occupied by guests. [**27] By virtue of this interpretation, there is no discrimination against out-of-state STR operators, and Appellants' dormant Commerce Clause argument necessarily fails.

IV.

The judgment of the district court is AFFIRMED in part; REVERSED in part specifically as to (1) §§ 26-617(a)'s and 26-619(a)'s prohibition on owner or operator permits to business entities and (2) § 26-618(a)(3)'s requirement that each advertisement for an STR list only one dwelling unit; and REMANDED for further proceedings.

JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED IN PART and REVERSED IN PART specifically as to (1) §§ 26-617(a)'s and 26-619(a)'s prohibition on owner or operator permits to business entities and (2) § 26-618(a)(3)'s requirement that each advertisement for an STR list only one dwelling unit, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

The judgment or mandate of this court shall issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition [**28] for rehearing en banc, or motion for stay of mandate, whichever is later. See FED. R. APP. P. 41(b). The court may shorten or extend the time by order. See 5TH CIR. R. 41 I.O.P.

154 F.4th 345, *360; 2025 U.S. App. LEXIS 26061, **28

**End of Document**

⚠ Caution
As of: January 19, 2026 6:50 PM Z

# Patel v. Tex. Dep't of Licensing & Regulation

Supreme Court of Texas

February 27, 2014, Argued; June 26, 2015, Opinion Delivered

NO. 12-0657

**Reporter**
469 S.W.3d 69 *; 2015 Tex. LEXIS 617 **; 58 Tex. Sup. J. 1298

ASHISH PATEL, ANVERALI SATANI, NAZIRA MOMIN, MINAZ CHAMADIA, AND VIJAY LAKSHMI YOGI, PETITIONERS/CROSS-RESPONDENTS, v. TEXAS DEPARTMENT OF LICENSING AND REGULATION, ET AL., RESPONDENTS/CROSS-PETITIONERS

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS.

Patel v. Tex. Dep't of Licensing and Regulation, 464 S.W.3d 369, 2012 Tex. App. LEXIS 6187 (Tex. App. Austin, July 25, 2012)

**Counsel:** For Houston Belt & Terminal Railway Co., BNSF, Amicus Curiae: James B. Harris, Richard Barrett Phillips Jr., Thompson & Knight LLP, Dallas TX.

For Pacific Legal Foundation, Amicus Curiae: J. David Breemer, Pacific Legal Foundation, Sacremento CA.

For South Texas College of Law, Amicus Curiae: C. W. "Rocky" Rhodes, South Texas College of Law, Houston TX.

For Patel, Ashish, Anverali Satani, Nazira Momin, Tahereh Rokhti, Minaz Chamadia and Vijay Lakshmi Yogi, Petitioner: Arif Panju, Matthew R. Miller, Institute for Justice Texas Chapter, Austin TX; Wesley Hottot, Institute for Justice, Bellevue WA.

For Texas Department of Licensing and Regulation, et al., Respondent: Amanda Joy Cochran-McCall, Dustin Mark Howell, Office of the Attorney General of Texas, Austin TX; Daniel Tekstar Hodge, First Asst. Attorney General, Austin TX; Greg W. Abbott, Attorney General of Texas, Austin TX; Jonathan F. Mitchell, Solicitor General, Office of the Attorney General, Austin TX; Nancy K. Juren, Office of Attorney General of Texas, General Litigation Division, Austin TX.

**Judges:** JUSTICE JOHNSON delivered the opinion of the Court, in which [**2] JUSTICE GREEN, JUSTICE WILLETT, JUSTICE LEHRMANN, and JUSTICE DEVINE joined. JUSTICE WILLETT filed a concurring opinion, in which JUSTICE LEHRMANN and JUSTICE DEVINE joined. JUSTICE BOYD filed a concurring opinion. CHIEF JUSTICE HECHT filed a dissenting opinion, in which JUSTICE GUZMAN and JUSTICE BROWN joined. JUSTICE GUZMAN filed a dissenting opinion.

**Opinion by:** Phil Johnson

## Opinion

[*73] In this declaratory judgment action several individuals practicing commercial eyebrow threading and the salon owners employing them assert that, as applied to them, Texas's licensing statutes and regulations violate the Texas Constitution's due course of law provision. They claim that most of the 750 hours of training Texas requires for a license to practice commercial eyebrow threading are not related to health and safety or what threaders actually do. The State

concedes that over 40% of the required hours are unrelated, but maintains that the licensing requirements are nevertheless constitutional.

The trial court and court of appeals agreed with the State. We do not. We reverse and remand to the trial court for further proceedings.

## I. Background

Eyebrow threading is a grooming practice mainly performed in South Asian and Middle [**3] Eastern communities. It involves the removal of eyebrow hair and shaping of eyebrows with cotton thread. "Threading," as it is most commonly known, is increasingly practiced in Texas on a commercial basis. Threaders tightly wind a single strand of cotton thread, form a loop in it with their fingers, tighten the loop, and then quickly brush the thread along the skin of the client, trapping unwanted hair in the loop and removing it. In 2011, commercial threading became regulated in Texas when the Legislature categorized it as a practice of "cosmetology." *See* Tex. Occ. Code § 1602.002(a)(8) ("'[C]osmetology' means the practice of performing or offering to perform for compensation . . . [the] remov[al] [of] superfluous hair from a person's body using depilatories, preparations, or tweezing techniques . . . ."). That categorization and its effects underlie this case.

In order to legally practice cosmetology in Texas a person must hold either a general operator's license or, in certain instances, a more limited but easier-to-obtain esthetician license. *Id.* § 1602.251(a). Licensing requirements for general operators include completing a minimum of 1,500 hours of instruction in a licensed beauty culture school and passing a state-mandated test. *Id.* § 1602.254; 16 Tex. Admin. Code § 83.20(a). Requirements [**4] for an esthetician license include completing a minimum of 750 hours of instruction in an approved training program and passing a state-mandated test. Tex. Occ. Code § 1602.257(b); 16 Tex. Admin. Code § 83.20(b). Commercial

eyebrow threaders must have at least an esthetician license. *See* Tex. Occ. Code §§ 1602.002(a)(8), .257; *see also* 16 Tex. Admin. Code § 83.10(36).

[*74] The Texas Department of Licensing and Regulation (TDLR or the Department), which is governed by the Texas Commission of Licensing and Regulation (the Commission), is charged with overseeing individuals and businesses that offer cosmetology services. Tex. Occ. Code §§ 51.051, .201(a), 1602.001-.002, 1603.001-.456. The executive director of TDLR is authorized to impose administrative fines of as much as $5,000 per violation, per day. *See id.* §§ 51.302, 1602.251.

In late 2008 and early 2009, TDLR inspected Justringz—a threading business with kiosk locations in malls across Texas—and found Nazira Nasruddin Momin and Vijay Lakshmi Yogi performing eyebrow threading without licenses. TDLR issued Notices of Alleged Violations to them for the unlicensed practice of cosmetology. Minaz Chamadia was also performing threading at Justringz without a license, but she was not cited by TDLR. The administrative hearings and fines pending against Momin and Yogi have been stayed pursuant to a Rule 11 Agreement. *See* Tex. R. Civ. P. 11.

Ashish [**5] Patel and Anverali Satani own threading salons named Perfect Browz. The State has not taken any administrative action related to Perfect Browz. Satani is the sole owner of another threading business, Browz and Henna. TDLR inspected and investigated Browz and Henna on the basis of complaints filed against it. Although Satani received two warnings for Browz and Henna employing unlicensed threaders, the Department did not issue a Notice of Alleged Violation. Like the proceedings against Momin and Yogi, prosecution of Browz and Henna has been stayed by agreement of the parties.

In December 2009, Patel, Satani, Momin, Chamadia, and Yogi (collectively, the Threaders) brought suit against TDLR, its executive director,

the Commission, and the Commission's members (collectively, the State) pursuant to the Uniform Declaratory Judgments Act (UDJA) seeking declaratory and injunctive relief. *See* Tex. Civ. Prac. & Rem. Code §§ 37.001-.004, .006, .010. The Threaders alleged that the cosmetology statutes and administrative rules issued pursuant to those statutes (collectively, the cosmetology scheme) were unreasonable as applied to eyebrow threading and violated their constitutional right "to earn an honest living in the occupation of one's choice [**6] free from unreasonable governmental interference." They specifically sought declaratory judgment that, as applied to them, the cosmetology statutes and associated regulations violate the privileges and immunities and due course guarantees of Article I, § 19 of the Texas Constitution. They also sought a permanent injunction barring the State from enforcing the cosmetology scheme relating to the commercial practice of eyebrow threading against them.

The Threaders moved for summary judgment, contending that "application of the state's cosmetology laws and administrative rules to the commercial practice of eyebrow threading is unconstitutional because it places senseless burdens on eyebrow threaders and threading businesses without any actual benefit to public health and safety." The motion urged that the State could not constitutionally regulate the commercial practice of eyebrow threading as conventional cosmetology unless it could establish a real and substantial relationship between the statutes and regulations and the public's health and safety, and the State could not meet this standard. The State filed both a plea to the jurisdiction and a traditional motion for summary judgment. By its plea to the jurisdiction, the State [**7] challenged the Threaders' standing, contending that their claims were barred by sovereign immunity [*75] and the redundant remedies doctrine. In its motion for summary judgment, the State asserted that the Threaders failed to show that Texas's regulation of the practice of eyebrow threading deprived the Threaders of any substantive due process right

protected by Article I, § 19 or to plead a privileges and immunities claim different from their substantive due process claim.

The district court denied the State's plea to the jurisdiction, granted its motion for summary judgment, and denied the Threaders' motion for summary judgment. Both parties appealed.

The court of appeals affirmed. *Patel v. Tex. Dep't of Licensing & Regulation, 464 S.W.3d 369, 2012 Tex. App. LEXIS 6187 (Tex. App.—Austin 2012).* As to the State's jurisdictional issues, the court held that the Threaders' suit was not barred by sovereign immunity or the redundant remedies doctrine, the Threaders had standing, and their claims were ripe. *Id.* at 379, 2012 Tex. App. LEXIS 6187, at *25. As to the merits, the appeals court concluded that under either the real and substantial or rational basis test, the State established that the challenged cosmetology scheme, as applied to the Threaders, does not violate Article I, § 19. *Id.* at 387, 2012 Tex. App. LEXIS 6187, at *50.

In this Court the Threaders argue that (1) the real and substantial test [**8] governs substantive due process challenges to statutes and regulations affecting economic interests when the challenges are brought under Article I, § 19 of the Texas Constitution; (2) the cosmetology statutes and rules are unconstitutional as applied to the Threaders because they have no real and substantial connection to a legitimate governmental objective; and (3) even if rational basis review is the correct constitutional test, under the appropriate test, the statutes and regulations are unconstitutional as applied to the Threaders.

The State contends that (1) it is immune from declaratory judgment claims raising constitutional challenges to statutes; (2) the Threaders' claims lack both justiciability and ripeness; (3) the claims are barred by the redundant remedies doctrine; (4) the business owners lack standing; (5) there is no real difference between the "real and substantial" and "rational relationship" tests for due process

concerns; and (6) threading raises public health concerns, implicating valid governmental concerns, thus the challenged licensing statutes and regulations that address these concerns comport with the substantive due process requirements regardless of which test is applied.[1]

We address the arguments in turn, necessarily beginning with the jurisdictional issues the State raises. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012) (noting that if a court does not have jurisdiction, its opinion addressing any issues other than jurisdiction is advisory).

## II. Jurisdiction

### A. Sovereign Immunity

Sovereign immunity implicates a trial court's jurisdiction, and, when it applies, precludes suit against a governmental entity. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). The State acknowledges this Court's decisions to the effect that sovereign immunity is inapplicable when a suit challenges the constitutionality of a statute [*76] and seeks only equitable relief. *See City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007) (concluding "that the appeals court did not err by refusing to dismiss the plaintiffs' claims [against the city] for injunctive relief on alleged constitutional violations"); *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995) (determining that a plaintiff whose constitutional rights have been violated may sue the State for equitable relief). But referencing *Texas Department of Insurance v. Reconveyance Services, Inc.*, 306 S.W.3d 256, 258-59 (Tex. 2010), and *City of El Paso v. Heinrich*,

284 S.W.3d 366, 370-72 (Tex. 2009), the State [**10] argues that our more recent decisions indicate that we may be departing from that rule. We are not.

In *Heinrich* we decided that sovereign immunity does not prohibit suits brought to require state officials to comply with statutory or constitutional provisions. 284 S.W.3d at 372. But, to fall within this "ultra vires exception," a suit must allege that a state official acted without legal authority or failed to perform a purely ministerial act, rather than attack the officer's exercise of discretion. *Id.* The governmental entities themselves remain immune from suit, though, because unlawful acts of officials are not acts of the State. *Id.* at 372-73. Thus, we concluded that suits complaining of ultra vires actions may not be brought against a governmental unit, but must be brought against the allegedly responsible government actor in his official capacity. *Id.* at 373.

We reconfirmed the point in *Reconveyance*, where we held that the trial court lacked jurisdiction to hear a suit against the Texas Department of Insurance. 306 S.W.3d at 258-59. We concluded that the claims were substantively ultra vires claims because the pleadings alleged the Department of Insurance had acted beyond its statutory authority. *Id.* That being so, the claims should have been brought against the appropriate [**11] state officials in their official capacities. *Id.*

In this case, the Threaders did not plead that the Department and Commission officials exceeded the authority granted to them; rather, they challenged the constitutionality of the cosmetology statutes and regulations on which the officials based their actions. The State proposes that an official can act ultra vires either by acting inconsistently with a constitutional statute or by acting consistently with an unconstitutional one. It urges that the Threaders' claims fall within the "acting consistently with an unconstitutional statute" category. But the premise underlying the ultra vires exception is that the State is not responsible for unlawful acts of officials.

---

[1] *Amicus curiae* briefs have [**9] been submitted by the Pacific Legal Foundation (in support of the Threaders); Houston Belt & Terminal Railway Co., BNSF Railway Co., and Union Pacific Railway Co.; and South Texas College of Law 2014 State Constitutional Law Class (not submitted in support of either party).

*Heinrich*, 284 S.W.3d at 372. The State's proposal would effectively immunize it from suits claiming a statute is unconstitutional—an illogical extension of that underlying premise.

Contrary to the State's position, Heinrich and Reconveyance do not represent a departure from the rule that sovereign immunity is inapplicable in a suit against a governmental entity that challenges the constitutionality of a statute and seeks only equitable relief. *See id.* at 373 n.6. To the contrary, in *Heinrich* we clarified that "[f]or claims [**12] challenging the validity of . . . statutes . . . the Declaratory Judgment Act requires that the relevant governmental entities be made parties, and thereby waives immunity." *Id.* (citing *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994)). And we have reiterated the principle more recently. *See Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621-22 & n.3 (Tex. 2011) (restating that state entities can be—and in some instances such as when the constitutionality of a statute is at issue, must be—parties to challenges under the UDJA; *Tex. Lottery Comm'n v.* [*77] *First State Bank of DeQueen*, 325 S.W.3d 628, 634 (Tex. 2010) (holding that allegations against the lottery commissioner were not ultra vires allegations because the claim challenged a statute and was not one involving a government officer's action or inaction). Accordingly, because the Threaders challenge the validity of the cosmetology statutes and regulations, rather than complaining that officials illegally acted or failed to act, the ultra vires exception does not apply. The Department and the Commission are not immune from the Threaders' suit.

## B. Viability

Next, the State contends that the officials are immune from suit because the Threaders had to prove their claims in order to survive a plea to the jurisdiction. *See Heinrich*, 284 S.W.3d at 372 ("To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of

discretion, [**13] but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act."). The State argues that because the trial court granted summary judgment to the State on the merits, the Threaders did not prove a valid claim, rendering their pleadings insufficient to give the trial court jurisdiction. The State relies on *Andrade v. NAACP of Austin*, in which we held that the Secretary of State was immune from suit because the constitutional claims against her were non-viable. 345 S.W.3d 1, 6, 11-12, 18 (Tex. 2011). But, our conclusion there simply followed a line of decisions in which we held that claims were not viable due to basic pleading defects. *Id.* at 13-14. Andrade stands for the unremarkable principle that claims against state officials—like all claims—must be properly pleaded in order to be maintained, not that such claims must be viable on their merits to negate immunity. *Id.* Because the Threaders' pleadings presented a viable claim, they were sufficient.

## C. Justiciability

Next, the State employs the doctrines of standing, ripeness, and redundant remedies to argue that the courts below, and this Court, lack jurisdiction because the claims of the Threaders are not justiciable. [**14] We consider each doctrine in turn.

## 1. Standing

The standing doctrine identifies suits appropriate for judicial resolution. *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001). Standing assures there is a real controversy between the parties that will be determined by the judicial declaration sought. *Id.* (quoting *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 517-18 (Tex. 1995)). "[T]o challenge a statute, a plaintiff must [both] suffer some actual or threatened restriction under the statute" and "contend that the statute

unconstitutionally restricts the plaintiff's rights." *Garcia*, 893 S.W.2d at 518. The State argues that Patel and Satani—whose claims are based solely on their status as threading salon owners—lack standing because they fail both prongs of the standing test.

Generally, courts must analyze the standing of each individual plaintiff to bring each individual claim he or she alleges. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 152 (Tex. 2012). However, "where there are multiple plaintiffs in a case, who seek injunctive or declaratory relief (or both), who sue individually, and who all seek the same relief[,] . . . the court need not analyze the standing of more than one plaintiff—so long as that plaintiff has standing to pursue as much or more relief than any of the other plaintiffs." *Id.* at 152 n.64. The reasoning is [*78] fairly simple: if one plaintiff prevails on the merits, the same prospective [**15] relief will issue regardless of the standing of the other plaintiffs. *Id.*; *see also Andrade*, 345 S.W.3d at 6 ("Because the voters seek only declaratory and injunctive relief, and because each voter seeks the same relief, only one plaintiff with standing is required.").

Here, Momin and Yogi, the threaders who received Notices of Alleged Violation, have standing, and the State does not contend otherwise. First, they have suffered some actual restriction under the challenged statute because TDLR initiated regulatory proceedings against each of them pursuant to their alleged violations of the Texas cosmetology statutes and regulations. And second, they are contending that the statute unconstitutionally restricts their rights to practice eyebrow threading. Accordingly, because Momin and Yogi have standing, we need not analyze the standing of Patel and Satani.

The State also argues that because the Threaders seek attorneys' fees, the relief ultimately awarded will not necessarily be identical. But standing is determined at the beginning of a case, and whether the relief ultimately granted is the same for all parties is not determinative of the question. Here, Momin and Yogi have standing to seek relief and that is [**16] all we need to determine. *See Andrade*, 345 S.W.3d at 6-11; *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 626-27 (Tex. 1996); *Garcia*, 893 S.W.2d at 518-19.

## 2. Ripeness

The State next argues that the claims brought by Patel, Satani, and Chamadia are not ripe because Patel, Satani, and Chamadia have not faced administrative enforcement. We disagree.

Under the ripeness doctrine, courts must "consider whether, *at the time a lawsuit is filed*, the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851-52 (Tex. 2000) (emphasis in original) (citations omitted). Thus, the ripeness analysis focuses on whether a case involves uncertain or contingent future events that may not occur as anticipated or may not occur at all. *Id.* at 852.

Here, although Patel, Satani, and Chamadia have not faced administrative enforcement, the threat of harm is more than conjectural, hypothetical, or remote. Satani's business, Browz and Henna, has received two warnings for employing unlicensed threaders, and he has been referred to TDLR's legal department for enforcement. Patel and Satani risk $5,000 in penalties daily for employing unlicensed threaders. Tex. Occ. Code §§ 51.302(a), 1602.403(c)(1). And Chamadia works at the same threading salon where Momin and Yogi were cited. Because at the time the lawsuit was filed Chamadia [**17] was performing threading services without a cosmetology license and Patel and Satani were employing threaders who did not have cosmetology licenses, these individuals were subject to a real threat of likely civil and criminal proceedings, as well as administrative proceedings

that could result in penalties and sanctions. *See Mitz v. Tex. State Bd. of Veterinary Med. Exam'rs, 278 S.W.3d 17, 26 (Tex. App.—Austin 2008, pet. dism'd by agr.)* (holding that a constitutional challenge to a state-licensing law is ripe when enforcement of the law is "sufficiently likely" to occur). Therefore, their claims are ripe.

### 3. Redundant Remedies

The State also seeks to dismiss the claims of the Threaders who have received [*79] citations based on the redundant remedies doctrine. Under the redundant remedies doctrine, courts will not entertain an action brought under the UDJA when the same claim could be pursued through different channels. *See, e.g., Tex. Mun. Power Agency v. Pub. Util. Comm'n, 253 S.W.3d 184, 200 (Tex. 2007).* The focus of the doctrine is on the initiation of the case, that is, whether the Legislature created a statutory waiver of sovereign immunity that permits the parties to raise their claims through some avenue other than the UDJA. *See, e.g., Aaron Rents, Inc. v. Travis Cent. Appraisal Dist., 212 S.W.3d 665, 669 (Tex. App.—Austin 2006, no pet.)* (en banc) ("When a statute provides an avenue for attacking an agency order, a declaratory judgment action will not lie to provide redundant [**18] remedies."); *see also Alamo Express, Inc. v. Union City Transfer, 158 Tex. 234, 309 S.W.2d 815, 827 (Tex. 1958)* (holding "an action for declaratory judgment does not lie" in a suit that asserts a "direct attack upon the [agency's] order by appeal").

The State maintains that the Legislature has provided Momin and Yogi two alternative avenues under the Administrative Procedures Act (APA): (1) a suit for judicial review alleging that the administrative decision was "in violation of a constitutional or statutory provision," *Tex. Gov't Code § 2001.174(2)(A)*; or (2) a suit for a pre-enforcement declaratory judgment alleging "that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." *Id. §*

*2001.038(a).* The State contends that because either of those APA provisions permits Yogi and Momin to file suits that would redress their alleged injuries, they may not pursue relief under the UDJA.

We disagree with the State's assertion that a favorable decision under *Section 2001.174 of the APA*—authorizing courts to review administrative decisions—would obviate the need for the relief the Threaders seek. *See id. § 2001.174* (allowing state courts to reverse or remand existing agency orders, but not enjoin future ones). The available remedies on appeal from an administrative [**19] finding are limited to reversal of the particular orders at issue. *Id.* But the Threaders seek more than a reversal of the citations issued to Momin and Yogi. They seek prospective injunctive relief against future agency orders based on the statutes and regulations. Accordingly, because the declaration sought goes beyond reversal of an agency order, *Section 2001.174 of the APA* does not provide a redundant remedy.

The State's contention that *Section 2001.038 of the APA* creates an avenue for pre-enforcement declaratory judgment that an agency rule is invalid and would redress the Threaders' alleged injuries is likewise unavailing. When a plaintiff files a proceeding that only challenges the validity of an administrative rule, the parties are bound by the APA and may not seek relief under the UDJA because such relief would be redundant. *See Leeper*, 893 S.W.2d at 443-44. The APA defines a rule as:

> (A) . . . a state agency statement of general applicability that:
>
> > (i) implements, interprets, or prescribes law or policy; or
> >
> > (ii) describes the procedure or practice requirements of a state agency;
>
> (B) includ[ing] the amendment or repeal of a prior rule; and
>
> (C) . . . not includ[ing] a statement regarding only the internal management or organization of a state agency and not affecting private

rights [**20] or procedures.

 [*80] Tex. Gov't Code § 2001.003(6). Here the Threaders challenge both rules as defined by the APA and statutes. Because the Threaders cannot attack the constitutionality of the statutes pursuant to Section 2001.038 of the APA, their UDJA claims are not barred by the redundant remedies doctrine.

Having concluded that the lower courts had jurisdiction, we turn to the merits.

## III. Constitutionality of the Statutes and Regulations

### A. Due Course of Law

Article I, § 19 of the Texas Constitution provides that

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Tex. Const. art. I, § 19.

We have at least twice noted that Texas courts have not been entirely consistent in the standard of review applied when economic legislation is challenged under Section 19's substantive due course of law protections. See Trinity River Auth. v. URS Consultants, Inc.—Tex., 889 S.W.2d 259, 263 & n.5 (Tex. 1994); Garcia, 893 S.W.2d at 525. The Threaders go beyond those two cases. They assert that courts considering as-applied substantive due process challenges under Section 19 have mixed and matched three different standards of review through the years. They label those standards as: (1) real and substantial, (2) rational basis including consideration of evidence, and (3) no-evidence rational [**21] basis.

The Threaders argue that the first referenced standard—"real and substantial"—is exemplified by cases such as State v. Richards, 157 Tex. 166, 301 S.W.2d 597 (Tex. 1957); Aladdin's Castle, Inc. v. City of Mesquite, 713 F.2d 137, 138 n.2 (5th Cir.1983) (applying Texas law); Satterfield v. Crown Cork & Seal Co., 268 S.W.3d 190, 215 (Tex. App.—Austin 2008, no pet.); Texas State Board of Pharmacy v. Gibson's Discount Center, Inc., 541 S.W.2d 884, 887-89 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.); City of Houston v. Johnny Frank's Auto Parts Co., 480 S.W.2d 774, 779 (Tex. Civ. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.); Humble Oil & Refining Co. v. City of Georgetown, 428 S.W.2d 405, 407-08 (Tex. Civ. App.—Austin 1968, no writ); and City of Coleman v. Rhone, 222 S.W.2d 646, 649 (Tex. Civ. App.—Eastland 1949, writ ref'd). They interpret this standard as one in which the reviewing court considers whether (1) the legislative purpose for the statute is a proper one, (2) there is a real and substantial connection between that purpose and the language of the statute as the statute functions in practice, and (3) the statute works an excessive or undue burden on the person challenging the statute in relation to the statutory purpose. They argue that the distinguishing characteristic of cases employing the standard is that the courts using it consider evidence concerning both the government's purpose for a law and the law's real-world impact on the challenging party.

The Threaders recognize that the real and substantial test affords less deference to legislative judgments than does the federal rational basis standard. But they point to In the Interest of J.W.T., 872 S.W.2d 189, 197-98 & n.23 (Tex. 1994); Davenport v. Garcia, 834 S.W.2d 4, 10 (Tex. 1992); and LeCroy v. Hanlon, 713 S.W.2d 335, 338-41 (Tex. 1986), as examples of cases in which this Court specifically said or implied that certain language in the Texas Constitution affords more protection than comparable text in the federal Constitution. They also reference the [**22] United States Supreme Court as having noted in City of Mesquite v. Aladdin's [*81] Castle, Inc., 455 U.S. 283, 293, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982), that Article I, § 19 of the Texas Constitution might afford more protections than

does the Fourteenth Amendment. They claim that twenty other states utilize the "real and substantial" test.[2]

_____

[2] The Threaders cite the following to support their position: *Khan v. State Bd. of Auctioneer Exam'rs*, 577 Pa. 166, 842 A.2d 936, 946-48 & n.7 (Pa. 2004) (upholding auctioneer regulations designed to prevent fraud); *OMYA, Inc. v. Town of Middlebury*, 171 Vt. 532, 758 A.2d 777, 780 (Vt. 2000) (upholding commercial traffic limits that reduced congestion, pollution, and property damage); *Peppies Courtesy Cab Co. v. City of Kenosha*, 165 Wis. 2d 397, 475 N.W.2d 156, 158-59 (Wis. 1991) (striking down taxicab dress code because it lacked a substantial relation to improving city's public image); *Katz v. S.D. State Bd. of Med. & Osteopathic Exam'rs*, 432 N.W.2d 274, 278-79 & n.6 (S.D. 1988) (upholding medical-practice regulations designed to prevent malpractice and fraud); *Louis Finocchiaro, Inc. v. Neb. Liquor Control Comm'n*, 217 Neb. 487, 351 N.W.2d 701, 704-06 (Neb. 1984) (striking down liquor wholesale price controls because they lacked any substantial relationship to public welfare); *Myrick v. Bd. of Pierce Cnty. Comm'rs*, 102 Wn.2d 698, 677 P.2d 140, 143-47 (Wash. 1984) (en banc), *amended by* 687 P.2d 1152 (striking down most provisions of massage parlor regulations); *Red River Constr. Co. v. City of Norman*, 1981 OK 20, 624 P.2d 1064, 1067 (Okla. 1981) (striking down municipal ordinance prohibiting sand trucks from using certain streets because the ordinance actually increased traffic and the risk of accidents); *Rockdale Cnty. v. Mitchell's Used Auto Parts, Inc.*, 243 Ga. 465, 254 S.E.2d 846, 847 (Ga. 1979) (reversing lower court ruling that zoning requirements were facially unconstitutional, but remanding to allow the plaintiff to show that the requirements had no real and substantial relationship to public health and safety); *In re Fla. Bar*, 349 So. 2d 630, 634-35 (Fla. 1977) (per curiam) [**23] (rejecting maximum contingency-fee schedule that failed to meaningfully address problem of excessive fees); *McAvoy v. H.B. Sherman Co.*, 401 Mich. 419, 258 N.W.2d 414, 422, 427-29 (Mich. 1977) (upholding law requiring employers to pay 70% of workers' compensation award while appeal of the award was pending); *Dep't for Natural Res. & Envtl. Prot. v. No. 8 Ltd. of Va.*, 528 S.W.2d 684, 686-87 (Ky. 1975) (striking down law that conditioned the grant of strip-mining permits on obtaining the surface owner's consent because it was ineffective as an environmental-protection measure); *Hand v. H & R Block, Inc.*, 258 Ark. 774, 528 S.W.2d 916, 923 (Ark. 1975) (striking down minimum price for franchise agreements because it bore no relation to public health and safety); *Leetham v. McGinn*, 524 P.2d 323, 325 (Utah 1974) (striking down law restricting cosmetologists to women's hair); *Md. State Bd. of Barber Exam'rs v. Kuhn*, 270 Md. 496, 312 A.2d 216, 224-25 (1973) (same); *Colo ex rel. Orcutt v. Instantwhip Denver, Inc.*, 176 Colo. 396, 490 P.2d 940, 943-45 (Colo. 1971) (striking down ban on so-called "filled milk" products because the ban bore no relationship to protecting public safety or preventing fraud); *Brennan v. Ill. Racing Bd.*, 42 Ill. 2d 352, 247 N.E.2d 881, 882-84 (Ill. 1969) (striking down regulation that conditioned a horse trainer's license on his horses' drug-testing results); *Coffee-Rich, Inc. v. Comm'r of Pub. Health*, 348 Mass. 414, 204 N.E.2d 281, 286-89 (Mass. 1965) (striking down law banning the sale of imitation coffee

The Threaders present the second standard—"rational basis including consideration of evidence"—as being exemplified by cases such as *City of San Antonio v. TPLP Office Park Properties, L.P.*, 218 S.W.3d 60, 65-66 (Tex. 2007); *Garcia*, 893 S.W.2d at 525-26; *Limon v. State*, 947 S.W.2d 620, 627-29 (Tex. App.—Austin 1997, no writ); and *Martin v. Wholesome Dairy, Inc.*, 437 S.W.2d 586, 590-600 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.). Courts applying this test, the Threaders [*82] posit, lean heavily on the federal rational basis test and often weigh evidence—including expert testimony—to determine the purpose of a law and whether the law enacted to effect that purpose is reasonable.

The Threaders reference the third standard as "no evidence rational basis," which they say is embodied in cases such as *Barshop*, 925 S.W.2d at 625, 632-33; *Garcia v. Kubosh*, 377 S.W.3d 89, 98-100 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Lens Express v. Ewald*, 907 S.W.2d 64 (Tex. App.—Austin 1995, no writ); and *Texas Optometry Board v. Lee Vision Center, Inc.*, 515 S.W.2d 380, 385-86 (Tex. Civ. App.—Eastland 1974, writ ref'd n.r.e.). Under the no-evidence version of the rational basis test, they argue, economic regulations do not violate Section 19 if they have any conceivable justification in a legitimate state interest, regardless of whether the justification is advanced by the government or "invented" by the reviewing court, and evidence "seldom" matters.

The Threaders say both the "real and substantial" and "rational basis including consideration of evidence" standards have two prongs, with the first being the primary difference between them. [**25]

_____

cream because the law did not prevent fraud or market confusion); *Zale-Las Vegas, Inc. v. Bulova Watch Co.*, 80 Nev. 483, 396 P.2d 683, 691-93 (Nev. 1964) (striking down law that bound third parties to non-compete provisions in private contracts because the law did not promote competition); *Berry v. Koehler*, 369 P.2d 1010, 1014-15 (Idaho 1961) (upholding regulation of dental prosthetics as licensed [**24] dentistry because licensure meaningfully protected the public); *Christian v. La Forge*, 194 Ore. 450, 242 P.2d 797, 804 (Or. 1952) (en banc) (striking down fixed barbering prices because they only benefitted barbers, not the public).

The first prong of the real and substantial standard, they maintain, is whether the challenged statute or regulation has a real and substantial connection to a legitimate governmental objective. They contrast that test with the rational basis including consideration of evidence standard, which they argue is more lenient and favorable toward the government because it asks only whether a statute or regulation arguably *could* bear some rational relationship to a legitimate governmental objective. They further maintain that for both standards the second prong is whether, on balance, the challenged statute or rule imposes an arbitrary or unduly harsh burden on the challenger in light of the government's objective.

In light of the parties' contentions, we first briefly review the history of the due course of law language in Article I, § 19.

## B. Development of the Standard

The Declaration of Rights of the 1836 Republic of Texas Constitution included three separate rights guaranteeing "due course of law" or the "due course of the law of the land": (1) the sixth, which (among other protections) prevented an accused in a criminal proceeding from being "deprived of life, liberty, or property, but by due [**26] course of law"; (2) the eleventh, which provided that an injured person "shall have remedy by due course of law"; and (3) the seventh, which provided that "[n]o citizen shall be deprived of privileges, outlawed, exiled, or in any manner disenfranchised, except by due course of the law of the land." REP. OF TEX. CONST. OF 1836, Declaration of Rights 6-7, 11, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 1083 (Austin, Gammel Book Co. 1898).

In 1845, a group of delegates met to draft and propose Texas's first state constitution. The committee responsible for drafting the Bill of Rights proposed including two due course of law clauses—not the three clauses in the Declaration of

Rights of the 1836 Republic of Texas Constitution. Comm. on Bill of Rights & Gen. Provisions, *Journals of the Convention, Assembled at the City of Austin on the Fourth of July, 1845, for the Purpose of Framing a Constitution for the State of Texas, assembled* July 11, 1845, at 34 (Austin, Mine & Cruger 1845), *available at* http://tarlton.law.utexas.edu/constitutions/texas1845/journals . One of the suggested clauses protected an injured party's right to have "remedy by due course of law." *Id.* The other clause incorporated the criminal due [*83] course of law protections from Section 6 of the Republic's Declaration [**27] of Rights into a composite due course guarantee: "No citizen of this state shall be deprived of life, liberty, property, or privileges, outlawed, exiled, or in any manner disenfranchised, except by due course of the law of the land." *Id.* Thus, the committee's proposal added "life, liberty, property" to the existing due course of law guarantee, while removing the same phrase from the protections for the criminally accused. *Id.* The proposal also added "of this state" after the word "citizen." The proposal was ratified as Article I, § 16 of the Texas Constitution of 1845.

The language in the Due Course of Law Clause was not changed in the Texas Constitutions adopted in 1861, 1866, and 1869. *See* Tex. Const. of 1861, art. I, § 16; TEX. CONST. OF 1866, ART. I, § 16; Tex. Const. of 1869, art. I, § 16. But the Constitutional Convention of 1875 reexamined the clause and proposed changing it to its current language. Comm. on Bill of Rights, *Journal of the Constitutional Convention of the State of Texas, Begun and Held at the City of Austin, September 6th, 1875, assembled* Oct. 2, 1875, at 274 (Galveston, News Office 1875), *available at* http://tarlton.law.utexas.edu/constitutions/texas1876/journals . The proposals were adopted, resulting in the clause reading as it now does. *See* Tex. Const. art. I, § 19.

In 1873, two years before the convention that proposed the 1875 Texas Constitution, [**28] the United States Supreme Court interpreted the phrase

469 S.W.3d 69, *83; 2015 Tex. LEXIS 617, **28

"privileges or immunities" in the United States Constitution in the *Slaughter-House Cases*, 83 U.S. 36, 21 L. Ed. 394 (1873). There, several butchers challenged a Louisiana statute granting a single slaughtering company a monopoly on the butchering of animals in New Orleans. *Id.* at 38-39. The statute was challenged under the Thirteenth and Fourteenth Amendments to the federal Constitution. *Id.* at 58-59. In rejecting the butchers' claims, the Court discerned a distinction in the text of the Fourteenth Amendment between the "privileges and immunities of citizens of the United States" and those of "citizens of the several states," and concluded that the Fourteenth Amendment protected only privileges and immunities which owed their existence to the federal government. *Id.* at 74, 78-79. It was the obligation of the states, according to the Supreme Court, to protect "privileges or immunities" founded in state citizenship, including even such fundamental rights as the right to acquire and possess property and to pursue and obtain happiness and safety. *Id.* at 74-78. Thus, discussions preceding proposal and adoption of the 1875 Texas Constitution were held against the backdrop of recent Supreme Court mandates placing guardianship of non-federal rights of individuals squarely in the hands of the states. *See* DEBATES IN THE TEXAS CONSTITUTIONAL [**29] CONVENTION of 1875, 292 (Seth S. McKay ed., Univ. of Tex. 1930).

Ratification of the Fourteenth Amendment to the United States Constitution in 1868 seemed to hasten development of substantive due process jurisprudence. *See* THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 354-56 (1868). The view in Texas was the same, as exemplified by cases such as *Milliken v. City Council of Weatherford*, 54 Tex. 388 (1881).[3]

There the Court addressed a [*84] claim by Weatherford's mayor that he had been improperly removed from office for violating a city ordinance that barred renting rooms to prostitutes without respect to whether the rooms were used for prostitution. *Id.* at 393. The Court concluded that the city could not prohibit prostitutes as a class from renting rooms because such action would be "unreasonable and in contravention of common right." *Id.* at 394. Although the Court did not mention "due course" or "due process" of law, its supporting citations included Article I, § 19. *See id.* And in *Houston & Texas Central Railway Co. v. City of Dallas*, 98 Tex. 396, 84 S.W. 648 (Tex. 1905), the Court considered the constitutionality of a municipal ordinance governing railroad crossing grades. The Court explained that

> it may often become necessary for courts, having proper regard to the constitutional safeguard . . . , to inquire as to [**30] the existence of the facts upon which a given exercise of the [police] power rests, and into the manner of its exercise, and if there has been an invasion of property rights under the guise of this power, without justifying occasion, or in an unreasonable, arbitrary, and oppressive way, to give to the injured party that protection which the Constitution secures.

*Id.* at 653. In accord with decisions from the United States Supreme Court, this Court rejected the city's contention that a legislative judgment was conclusive. *Id.* at 653-54. The Court determined that the lower courts erred by upholding the ordinance without providing the railroad an opportunity to present evidence regarding the unreasonableness of the ordinance. *Id.*

Texas judicial decisions in the nineteenth and early twentieth century indicated that the Texas Due Course of Law Clause and the federal Due Process Clause were nearly, if not exactly, coextensive. Such decisions generally tracked the thinking

---

[3] As to procedural due process relationships between the Fourteenth Amendment and Article I, § 19, see *City of Sherman v. Henry*, 928 S.W.2d 464, 472-73 & n.5 (Tex. 1996) (citing *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)), and *Mellinger v.*

*City of Houston*, 68 Tex. 37, 3 S.W. 249, 252-53 (Tex. 1887).

expressed by the Court in *Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249, 252-53 (Tex. 1887), where the Court held that Article I, § 19 was not violated under the facts of that case because of the United States Supreme Court's interpretation of the Fourteenth Amendment in a similar case. During this period, [**31] Texas courts frequently addressed whether a legislative enactment was a proper exercise of the governmental unit's police power, examining justifications for the enactment and typically relying on decisions from the United States Supreme Court as guidance. *See, e.g., Mabee v. McDonald*, 107 Tex. 139, 175 S.W. 676, 680 (Tex. 1915) ("'Due process of law,' as used in the fourteenth amendment, and 'due course of the law of the land,' as used in Article I, § 19, of the Constitution of Texas, . . . according to the great weight of authority, are, in nearly if not all respects, practically synonymous."), *rev'd on other grounds*, 243 U.S. 90, 92, 37 S. Ct. 343, 61 L. Ed. 608 (1917) (holding that federal Due Process Clause was violated); *St. Louis Sw. Ry. Co. of Tex. v. Griffin*, 106 Tex. 477, 171 S.W. 703, 704-07 (1914) (holding statute impairing corporation's right to discharge employees at will violated liberty of contract protected by both federal and state Constitutions); *Bruhl v. State*, 111 Tex. Crim. 233, 13 S.W.2d 93, 94-95 (1928) (statute prohibiting non-optometrist merchant from assisting a customer in purchase of eyeglasses violated both Article I, § 19 and the Fourteenth Amendment). Occasionally, Texas courts mentioned that a proper review involved examining the enactment for a "real or substantial" relationship to the government's police power interest in public [*85] health, morals, or safety—a standard consistent with decisions of the United States Supreme Court. *See, e.g., Ex parte Flake*, 67 Tex. Crim. 216, 149 S.W. 146, 148-50 (1911) (quoting *Mugler v. Kansas*, 123 U.S. 623, 8 S. Ct. 273, 31 L. Ed. 205 (1887)).

As to federal due process standards, this period before 1935 [**32] is sometimes referred to as the "*Lochner* period" in reference to the United States Supreme Court's decision in *Lochner v. New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905). There, the Court considered a statute regulating the number of hours that bakers could work, enacted ostensibly for the purpose of protecting the health of bakers. *Id.* at 45-47, 58. The Court determined that the legislatively declared purpose for an enactment could be disregarded by a court reviewing challenges to the statute and that

> [t]he purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose. . . .
>
> . . . [T]his section of the statute . . . has no such direct relation to, and no such substantial effect upon, the health of the employee, as to justify us in regarding the section as really a health law.

*Id.* at 64. The Court held that the law was intended only "to regulate the hours of labor between the master and his employees" despite the legislature's stated purpose of concern for the health of bakers. *Id.* Because the Fourteenth Amendment did not permit such a regulation without [**33] a legitimate health and safety justification, the Court struck down the law. Justice Holmes, in dissent, advanced a much more deferential standard of review:

> We [have] said that the power of the courts to review legislative action in respect of a matter affecting the general welfare exists *only* when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law . . . . *If there be doubt as to the validity of the statute, that doubt must therefore be resolved in favor of its validity, and the courts must keep their hands off, leaving the*

469 S.W.3d 69, *85; 2015 Tex. LEXIS 617, **33

*legislature to meet the responsibility for unwise legislation. If the end which the legislature seeks to accomplish be one to which its power extends, and if the means employed to that end, although not the wisest or best, are yet not plainly and palpably unauthorized by law, then the court cannot interfere.*

*Id.* at 68 (Holmes, J., dissenting) (emphasis added) (internal quotation marks omitted).

The [**34] Court remained within the bounds charted by *Lochner* for several years. *See, e.g., Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923); *N.Y. Life Ins. Co. v. Dodge*, 246 U.S. 357, 38 S. Ct. 337, 62 L. Ed. 772 (1918); *Truax v. Raich*, 239 U.S. 33, 36 S. Ct. 7, 60 L. Ed. 131 (1915); *Coppage v. Kansas*, 236 U.S. 1, 35 S. Ct. 240, 59 L. Ed. 441 (1915), *overruled in part by Phelps Dodge Corp. v. Nat'l Labor Relations Bd.*, 313 U.S. 177, 187, 61 S. Ct. 845, 85 L. Ed. 1271 (1941); *Adair v. United States*, 208 U.S. 161, 28 S. Ct. 277, 52 L. Ed. 436, 5 Ohio L. Rep. 605 (1908), *overruled in part by Phelps Dodge Corp.*, 313 U.S. at 187. Basically, then, during the "*Lochner* era," substantive due process [*86] was a touchstone by which courts analyzed both the purpose and the effect of governmental economic regulation by scrutinizing them with a somewhat equivocal deference to the legislative body's pronounced purpose for a law and its choice of the method embodied in the law to achieve that purpose.

The federal landscape changed in 1938. In *United States v. Carolene Products Co.*, 304 U.S. 144, 58 S. Ct. 778, 82 L. Ed. 1234 (1938), the Supreme Court pronounced that

regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis.

*Id.* at 152. Ensuing federal decisions tracked *Carolene Products*' guidance that economic regulatory laws were presumed to be constitutional absent evidence or judicially known facts demonstrating that no rational basis existed for the regulation. For example, in 1955 in *Williamson v. Lee Optical of Oklahoma, Inc.*, the Supreme Court explained that

[t]he day is gone when [**35] this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.

348 U.S. 483, 488, 75 S. Ct. 461, 99 L. Ed. 563 (1955).

Texas courts were faced with the question of whether, after *Carolene Products*, to stay the course as to prior decisions interpreting Article I, § 19's due course of law provision, or follow the lead of the United States Supreme Court as to the Fourteenth Amendment's Due Process Clause. That is, Texas courts had to decide whether "due process of law," as used in the Fourteenth Amendment, and "due course of law of the land," as used in Article I, § 19 of the Texas Constitution, remained "in nearly if not all respects, practically synonymous," or whether the meaning of the Texas Constitution remained the same as it had been earlier interpreted because the Constitution's language had not been amended through the political process. *See Mabee, 175 S.W. at 680*. As the parties to this case—and numerous Texas courts and commentators—have pointed out, the answer has not been made clear as to substantive due process challenges to governmental regulation of economic interests. As set out more fully above, the Threaders argue that in some cases this Court[4] as well as courts of

---

[4] *See, e.g., Tex. Power & Light Co. v. City of Garland*, 431 S.W.2d 511, 517-20 (Tex. 1968) (holding ordinance must be reasonable exercise of city's police power, meaning ordinance must directly promote the general health, safety, welfare, or morals, and must have

appeals have continued using a less deferential, heightened-scrutiny standard of review, [**36] while in some cases different ones have been applied.

Following the lead of our prior jurisprudence, we conclude that the Texas due course of law protections in Article I, § 19, for the most part, align with the protections found in the Fourteenth Amendment to the United States Constitution. But, that having been said, the drafting, proposing, and adopting of the 1875 Constitution was accomplished shortly [*87] after the United States Supreme Court decision in the *Slaughter-House Cases* by which the Court put the responsibility for protecting a large segment of individual rights directly on the states. Given the temporal legal context, Section 19's substantive due course provisions undoubtedly were intended to bear at least some burden for protecting individual rights that the United States Supreme Court determined were not protected by the federal [**37] Constitution. That burden has been recognized in various decisions of Texas courts for over one hundred and twenty-five years. We continue to do so today: the standard of review for as-applied substantive due course challenges to economic regulation statutes includes an accompanying consideration as reflected by cases referenced above: whether the statute's effect as a whole is so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest. *See, e.g., Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 938 (Tex. 1998) (stating that an ordinance "will violate substantive due process only if it is *clearly* arbitrary and unreasonable") (emphasis in original); *Garcia,* 893 S.W.2d at 525 (determining statute was "sufficiently *rational and reasonable* to meet constitutional due course requirements") (emphasis added); *Trinity River Auth.,* 889 S.W.2d at 264

a "real and substantial" relation to such purpose); *State v. Richards,* 157 Tex. 166, 301 S.W.2d 597, 602 (Tex. 1957) (explaining it is essential that the police power "be used for the purpose of accomplishing, and in a manner appropriate to the accomplishment of, the purposes for which it exists").

(identifying statute as constitutional because it "strikes a *fair balance*" between the legislative purpose and rights of litigants) (emphasis added); *Hous. & Tex. Cent. Ry. Co.,* 84 S.W. at 653 (noting the constitutional inquiry was whether statute's effect was justified, or operated in "an unreasonable, arbitrary, and oppressive way"); *Milliken,* 54 Tex. at 394 (stating the constitutional inquiry was whether statute operated "unreasonabl[y] and in contravention of common right").

In sum, statutes are presumed [**38] to be constitutional. To overcome that presumption, the proponent of an as-applied challenge to an economic regulation statute under Section 19's substantive due course of law requirement must demonstrate that either (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest.

To be clear, the foregoing standard includes the presumption that legislative enactments are constitutional, *e.g., Smith v. Davis,* 426 S.W.2d 827, 831 (Tex. 1968), and places a high burden on parties claiming a statute is unconstitutional. *See, e.g., Tex. State Bd. of Barber Exam'rs v. Beaumont Barber Coll., Inc.,* 454 S.W.2d 729, 732 (Tex. 1970). The presumption of constitutionality and the high burden to show unconstitutionality would apply as well to regulations adopted by an agency pursuant to statutory authority. *See Trapp v. Shell Oil Co.,* 198 S.W.2d 424, 428, 145 Tex. 323 (1946). Although whether a law is unconstitutional is a question of law, the determination will in most instances require the reviewing court to consider the entire record, including evidence offered by the parties. *Garcia,* 893 S.W.2d at 520.

## C. Application: The Texas Cosmetology Statutes

and Regulations [**39]

The Threaders do not contend that the State's licensing of the commercial practice of cosmetology is not rationally related to a legitimate governmental interest.[5] [*88] But they strongly urge that the number of hours of training required to obtain even an esthetician license has an arbitrary and unduly burdensome effect as applied to them because the 750-hour requirement has no rational connection to reasonable safety and sanitation requirements, which the State says are the interests underlying its licensing of threaders. In resolving the issue, we consider the entire record. *Garcia*, 893 S.W.2d at 520.

Several statutes address safety standards and sanitary conditions relating to cosmetology. *See* Tex. Occ. Code §§ 1602.001, 1603.001. Commission rules also address public safety and sanitary conditions. *E.g.*, 16 Tex. Admin. Code §§ 83.50(a), .53(a)-(b), .70(i), .71(b), .100-.115. To address competency of cosmetologists in Texas, the Legislature and Commission have imposed specific educational and training requirements for cosmetologists, estheticians, and salon operators. Tex. Occ. Code §§ 1602.001, .254, .255, .257. To become a licensed esthetician, threaders must take at least 750 hours of instruction in a Commission-approved training program, *id.* § 1602.254(b)(3), and take State-prescribed practical and written examinations. *See* 16 Tex. Admin. Code §§ 83.20(a)(6), .21(c), .21(e). Those training programs must devote at least 225 hours of instruction to facial treatments, cleansing, masking, and therapy;

_____

[5] The State has regulated the practice of cosmetology since 1935. *See* Act of Apr. 25, 1935, 44th Leg., R.S., ch. 116, 1935 Tex. Gen. Laws 304, 304-11, *repealed by* Act of May 13, 1999, 76th Leg., R.S., ch. 388, §§ 1, 6, 1999 Tex. Gen. Laws 1431, 2182-2206, 2439-40 (repealing former Act while also adopting the Occupations Code). The stated intent of the initial legislation was to "prevent the spreading of contagious and infectious diseases." *Id.* at 304, 311 (observing that the purpose of the Act was to "protect the public from inexperienced and unscrupulous beauty parlors and beauty culture schools" in response to the public being "daily exposed [**40] to disease due to insufficient care as to sanitation and hygiene").

90 hours to anatomy and physiology; 75 hours to electricity, machines, and related equipment; 75 hours to makeup; 50 hours to orientation, rules, and laws; 50 hours to chemistry; 50 hours to care of clients; 40 hours to sanitation, safety, and first aid; 35 hours to management; 25 hours to superfluous hair removal; 15 hours to aroma therapy; 10 [**41] hours to nutrition; and 10 hours to color psychology. *Id.* § 83.120(b). Commission-approved beauty schools are not required to teach threading techniques. The schools are required to provide 25 hours of instruction in superfluous hair removal, which encompasses threading, but individual schools decide which techniques to teach. The record reflects that fewer than ten of the 389 Commission-approved Texas beauty schools teach threading techniques, and only one of those devotes more than a few hours to them. Further, threading techniques are not required to be part of the mandated tests. Both the practical and written tests are administered and scored by a third-party testing firm. The firm's testing guidelines show that the practical examination is an hour and thirty minutes in length and includes sanitation, disinfection and hair removal, but does not include threading, although a test-taker may *elect* to remove six hairs from the model's eyebrow using thread instead of tweezers during part of the exam. Nor does the written examination include questions as to threading techniques, although it includes globally relevant questions about sanitation, disinfection, and safety.

As shown above, of the 750 [**42] hours of required instruction for an esthetician license, 40 are required to be directly devoted to sanitation, safety, and first aid. *Id.* [*89] But in addition, hygiene and sanitation are covered as they relate to four other portions of the curriculum: facial treatment, anatomy, rules and laws, and superfluous hair removal. Hygiene and sanitation are also addressed in the written and practical licensing exams, along with other topics including disinfection and safety.

One argument the Threaders make, which at its

core challenges the rationality of *any* required training, is that the unlicensed practice of eyebrow threading is simply not a threat to public health and safety. In support of the argument they reference their expert witness who submitted a report addressing all of the available medical literature on eyebrow threading, as well as her own empirical analysis of the technique's safety. Based on her investigation and professional experience with eyebrow threading, the expert concluded that threading is safe and, from a medical perspective, requires nothing more than basic sanitation training.

But the Threaders' expert also raised public health concerns during her testimony. She testified [**43] that threading may lead to the spread of highly contagious bacterial and viral infections, including flat warts, skin-colored lesions known as mulluscum contagiosum, pink eye, ringworm, impetigo, and staphylococcus aureus, among others. She also agreed that failure to utilize appropriate sanitation practices—for example, proper use of disposable materials, cleaning of work stations, effective hand-washing techniques, and correct treatment of skin irritations and abrasions—can further expose threading clients to infection and disease.

Moving beyond the argument that threading does not pose health risks to begin with, the Threaders contend that as many as 710 of the required 750 training hours for an esthetician license are not related to properly training threaders in hygiene and sanitation, considering the activities they actually perform. The State argues that the Threaders greatly exaggerate the number of unrelated hours, but concedes that as many as 320 of the curriculum hours are not related to activities threaders actually perform.

Differentiating between types of cosmetology practices is the prerogative of the Legislature and regulatory agencies to which the Legislature properly [**44] delegates authority. And it is not for courts to second-guess their decisions as to the

necessity for and the extent of training that should be required for different types of commercial service providers. But we note in passing that persons licensed to apply eyelash extensions—a specialty involving the use of chemicals and a high rate of adverse reactions—are required to undergo only 320 hours of training. *See id.* We also note that when the Threaders filed suit, hair braiders were required to undergo only 35 hours of training, 16 of which were in health and safety. *See id.* § 83.120(b). Hair braiding, however, has since been deregulated by the Legislature. *See* Act of May 13, 1999, 76th Leg., R.S., ch. 388, § 1, sec. 1602.002(2), 1999 Tex. Gen. Laws 1431, 2186, *repealed by* Act of May 22, 2015, 84th Leg., R.S., H.B. 2717 (to be codified at Tex. Occ. Code §§ 1601.003, 1602.003(b)(8)).

The fact that approximately 58% of the minimum required training hours are arguably relevant to the activities threaders perform, while 42% of the hours are not, is determinative of the aspect of the second prong of the as-applied standard which asks whether the effect of the requirements as a whole could be rationally related to the governmental interest. They could [**45] be. But the percentage must also be considered along with other factors, such as the quantitative aspect of the hours represented by that percentage and the [*90] costs associated with them when determining the other aspect of the second prong—whether the licensing requirements as a whole are so burdensome as to be oppressive to the Threaders. Where the number of hours required and the associated costs are low, the ratio of required hours to arguably relevant hours is less important as to the burdensome question. But its importance increases as the required hours increase. For example, if the statute and Commission's rules required ten hours of training for a threader to be licensed and 58 percent, or 5.8 hours, were arguably relevant to what threaders do, the burden of the irrelevant hours would weigh less heavily in determining whether the effect of the requirements as a whole on aspiring threaders is oppressive. In the case of the Threaders, however, the large number of hours not arguably related to

the actual practice of threading, the associated costs of those hours in out-of-pocket expenses, and the delayed employment opportunities while taking the hours makes the number highly relevant [**46] to whether the licensing requirements as a whole reach the level of being so burdensome that they are oppressive.

The dividing line is not bright between the number of required but irrelevant hours that would yield a harsh, but constitutionally acceptable, requirement and the number that would not. Even assuming that 430 hours (a number the Threaders dispute) of the mandated training are arguably relevant to what commercial threaders do in practice, that means threaders are required to undergo the equivalent of eight 40-hour weeks of training unrelated to health and safety as applied to threading. The parties disagree about the costs of attending cosmetology training required for a license to practice threading. The Threaders point to evidence that the cost averages $9,000. The State says the $9,000 cost is for private schools while public schools charge only $3,500. Given the record as to the number of hours of training required for subjects unrelated to threading, our decision neither turns on, nor is altered by, the exact cost. But the admittedly unrelated 320 required training hours, combined with the fact that threader trainees have to pay for the training and at the same time [**47] lose the opportunity to make money actively practicing their trade, leads us to conclude that the Threaders have met their high burden of proving that, as applied to them, the requirement of 750 hours of training to become licensed is not just unreasonable or harsh, but it is so oppressive that it violates Article I, § 19 of the Texas Constitution.

## IV. Response to the Dissents

The dissenting Justices say four things that bear responding to. First, they say that measuring the effects of the provisions by an "oppressive" standard is to measure it by no standard at all. *Post* at __ (Hecht, C.J., dissenting); *post* at __ (Guzman,

J., dissenting). The actuality of the matter is that the standard they propose for measuring the effects of the provisions is for all practical purposes no standard. The only way an enactment could fail the test the dissenters advocate is if the purpose of the enactment were completely mismatched with—that is, it bore no rational relationship to—the provisions enacted to effect it. For example, assume in this case the record demonstrated conclusively, or the State conceded, that the Threaders are right and only 40 hours of the required training are relevant to safety and sanitation in performing threading. It would [**48] not matter under the CHIEF JUSTICE'S proposed standard. For under that standard, so long as at least some part of the required training could be rationally related to safety and sanitation, the entire [*91] 750 hours are rationally related because the provisions as a whole "might achieve the objective." *Post* at __. The logical result of such standard would be that if the State were to require 1,500 or even more hours of training, the increased requirement would pass constitutional muster. Why is that so? Because if 40 hours of training might conceivably effect the Legislature's purpose and be constitutional, then any greater number that included that same 40 hours would also.

Second, the CHIEF JUSTICE references a small minority of other states that require threaders to be licensed either explicitly or by generally requiring licensing of those who commercially remove superfluous hair. *Post* at __. But the Threaders neither contest the rationality of the State's requiring them to be licensed, nor the requirement that they take training in subjects such as sanitation and hygiene. What they contest is the excessiveness of the training requirements given the magnitude of the irrelevant [**49] excessive requirement violates the Texas Constitution is not determined by the relationship between other states' statutes and regulations and their respective constitutions.

Third, the CHIEF JUSTICE says that articulating and weighing factors such as the cost and relevance of

the required training in considering the constitutionality of the provisions is "generally referred to as legislating" and should not be done by judges, *post* at __, and JUSTICE GUZMAN asserts that any line drawing in this case should be done by the Legislature, *post* at __. But providing standards for measuring the constitutionality of legislative enactments is not only a judicial prerogative—it is necessary in order to make the law predictable and not dependent on the proclivities of whichever judge or judges happen to be considering the case. Indeed, the dissenting Justices would reach the result they propose by measuring the licensing provisions against standards—the standards of "rational relationship" jurisprudence—just different standards. *Post* at __. Expressing factors by which a statute's constitutionality is to be measured and by which we reach our decision is not legislating; it is judging and providing guidance [**50] for courts to use in future challenges to statutes or regulations, which history tells us will come.

Fourth, the CHIEF JUSTICE refers to rediscovering and unleashing "the *Lochner* monster" if legislative enactments are measured against a standard other than the rational relationship standard. *Post* at __. But as discussed above, Texas courts, including this Court, have expressed and applied various standards for considering as-applied substantive due process claims for over a century. And it is those decisions on which the standards we set out today are based. Surely if those cases represented a "monster" running amuck in Texas, this Court would have long ago decisively dealt with it.

Courts must extend great deference to legislative enactments, apply a strong presumption in favor of their validity, and maintain a high bar for declaring any of them in violation of the Constitution. But judicial deference is necessarily constrained where constitutional protections are implicated.

## V. Conclusion

The provisions of the Texas Occupations Code and Commission rules promulgated pursuant to that Code requiring the individual Threaders to undergo at least 750 hours of training in order to obtain a state license [**51] before practicing commercial threading violate the Texas Constitution.

We reverse the judgment of the court of appeals and remand the case to the trial [*92] court for further proceedings in accordance with this opinion.

Phil Johnson

Justice

**OPINION DELIVERED**: June 26, 2015

**Concur by:** Don R. Willett; Jeffrey S. Boyd

## Concur

JUSTICE WILLETT, joined by JUSTICE LEHRMANN and JUSTICE DEVINE, concurring.

> *To understand the emotion which swelled my heart as I clasped this money, realizing that I had no master who could take it from me—that it was mine—that my hands were my own, and could earn more of the precious coin . . . . I was not only a freeman but a free-working man, and no master Hugh stood ready at the end of the week to seize my hard earnings.*[1]

Frederick Douglass's irrepressible joy at exercising his hard-won freedom captures just how fundamental—and transformative—economic liberty is. Self-ownership, the right to put your mind and body to productive enterprise, is not a mere luxury to be enjoyed at the sufferance of governmental grace, but is indispensable to human dignity and prosperity.[2]

---

[1] FREDERICK DOUGLASS, THE LIFE AND TIMES OF FREDERICK DOUGLASS 259 (photo. reprint 2001) (1882).

[2] Honest work, Pope Francis recently [**52] reflected, means more than just earning our daily bread: "Where there is no work, there is no dignity." Pope Francis (Pontifex). June 11, 2014, 1:11 a.m.

469 S.W.3d 69, *92; 2015 Tex. LEXIS 617, **52

Texans are doubly blessed, living under two constitutions sharing a singular purpose: to secure individual freedom, the essential condition of human flourishing. In today's age of staggering civic illiteracy—when 35 percent of Americans cannot correctly name a single branch of government—it is unsurprising that people mistake majority rule as America's defining value.[3] But our federal and state charters are not, contrary to popular belief, about "democracy"—a word that appears in neither document, nor in the Declaration of Independence. Our enlightened 18th- and 19th-century Founders, both federal and state, aimed higher, upended things, and brilliantly divided power to enshrine a *promise* (liberty), not merely a *process* (democracy).

One of our constitutions (federal) is short, the other (state) is long—like *really* long—but both underscore liberty's primacy right away. The federal Constitution, in the first sentence of the Preamble, declares its mission to "secure the Blessings of Liberty."[4] The Texas Constitution likewise wastes no time, stating up front in the Bill of Rights its paramount aim to recognize and establish "the general, great and essential principles of liberty and free government."[5] The point is unsubtle and undeniable: Liberty is not *provided* by government; [*93] liberty *preexists* government. It is not a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable.

* * *

*Democracy is two wolves and a lamb voting on what to have for lunch. Liberty is a well-armed lamb contesting the vote.*[6]

This case concerns the timeless struggle between personal freedom and government power. Do Texans live under a presumption of liberty or a presumption of restraint? The Texas Constitution confers power—but even more critically, it constrains power. What *are* the outer-boundary [**54] limits on government actions that trample Texans' constitutional right to earn an honest living for themselves and their families? Some observers liken judges to baseball umpires, calling legal balls and strikes, but when it comes to restrictive licensing laws, just how generous is the constitutional strike zone? Must courts rubber-stamp even the most nonsensical encroachments on occupational freedom? Are the most patently farcical and protectionist restrictions nigh unchallengeable, or are there, in fact, judicially enforceable limits?

This case raises constitutional eyebrows because it asks building-block questions about constitutional architecture—about how we as Texans govern ourselves and about the relationship of the citizen to the State. This case concerns far more than whether Ashish Patel can pluck unwanted hair with a strand of thread. This case is fundamentally about the American Dream and the unalienable human right to pursue happiness without curtsying to government on bended knee. It is about whether government can connive with rent-seeking factions to ration liberty unrestrained, and whether judges must submissively uphold even the most risible encroachments.

The U.S. [**55] Supreme Court has repeatedly declared that the right to pursue a lawful calling

---

Tweet. *Available at* https://twitter.com/Pontifex/status/608909299704709120 .

[3] Press Release, Annenberg Pub. Policy Ctr. of the Univ. of Penn., Americans know surprisingly little about their government, survey finds (Sept. 17, 2014), *available at* http://cdn.annenbergpublicpolicycenter.org/wp-content/uploads/Civics-survey-press-release-09-17-2014-for-PR-Newswire.pdf (last visited June 25, 2015); *see also* ANNENBERG PUB. POLICY CTR., CIVICS SURVEY APPENDIX at 2 (2014) (providing the [**53] methodology for the study), http://www.annenbergpublicpolicycenter.org/wp-content/uploads/Civics-survey-appendix-09-17-14.pdf (last visited June 25, 2015).

[4] U.S. Const. pmbl.

[5] Tex. Const. art. I.

[6] Widely, if not assuredly, attributed to Benjamin Franklin.

"free from unreasonable governmental interference" is guaranteed under the federal Constitution,[7] and is "objectively, deeply rooted in this Nation's history and tradition."[8] A pro-liberty presumption is also hardwired into the Texas Constitution, which declares no citizen shall be "*deprived* of life, liberty, property, [or] privileges or immunities"[9]—phrasing that indicates citizens already possess these freedoms, and government cannot take them "except by the due course of the law of the land."[10] Texans are thus presumptively free, and government must justify its deprivations. So just how nonsensically can government stifle your constitutional right to put your know-how and gumption to use in a gainful trade?

I recognize the potential benefits of licensing: protecting the public and preventing charlatanism. I also recognize the proven benefits of constitutional constraints: protecting the public and preventing collectivism. Invalidating irrational laws does not [**56] beckon a Dickensian world of run-amok frauds and pretenders. The Court's view is simple, and simply stated: Laws that impinge your constitutionally [*94] protected right to earn an honest living must not be preposterous.

By contrast, the dissents see government power in the economic realm as infinitely elastic, and thus limited government as entirely fictive, troubling since economic freedom is no less vulnerable to majoritarian oppression than, say, religious freedom—perhaps more so. Exalting the reflexive deference championed by Progressive theorists like Justice Oliver Wendell Holmes, Jr., the dissents would seemingly uphold even the most facially

protectionist actions. Stranger still, the principal dissent, while conceding that our state and federal Constitutions protect economic liberty, quotes liberally from Justice Holmes, who rejected that the Fourteenth Amendment does any such thing.[11]

In any event, as Justice Holmes cruelly proved, dogmatic majoritarianism can exact a ruthless price. In *Buck v. Bell*, the U.S. Supreme Court considered whether Carrie Buck, a Virginia teenager raped and impregnated by her foster parents' [**58] nephew, could be forcibly sterilized on grounds that she was "feeble minded."[12] Speaking through Justice Holmes, the Court credulously accepted at face value the government's assertion that public welfare was a good-enough reason to forbid the "manifestly unfit from continuing their kind."[13] Compulsory sterilization was preferable to waiting to "execute degenerate offspring for crime, or to let them starve

---

[7] *Greene v. McElroy*, 360 U.S. 474, 492, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959).

[8] *Washington v. Glucksberg*, 521 U.S. 702, 703, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997); *s*ee *also* 1 WILLIAM BLACKSTONE, COMMENTARIES *427 ("At common law every man might use what trade he pleased . . . .").

[9] Tex. Const. art. I, § 19 (emphasis added).

[10] *Id.*

---

[11] The principal dissent dramatically—and predictably—accuses the Court of seeking to unleash the "*Lochner* monster," trying to resurrect *Lochner v. New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905), in which the U.S. Supreme Court invalidated on federal "liberty of contract" grounds a state maximum-hours law for bakery workers. Post, at 12. (Hecht, C.J., dissenting). The *Lochner* bogeyman is a [**57] mirage but a ready broadside aimed at those who apply rational basis rationally. As one constitutional law scholar noted a generation ago, "'*Lochnerizing*' has become so much an epithet that the very use of the label may obscure attempts at understanding." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 435 (1st ed. 1978).

I doubt the 3-0 panel of the U.S. Court of Appeals for the Fifth Circuit and Judge Sparks of the Western District of Texas believed they were unleashing any monsters, or, scarier still, *legislating from the bench*!—when they recently struck down state economic regulations on rational-basis grounds. *See St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir.), *cert. denied*, 134 S. Ct. 423, 187 L. Ed. 2d 281 (2013) (invalidating the Louisiana "casket cartel"); *Brantley v. Kuntz*, No. A-13-CA-872-SS, 98 F. Supp. 3d 884, 2015 U.S. Dist. LEXIS 680, 2015 WL 75244 (W.D. Tex. Jan. 5, 2015) (invalidating Texas barber-school regulations as applied to African hair braiding). Indeed, the Fifth Circuit in the casket cartel case dismissed the tired *Lochner* charge head-on, denying that the "ghost of Lochner" [was] lurking about." *St. Joseph Abbey*, 712 F.3d at 227.

[12] 274 U.S. 200, 205, 47 S. Ct. 584, 71 L. Ed. 1000 (1927).

[13] *Id.* at 207.

for their imbecility."[14] Nothing—not even coercive eugenics—trumped judicial submissiveness to whatever the majority decreed. Justice Holmes was unyielding, thundering one of the most heartless, ignominious lines in Supreme Court history: "Three generations of imbeciles are enough."[15]

Justice Holmes later boasted to a friend that "[it] gave me pleasure, establishing the constitutionality of a law permitting the sterilization of imbeciles."[16] Unquestioning deference necessarily meant civil [*95] liberties were trampled, but Justice Holmes's pro-statism minced no words: "a law should be called good if it reflects the will of the dominant forces of the community even if it will take us to hell."[17] In fact, said Justice Holmes, "if my fellow citizens want to go to Hell I will help them. It's [**59] my job.[18]

Like the Court, I favor a less hard-hearted and more liberty-minded view for Texas, one that sees the judiciary as James Madison did when he introduced the Bill of Rights, as an "impenetrable bulwark" against imperious government.[19] The Texas Constitution enshrines structural principles meant to advance individual freedom; they are not there for mere show. Our Framers opted for constitutional—that is, *limited*—government, meaning majorities don't possess an untrammeled

right to trammel. The State would have us [**60] wield a rubber stamp rather than a gavel, but a written constitution is mere meringue if courts rotely exalt majoritarianism over constitutionalism, and thus forsake what Chief Justice Marshall called their "painful duty"—"to say, that such an act was not the law of the land."[20]

To be sure, the Capitol, not this Court, is the center of policymaking gravity, and judges are lousy second-guessers of the other branches' economic judgments. Lawmakers' policy-setting power is unrivaled—but it is not unlimited. Preeminence does not equal omnipotence. Politicians decide if laws pass, but courts decide if those laws pass muster. Cases stretching back centuries treat economic liberty as constitutionally protected—we crossed that Rubicon long ago—and there is a fateful difference between active judges who defend rights and activist judges who concoct rights. If judicial review means *anything*, it is that judicial restraint does not allow *everything*. The rational-basis bar may be low, but it is not subterranean.

I support the Court's "Don't Thread on Me" approach: Threaders with no license are less menacing than government with unlimited license. [**61]

I.

This case lays bare a spirited debate raging in legal circles, one that conjures legal buzzwords and pejoratives galore: activism vs. restraint, deference vs. dereliction, adjudication vs. abdication. The rhetoric at times seems overheated, but the temperature reflects the stakes. It concerns the most elemental—if not elementary—question of American jurisprudence: the proper role of the judiciary under the Constitution.

Judicial duty requires courts to act judicially by adjudicating, not politically by legislating. So when *is* it proper for a court to strike down legislative or

---

[14] Id.

[15] *Id.*

[16] Letter from Oliver Wendell Holmes, Jr. to Lewis Einstein (May 19, 1927), *in* THE HOLMES-EINSTEIN LETTERS: CORRESPONDENCE OF MR. JUSTICE HOLMES AND LEWIS EINSTEIN 1903-1935 267 (James Bishop Peabody, ed., 1964).

[17] KEN I. KERSCH, CONSTRUCTING CIVIL LIBERTIES: DISCONTINUITIES IN THE DEVELOPMENT OF AMERICAN CONSTITUTIONAL LAW 151 (2004).

[18] Letter from Oliver Wendell Holmes, Jr. to Harold Laski (Mar. 4, 1920), *in* 1 HOLMES-LASKI LETTERS: THE CORRESPONDENCE OF MR. JUSTICE HOLMES AND HAROLD J. LASKI 1916-1935 249 (Mark DeWolfe Howe ed., 1953). Holmesian deference was praised by turn-of-the-century Progressives who craved a pervasive regulatory state, and got it via the New Deal-era U.S. Supreme Court.

[19] *See* 1 ANNALS OF CONG. 439 (1789) (Joseph Gales ed., 1843).

[20] *McCulloch v. Maryland,* 17 U.S. 316, 423, 4 L. Ed. 579 (1819).

executive action as unconstitutional? There are people of goodwill on both sides, and as this case demonstrates, it seems a legal Rorschach test, where one person's "judicial engagement" is another person's "judicial [*96] usurpation."[21]

There are [**62] competing visions, to put it mildly, of the role judges should play in policing the other branches, particularly when reviewing economic regulations. On one side is the Progressive left, joined by some conservatives, who favor absolute judicial deference to majority rule. Judge Robert Bork falls into this camp. A conservative luminary, Bork is heir to a Progressive luminary, Justice Holmes, who also espoused judicial minimalism. Both men believed the foremost principle of American government was not individual liberty but majoritarianism.[22] As Judge Bork put it, "majorities are entitled to rule, if they wish, simply because they are majorities."[23]

The other side advocates "judicial engagement" whereby courts meaningfully enforce constitutional boundaries, lest judicial restraint become judicial surrender.[24] The pro-engagement camp argues the judiciary should [**63] be less protective of Leviathan government and more protective of individual freedom. Government exists, they contend, to secure pre-existing rights, as the Declaration makes clear in its first two paragraphs.[25] Thus, when it comes to judicial review of laws burdening economic freedoms, courts should engage forthrightly, and not put a heavy, pro-government thumb on the scale.

This much is clear: Spirited debates over judicial review have roiled America since the Founding, from *Marbury v. Madison*,[26] to *Worcester v. Georgia*[27] (against which President Jackson bellowed, "John Marshall has made his decision—now let him enforce it."[28] ), to the late 19th [**64] and early 20th centuries, when Progressives opposed judicial enforcement of economic liberties, all the way to present-day battles over the Patient Protection and Affordable Care Act.[29] In the 1920s and 1930s, liberals began backing judicial protection [*97] of *non*economic rights, while resisting similar protection for property rights and other economic freedoms. The Progressives' preference for judicial nonintervention was later embraced by post-New Deal conservatives like Judge Bork. The judicial-review debate, both raucous and reasoned, is particularly pitched today within the broader conservative legal movement. A prominent fault line has opened on the right between traditional conservatives who champion majoritarianism and more liberty-minded theorists who believe robust judicial protection of economic

---

[21] When it comes to the "judicial activism" label, some observers throw up their hands entirely and insist it all turns on whose ox is gored. Justice Kennedy responds to charges of judicial activism this way: "An activist court is a court that makes a decision you don't like." Hon. Anthony Kennedy, Address at Forum Club of the Palm Beaches, Florida (May 14, 2010), *available at* http://www.c-span.org/video/?293521-1/justice-kennedy-remarks-supreme-court .

[22] Judge Bork believed legislative majorities should wield near-absolute power, not just with economic policy as favored by turn-of-the-century Progressives, but across the board, including the unenumerated rights enshrined during the so-called "rights revolution" of the mid-20th century.

[23] ROBERT H. BORK, THE TEMPTING OF AMERICA 139 (1990).

[24] TIMOTHY SANDEFUR, THE RIGHT TO EARN A LIVING—ECONOMIC FREEDOM AND THE LAW (2010) (tracing the history of the right to earn a living as it was understood by the Founders, through the Civil War Amendments, the Progressive era, and current controversies over restrictive licensure laws); DAMON ROOT, OVERRULED—THE LONG WAR FOR CONTROL OF THE U.S. SUPREME COURT (2014) (chronicling the conflicting visions of judicial review and the degree to which courts should intervene to protect individual rights against government encroachment).

[25] *See* THE DECLARATION OF INDEPENDENCE para. 1-2 (U.S. 1776).

[26] 5 U.S. 137, 2 L. Ed. 60 (1803).

[27] 31 U.S. 515, 8 L. Ed. 483 (1832).

[28] HORACE H. HAGAN, EIGHT GREAT AMERICAN LAWYERS 79 (Fred B. Rothman & Co. 1987) (1923).

[29] *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius* (NFIB), 132 S. Ct. 2566, 183 L. Ed. 2d 450 (2012); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014); *King v. Burwell*, 759 F.3d 358 (4th Cir. 2014), *affirmed*, 135 S. Ct. 2480, 192 L. Ed. 2d 483, 2015 U.S. LEXIS 4248 (2015).

rights is indispensable to limited government.[30]

When it comes to regulating the economy, Holmesian deference still dominates, as seen in the Supreme Court's landmark 2012 decision upholding the constitutionality of the Affordable Care Act.[31] During oral argument, the Solicitor General—echoing the dissenters in today's case—admonished that striking down President Obama's signature health-care law would amount to judicial activism that would "import *Lochner*-style substantive due process."[32] The Court, he implored, "has a solemn obligation to respect the judgments of the democratically accountable branches of government."[33] A [**66] few days later, the President himself charged it would constitute raw judicial activism if the Court took the "unprecedented, extraordinary step of overturning a law that was passed by a strong majority of a

democratically elected Congress,"[34] adding, "We have not seen a court overturn a law that was passed by Congress on an economic issue . . . for decades"—"We're going to the '30s, pre-New Deal."[35] We know how the story ended. The Court upheld the ACA on tax-power grounds, with Chief Justice Roberts famously stating, "It is not our job to protect the people from the consequences of their political choices."[36]

[*98]  Today's case arises under the *Texas* Constitution, over which we have final interpretive authority, and nothing in its 60,000-plus words requires judges to turn a blind eye to transparent rent-seeking that bends government power to private gain, thus robbing people of their innate right—antecedent to government—to earn an honest living. Indeed, even if the Texas Due Course of Law Clause mirrored perfectly the federal Due Process Clause, that in no way binds Texas courts to cut-and-paste federal rational-basis jurisprudence that long post-dates enactment of our own constitutional provision, one more inclined to freedom.

The principal dissent claims "the rational basis standard invokes objective reason as its measure," a contention difficult to take seriously.[37] Legal fictions abound in the law, but the federal "rational

---

[30] Judge Bork favored both constitutional originalism and judicial deference to the democratic process, two ideals that sometimes clash, producing what Professor Ilya Somin calls the "Borkean dilemma." Ilya Somin, *The Borkean Dilemma: [**65] Robert Bork and the Tension Between Originalism and Democracy*, 80 U. OF CHI. L. REV. DIALOGUE 243 (2013). Originalism sometimes requires judicial invalidation of laws that contradict the Constitution's original meaning. But striking down laws contradicts Bork's preference for judicial minimalism. So while Judge Bork favored judicial deference, he also criticized as "judicial activism" certain New Deal-era Court decisions that expanded government control over the economy. BORK, *supra* note 23, at 56-57 (discussing *Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942)*, and lamenting that the Court's "new, permissive attitude toward congressional power was a manifestation of judicial activism").

[31] *NFIB, 132 S. Ct. at 2566.*

[32] Transcript of Oral Argument at 30, *Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 183 L. Ed. 2d 450 (2012)* (No. 11-398), *available at* http://www.archives.gov/research/court-records/supreme-court/11-398-tuesday.pdf .

[33] *Id.* at 110. The Chief Justice rejected the *Lochner* epithet and turned the tables, saying if the Court adopted the government's theory of the Commerce Clause, limited only to regulating insurance, it "would be going back to *Lochner*"—with courts selectively allowing Congress to use its commerce power to impose a health-insurance mandate but not an eat-your-broccoli mandate. *Id.* at 39.

[34] Jeff Mason, *Obama takes a shot at Supreme Court over healthcare*, REUTERS, Apr. 2, 2012, http://www.reuters.com/article/2012/04/02/us-obama-healthcare-idUSBRE8310WP20120402 .

[35] Greg Jaffe, *Why does President Obama criticize the Supreme Court so much?*, WASH. POST, June 20, 2015, http://www.washingtonpost.com/politics/why-does-president-obama-criticize-the-supreme-court-so-much/2015/06/20/b41667b4-1518-11e5-9ddc-e3353542100c_story.html .

[36] *NFIB, 132 S. Ct. at 2579.* Two years earlier, however, in a political-speech case that involved a more searching standard of review, the Chief Justice declared, "there is a difference between judicial restraint and judicial abdication." *Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 375, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010).*

[37] Post, at 18. (Hecht, C.J., dissenting).

basis test" is something special; it is a misnomer, wrapped in an anomaly, inside a contradiction. Its measure often seems less objective reason than subjective rationalization. The [**68] dissent also says the fact that other states regulate threading provides "strong evidence that Texas' regulatory framework has a rational basis."[38] In my view, what happens in the Aloha State makes not the slightest constitutional difference in the Lone Star State. Unconstitutional encroachments reach across time zones and centuries. Just this week, in a case that took almost 80 years to bring, the U.S. Supreme Court struck down as unconstitutional a New Deal-era, raisin-confiscation regime that had spanned thirteen Presidents.[39]

The test adopted today bears a passing resemblance to "rational basis"-type wording, but this test is rational basis with bite, demanding actual *rationality*, scrutinizing the law's actual *basis*, and applying an actual *test*.[40] In my view, the principal

---

[38] *Id.*

[39] *Horne v. Dep't of Agric.*, No. 14-275, 135 S. Ct. 2419, 192 L. Ed. 2d 388, 2015 U.S. LEXIS 4064, 2015 WL 2473384 (U.S. June 22, 2015).

[40] While the dissenting Justices favor federal-style deference in economic matters, there is a notable distinction between the Texas Constitution and the federal Constitution as interpreted by federal courts. The Texas Constitution protects not just life, liberty, and property, but also "privileges or immunities," language the U.S. Supreme Court read out of the Fourteenth Amendment in the Slaughter-House Cases, 83 U.S. 36, 21 L. Ed. 394 (1872). *Slaughter-House* involved special-interest favoritism masquerading as a public-health measure, a law granting a private corporation an exclusive benefit at the expense of hundreds of local butchers. A few years earlier, when the Fourteenth Aumendment was adopted to counter the Black Codes and other oppressive state laws, the amendment's author, antislavery Representative John Bingham, confirmed the liberties it protected included "the right to work in an honest calling and contribute by your toil in some sort to the support of your fellowmen and to be secure in the enjoyment of the fruits of your toil." CONG. GLOBE, 42D CONG., 1ST SESS., 86 app. (1871). The Fourteenth Amendment was a response to [**70] a host of post-Civil War actions to oppress former slaves. Section One, drafted by Representative Bingham, includes three clauses to safeguard individual rights: the Privileges or Immunities Clause, the Due Process Clause, and the Equal Protection Clause. So what *are* an American citizen's privileges and immunities? According to perhaps

[*99] dissent is unduly diffident, concluding the threading rules, while "excessive"[41] and "obviously too much"[42] are not "clearly arbitrary."[43] If these rules are not arbitrary, then the definition of "arbitrary" is itself arbitrary. Without discussing (or even citing) recent federal cases striking down nonsensical licensing rules under the supine federal

---

the leading Fourteenth Amendment history, anti-slavery abuses spurred Congress to fortify all Americans' civil rights against overbearing state governments, and to restore the Constitution's original purpose as "a document protecting liberty." MICHAEL KENT CURTIS, NO STATE SHALL ABRIDGE: THE FOURTEENTH AMENDMENT AND THE BILL OF RIGHTS 7 (1986). *See also* AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 166 (1998) (noting that the words "privileges," "immunities," "rights," and "freedoms" are "roughly synonymous"). Citing Madison and other founders who used the words "rights," "liberties," "privileges," and "immunities" interchangeably, CURTIS, *supra* at 64-65, Curtis found similar usage in William Blackstone's influential 1765 *Commentaries on the Laws of England*, which described "privileges and immunities" as a blend of rights and liberties—although Curtis notes that Blackstone "divided the rights and liberties of Englishmen into those 'immunities' that were the residuum of natural liberties [**71] and those 'privileges' that society had provided in lieu of natural rights." CURTIS, *supra* at 64. Boiled down, privileges are state-given civil rights while immunities are God-given natural rights.

When the Court in *Slaughter-House* upheld 5-4 the Louisiana monopoly law, it stressed that the Privileges or Immunities Clause only protected rights guaranteed by the United States and did not restrict state police power. What's the consensus view today of *Slaughter-House*? "Virtually no serious modern scholar—left, right, or center—thinks [that *Slaughter-House*] is a plausible reading of the [Fourteenth] Amendment." Akhil R. Amar, *Foreword: The Document and the Doctrine*, 114 Harv. L. Rev. 26, 123 n.327 (2000).

The important point for today's case is that *Slaughter-House*, while holding that the Fourteenth Amendment's Privileges or Immunities Clause offered no protection for individual rights against state officials, underscored that states themselves possess power to protect their citizens' privileges or immunities, including the right to pursue an honest living against illegitimate state intrusion. As the Court correctly notes, the drafters of the Texas Constitution were doubtless aware of this reservation of power to the states when they passed our own Privileges or Immunities Clause just two years later [**72] in 1875. One question lurking in today's case was whether this Court would do to *our* Privileges or Immunities Clause what the U.S. Supreme Court did to the federal clause—nullify it by judicial fiat.

[41] Post, at 11. (Hecht, C.J., dissenting).

[42] *Id.*

[43] *Id.* at 25.

test,[44] the dissents sever "rational" from [**69] "rational basis," loading the dice—relentlessly—in government's favor.[45] Their test is tantamount to no test at all; at most it is pass/fail, and government never fails.[46]

---

[44] *See, e.g.,* St. Joseph Abbey v. Castille, 712 F.3d 215 (5th Cir.), *cert. denied,* **134 S. Ct. 423, 187 L. Ed. 2d 281 (2013);** Brantley v. Kuntz, No. A-13-CA-872-SS, 98 F. Supp. 3d 884, 2015 U.S. Dist. LEXIS 680, 2015 WL 75244 (W.D. Tex. Jan. 5, 2015).

[45] The principal dissent cites our 1957 decision in State v. Richards, 157 Tex. 166, 301 S.W.2d 597 (Tex. 1957), the last time we examined the constitutional protections due innocent property owners facing government seizure of their property. It merits mention that at least three members of this Court believe the modern asset-forfeiture regime "deserves attentive constitutional reconsideration, if not recalibration." El-Ali v. State, 428 S.W.3d 824, 826 (Willett, J., joined by Lehrmann, J., and Devine, J., dissenting to denial of pet.). And two others are open to reconsidering *Richards* in a future case. Id. at 824 (Boyd, J., concurring, joined by Guzman, J.).

[46] The dissents side with Justice Holmes's oft-quoted *Lochner* dissent, even though Justice Holmes rejected there what the dissents reaffirm here: the Constitution *does* protect economic liberty. Justice Holmes indeed seems to exalt majority rule above all—except when he doesn't. After he famously said, "I think that the word 'liberty,' in the Fourteenth Amendment, is perverted [**73] when it is held to prevent the natural outcome of a dominant opinion," he added this sweeping caveat: "unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law." Lochner v. New York, 198 U.S. 45, 76, 25 S. Ct. 539, 49 L. Ed. 937 (1905) (Holmes, J., dissenting). This proviso, according to Judge Robert Bork, "spoiled it all" and prompted Bork to accuse Justice Holmes, a fellow judicial minimalist, of activism himself. BORK, *supra* note 23, at 45. ("So Holmes, after all, did accept substantive due process, he merely disagreed . . . about which principles were fundamental.").

A quick word on *Lochner*. While the vote was 5-4, eight of nine Justices (all but Justice Holmes) agreed that the Constitution protects economic liberty. And *Lochner* was not the first Supreme Court case to say so. That happened eight years earlier in *Allgeyer v. Louisiana*, which defined "liberty" in the Fourteenth Amendment to include the freedom "to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned." 165 U.S. 578, 589, 17 S. Ct. 427, 41 L. Ed. 832 (1897). As Justice Harlan acknowledged [**74] in the principal *Lochner* dissent, "there is a liberty of contract which cannot be violated even under the sanction of direct legislative enactment." 198 U.S. at 68 (Harlan, J., dissenting). Government may not "unduly interfere with the right of the citizen to enter into contracts" or to

"earn his livelihood by any lawful calling, to pursue any livelihood or avocation." Id. at 65.

Historical note: This is the *first* Justice Harlan, The Great Dissenter, not his grandson who served on the Court in the mid-20th century. The first Justice Harlan, a strong proponent of natural rights, famously dissented in Plessy v. Ferguson, 163 U.S. 537, 552, 16 S. Ct. 1138, 41 L. Ed. 256 (1896) (Harlan, J., dissenting), *overruled by* Brown v. Bd. of Ed., 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), and also in the *Civil Rights Cases,* 109 U.S. 3, 33, 3 S. Ct. 18, 27 L. Ed. 835 (1883) (Harlan, J., dissenting), that struck down federal anti-discrimination laws. Some scholars believe that Justice Harlan's dissent in *Lochner* had initially garnered a five-vote majority, but someone switched his vote.

While Justice Harlan's dissent, unlike Justice Holmes's dissent, believed economic liberty was constitutionally enshrined, he understood that states have a valid police-power interest in advancing public welfare. *Id.* ("liberty of contract is subject to such regulations as the state may reasonably prescribe for the common good and the well-being [**75] of society"). A law should be struck down only if there is "no real or substantial relation between the means employed by the state and the end sought to be accomplished by its legislation." Id. at 69. Justice Harlan would have upheld the New York maximum-hours law, but he stressed the presumption of constitutionality can be rebutted by evidence showing the restriction was arbitrary, unreasonable, or discriminatory. He simply found the government's health-and-safety justification plausible.

Importantly, there was no disagreement—none—between the *Lochner* majority and Justice Harlan's dissent over whether courts can legitimately scrutinize economic regulations. Nobody seriously disputes the states' omnibus power to safeguard its citizens' health and safety via economic regulation. Of course states have broad, inherent police power to enact general-welfare laws. Indeed, a few months after *Lochner*, the Court reaffirmed states' "firmly established" authority "to prescribe such regulations as may be reasonable, necessary and appropriate" to advance "the general comfort, health, and general prosperity of the state." Cal. Reduction Co. v. Sanitary Reduction Workers, 199 U.S. 306, 318, 26 S. Ct. 100, 50 L. Ed. 204 (1905). And just three years later, the Court upheld a maximum hours law for women. Muller v. Oregon, 208 U.S. 412, 28 S. Ct. 324, 52 L. Ed. 551 (1908). [**76] In fact, the *Lochner*-era Court upheld many more economic regulations than it overturned. Thomas Colby & Peter J. Smith, *The Return of Lochner,* 100 Cornell L. Rev. 527, 539-40 (2015). The disagreement in *Lochner* was over who bears the burden—the government to prove legitimacy, or the challenger to prove illegitimacy. Justice Harlan believed the latter: "when the validity of a statute is questioned, the burden of proof . . . is upon those who assert it to be unconstitutional." Lochner, 198 U.S. at 68 (citations omitted) (Harlan, J., dissenting). The Court today agrees, adopting an approach some might say tracks the principal Lochner dissent more than the *Lochner* majority.

The core question is one of constitutional limitation. Should judges blindly accept government's health-and-safety rationale, or instead

[*101] II.

*You take my house when you do take the prop /*
*That doth sustain my house; you take my life /*
*When you do take the means whereby I live.*[47]

Government understandably wants to rid society of quacks, swindlers, and incompetents. And licensing is one of government's preferred tools, aiming to protect us from harm by credentialing certain occupations and activities. You can't practice medicine in Texas without satisfying the Board of Medical Examiners. You can't zoom down SH-130 outside Austin at 85 miles per hour (reportedly the highest speed limit in the Western Hemisphere) without a driver's license. Sensible rules undoubtedly boost our quality of life. And senseless rules undoubtedly weaken our quality of life. Governments at every level—national, state, and local—wield regulatory power, but not always with

regulatory prudence, which critics say stymies innovation, raises consumer prices,[48] and impedes economic opportunity with little or no concomitant public benefit.[49] The academic literature has attained consensus: "a licensing restriction can only be justified where it leads to better quality professional services—and for many restrictions, [**79] proof of that enhanced quality is lacking."[50]

[*102] It merits repeating: Judicial duty does not include second-guessing everyday policy choices, however improvident. The question for judges is not whether a law is sensible but whether it is constitutional. Does state "police power"—the inherent authority to enact general-welfare legislation—*ever* go too far? Does a Texas Constitution inclined to limited government have *anything* to say about government irrationally subjugating the livelihoods of Texans?

A.

The Republic of Texas regulated just one

---

probe more deeply to ensure the aim is not suppressing competition to benefit entrenched interests? A century and a half of pre-*Lochner* precedent allowed for judicial scrutiny of laws to ensure the laws actually intend to serve the public rather than a narrow faction. *See generally* Howard Gillman, The Constitution Besieged: The Rise and Demise of Lochner Era Police Powers Jurisprudence (1993) (discussing the origins of *Lochner* [**77] -era jurisprudence). *Lochner* focused on a narrow issue: whether the maximum-hours law was truly intended to serve the general welfare or "other motives," namely to advantage the bakers' union and unionized bakeries over small, non-union bakeries, many of which employed disfavored immigrants.

Interestingly, some of the Texas commentary immediately following Lochner was quite favorable, including in the Dallas Morning News, which wrote "The right of contract is one of the most sacred rights of the freeman, and any interference with such privilege by Legislatures or courts is essentially dangerous and vicious." In Which the Right of Contract is Upheld, Dallas Morning News, Apr. 20, 1905, at 6.

A wealth of contemporary legal scholarship is reexamining *Lochner*, its history and correctness as a matter of constitutional law, and its place within broader originalist thought, specifically judicial protection of unenumerated rights such as economic liberty. *See supra* note 24. Long story short: Legal orthodoxy about *Lochner* is evolving among many leading constitutional theorists. *See, e.g.,* Colby & Smith, *supra* at 527; David E. Bernstein, Rehabilitating Lochner—Defending Individual Rights Against Progressive Reform (2011). [**78]

[47] William Shakespeare, The Merchant of Venice, act 4 sc. 1.

[48] Licensing restrictions impact price "along four dimensions" according to one recent study:

First, professional licensing can act as a barrier to entry into the profession. Second, licensing can establish rules of practice, like advertising bans, that restrict competition. Third, state boards can suppress interstate competition by recognizing licenses only from their own state. Finally, a profession can prevent competition by broadening the definition of its practice, bringing more potential competitors under its licensing scheme. These 'scope-of-practice' limitations tend to oust low-cost competitors that operate at the fringes of an established profession.

Aaron Edlin & Rebecca Haw, *Cartels by Another Name: Should Licensed Occupations Face Antitrust Scrutiny?*, 162 U. Pa. L. Rev. 1093, 1112 (2014) (footnotes and citations omitted).

[49] Some government labor economists have concluded that "mandatory entry requirements of licensing cannot necessarily be relied upon to raise the quality of services." Carolyn Cox & Susan Foster, Bureau of Econ., Ftc, The Costs and Benefits of Occupational Regulation 21-27, 40 (1990), *available at* http://www.ramblemuse.com/articles/cox_foster.pdf .

[50] Edlin and Haw, *supra* note 48, at 1111-12 n.101 and accompanying text (citing numerous [**80] academic studies questioning the putative benefits of licensure).

profession: doctors.[51] In 1889, the State of Texas added one more: dentists.[52] Until the mid-20th century, occupational regulation in the Lone Star State was rare (aside from the post-Prohibition alcohol industry)[53] and was generally limited to professions with a clear public-safety impact: nurses, pharmacists, optometrists, engineers, etc.

Since World War II, however, the economy, both nationally and here in Texas, has undergone a profound shift. States now assert licensing authority over an ever-increasing range of occupations, particularly in the fast-growing service sector, which makes up "three-quarters of gross domestic product and most job growth in the U.S."[54] During the 1950s, fewer than five percent of American workers needed a state license.[55] By 1970 it had doubled to 10 percent, and by 2000 had doubled again.[56] In 2006, nearly one-third of U.S. [*103] workers needed government permission to do their job.[57]

This spike in licensing coincides with a decline in labor-union membership. "In fact, [occupational licensing] has eclipsed unionization as the dominant organizing force of the U.S. labor market."[58] Twice as many workers today are covered by licensing as by labor contracts.[59] Moreover, the pervasiveness of licensing seems unrelated to whether a state is labeled "red" or "blue" politically. Occupational regulation seems wholly disconnected from party-specific ideology. In addition, most economic regulations are enacted not by legislatures answerable to voters but by administrative bodies, often with scant oversight by elected officials.

The Lone Star State is not immune from licensure proliferation. An ever-growing number of Texans must convince government of their fitness to ply their trade, spurring the House Committee on

---

[51] Interim Report To The 83Rd Tex. Leg., 82d Tex. H. Comm. On Gov't Efficiency & Reform 57 (Jan. 2013), *available at* http://www.house.state.tx.us/_media/pdf/committees/reports/82interim/House-Committee-on-Goverement-Efficiency-and-Refrom-Interim-Report.pdf .

[52] *Id.*

[53] Traditionally, only the medical and legal professions were subject to occupational licensing. J.R.R., II, *Note, Due Process Limitations on Occupational Licensing*, 59 Va. L. Rev. 1097, 1097 (1973). Later, [**81] as women, minorities and immigrants—those lacking political power—entered the labor market, incumbent interests lobbied politicians to erect barriers to thwart newcomers. For example, California called a constitutional convention in 1878 to combat what the Workingmen's Party called the "Chinese Menace," an influx of immigrant laborers from China. The result, cheaper labor costs and thus cheaper goods and services, was intolerable to incumbent interests, who imposed severe barriers to entry. One convention delegate confessed his goal forthrightly: "to hamper them in every way that human ingenuity could invent." Sandefur, *supra* note 24, at 146.

One such xenophobic law targeted Chinese launderers, who dominated San Francisco's laundry market. The U.S. Supreme Court said no. In *Yick Wo v. Hopkins*, the Court rejected efforts to persecute disfavored interests through arbitrary permitting laws. 118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220 (1886) (striking down San Francisco's laundry-permitting ordinance, which, while couched in public-safety rhetoric, plainly aimed to eliminate competition from Chinese operators). The Court minced no words: "the very idea that one man may be compelled to hold his life, or the means of living . . . at the mere will of another [**82] seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." *Id.* at 370.

[54] Stephanie Simon, *A License to Shampoo: Jobs Needing State

---

*Approval Rise*, Wall St. J., Feb. 7, 2011, *available at* http://www.wsj.com/articles/SB10001424052748703445904576118030935929752 .

[55] Morris M. Kleiner & Alan B. Krueger, *The Prevalence and Effects of Occupational Licensing*, British J. of Industrial Relations 676, 678 (2010).

[56] *Id.* at 679.

[57] *Id.* at 678. *See also* Morris M. Kleiner, Licensing Occupations: Ensuring Quality or Restricting Competition? 1 (W.E. Upjohn Institute for Employment Research, 2006); Morris M. Kleiner, *Occupational Licensing: Protecting the Public Interest or Protectionism*? 1 (W.E. [**83] Upjohn Institute for Employment Research, Policy Paper No. 2011-009, 2011).

[58] Edlin and Haw, *supra* note 48, at 1102. Today, licensing substitutes to some extent for unionization. *See* Suzanne Hoppough, *The New Unions*, Forbes. Feb. 25, 2008, *available at* http://www.forbes.com/part_forbes/2008/0225/100.html .

[59] Alan B. Krueger, *Do You Need a License to Earn a Living? You Might Be Surprised at the Answer*, N.Y. Times, Mar. 2, 2006, at C3.

Government Efficiency and Reform [**84] in 2013 to lament the kudzu-like spread of licensure: "The proliferation of occupational licensing by the State of Texas can be to the detriment of the very consumer the licensing is professing to protect."[60] Today the number of regulated occupations exceeds 500[61]—about 2.7 million individuals and businesses,[62] roughly one-third of the Texas workforce,[63] higher than the national average[64]—with many restrictions backed by heavy fines and even jail time. Importantly, these statistics reflect state-only regulations; local and federal rules raise the number of must-be-licensed workers higher still.[65]

Unlike some states, Texas doesn't yet require florists,[66] interior designers,[67] horse massagers,[68]

ferret breeders,[69] or [*104] fortune tellers[70] to get state approval (though the soothsayers would presumably see it coming). But the Lone Star State *does* require state approval to be a shampoo apprentice.[71] And to be an in-person auctioneer[72] (though not to be an *internet* auctioneer). And while you don't need a license to be a bingo caller in Texas, you must be listed on the Registry of Approved Bingo Workers in order to yell out numbers and letters.[73]

The "sum of good government," Thomas Jefferson said in his first inaugural, was one "which shall restrain men from injuring one another"—indisputably true—but "shall leave them otherwise free to regulate their own pursuits of industry and improvements."[74] Without question, many licensure rules are justified by legitimate public health and safety concerns. And isolating the point at which a rule becomes unconstitutionally "irrational" eludes mathematical precision. But it is no more imprecise as when judges ascertain under the Constitution when a search is "unreasonable"[75] or bail

---

[60] INTERIM REPORT, *supra* note 51, at 58.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.* (citing KLEINER, LICENSING OCCUPATIONS, *supra* note 57, at 12).

[65] Kleiner & Krueger, *supra* note 55, at 678.

[66] Louisiana is the [**85] only state in the country that requires licenses for florists. *See* La. Rev. Stat. Ann. §§ 3:3804(A)(2), (3), (4), (C), (D), 3:3809 (2014). And until 2010, part of the licensing exam for aspiring florists included a flower-arranging demonstration . . . judged by their future competition. *See id.* § 3:3807(B)(2) (2008), *amended by* H.B. 1407, 2010 Leg., Reg. Sess. (La. 2010); *see also* Robert Travis Scott, *Florist bill delivered to Gov. Bobby Jindal's desk*, THE TIMES-PICAYUNE (June 16, 2010), *available at* http://www.nola.com/politics/index.ssf/2010/06/florists_bill_delivered_to_gov.html .

[67] *See, e.g.,* Fla. Stat. Ann. §§ 481.213 (West 2015); La. Rev. Stat. Ann. § 37:3176 (West 2014); Nev. Rev. Stat. Ann. § 623.180(1) (West 2014); D.C. Code § 47-2853.103 (2015).

[68] In Arizona and Nebraska, you can't be a horse masseuse without a license. *See* ARIZ. REV. STAT. ANN. § 32-2231(A)(4) (West 2015) (defining practice of veterinary medicine); 172 NEB. ADMIN. CODE § 182-004.02D (2015) (eligibility for licensure as an Animal Therapist in Massage Therapy); *see also* ANIMAL MASSAGE LAWS BY STATE, INT'L ASSOC. OF ANIMAL MASSAGE AND BODYWORK, http://www.iaamb.org/reference/state-laws-2013.html (last visited

June 25, 2015).

[69] *See, e.g.,* Mass. Gen. Laws Ann. ch. 131 § 77(2) (West 2015) ("[N]o person shall possess a ferret for breeding purposes without obtaining a license from the director. . . .").

[70] *See id.* ch. 140 § 185I(2) ("No person shall tell fortunes for money unless a license therefor has been [**86] issued by the local licensing authority.").

[71] Tex. Occ. Code § 1602.267. In Tennessee, a shampoo license has a 300 hour instructional requirement. *See* Shampoo Technician, TN. DEP'T OF COMM. & INS. (last visited June 25, 2015), https://www.tn.gov/commerce/article/cosmo-shampoo-technician . Alabama also requires a license to practice as a "shampoo assistant." *See* Ala. Code § 34-7B-1(21) (2014). *See also* Simon, *supra* note 54 (surveying trade regulations in several states, including shampooing regulations in Texas and barber regulations in California).

[72] Tex. Occ. Code § 1802.051(a).

[73] 16 TEX. ADMIN. CODE § 402.402(b).

[74] President Thomas Jefferson, First Inaugural Address (Mar. 4, 1801), *in* 8 THE WRITINGS OF THOMAS JEFFERSON 3-4 (Henry A. Washington ed., 1854).

[75] U.S. Const. amend. IV.

"excessive"[76] or cause "probable"[77] or punishment "cruel and unusual."[78] Degree of difficulty aside, judges exist to be judgmental, hence the [**87] title.

The Texas Constitution has something to say when barriers to occupational freedom are absurd or have less to do with fencing out incompetents than with fencing in incumbents. As Nobel economist Milton Friedman observed, "the *justification*" for licensing is always to protect the public, but "the *reason*" for licensing is shown by observing who pushes for it—usually those representing not consumers but vested, already-licensed practitioners.[79] In other words, government's coercive power is often wielded to quash newcomers. As two federal appellate judges provocatively put it, "The practical effect of rational basis review of economic regulation is the absence of any check on the group interests that all too often control the democratic process. It allows the legislature free reign to subjugate the common good and individual liberty to the electoral calculus of politicians, the whims of majorities, or the self-interest of factions."[80] Summarizing: "Rational basis review means property is [**88] at the mercy of the pillagers. [*105] The constitutional guarantee of liberty deserves more respect—a lot more."[81]

Indeed, some fret that the focus of occupational regulation has morphed from protecting the public from unqualified providers to protecting practitioners from unwanted competition. Courts are increasingly asking whether societal benefits are being subordinated to the financial benefits of those lucky enough to be licensed. The U.S. Court of Appeals for the Fifth Circuit recently buried the so-called "casket cartel" in Louisiana, siding 3-0 with a group of woodworking Benedictine monks who supported their monastery by selling handcrafted pine coffins. State-licensed funeral directors found the competition unwelcome, and the monks were threatened with a fine and jail time for breaching Louisiana law that said only state-licensed funeral directors could sell "funeral merchandise." In striking down the anticompetitive law, the Fifth Circuit explained: "The great deference due state economic regulation does not demand judicial blindness to the history [**89] of a challenged rule or to the context of its adoption nor does it require courts to accept nonsensical explanations for regulation."[82] While acknowledging that *Williamson v. Lee Optical*[83]— the Supreme Court's authoritative treatment of rational-basis scrutiny—dictates deference to state policymakers, the Fifth Circuit underscored that "*Williamson* insists upon a rational basis," adding, "a hypothetical rationale, even post hoc, cannot be fantasy" or impervious to "evidence of irrationality."[84]

A similar casket-cartel law was invalidated in 2002 by the U.S. Court of Appeals for the Sixth Circuit, the first federal appellate court since the New Deal to invalidate an economic regulation for offending economic liberties secured by the Fourteenth Amendment.[85] The court found no sensible [*106]

---

[76] *Id.* amend. VIII.

[77] *Id.* amend. IV.

[78] *Id.* amend. VIII.

[79] MILTON FRIEDMAN & ROSE FRIEDMAN, FREE TO CHOOSE 240 (1980) (emphasis in original).

[80] *Hettinga v. United States*, 677 F.3d 471, 482-83, 400 U.S. App. D.C. 218 (D.C. Cir. 2012) (Brown, J., joined by Sentelle, C.J. concurring).

[81] *Id.* at 483.

[82] *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir.), *cert. denied*, **134 S. Ct. 423, 187 L. Ed. 2d 281 (2013)**.

[83] 348 U.S. 483, 75 S. Ct. 461, 99 L. Ed. 563 (1955).

[84] *Id.* at 223.

[85] *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002). The U.S. Supreme Court grounds economic liberty in the Fourteenth Amendment, but as discussed above, it does so within the judicially invented concept of "substantive due process" rather than within the textual Privileges or Immunities Clause of the Fourteenth Amendment. The Clause, drafted by the Committee on

connection between the onerous licensing requirements and the law's alleged "health and safety" purpose. The court rejected the state's predictable cries of "*Lochner*ism" and said the alleged bases for the law came close to "striking us with 'the force of a five-week-old, unrefrigerated dead fish.'"[86] The Sixth Circuit concluded it was ludicrous to see the law as anything but "an attempt to prevent economic competition," [**90] [87] and that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose."[88] Granting special

economic favors to preferred interests may be a *common* government purpose—"the favored pastime of state and local governments," as the Tenth Circuit put it[89]—but common doesn't mean constitutional. Merely asserting—and accepting— "Because government says so" is incompatible with individual freedom. Courts need not be contortionists, ignoring obvious absurdities to contrive imaginary justifications for laws designed to favor politically connected citizens at the expense of others.

More and more, courts—even comedians[90]—are scrutinizing the entry barriers imposed by occupational regulations. Earlier this year, a federal district court in Austin rejected the state's attempt to force a teacher of African hair braiding to meet state barber-school regulations.[91] Isis Brantley was vexed as to why her Institute of Ancestral Braiding needed a 2,000-square foot facility, 10 barber chairs, and 5 sinks to teach people how to twist and braid hair.[92] The court examined means and ends and agreed the requirements were senseless.[93] Why require sinks, for example, when braiders don't wash hair, and state law allows braiders to use just hand sanitizer?[94] The court refused to accept

---

Reconstruction, was specifically enacted to relieve rigid constraints on economic liberty, including post-Civil War licensing systems that hamstrung the economic activities of freed slaves. *See generally* HAROLD M. HYMAN & WILLIAM M. WIECEK, EQUAL JUSTICE UNDER LAW 319 (1982). Constitutionalizing well-understood rights, including the economic rights [**91] protected by the Civil Rights Act of 1866—making freedom actually meaningful—was the overriding point. And these protected economic rights included the right to practice a chosen trade. Jeffrey Rosen, *Translating the Privileges or Immunities Clause*, 66 Geo. Wash. L. Rev. 1241, 1250-51 (1998). As noted above, the Clause's abolitionist author explained that it was intended to safeguard "the liberty . . . to work in an honest calling and contribute by your toil in some sort to the support of yourself, to the support of your fellowmen, and to be secure in the enjoyment of the fruits of your toil." CONG. GLOBE, 42D CONG., 1ST SESS., 86 app. (1871). The Fourteenth Amendment's legislative record is replete with indications that "privileges or immunities" encompassed the right to earn a living free from unreasonable government intrusion. *Id.*

As explained above, the U.S. Supreme Court's nullification of the federal Privileges or Immunities Clause in *Slaughter-House* began the process of undermining the amendment's civil-rights protections for black Americans in the South. *See, e.g., United States v. Cruikshank*, 92 U.S. 542, 23 L. Ed. 588 (1875); *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896) overruled by *Brown v. Bd. of Ed.*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954). *Slaughter-House* has been accused of "strangling the privileges or immunities clause in its crib." Akhil R. Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 Yale L.J. 1193, 1259 (1992). Worse, it emboldened legislatures to enact notorious [**92] Jim Crow laws. Scholars across the political spectrum agree that *Slaughter-House* reflects a deeply flawed understanding of constitutional history.

[86] *Craigmiles*, 312 F.3d at 225 (quoting *United States v. Searan*, 259 F.3d 434, 447 (6th Cir. 2001)).

[87] *Id.*

[88] *Id.* at 224.

---

[89] *Powers v. Harris*, 379 F.3d 1208, 1221 (10th Cir. 2004).

[90] A few years ago, Jon Stewart's *The Daily Show* lampooned state efforts to regulate hair braiding. *See The Daily Show* (Comedy Central television broadcast June 3, 2004), *available at* http://thedailyshow.cc.com/videos/adygsa/the-braidy-bill .

[91] *See Brantley v. Kuntz*, No. A-13-CA-872-SS, 98 F. Supp. 3d 884, 2015 U.S. Dist. LEXIS 680, 2015 WL 75244, *8 (W.D. Tex. Jan. 5, 2015)* ("[T]he regulatory scheme . . . exclude[s] Plaintiffs from the market absent a rational connection . . .").

[92] *See* 2015 U.S. Dist. LEXIS 680, [WL] at *2.

[93] *See* 2015 U.S. Dist. LEXIS 680, [WL] at *7.

[94] *See* 2015 U.S. Dist. LEXIS 680, [WL] at *6. *The Oregonian* recently profiled a hair braider in Oregon, where braiders must have a cosmetology license, who daily crosses the border into Washington, where braiders are exempt. Most of her clients cross the border, too. The options for customers are simple: pay the cartel price or find an illicit braider. *See* Anna Griffin, *Braiding African*

blindly the state's purported justifications. It conducted an actual judicial inquiry and observed the state was trying to "shoehorn two unlike professions 'into a [*107] single, identical mold, by treating hair braiders—who perform a very distinct set of services—as if they were [barbers].'"[95] The court stressed "the logical disconnect inherent in the scheme [**93] which contemplates the existence of hair-braiding schools but makes it prohibitively difficult for a hair-braiding school to enter the market."[96] The court concluded the rules lacked any "rational relationship to any legitimate government interest"[97] and were thus unconstitutional under the [Fourteenth Amendment](#).[98]

Tellingly, the state declined to appeal, saying it would instead launch "a comprehensive review of the [**94] barber and cosmetology statutes" and "work with [the] legislative oversight committees on proposals to remove unnecessary regulatory burdens for Texas businesses and entrepreneurs."[99] Legislative response was swift—and unanimous—and Governor Abbott 15 days ago signed House Bill 2717 to deregulate hair braiding.[100] But as with

many matters (*e.g.*, public school finance), it took a judicial ruling on constitutionality to spark legislative action.

The U.S Supreme Court itself recently examined how states regulate professions, scrutinizing whether licensing boards dominated by industry incumbents are rightly focused on weeding out scammers and inept practitioners or wrongly focused on weeding out newcomers.[101] Earlier this year in *North Carolina State Board of Dental Examiners v. FTC*,[102] the High Court held that a state dental board controlled by "active market participants" could be sued under federal antitrust law for cracking [**95] down on non-dentists who were offering teeth-whitening treatments.[103] The decision brought a smile to licensure critics who had long argued that self-regulation invites self-dealing and that state licensing boards prone to regulatory capture deserved no immunity for Sherman Act[104] abuses. Ever since *Parker v. Brown* 80-plus years ago,[105] such boards were deemed outside the Act's ban on cartels because, unlike traditional cartels, they were sanctioned by the state.[106] No [*108] more. *Parker* no longer insulates regulated regulators regulating to anticompetitive effect. Licensing boards comprised of private competitors will face Sherman Act liability if they flex power to smother aspiring

---

*American Hair at center of overregulation battle in Oregon*, THE OREGONIAN (Aug. 11, 2012), [http://www.oregonlive.com/politics/index.ssf/2012/08/braiding_afric an_american_hair.html](http://www.oregonlive.com/politics/index.ssf/2012/08/braiding_african_american_hair.html) .

[95] *[Brantley, 2015 U.S. Dist. LEXIS 680, 2015 WL 75244, at *7](#)* (quoting *[Clayton v. Steinagel, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012)](#)* (quoting *[Clayton v. Steinagel, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012)](#)*).

[96] Id.

[97] [2015 U.S. Dist. LEXIS 680, [WL] at *8](#).

[98] Id.

[99] Angela Morris, *Braider Wins Against State Barber Regulations*, TEXAS LAWYER, Jan. 19, 2015, *available at* [http://www.texaslawyer.com/id=](http://www.texaslawyer.com/id=)1202715320677/Braider-Wins-Against-State-Barber-Regulations .

[100] Act of May 22, 2015, 84th Leg., R.S., ch. 413, § 2, 2015 Tex. Sess. Law Serv. 2717 (to be codified at [Tex. Occ. Code § 1601.003(2)(E))](#), *available at* [http://www.capitol.state.tx.us/tlodocs/84R/billtext/pdf/HB02717F.pd f#navpanes=0](http://www.capitol.state.tx.us/tlodocs/84R/billtext/pdf/HB02717F.pdf#navpanes=0) .

---

[101] *See* Morris M. Kleiner, *Occupational Licensing*, 14 J. ECON. PERSPECTIVES 189, 191 (2000) (describing the composition of state licensing boards).

[102] [135 S. Ct. 1101, 191 L. Ed. 2d 35 (2015)](#).

[103] *[Id. at 1110](#)*.

[104] *See generally* [15 U.S.C. §§ 1-7 (2004)](#).

[105] [317 U.S. 341, 63 S. Ct. 307, 87 L. Ed. 315 (1943)](#). *See also [Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S. Ct. 937, 63 L. Ed. 2d 233](#)* (stating two standards for *Parker* state action immunity: (1) state articulation of its purpose to displace competition, and (2) active state supervision).

[106] *See [Parker, 317 U.S. at 351](#)* ("The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.").

469 S.W.3d 69, *108; 2015 Tex. LEXIS 617, **95

entrepreneurs.[107]

B.

As today's case shows, the Texas occupational licensure regime, predominantly impeding Texans of modest means, can seem a hodge-podge of disjointed, logic-defying irrationalities, where the burdens imposed seem almost farcical, forcing many lower-income Texans to face a choice: submit to illogical bureaucracy or operate an illegal business? Licensure absurdities become apparent when you compare the wildly disparate education/experience burdens visited on various professions. The disconnect between the strictness of some licensing rules and their alleged public-welfare rationale is patently bizarre:

> Emergency Medical Technicians. EMTs are entrusted with life-and-death decisions. But in Texas, entry-level EMTs need only 140 hours of training before rendering life-saving aid.[108] Contrast that [**97] with the radically more onerous education/experience requirements for barbers (300 hours),[109] massage therapists (500 hours),[110] manicurists (600 hours),[111] estheticians (750 hours),[112] and full-service cosmetologists (1,500 hours).[113]

> Backflow Prevention Assembly Testers. Of the number of states and the District of Columbia that require licenses for backflow prevention assembly testers, the Lone Star State is the only place where it takes more than two weeks of training/experience—*way* more. Fifty times more. Not two weeks but two *years*.[114]

State licensing impacts our lives from head to toe. Literally. Starting at the [*109] top, where does hair end and the beard begin? Texas law has been quite finicky on the matter, leading Texas barbers and cosmetologists to spend years splitting legal hairs and clogging Texas courts. Both of these state-licensed professionals may cut hair, but until 2013 only barbers, not cosmetologists, had state permission to wield a razor blade to shave *facial* hair. Before 2013, if you wanted your beard shaved, you had to visit a barber (probably a man) and not a cosmetologist (probably a woman).[115]

---

[107] See [**96] *N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1110-11 ("But while the Sherman Act confers immunity on the States' own anticompetitive policies out of respect for federalism, it does not always confer immunity where, as here, a State delegates control over a market to a non-sovereign actor. . . . For purposes of *Parker*, a nonsovereign actor is one whose conduct does not automatically qualify as that of the sovereign State itself.") (citation omitted).

[108] 25 TEX. ADMIN. CODE § 157.32(c)(2)(B).

[109] Tex. Occ. Code § 1601.253(c)(2).

[110] *Id.* § 455.156(b)(1).

[111] *Id.* § 1601.257(b)(3).

[112] *Id.* § 1602.257(b)(3).

[113] *Id.* § 1602.254(b)(3). A Class A Barber who completes an additional 300 hours of instruction in cosmetology—a total of 600 hours of training—may also be eligible to become a full-service cosmetologist. *Id.* § 1602.254(c).

---

[114] See Tex. Health & Safety Code § 341.034(c); 30 Tex. Admin. Code § 30.60. Although one can begin working as a backflow prevention assembly tester with only 40 hours of instruction in Texas, obtaining a license requires two years of work experience. *See, e.g.*, 30 Tex. Admin. Code § 30.60(4)-(5). In contrast, other states do not require pre-licensure work experience in addition to knowledge-based examinations. *See* IDAHO ADMIN CODE ANN. § r.24.05.01.335 (2014) (requirements for [**98] a backflow assembly tester license); MINN. STAT. § 326B.42 (West 2015) (defining "backflow prevention tester" as an individual qualified by training prescribed by the Plumbing Board); MINN. DEP'T OF LABOR & INDUS., Minnesota backflow agreement 2013, ASSE INT'L Ltr. (Oct. 15, 2013) (determining the requirements for certification), *available at* http://www.dli.mn.gov/CCLD/PDF/pe_agree.pdf ; MO. CODE REGS. Tit. 10, § 60-11.030 (2015) (providing for certification upon completion of a written exam); UTAH ADMIN. CODE r. 309-305-5 (2015) (providing for certification upon completion of written and practical examinations).

[115] Prior to the 1960s and 1970s, rigid state laws codified sexual stereotypes that distinguished male barbers and barbershops from female cosmetologists (or beauticians) and beauty parlors. Unisex hair salons became in vogue in the late 1960s through the 1970s as courts invalidated these state statutes under the equal protection clause of the Fourteenth Amendment.

Today, although there is hardly a distinction between most barber and cosmetology services, there is plenty of opportunity for overzealous regulators to tag unsuspecting shop owners with "gotcha" fines. *See, e.g.*, *Tex. Dep't of Licensing & Regulation v.*

And what *is* a "beard" anyway? Why, it's the facial hair below [**99] the "line of demarcation" as defined in the Administrative Code.[116] Even the Attorney General of Texas got all shook up wondering whether Elvis's famous sideburns "were hair which a cosmetologist might trim, or a partial beard which could be serviced only [by] a barber."[117]

At the other bodily extreme, what's the demarcation between the foot (which podiatrists can treat) and the ankle (which they can't)? These are high-stakes disputes, and sometimes the licensing bodies have jurisdictional spats with each other, usually over "scope of practice" issues. So where *does* the foot end and the ankle begin? In 2010, this Court ended a nearly ten-year legal battle between, in one corner, the Texas Medical Association and Texas Orthopedic Association, and in the other, the Texas State Board of Podiatric Medical Examiners and Texas Podiatric Medical Association.[118]

According to the academic literature, the real-world effects of steroidal regulation are everywhere: increased consumer cost; decreased consumer [**101] choice; increased practitioner

income; decreased practitioner mobility[119]—plus shrunken economic prospects for lower income, would-be entrepreneurs.[120] Thomas Edison, with little formal schooling, likely could not be a licensed engineer today, nor could Frank Lloyd Wright be a licensed architect.[121]

[*110]  III.

*No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.*[122]

Anyone acquainted with human nature understands, as Madison did, that when people, or branches of government, are free to judge their own actions, nothing is prohibited. The Court recognizes that Texans possess a basic liberty under Article I,

---

*Roosters MGC, LLC*, No. 03-09-00253-CV, 2010 Tex. App. LEXIS 4392, 2010 WL 2354064 (Tex. App.—Austin June 10, 2010, no pet.) (discussing whether a cosmetologist's use of a safety razor to remove hair from a customer's neck or face violates state law controlling what services can be provided exclusively by barbers).

[116] 16 TEX. ADMIN. CODE §§ 82.10 (8), (23).

[117] Tex. Att'y Gen. Op. No. JC-0211 (2000) ("We think it likely that most observers would consider the sideburns worn by the late Elvis Presley at the time of his early success in 1956 as part of his [**100] hair. On the other hand, whether the muttonchops which adorned his face at the time of his death were hair which a cosmetologist might trim, or a partial beard which could be serviced only a barber, is a question which in the absence of any articulated standard might well present difficulties to a cosmetologist who wished to remain within his or her licensed practice.").

[118] *Tex. Orthopaedic Ass'n v. Tex. State Bd. of Podiatric Med. Exam'rs*, 254 S.W.3d 714 (Tex. App—Austin 2008, pet. denied) (invalidating the Texas State Board of Podiatric Medical Examiners rule defining the word "foot").

[119] *See e.g.*, SANDEFUR, *supra* note 24, at 24.

[120] *Id.* (noting that monopoly laws and restrictive licensing schemes were "often used to give economic favors to politically influential lobbyists . . .").

[121] One powerful way regulations handicap innovation is through sweeping, inflexible, one-size-fits-all measures that crowd out novel services. For example, in the recent teeth-whitening case at the U.S. Supreme Court, the state dental board defined dentistry broadly to include teeth whitening. *N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. 1101, 1120, 191 L. Ed. 2d 35 (2015). In today's case, eyebrow threaders want to thread eyebrows—and *only* want to thread eyebrows—but Texas defines the regulated trade of cosmetology so broadly, and irrationally, that threaders must take pricey and time-consuming classes to learn, well, *nothing* about threading but *lots* about non-threading. These Texans aim to provide a single service, but the government—exercising maximum will but minimum judgment—shackles creativity and innovation by lumping [**102] threading in with licensed, full-fledged cosmetology and requiring people to spend untold hours and dollars learning wholly irrelevant cosmetology techniques. The result, disproportionately affecting the poor, is the so-called "Cadillac effect": would-be entrepreneurs squashed by exorbitant start-up costs, and would-be consumers forced to either (1) pay a higher-than-necessary price (a Cadillac) when all they want to buy is a discrete service at a lower price (a Kia), or (2) go without, or perhaps try to do it themselves.

[122] THE FEDERALIST No. 10, at 79 (James Madison) (Clinton Rossiter ed., 1961).

Section 19 to earn a living. And to safeguard that guarantee, the Court adopts a test allergic to nonsensical government encroachment. I prefer authentic judicial scrutiny to a rubber-stamp exercise that stacks the [**103] legal deck in government's favor.

My views are simply stated:

1. The economic-liberty test under Article I, Section 19 of the Texas Constitution is more searching than the minimalist test under the Fourteenth Amendment to the United States Constitution.

Even under the lenient rational-basis test—"the most deferential of the standards of review"[123]—the would-be threaders should win this case. It is hard to imagine anything more irrational than forcing people to spend thousands of dollars and hundreds of hours on classes that teach everything they don't do but nothing they actually do. Not one of the 750 required hours of cosmetology covers eyebrow threading. Government-mandated barriers to employment should actually bear some meaningful relationship to reality.

It is instructive to consider the U.S. Supreme Court's first occupational licensing case, from 1889. In *Dent v. West Virginia*[124]—which has never been overruled and is still cited approvingly[125]—the Court upheld a physician-licensing regime, calling it a way to protect "the general welfare of [the] people" and "secure them against the consequences of ignorance and incapacity, as well as of deception and fraud."[126] But the Court cautioned that constitutional limits exist. Government is free to mandate [**104] requirements "appropriate to the

calling or profession," but not those that "have no relation to such calling or [*111] profession."[127] Why? Because that would "deprive one of his right to pursue a lawful vocation."[128] Restrictions must have a reasonable connection to the person's fitness or capacity. That explains the High Court's 1957 ruling in *Schware v. Board of Bar Examiners*,[129] the *only* time the Court has struck down a licensing restriction under rational-basis review. In *Schware*, the Court invalidated New Mexico's attempt to bar a Communist Party member from practicing law: "any qualification must have a rational connection with the applicant's fitness or capacity to practice."[130]

The federal rational-basis requirement debuted amid Depression-era upheaval in 1934, when the Court in *Nebbia v. New York*,[131] criminalizing the sale of milk below the government-approved price, held "a State is free to adopt whatever economic policy may reasonably be deemed to promote public welfare,"[132] so long as it is not "unreasonable [**105] or arbitrary."[133] *Nebbia* was a constitutional bombshell, and its abandonment of strong judicial protection for economic liberty presaged a vast expansion of government power. Twenty years later came the Court's authoritative guidance on Fourteenth Amendment review of economic regulation: *Williamson v. Lee Optical*.[134] In *Lee Optical*, the Court, while implicitly

---

[123] BLACK'S LAW DICTIONARY 1453 (10th ed. 2009).

[124] 129 U.S. 114, 9 S. Ct. 231, 32 L. Ed. 623 (1889).

[125] *See, e.g.,* *Conn v. Gabbert*, 526 U.S. 286, 292, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999) (citing *Dent* with approval but declining to extend).

[126] *Dent,* 129 U.S. at 122.

[127] *Id.*

[128] *Id.*

[129] 353 U.S. 232, 238-39, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957) (holding that former communist ties are not sufficiently related to the practice of law to warrant disbarment).

[130] *Id. at 239.*

[131] 291 U.S. at 530 (1934).

[132] *Id. at 537.*

[133] *Id. at 530.*

[134] 348 U.S. 483, 75 S. Ct. 461, 99 L. Ed. 563 (1955).

recognizing a liberty right to pursue one's chosen occupation, held that economic regulation—here, forbidding opticians from putting old lenses in new frames—would be upheld if the court could conjure out of thin air any hypothetical reason why lawmakers *might* have enacted the law.[135] Uncertainty has persisted for decades, partly because, as the Court acknowledges, "Our cases have not elaborated on the standards for determining what constitutes a 'legitimate government interest.'"[136] Some federal circuits, including the Fifth, have held it is improper to regulate solely to insulate incumbent business from competition.[137] But with a few notable exceptions, like the [*112] recent "casket cartel"[138] and African hair-braiding cases,[139] rational-basis review under the Fourteenth Amendment is largely a judicial shrug.

Indeed, federal-style scrutiny is quite unscrutinizing, with many burdens acing the rational-basis test while flunking the straight-face test. As the U.S. Supreme Court held almost 80 years ago in *United States v. Carolene Products*,[140] government has no obligation to produce evidence to sustain the rationality of its action; rather, "the [**107] existence of facts supporting the legislative judgment is to be presumed."[141] Courts "never require a legislature to articulate its reasons for enacting a statute" and will uphold a law "if there is any reasonably conceivable state of facts that could provide a rational basis" for it.[142] Indeed, it is "entirely irrelevant" whether the purported justification for a burdensome law "actually motivated the legislature."[143] Challengers must negate every conceivable basis that might support it,[144] and judges are exhorted to invent a colorable justification if the one articulated by the government falls short. All this explains why critics charge the test is less "rational basis" than "rationalize a basis."

The dissents would subordinate concrete scrutiny to conjectural scrutiny that grants a nigh-irrebuttable presumption of constitutionality. It is elastic review where any conceivable, theoretical, imaginary justification suffices. In my view, Texas judges should instead conduct a genuine search for truth—*as they do routinely in countless other constitutional areas*—asking "What is government actually up to?" When constitutional rights are imperiled, Texans deserve actual scrutiny of actual [**108] assertions with actual evidence.

- Should Texas courts reflexively accept disingenuous or smokescreen explanations for the government's actions? No.
- Is government allowed to prevail with purely illusory or pretextual justifications for a

---

[135] *Id.* at 487-89.

[136] *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987). Indeed, the label "rational basis" is misleading because the federal [**106] test doesn't require the law to actually make sense. Rather, it asks whether a lawmaker maybe, possibly, conceivably, plausibly, imaginably, hypothetically *might* have thought it was a good idea. It doesn't even matter if lawmakers actually *intended* to violate the Constitution. The law will be upheld so long as a court can conjure *any* legitimate public purpose for the law. One complication: The U.S. Supreme Court has yet to articulate with precision what constitutes a "legitimate" government interest. But how can one make sense of the "legitimate state interest" requirement unless and until the Court explains what purposes are and are not acceptable? Answering the question would necessarily require the Court to state straightforwardly that some things are illegitimate state interests.

[137] *See, e.g.*, *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002); *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008); *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir.), cert. denied, 134 S. Ct. 423, 187 L. Ed. 2d 281 (2013).

[138] *See* *St. Joseph Abbey*, 712 F.3d at 215.

[139] *Brantley v. Kuntz*, No. A-13-CA-872-SS, 98 F. Supp. 3d 884, 2015 U.S. Dist. LEXIS 680, 2015 WL 75244 (W.D. Tex. Jan. 5, 2015).

[140] 304 U.S. at 152 (1938).

[141] *Id.* at 152.

[142] *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993).

[143] *Id.* at 307, 315.

[144] *Id.* at 314-15.

challenged law? No.
• Must citizens negate even purely hypothetical justifications for the government's infringement of liberty? No.
• Are Texas courts obliged to jettison their truth-seeking duty of neutrality and help government contrive post hoc justifications? No.

Texas judges should discern whether government is seeking a constitutionally valid end using constitutionally permissible means. And they should do so based on real-world facts and without helping government invent after-the-fact rationalizations. I believe the Texas Constitution requires an earnest search for truth, not the turn-a-blind-eye approach that prevails under the federal Constitution.[145]

[*113]  2. <u>The Texas Constitution narrows the difference in judicial protection given to "fundamental" rights (like speech or religion) and so-called "non-fundamental" rights (like the right to earn a living).</u>

The jurisprudential fact of the matter is that courts are more protective of some constitutional guarantees than others. One bedrock feature of 20th-century jurisprudence, starting with the U.S. Supreme Court's New Deal-era decisions, was to relegate economic rights to a more junior-varsity echelon of constitutional protection than "fundamental" rights. Nothing in the federal or Texas Constitutions requires treating certain rights as "fundamental" and devaluing others as "non-

fundamental" and applying different levels of judicial scrutiny, but it is what it is: Economic liberty gets less constitutional protection than other constitutional rights.

This is not opinion but irrefutable, demonstrable [**110] fact. Ever since what is universally known as "the most famous footnote in constitutional law"[146]—footnote four in *Carolene Products* in 1938[147]—the U.S. Supreme Court has applied varying tiers of scrutiny to constitutional challenges. Simplified, the Court divides constitutional rights into two discrete categories: fundamental and non-fundamental. Upshot: Your favored First Amendment speech rights receive stronger judicial protection than your disfavored Fifth Amendment property rights. The fragmentation is less logical than rhetorical, and is anchored less in principle than in power. Under the post-New Deal picking and choosing, speech gets preferred status while economic liberty is treated as "a poor relation"[148]—despite the <u>Due Process Clause</u>'s explicit inclusion of "property" (and given the High Court's nullification of the Privilege or Immunities Clause in *Slaughter-House*). Speech rights get no-nonsense "strict scrutiny" to ensure government is behaving itself while property rights get servile, pro-government treatment.

For example, when courts decide an Establishment Clause challenge under the <u>First Amendment</u>, they normally defer to a State's asserted secular purpose. But such deference is not blind. Courts don't simply take government's word for it; they are careful to ensure that a "statement of such purpose be sincere

---

[145] As mentioned above, the Texas Constitution has its own "privileges or immunities"-like language, and while *Slaughter-House* nullified federal protection, the U.S. Supreme Court declared that states were proper guardians of the "privileges or immunities" of state citizenship, including the right to [**109] pursue a calling. *Slaughter-House Cases, 83 U.S. 36, 77-78, 21 L. Ed. 394 (1873).* Texas did exactly that in its 1875 Constitution, acting quickly on the Court's statement that protection of individuals' non-federal privileges and immunities was a state concern. As the Court notes, however, the plaintiffs did not raise a separate privileges or immunities challenge.

[146] *See, e.g.,* Felix Gilman, *The Famous Footnote Four: A History of the* Carolene Products *Footnote, 46 Tex. L. Rev. 163, 165 (2004).*

[147] *304 U.S. 144, 152 n.4, 58 S. Ct. 778, 82 L. Ed. 1234 (1938)* (creating a dichotomy between laws that regulate economic affairs, which get deferential judicial review, and laws that curtail important personal [**111] liberties or that target "discrete and insular minorities," which get more searching judicial scrutiny).

[148] *Dolan v. City of Tigard, 512 U.S. 374, 392, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994).*

and not a sham."[149] Same with gender classifications. The Court in 1996 struck down Virginia's exclusion of women from Virginia Military Institute, explaining that government's asserted justification must be "genuine," as opposed to one that's been "hypothesized or invented *post hoc* in response to litigation."[150]

Digital privacy under the Fourth Amendment is another constitutional area [*114] where the U.S. Supreme Court requires real-world evidence rather than putting a pro-government thumb on the scale. Recently, in the landmark case *Riley v. California*,[151] prosecutors, citing concerns for officer safety and preserving evidence, insisted they did not need a warrant before searching an arrested suspect's smartphone. The Court unanimously rejected the prosecutors' excuses, making clear that justifications for burdening constitutional rights [**112] must be concrete, non-imaginary concerns "based on actual experience."[152] The Court held there was no real and documented evidence that warrantless searches were necessary to protect officers.[153] As for evidence destruction, the Court was likewise unmoved, noting again the absence of actual evidence to back the State's assertion, adding that in any event, law enforcement has "more targeted ways to address those concerns."[154]

Some constitutional rights fall somewhere in between, like "commercial speech," not because the Constitution draws that distinction but because judges do. Commercial speech—advertisements and other business-related speech—is a hybrid under U.S. Supreme Court precedent, involving speech rights (protected vigorously) and economic rights (protected not so vigorously).[155] Imagine a law that makes it illegal to advertise Axe Body Spray because lawmakers believe it endangers the public. This law plainly burdens speech, but it burdens *economic* speech, which receives less judicial protection than, say, political speech.[156] Nonetheless, commercial speech restrictions still get meaningful judicial review. Courts would examine three factors: (1) whether government has a "substantial [**113] interest" in burdening the speech; (2) whether the restriction actually furthers that interest; and (3) whether there are less restrictive ways to achieve the stated goal so that speech is restricted as little as necessary.[157] Government bears the burden of proof, and the law receives a serious judicial pat-down, including whether it was honestly driven by a desire to serve public interests or was merely a pretext to serve private interests. Now imagine a different law, one banning the *sale* of Axe Body Spray. With this law, the legal deck is shuffled differently, and a judge would apply a less-rigorous test because the law targets not commercial *speech* but commercial *activity*, a so-called *non*-fundamental right. Because this law focuses on economic activity, government wouldn't have to prove its health claims, or show that less restrictive means were available, or convince a judge that the law's purported purpose was a pretext to mask its true purpose.[158]

---

149 *Edwards v. Aguillard*, 482 U.S. 578, 586-87, 107 S. Ct. 2573, 96 L. Ed. 2d 510 (1987).

150 *United States v. Virginia*, 518 U.S. 515, 533, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996).

151 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014).

152 *Id.* at 2485.

153 *Id.* at 2494.

154 *Id.* at 2487.

---

155 The Court first recognized the right "to follow any lawful calling, business, or profession he may choose" in *Dent v. West Virginia*, 129 U.S. 114, 121, 9 S. Ct. 231, 32 L. Ed. 623 (1889). For 126 years the Court has reaffirmed that right, even though judicial protection of it has waned. See *supra* notes 124-29 and [**114] accompanying text.

156 *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 131 S. Ct. 2653, 2672, 180 L. Ed. 2d 544 (2011) ("Indeed the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.'") (citations omitted).

157 *Id.* at 2672-84.

158 The constitutional double standard becomes perplexing in cases

[*115] But "economic" and "noneconomic" rights indisputably [**115] overlap. As the U.S. Supreme Court has recognized, freedom of speech would be meaningless if government banned bloggers from owning computers. Economic freedom is indispensable to enjoying other freedoms—for example, buying a Facebook ad to boost your political campaign. A decade (and three days) ago in *Kelo v. City of New London*,[159] the landmark takings case that prompted a massive national backlash,[160] Justice Thomas's dissent lamented the bias against economic rights this way: "Something has gone seriously awry with this Court's interpretation of the Constitution. Though citizens are safe from the government in their homes, the homes themselves are not."[161]

*Kelo* is indeed illustrative, as the rational-basis test applies in eminent-domain cases, too, notwithstanding the assurance in footnote four of *Carolene Products* that alleged violations of the Bill of Rights deserve heightened scrutiny.

Even [**116] though the Fifth Amendment explicitly protects property, the U.S. Supreme Court has supplanted the *Carolene Products* bifurcation with rational-basis deference in takings cases. The *Kelo* Court stressed its "longstanding policy of deference to legislative judgments,"[162] and its unwillingness to "second-guess"[163] the city's determination as to "what public needs justify the use of the takings power."[164] Justice O'Connor's scathing dissent, her final opinion on the Court, forcefully accused her colleagues of shirking their constitutional duty.[165]

A few years later in *District of Columbia v. Heller*,[166] which struck down D.C.'s ban on handguns and operable long guns, the Court divided on what measure of deference was appropriate in the Second Amendment context. In dissent, Justice Stevens lauded New Deal-era Justice Frankfurter and accused the Court of aggressive activism, chastising, "adherence to a policy of judicial restraint would be far wiser than the bold decision announced today."[167]

[*116] I would not have Texas judges condone government's dreamed-up justifications (or dream up post hoc justifications themselves) for interfering with citizens' constitutional guarantees. [**117] As in other constitutional settings, we should be neutral arbiters, not bend-over-backwards advocates for the government. Texas judges weighing state constitutional challenges should scrutinize government's *actual* justifications for a law—what policymakers *really* had in mind at the time, not something they

---

where fundamental and non-fundamental rights overlap. A few years ago, the Eleventh Circuit upheld the constitutionality of an Alabama law banning the commercial distribution of sex toys. *Williams v. Morgan*, 478 F.3d 1316 (11th Cir. 2007). The case involved the collision of sexual activity (deemed fundamental) and commercial activity (deemed non-fundamental). Plaintiffs aimed for strict scrutiny by framing the case in sexual-privacy terms because they knew if the case was treated as an economic-rights case, the ban would likely survive rational-basis review. The Eleventh Circuit applied rational-basis review and upheld the law, viewing the case as one about *accessing* sex toys and not about *using* sex toys. Result: Purchasing items for the bedroom can be regulated, but using them consensually cannot. The Fifth Circuit held the opposite way, saying a similar Texas ban violated the Due Process Clause in *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 740 (5th Cir. 2008).

[159] 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005) (upholding the power of government to condemn private property for economic-development purposes).

[160] In the wake of *Kelo*, 45 states enacted property-rights reform to curb eminent domain. *See* Ilya Somin, *The political and judicial reaction to* Kelo, WASH. POST, June 4, 2015, *available at* http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/06/04/the-political-and-judicial-reaction-to-kelo/ .

[161] *Kelo*, 545 U.S. at 518 (Thomas, J., dissenting).

[162] *Id.* at 469.

[163] *Id.* at 488.

[164] *Id.* at 483.

[165] *Id.* at 494 (O'Connor, J., dissenting).

[166] 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).

[167] *Id.* at 680 n.39 (Stevens, J., dissenting).

dreamed up after litigation erupted. And judges should not be obliged to concoct speculative or far-fetched rationalizations to save the government's case.

3. <u>Texas courts need not turn a blind eye to the self-evident reasons why an increasing number of Texans need a government permission slip to work in their chosen field.</u>

Today's decision recognizes another key contributor to the irrationalities afflicting occupational licensing: the hard-wired inclination to reduce competition. This metabolic impulse—Human Nature 101—has always existed.

English courts protected the right to earn a living since the early Seventeenth Century, long before the U.S. Constitution was adopted. In 1614, the Court of King's Bench invalidated a law that required an apprenticeship with the local guild before someone could become an upholsterer, dismissing the cries of licensed upholsterers who warned of inexpert [**118] practitioners. Lord Chief Justice Coke, Britain's highest judicial officer, was unpersuaded, holding "no skill" was required, "for [someone] may well learn this in seven hours."[168] Lord Coke wrote that Magna Carta (now 800 years old) and English common law safeguarded the right of "any man to use any trade thereby to maintain himself and his family."[169] He compared the proponents of barriers, invariably incumbent businesses, to someone rowing a boat: "they look one way and row another: they pretend public profit, intend private."[170] That is, they speak of public welfare (increasing competence) but seek private welfare (decreasing competition). Guilds in England wielded licensing to create "artificial scarcity," prompting English courts to declare the

right to earn a living one of "nationalistic concern for increasing the wealth of the realm."[171] Lord Coke said legal redress, not licensing, was preferred for most occupations, explaining the "possibility that a practitioner might do a bad job was not a good excuse for restricting economic freedom, raising costs to consumers, and depriving entrepreneurs of economic opportunity."[172]

Adam Smith echoed Coke a century and a half later in *The Wealth of Nations*, calling efforts to thwart people from exercising their dexterity and industry as they wish "a plain violation of this most sacred property."[173] Economic freedom was indeed prized in the colonies, which lacked a guild system, but the right was extolled less as a national wealth creator and more as man's natural birthright. In 1775, Thomas Jefferson previewed a principle he [*117] would underscore in the Declaration—the right to pursue happiness[174]—lamenting British laws that "prohibit us from manufacturing, for our own use, the articles we raise on our own lands, with our own labour."[175] Like what? Colonists were forbidden from making iron tools. Why? To enrich British toolmakers. Colonists were forbidden from making their own hats from the fur of American animals. Why? To enrich British hatmakers. Adam Smith, who considered economic choice "the most sacred and inviolable of rights," likewise observed

---

168 *Allen v. Tooley*, (1613) 80 Eng. Rep. 1055 (K.B.) 1057; 2 Bulstrode 186, 189.

169 *Id.* at 1055.

170 R.H. COASE, *The Lighthouse in Economics* (1974), [**119] *in* THE FIRM, THE MARKET, AND THE LAW 187, 196 (1988) (quoting Chief Justice Sir Edward Coke) (spelling modernized).

171 SANDEFUR, *supra* note 24, at 23.

172 *Id.*

173 ADAM SMITH, AN INQUIRY INTO [**120] THE NATURE AND CAUSES OF THE WEALTH OF NATIONS 122 (Edwin Cannon, ed., Random House 1937).

174 Jefferson echoed phrasing from the Virginia Declaration of Rights, written by Jefferson's friend George Mason just one month before Jefferson's masterpiece was issued, who extolled "the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety." *See* Va. Declaration of Rights § 2 (1776), *in* 1 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 234-35 (1971).

175 THOMAS JEFFERSON, *A Summary View of the Rights of British America* (1774), *in* THE JEFFERSONIAN ENCYCLOPEDIA 963, 964 (John P. Foley ed., Funk & Wagnalls Co. 1900).

the tendency of trades to raise wages by reducing the supply of skilled craftsmen.[176]

What is past is indeed prologue.[177] Fast forward almost 250 years, and a prized taxi medallion in New York City now costs $1.25 million, quadruple the price of just a decade ago.[178] But the unalienable right to pursue happiness is not merely the right to possess things or to participate in activities we enjoy; it necessarily includes the right to improve our lot in life through industry and ingenuity.

A raft of modern research by Nobel Prize-winning economist Gary Becker and various social scientists confirms that practitioners desire to stifle would-be competitors.[179] In 2013, the Texas House Committee on Government Efficiency and Reform found this anticompetitive impulse alive and well in Texas, where licensure affords "clear advantages to members of the licensed profession, such as reduced competition and increased earnings."[180] The Committee observed that stiffer occupational regulations rarely originate with consumer and consumer advocacy groups; rather, they are pushed by entrenched industry members to secure "less competition, improved job security, and greater profitability."[181] The Committee, recognizing the myriad harms of occupational overregulation—measured in damage to "job growth and consumer choice"[182]—and fearing that Texas was headed towards "more, large-scale occupational licensing

programs,"[183] made this recommendation: "The Legislature should implement a process to review proposals to regulate new occupations, as well as existing licensing programs, based on real and documented harm to the public."[184]

The Legislature responded by passing House Bill 86, which creates a mechanism to critically examine whether existing occupational regulations are still needed, and [*118] to phase out those deemed unnecessary. Specifically, the new law requires the Sunset Advisory Commission, in assessing "an agency that licenses an occupation or profession," to probe whether, and how, existing occupational regulations actually serve the public interest.[185] The new law also allows a legislator to submit to the Commission for review and analysis any proposed legislation that would create a new or significantly modify an existing occupational licensing program.[186]

---

[176] SMITH, *supra* note 173, at 121-22.

[177] *See* WILLIAM SHAKESPEARE, THE TEMPEST act 2, sc. 1.

[178] Matt Flegenheimer, *$1 Medallions Stifling the Dreams of Cabdrivers*, N.Y. TIMES [**121] , Nov. 14, 2013, at A24.

[179] Gary S. Becker, *A Theory of Competition Among Pressure [**122] Groups for Political Influence*, Q. J. ECON., 371-400 (1983).

[180] INTERIM REPORT, *supra* note 51, at 59.

[181] *Id.*

[182] *Id.*

[183] *Id.* at 60.

[184] *Id.* at 62.

[185] Tex. Gov't Code § 325.0115(b). The Commission is required to assess:

(1) whether the occupational licensing program:

(A) serves a meaningful, defined public interest; and

(B) provides the least restrictive form of regulation that will adequately protect the public interest;

    (2) the extent to which the regulatory objective of the occupational licensing program may be achieved through market forces, private or industry certification and accreditation programs, or enforcement [**123] of other law;

(3) the extent to which licensing criteria, if applicable, ensure that applicants have occupational skill sets or competencies that correlate with a public interest and the impact that those criteria have on applicants, particularly those with moderate or low incomes, seeking to enter the occupation or profession; and

    (4) the impact of the regulation, including the extent to which the program stimulates or restricts competition and affects consumer choice and the cost of services. *Id.* at § 325.0115(b)(1)-(4).

[186] The new law authorizes the Commission's chair to deny such a request for review on the recommendation of the executive director.

Courts need not be oblivious to the iron political and economic truth that the regulatory environment is littered with rent-seeking by special-interest factions who crave the exclusive, state-protected right to pursue their careers. Again, smart regulations are indispensable, but nonsensical regulations inflict multiple burdens—on consumers (who pay more for goods and services, or try to do the work themselves),[187] on would-be entrepreneurs (who find market entry formidable, if not impossible), on lower-income workers (who can't break into entry-level trades), and on the wider public (who endure crimped economic growth while enjoying no tangible benefit whatsoever).[188]

IV.

*In Europe, charters of liberty have been granted by power. America has set the example . . . of charters of power granted by liberty.*[189]

The Founders pledged their lives, fortunes, and sacred honors to birth a new [*119] type of nation—one with a radical design: three separate, co-equal, and competing branches. Three rival branches deriving power from three unrivaled words: "We the People." Both the Texas and federal Constitutions presume the branches will be structural adversaries—that legislators, for example, will jealously guard their lawmaking prerogative if the executive begins aggrandizing power. Indeed, inter-branch political competition is a precondition to advancing inter-firm economic competition—that is, the judicial branch asserting judicial power to ensure that the political branches don't arbitrarily insulate established practitioners from newcomers.

Madison, lead architect of the U.S. Constitution, saw his bedrock constitutional mission as ensuring that America does not "convert a limited into an unlimited Govt."[190] Enlightenment philosopher Montesquieu likewise [**126] warned of power concentrated: "When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty."[191] Madison paid homage to "the celebrated Montesquieu" in Federalist 10, which gave voice to Madison's gravest worry: the risk of runaway majorities trampling individual liberty.[192] Madison turned 85 on the day delegates adopted the Constitution of the Republic of Texas. "He lived barely 100 days more, just long enough to see Texas free."[193] And just like Madison's handiwork, the *Texas* Constitution—then and today—exists to secure liberty.

A.

As mentioned earlier, the term "judicial activism" is

---

The bill requires the Commission to report its review findings to the Legislature before the start of the next legislative session. The bill also requires the Commission, in analyzing legislation proposing the creation of an occupational licensing program, to determine whether the unregulated practice of the occupation would be inconsistent with the public interest, whether the public can reasonably be expected to benefit from an assurance of initial and continuing professional skill sets or competencies, and whether the public can be more effectively protected [**124] by means other than state regulation. *Id.* § 325.023(c)(1)-(3).

[187] HOWARD BAETJER, JR., FREE OUR MARKETS—A CITIZENS' GUIDE TO ESSENTIAL ECONOMICS 95-96 (2013).

[188] KLEINER, LICENSING OCCUPATIONS, *supra* note 57, at 53.

[189] James Madison, *Charters* (Jan. 19, 1792), *in* JAMES MADISON—WRITINGS 733, 736 (Jack N. Rakove ed., 1999). *See also* 1 JAMES WILSON, *Of the Study of the Law in the United States, in* THE WORKS OF JAMES WILSON: ASSOCIATE JUSTICE OF THE SUPREME COURT, AND PROFESSOR [**125] OF LAW IN THE COLLEGE OF PHILADELPHIA 1, 6-7 (James De Witt Andrews ed., Callaghan & Co. 1895) ("Without liberty, law loses its nature and its name, and becomes oppression. Without law, liberty also loses its nature and its name, and becomes licentiousness.").

[190] James Madison, *Letter to Spencer Roane* (Sept. 2, 1819), *in* JAMES MADISON: WRITINGS, *supra* note 189, at 736.

[191] 1 CHARLES DE SECONDAT MONTESQUIEU, THE SPIRIT OF LAWS 181 (1st Amer. from the 5th London ed. 1802).

[192] THE FEDERALIST No. 51, at 298 (James Madison) (Clinton Rossiter ed., 1961) (citing Montesquieu for the proposition that the three branches of government, yet intertwined, do not violate the principle of separation of powers).

[193] *In re State Bd. for Educator Certification, 452 S.W.3d 802, 808 n.38 (Tex. 2013).*

a legal Rorschach test. I oppose judicial activism, inventing rights not rooted in the law. But the opposite extreme, judicial passivism, is corrosive, too—judges [**127] who, while not activist, are not *active* in preserving the liberties, and the limits, our Framers actually enshrined. The Texas Constitution is irrefutably framed in proscription, imposing unsubtle and unmistakable limits on government power. It models the federal Constitution in a fundamental way: dividing government power so that each branch checks and balances the others. But as we recently observed, "the Texas Constitution takes Madison a step further by including, unlike the federal Constitution, an explicit Separation of Powers provision to curb overreaching and to spur rival branches to guard their prerogatives."[194] The Texas Constitution constrains government power in another distinctive way: It lacks a Necessary and Proper Clause, often invoked to expand Congress's powers beyond those specifically enumerated.[195] Moreover, as noted above, it contains a Privileges or Immunities Clause that, unlike the federal version, has never been judicially nullified.[196]

 [*120]  As judges, we have no business second-guessing *policy* choices, but when the Constitution is at stake, it is not impolite to say "no" to government. Liberties for "We the People" necessarily [**128] mean limits on "We the Government." That's the very reason constitutions are written: to stop government abuses, not to ratify them. Our supreme duty to our dual constitutions and to their shared purpose—to "secure the Blessings of Liberty"[197]—requires us to check constitutionally verboten actions, not rubber-stamp them under the banner of majoritarianism. For people to live their lives as they see fit, a government of limited powers must exercise that power not with force but with reason. And an independent judiciary must *judge* government actions, not merely rationalize them. Judicial restraint doesn't require courts to ignore the nonrestraint of the other branches, not when their actions imperil the constitutional liberties of people increasingly hamstrung in their enjoyment of "Life, Liberty and the pursuit of Happiness."[198]

The power to "protect the public" is a heady and fearsome one.[199] Government is charged with promoting the general welfare, but it must always act within constitutional constraints. Our two constitutions exist to advance two purposes: individual liberty through limited government. Our federal and state Founders saw liberty as America's natural, foundational value, and our rights as too numerous to be exhaustively listed. Liberty both *justifies* government (to erect basic civic guardrails) and *limits* government (to minimize abridgements on human freedom). In other words, our dual constitutional charters exist not to *exalt* majority rule but to protect prepolitical rights that *limit* majority rule. Majoritarianism cannot be permitted to invert our bottom-line constitutional premise. The might of the majority, whatever the vote count, cannot trample individuals' rights recognized in both our federal and state Constitutions, not to mention in our nation's first law, the Declaration.[200]

---

[194] *Id.* at 808 n.39 (citing Tex. Const. art. II, § 1).

[195] U.S. Const. art. I, § 8, cl. 18.

[196] *See supra* notes 40, 86, and 145, and accompanying text.

[197] U.S. CONST. pmbl. *See also* Tex. Const. art. I (declaring its utmost mission to safeguard "the general, great and essential principles of liberty and free government").

[198] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) (underscoring that governments are "instituted among Men" in order to "secure" our "unalienable Rights, that among these are Life, Liberty and the pursuit [**129] of Happiness").

[199] *See, supra* notes 12-18 (discussing *Buck v. Bell*, 274 U.S. 200, 47 S. Ct. 584, 71 L. Ed. 1000 (1927), which upheld forcible sterilization of the "feeble-minded").

[200] Congress placed the Declaration of Independence at the outset—page 1, volume 1—of the United States Code, [**130] under this heading: "Organic Laws of the United States of America." Lincoln describes the Declaration of Independence as a lens through which just laws become clear—as the framework for interpreting the law—when he calls the Declaration an "apple of gold," and the Constitution the "frame of silver" around it. ABRAHAM LINCOLN, *Fragment on the Constitution and the Union* (Jan. 1861), *in* 4 THE

B.

*Our State Constitution, like Madison's Federal handiwork, is infused with Newtonian genius: three rival branches locked in synchronous orbit by competing interests—ambition checking ambition.*[201]

[*121] Isaac Newton died in 1727, before James Madison, the Father of the U.S. Constitution, was even born, but our Founders, both state and federal, understood political physics: "power seized by one branch necessarily means power ceded by another."[202] Newton's Third Law of Motion, while a physical law, also operates as a political law. When one branch of government exerts a force, [**131] there occurs an equal and opposite counterforce. The Laws of Constitutional Motion require these rival branches to stay within their sphere, flexing competing forces so that power is neither seized nor ceded.

Our Framers understood that government was inclined to advance its own interests, even to the point of ham-fisted bullying, which is precisely why the Constitution was written—to keep *government* on a leash, not We the People. But individual liberty pays the price when our ingenious system of checks and balances sputters, including when the judiciary subordinates liberty to the congeries of group interests that dictate majoritarian outcomes. Daily and undeniably, there exist government incursions that siphon what Thomas Jefferson called our "due degree of liberty"[203]—"siphoning that often occurs subtly,

with such drop-by-drop gentleness as to be imperceptible."[204]

Police power is undoubtedly an attribute of state sovereignty, but sovereignty ultimately resides in "the people of the State of Texas."[205] The Texas Constitution limits government encroachments, and does so on purpose. "Our Bill of Rights is not mere [**133] hortatory fluff; it is a purposeful check on government power."[206] And everyday Texans, and the courts that serve them, must remain vigilant. Government will always insist it is acting for the public's greater good, but as Justice Brandeis warned in his now-celebrated *Olmstead* dissent: "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent."[207]

Before solving a problem, you must first define it. The Lone Star State boasts a spirit of daring and rugged independence, virtues essential to personal and economic [*122] dynamism, but bureaucratic

---

COLLECTED WORKS OF ABRAHAM LINCOLN 169 (Roy P. Basler ed., 1953). The Constitution, indeed all laws, must not be considered independently of the ultimate purpose for which they are designed: not to unhinge democracy, but to secure liberty.

[201] *In re State Bd. for Educator Certification, 452 S.W.3d 802, 808 (2014).*

[202] *Id.*

[203] Letter from Thomas Jefferson to James Madison, Paris (1787), *in* THE JEFFERSONIAN ENCYCLOPEDIA: A COMPREHENSIVE COLLECTION

OF THE VIEWS OF THOMAS JEFFERSON 277 (John P. Foley ed., 1900). *See also* Edmund Burke, *Speech on Moving His Resolutions for Conciliation with the Colonies*, Mar. 22, 1775, *in* EDMUND BURKE: SELECTED WRITINGS [**132] AND SPEECHES 147, 158 (Peter J. Stanlis ed., Doubleday & Co. 1968) ("In this character of the Americans a love of freedom is the predominating feature which marks and distinguishes the whole: and as an ardent is always a jealous affection, your colonies become suspicious, restive, and untractable, whenever they see the least attempt to wrest from them by force, or shuffle from them by chicane, what they think the only advantage worth living for. This fierce spirit of liberty is stronger in the English colonies, probably, than in any other people of the earth . . .").

[204] *Robinson v. Crown Cork & Seal, Inc., 335 S.W.3d 126, 165 (Tex. 2010)* (Willett, J., concurring). Or, as 18th-century philosopher David Hume cautioned, "It is seldom, that liberty of any kind is lost all at once." Rather, suppression "must steal in upon [people] by degrees, and must disguise itself in a thousand shapes, in order to be received." DAVID HUME, OF THE LIBERTY OF THE PRESS (1741), *in* David HUME: POLITICAL ESSAYS 3 n.4 (Knud Haakonssen ed., 1994).

[205] TEX. CONST. pmbl.

[206] *Robinson, 335 S.W.3d at 164* (Willett, J., concurring).

[207] *Olmstead v. United States, 277 U.S. 438, 479, 48 S. Ct. 564, 72 L. Ed. 944 (1928)* (Brandeis, J., dissenting), *overruled by Katz v. United States, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).*

headwinds imperil that vitality. Almost two centuries ago, around the time of Texas independence, Alexis de Tocqueville, a keen observer of early America, warned of "soft despotism" wrought by government that "covers the surface of society with a network of small complicated rules" that "even the most original and energetic characters cannot penetrate."[208] Tocqueville's warnings for 1835 America apply equally to 2015 Texas, where "administrative despotism," though doubtless well meaning, inflicts a real-world toll on [**134] honest, hardworking Texans:

> The will of man is not shattered, but softened, bent, and guided; men are seldom forced by it to act, but they are constantly restrained from acting. Such a power does not destroy, but it prevents existence; it does not tyrannize, but it compresses, enervates, extinguishes, and stupefies a people, till each nation is reduced to nothing better than a flock of timid and industrious animals, of which government is the shepherd.[209]

Government's conception of its own power as limitless is hard-wired. But under the Texas Constitution, government may only pursue constitutionally permissible ends. Naked economic protectionism, strangling hopes and dreams with bureaucratic red tape, is not one of them. And such barriers, often stemming from interest-group politics, are often insurmountable for Texans on the lower rungs of the economic ladder (who unsurprisingly lack political power)—not to mention the harm inflicted on consumers deprived of the fruits of industrious entrepreneurs. Irrational licensing laws oppress hard-working Texans of modest means, men and women struggling to do what Texans of all [**135] generations have done: to better their families through honest enterprise.[210]

V.

*[W]hile baseball may be the national pastime of the citizenry, dishing out special economic benefits to certain in-state industries remains the favored pastime of state and local governments.*[211]

Governments are "instituted among Men" to "secure" preexisting, "unalienable Rights."[212] Our federal and Texas Constitutions are charters of liberty, not wellsprings of boundless government power. Madison adroitly divided political power because he prized a "We the People" system that extolled citizens over a monarchical system of rulers and subjects. The trick was to give government its requisite powers while structurally hemming in that power so that fallible men wouldn't become as despotic as the hereditary monarchs they had fled and fought. [**136]

Economic liberty is "deeply rooted in this Nation's history and tradition,"[213] and the right to engage in productive enterprise is as central to individual freedom as [*123] the right to worship as one chooses. Indeed, Madison declared that "protection" of citizens' "faculties of acquiring property" is the "first object of government,"[214] and admonished that a government whose "arbitrary restrictions" deny citizens "free use of their faculties, and free choice of their occupations" was

---

[208] ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 319 (P. Bradley ed.1994).

[209] *Id.*

[210] To the degree that "footnote four" of *Carolene Products* says

---

"discrete and insular minorities" in the political arena deserve special judicial protection, it is tough to imagine a group more disadvantaged by the majoritarian political process than would-be entrepreneurs denied their calling by Byzantine, State-enforced barriers enacted at the behest of entrenched, politically powerful interests.

[211] *Powers v. Harris,* 379 F.3d 1208, 1221 (10th Cir. 2004).

[212] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

[213] *Washington v. Glucksberg,* 521 U.S. 702, 703, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997).

[214] THE FEDERALIST No. 10, at 78 (James Madison) (Clinton Rossiter ed., 1961).

"not a just government."[215] When it comes to occupational licensing—often less about protecting the public than about bestowing special privileges on political favorites—government power has expanded unchecked. But government doesn't get to determine the reach of its own power, something that subverts the original constitutional design of limited government. The Texas Constitution imposes limits, and imposes them intentionally.[216] Bottom line: Police power cannot go unpoliced.

I believe judicial passivity is incompatible with individual liberty and constitutionally limited government. Occupational freedom, the right to earn a living as one chooses, is a nontrivial constitutional right entitled to nontrivial judicial protection. People are owed liberty by virtue of their very humanity—"endowed by their Creator," as the Declaration affirms.[217] And while government has undeniable authority to regulate economic activities to protect the public against fraud and danger, freedom should be the general rule, and restraint the exception.

The Founders understood that a "limited Constitution" can be preserved "no other way than through the medium of courts of justice, whose duty it must be to declare all [**138] acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing."[218] Judicial

duty—"so arduous a duty," Hamilton called it—requires courts to be "bulwarks of a limited Constitution against legislative encroachments,"[219] including holding irrational anticompetitive actions unconstitutional. Such is life in a constitutional republic, which exalts constitutionalism over majoritarianism precisely in order to tell government "no." That's the paramount point, to tap the brakes rather than punch the gas.

The Court today rejects servility in the economic-liberty realm, fortifying protections for Texans seeking what Texans have always sought: a better life for themselves and their families. There remains, as Davy Crockett excitedly wrote his children, "a world of country to settle."[220]

Don R. Willett

Justice

**OPINION DELIVERED**: June 26, 2015

JUSTICE BOYD, concurring in judgment.

I concur in the Court's judgment but do not fully agree [**139] with its reasoning. Specifically, I do not agree with the Court's [*124] adoption of a new alternative test under which the Texas Constitution's "due course of law" provision invalidates any law that is "so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest." *Ante* at __. Nevertheless, I conclude that the Texas statute requiring the petitioners—who merely remove superfluous hair using tweezing techniques—to obtain an esthetician's license is arbitrary and unreasonable, and therefore oppressive, because it has no rational relationship to a legitimate government interest.

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty,

---

[215] MADISON, *Property* (Mar. 29, 1792), *in* JAMES MADISON: WRITINGS, *supra* note 189, at 516. The author of the Declaration agreed: "[E]very one has a natural right to choose that [vocation] [**137] which he thinks most likely to give him comfortable subsistence." THOMAS JEFFERSON, THOUGHTS ON LOTTERIES (1826), *in* THE JEFFERSONIAN ENCYCLOPEDIA 609 (John P. Foley ed., Funk & Wagnalls Co. 1900).

[216] As discussed above, *see supra* notes 194-96 and accompanying text, the Texas Constitution does not mirror exactly the U.S. Constitution, and our Privileges or Immunities Clause, best I can tell, is alive and well, unlike its federal counterpart.

[217] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

[218] THE FEDERALIST NO. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[219] *Id.* at 469.

[220] Letter from David Crockett to his children (Jan. 9, 1836), *in* H.W. BRANDS, LONE STAR NATION 332 (2004).

property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. Under our precedent, this guarantee "contains both a procedural component and a substantive component." *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 632 (Tex. 1996). The issue here is whether requiring the petitioners to obtain an esthetician's license as a condition for practicing their trade of eyebrow threading violates their substantive rights to liberty, property, privileges, or immunities without due course [**140] of law.

As the Court notes, this Court has "not been entirely consistent" in its articulation of the standard by which we review the constitutionality of economic regulations under the due course of law provision. *Ante* at __. Through the years, for example, we have variously said that laws are presumed to be constitutional and a law is invalid only if:

• it is "unreasonable and in contravention of common right," *Milliken v. City Council of Weatherford*, 54 Tex. 388, 394 (1881);

• it invades rights "without justifying occasion, or in an unreasonable, arbitrary, and oppressive way," *Hous. & Tex. Cent. Ry. Co. v. City of Dall.*, 98 Tex. 396, 84 S.W. 648, 653 (Tex. 1905);

• it is not "sufficiently rational and reasonable," *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 525 (Tex. 1995);

• it has "no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense," *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 938 (Tex. 1998) (quoting *Nectow v. City of Cambridge*, 277 U.S. 183, 187-88, 48 S. Ct. 447, 72 L. Ed. 842 (1928));

• it is not "designed to accomplish an objective within the government's police power and [no] rational relationship exists between the ordinance and its purpose, *id.*;

• the "enacting body could [not] have rationally believed at the time of enactment that the ordinance would promote its objective," *id.*;

• it is not "at least fairly debatable that the [Legislature's] decision was rationally [**141] related to legitimate government interests," *id.*; or

• it is "*clearly* arbitrary and unreasonable," *id.*

These precedents illustrate the difficulty the Court has had articulating the appropriate standard. I would read our prior descriptions together, to provide that a law violates the substantive due course of law provision only if it is arbitrary and unreasonable, and therefore oppressive, because it has no rational relationship to a legitimate government interest. The Court, by contrast, holds that a law is invalid if its "purpose could not arguably be rationally related to a legitimate governmental interest" or "when considered as a whole, [its] [*125] actual, real-world effect as applied to the challenging party could not arguably be rationally related to, *or is so burdensome as to be oppressive in light of*, the governmental interest." *Ante* at __ (emphasis added). In other words, the Court holds that a law is invalid if it is "burdensome" and "oppressive in light of" the legitimate governmental interest, even if it is rationally related to that interest. As the CHIEF JUSTICE notes in his dissent, "[n]either this Court nor any other the Court can find has ever used 'oppressive' as a test for substantive [**142] due process." *Post* at __; *see Hous. & Tex. Cent. Ry. Co.*, 84 S.W. at 653 (holding Constitution prohibits laws that invade substantive rights "without justifying occasion, or in an unreasonable, arbitrary, and oppressive way," not "*or* oppressive way").

I agree that the Court's new burdensome/oppressive

standard is "loose"—too "loose," in fact, to be useful in our analysis of these types of constitutional challenges. *See post* at __ (Hecht, C.J., dissenting). Determining what "burdensome" or "oppressive" means in this context will be nigh impossible, unless we use those terms, as we have in our prior opinions, to refer to the burdens that result from a law that is not rationally related to a legitimate government interest. Like JUSTICE GUZMAN, "I have significant doubts that this standard is workable in practice." *Post* at __. And like both dissenting Justices, I believe the burdensome/oppressive standard makes it too easy for courts to invalidate regulations for their own personal policy reasons. *See post* at __ (Hecht, C.J., dissenting); *post* at __ (Guzman, J., dissenting). Because, as JUSTICE GUZMAN notes, courts cannot and should not "legislate from the bench," *post* at __, the bar should be set very high, to ensure that it is indeed the Constitution, [**143] and not merely a court, that invalidates a law.

But the bar cannot be insurmountable, and if the application of any regulatory licensing scheme were ever constitutionally invalid, this one is. I need not repeat my colleagues' descriptions, because everyone (including the State and both dissenting Justices) agrees that requiring eyebrow threaders to complete the current requirements necessary to obtain an esthetician's license "is obviously too much." *Post* at __ (Hecht, C.J., dissenting); *post* at __ (Guzman, J., dissenting). Certainly, "[i]f there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void." *State v. Richards*, 157 Tex. 166, 301 S.W.2d 597, 602 (Tex. 1957). But there is no difference of opinion here: requiring eyebrow threaders to obtain an esthetician's license is neither necessary nor reasonable. Requiring them to obtain training in sanitation and safety is rational, but requiring them to get an esthetician's license is not.

The CHIEF JUSTICE suggests that "there is . . . evidence from which the Legislature could

reasonably conclude that the required instruction and testing would further its goal of protecting [**144] public health and safety through the regulation of cosmetology." *Post* at __. I agree that protecting public health and safety is a legitimate government interest, but I do not agree that requiring eyebrow threaders to meet the current requirements for obtaining an esthetician's license is *rationally* related to achieving that interest. Under the dissenting Justices' approach, if the Legislature decided to require eyebrow threaders to obtain a medical license, we would have to uphold that decision because that licensing scheme also "instruct[s] in general sanitation and safety practices." *Post* at __ (Hecht, C.J., dissenting).

[*126] It may be convenient to impose the existing esthetician licensing scheme on eyebrow threaders, but in my view it is also arbitrary and unreasonable, and therefore oppressive, because doing so is not rationally related to the legitimate government interest in promoting public health and safety. Courts should not second-guess the Legislature, but in the end, as the CHIEF JUSTICE agrees, "the final authority to interpret and apply the Constitution belongs to the Judiciary[.]" *Post* at __. Although that authority is "not lightly to be exercised," *post* at __ (Hecht, C.J., dissenting), the Court is right to exercise [**145] it here.

I therefore concur in the judgment.

Jeffrey S. Boyd

Justice

Opinion delivered: June 26, 2015

**Dissent by:** Nathan L. Hecht; Eva M. Guzman

# Dissent

CHIEF JUSTICE HECHT, joined by JUSTICE GUZMAN and JUSTICE BROWN, dissenting.

This is one of those cases in which, once the Court has decided whom it wants to win, the less said the

better. Result is an inapt tool for shaping principle; it's supposed to work the other way around. And when principle ends up being mutilated, it can no longer be used to guide other results. Since it turns out that the Court thinks substantive due process means whatever judges say it means, it would be best to leave bad enough alone rather than pretend the idea has any support in the Constitution's text or history. The Court runs the risk that what passes for constitutional analysis around here will be seen as just picking words out of the air.

The Threaders deserve to have the yoke of the regulatory state thrown off, the shackles on their free enterprise shattered, in short—although brevity is not the hallmark of some of today's writings—to stick it to the man. And what better way to do all that than by having judges hold the State's 80-year-old cosmetology licensing scheme, also [**146] found in ten other states, unconstitutional as applied to eyebrow threading. The trouble is, this Court, like the United States Supreme Court, has repeatedly held that a statute with a rational basis does not violate substantive due process, and applying that standard here will not help the Threaders. Casting about, the Court comes up with "oppressive", a brand-new entrant in the substantive due process lexicon. Neither this Court nor any other the Court can find has ever used "oppressive" as a test for substantive due process. Which is great because the Court is now free—as free as the grateful Threaders from public health and safety regulation—to make up substantive due process from scratch.

Whether eyebrow threaders need 750 hours' training, or only 430, or 40, or 1, to practice their trade on the public is not for us to say, as long as the Legislature, whose job it is to say, is making a rational effort to protect public health and safety. As the Court acknowledges at one point, "it is not for courts to second-guess [legislative and agency] decisions as to the necessity for and the extent of training that should be required for different types

of commercial service providers."[1] The [**147] question for us is whether, by requiring 750 hours' training, the Legislature has violated substantive due process by depriving eyebrow threaders of their fundamental liberty without the due course of law guaranteed by the Texas Constitution.

Because the final authority to interpret and apply the Constitution belongs to the Judiciary, only the people themselves, by constitutional amendment, can alter the Court's substantive due process decisions. The Judiciary's authority is enormous and not lightly to be exercised. Justice Powell once observed that "[t]he history of substantive [*127] due process counsels caution and restraint."[2] The history to which he referred was the Supreme Court's own adventure with substantive due process beginning with *Lochner v. New York*,[3] in which the Court abrogated a state statute as "unreasonable, unnecessary and arbitrary",[4] and ending with *United States v. Carolene Products Company*,[5] in which the Court established that a statute with any rational basis will be upheld. The Court disregards the federal courts' experience with substantive due process in *Lochner* and its progeny, invents a new test unprecedented in American jurisprudence, and ushers in a new era [**148] of government by judges.

The Court, and JUSTICE WILLETT'S concurring opinion in its wild championing of economic liberty, seem oblivious to the reality that social liberty is no less important. The same substantive due process that can free eyebrow threaders from onerous training requirements can also be used to establish a right of privacy not otherwise to be

---

[1] *Ante* at __.

[2] *Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 229, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985)* (Powell, J., concurring) (citations omitted).

[3] 198 U.S. 45, 58-59, 25 S. Ct. 539, 49 L. Ed. 937 (1905).

[4] *Id. at 56*.

[5] 304 U.S. 144, 152, 58 S. Ct. 778, 82 L. Ed. 1234 (1938).

found in the Constitution.[6] Are restrictions on abortion "oppressive"? How about restrictions on marriage? Unconstrained by any meaningful standard, substantive due process allows judges to define liberty according to their personal policy preferences. History and reason warn that the Court has gone too far.

I respectfully dissent.

# I

The Legislature has regulated cosmetic services for 80 years. The original impetus was concern for public health and safety. "[T]he public," the Legislature found in the Cosmetology Act of 1935, "is daily exposed to disease due to insufficient care as to sanitation and hygiene [and should be protected by the Act] from inexperienced and unscrupulous beauty parlors and beauty culture schools".[7] Protection of the public health and

welfare remains [**149] the driving [*128] force for regulating cosmetology.[8] Beauty schools, salons, and practitioners are subject to "sanitation rules to prevent the spread of an infectious or contagious disease",[9] inspections to ensure compliance,[10] and investigation of public complaints.[11] The 1935 Act made it unlawful to practice, provide, or teach cosmetology—broadly defined to include any practice for beautifying the upper body[12]—without a license.[13] Applicants were required to complete 1,000 hours of training at a licensed school of beauty culture and pass an examination.[14]

In 1971, the Legislature rewrote the Act. An expanded definition of cosmetology specifically included "removing superfluous hair from the body by use of depilatories[15] or tweezers".[16] The revised

---

[6] *See, e.g., Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965).*

[7] Act of Apr. 25, 1935, 44th Leg., R.S., ch. 116, § 26, 1935 Tex. Gen. Laws 304, 311, *amended by* Act of Nov. 14, 1935, 44th Leg., 2d C.S., ch. 469, §§ 1-2, 1935 Tex. Gen. Laws 1846, 1846-1848. The 1935 Act and its successor provisions were codified first as article 734b in the former Penal Code, later as former article 734c, then "transferred" to former article 8451a of the Texas Revised Civil Statutes, which was in turn replaced by Chapter 1602 of the new Occupations Code. *See* Act of May 28, 1971, 62d Leg., R.S., ch. 1036, § 49, 1971 Tex. Gen. Laws 3389, 3402 (adopting a new Penal Code and repealing former articles); Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 5, 1973 Tex. Gen. Laws 883, 995, 996a, 996c (adopting a new Penal Code and transferring certain [**150] provisions to the Revised Civil Statutes); Act of May 13, 1999, 76th Leg., R.S., ch. 388, §§ 1, 6, 1999 Tex. Gen. Laws 1431, 2182-2206, 2439-2440 (adopting the Occupations Code, including Chapter 1602, and repealing former article 8451a); *see also* Act of May 28, 2005, 79th Leg., R.S., ch. 798, §§ 1.01, 6.01-.02, 2005 Tex. Gen. Laws 2734, 2735, 2759-2760 (adopting Chapter 1603 of the Occupations Code and repealing or amending related provisions in Chapters 1601 and 1602).

Before 1935, a statute required registration, but not licensing, of "beauty parlor" owners and operators, imposed certain health and cleanliness requirements, and sets fines for statutory violations. *See* Act of 1921, 37th Leg., R.S., ch. 79, 1921 Tex. Gen. Laws 155, 155-158, codified in TEX. PEN. CODE arts. 728-733 (Vernon's 1925).

[8] *See* House Comm. on Gov't Org., Bill Analysis, Tex. S.B. 384, 66th Leg., R.S. (1979) ("The need for regulation has primarily been based on the protection of the public health and welfare."); House Comm. on Public Health, Bill Analysis, Tex. S.B. 127, 69th Leg., R.S. (1985) ("The need for regulation has primarily been based on the protection of the public health and welfare.").

[9] Tex. Occ. Code § 1603.102.

[10] *Id.* §§ 1603.103, 1603.104.

[11] *Id.* § 51.252; *see also id.* § 1603.151.

[12] Act of Apr. 25, 1935, 44th Leg., R.S., [**151] ch. 116, § 3(a), 1935 Tex. Gen. Laws at 304, codified as former TEX. PEN. CODE art. 734b, § 3(a) ("Any person who with hands, or mechanical or electrical apparatus or appliances, or by the use of cosmetological preparations, antiseptics, tonics, lotions or creams, engages in any one or combination of the following practices for remuneration or pay, to-wit: cleansing, beautifying, or any kindred work of the scalp, face, neck, arm, bust, or upper part of the body or manicuring the nails of any person, shall be construed to be practicing the occupation of a cosmetologist.").

[13] *Id.* § 1, 1935 Tex. Gen. Laws at 304, codified as former TEX. PEN. CODE art. 734b, § 1.

[14] *Id.* §§ 9, 11(a), 1935 Tex. Gen. Laws at 306-307, codified as former TEX. PEN. CODE art. 734b, §§ 9, 11(a).

[15] A depilatory is "a cosmetic for the temporary removal of undesired hair". WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 605 (2002).

Act was more discriminating, creating five classes of licenses with different restrictions on the activities in which a holder could engage.[17] Training requirements ranged from 1,500 hours down to 150 hours,[18] and applicants had to pass written and practical examinations.[19] Since then, the Legislature has repeatedly adjusted the kinds of licenses and the training requirements for each.[20] There are now six classes of licenses with [**152] required training ranging from 1,500 hours to 320 hours.[21]

 [*129]  In 2005, the Legislature assigned the regulation of cosmetology to the Texas Department of Licensing and Regulation ("the Department"),[22] "the primary state agency responsible for the oversight of businesses, industries, general trades, and occupations that are regulated by the state and assigned to the department by the legislature."[23] The Department is managed by an executive [**153] director[24] and governed by the Texas Commission of Licensing and Regulation ("the Commission").[25] The Commission is comprised of seven members appointed by the Governor and confirmed by the Senate,[26] each of whom must be "a representative of the general public."[27] The Commission soon became aware of the practice of eyebrow threading, and in 2008 it began to insist that threading be included in the regulatory scheme like other forms of hair removal. In a 2011 case, the court of appeals was skeptical of the Department's position,[28] but after the decision issued, the Legislature amended the definition of cosmetology to include "removing superfluous hair from a person's body using depilatories, preparations, or *tweezing techniques*".[29] The

---

[16] Act of May 28, 1971, 62d Leg., R.S., ch. 1036, § 1(3)(C), 1971 Tex. Gen. Laws 3389, 3389, codified as former TEX. PEN. CODE art. 734c, § 1(3)(c).

[17] *Id.* §§ 13-17, 1971 Tex. Gen. Laws at 3392-3394, codified as former TEX. PEN. CODE art. 734c, §§ 13-17.

[18] *Id.*

[19] *Id.* §§ 4(d), 13-17, 1971 Tex. Gen. Laws. at 3391-3394, codified as former TEX. PEN. CODE art. 734c §§ 4(d), 13-17.

[20] *See, e.g.,* Act of May 28, 1979, 66th Leg., R.S., ch. 606, § 1, 1979 Tex. Gen. Laws 1340, 1343-1344 (amending former TEX. REV. CIV. STAT. art. 8451a, §§ 10-12); Act of May 27, 1991, 72d Leg., R.S., ch. 626, § 11, 1991 Tex. Gen. Laws 2260, 2265 (adding § 13A to former Tex. Rev. Civ. Stat. art. 8451a); Act of May 27, 2011, 82d Leg., R.S., ch. 1241, §§ 15-17, 2011 Tex. Gen. Laws 3319, 3325-3326 (amending Tex. Occ. Code § 1602.257 and adding §§ 1602.2571, 1602.2572, and 1602.261).

[21] Tex. Occ. Code §§ 1602.254-.2572, 1602.261, *amended by* Act of May 22, 2015, 84th Leg., R.S., H.B. 2717, *available at* http://www.capitol.state.tx.us/tlodocs/84R/billtext/pdf/HB02717F.pdf .

[22] Act of May 28, 2005, 79th Leg., R.S., ch. 798, §§ 1.01, 6.01-.02, 2005 Tex. Gen. Laws 2734, 2735, 2759-2760 (adopting Chapter 1603 of the Occupations Code and repealing or amending related provisions in Chapters 1601 and 1602); *see* Tex. Occ. Code § 1603.002.

[23] Tex. Occ. Code § 51.051(a). [**154]

[24] *Id.* §§ 51.101, 51.103.

[25] *Id.* § 51.051(b).

[26] *Id.* § 51.052(a).

[27] *Id.* § 51.053(a).

[28] *Kuntz v. Khan,* No. 03-10-00160-CV, 2011 Tex. App. LEXIS 446, 2011 WL 182882, *7-8 (Tex. App.—Austin, Jan. 21, 2011, no pet.) (mem. op.), *available at* http://www.search.txcourts.gov/Case.aspx?cn=03-10-00160-CV&coa=coa03 . In an interlocutory appeal from the trial court's partial denial of the governmental defendants' plea to the jurisdiction and temporary injunction barring defendants from taking any action to further investigate, regulate, or otherwise disrupt Khan's business, the Department argued that eyebrow threading constitutes the practice of cosmetology in three ways: threading involves "beautifying a person's face" using an "appliance", "administering a facial treatment", and "removing superfluous hair from a person's body using depilatories". *See* Tex. Occ. Code §§ 1602.002(7), 1602.002(8), 1602.002(9). In affirming the temporary injunction, the court of appeals concluded, *inter alia,* that the trial court reasonably determined that Khan had shown "a probable right to recovery based on the plain language of the statute". *Khan,* 2011 Tex. App. LEXIS 446, 2011 WL 182882, at *8.

[29] Act of May 27, 2011, 82d Leg., R.S., ch. 1241, § 12, 2011 Tex. Gen. Laws 3319, 3323-3324 (emphasis in original) (amending Tex. Occ. Code § 1602.002(a)(9)) to substitute "tweezing techniques" for

Department then amended its regulations to define "tweezing techniques" as "the extraction of hair from the hair follicle by use of . . . an instrument, appliance or implement . . . made of . . . thread or other material."[30]

The Department requires an esthetician specialty license for threading.[31] The license covers various [**155] skin care treatments such as facials and cleansing, "beautifying a person's face, neck, or arms" with preparations or other products, and removing superfluous hair from the skin.[32] An applicant for an esthetician specialty license must complete 750 hours of instruction in a [*130] licensed beauty culture school,[33] half the hours required for an "operator license" allowing the performance of "any practice of cosmetology."[34] The instruction for an esthetician specialty license covers the following subjects[35] :

⊞ Go to table1

Depending on the school, the training can take from nine to sixteen months and cost anywhere from $3,500 for a public junior college to $22,000 for a private school. Threading is not a required part of the curriculum, which generally covers "superfluous hair removal", and only a handful of schools offer instruction in threading. [**156] Health, safety, and sanitation issues are covered as part of the first five subjects listed above; these subjects account for 430 of the prerequisite hours.

An applicant must also pass a written and a practical examination.[36] The examinations test on safety, sanitation, and disinfectant criteria as well as the ability to perform various services. Hair removal is part of the practical exam, though threading is not, but an applicant may use threading to demonstrate her hair-removal ability.[37]

Cosmetology regulations require eyebrow threaders, like other cosmetologists, to wash their hands or use a liquid hand sanitizer before performing any services on a customer; dispose of all single-use items that have come in contact with the client's skin; store thread in sealed bags or covered containers and in a clean, dry, and debris-free storage area; and clean, disinfect, and sterilize or sanitize all multi-use items prior to each service.[38] Regulations further require cosmetologists and estheticians to clean the client's skin before performing hair removal services.[39] Special precautions must be taken with items such as creams, astringents, lotions, and other preparations, which are subject to possible cross-contamination.[40] Single-use items used to apply these products—such as tissue, cotton pads, or cotton balls—must be discarded in a trash receptacle [*131] that is emptied daily and kept clean by washing or using plastic liners.[41] Facial chairs, beds, and headrests must be cleaned and disinfected before service is provided to a client.[42] Regulations also provide specific procedures to follow whenever [**158] a cosmetology service causes bleeding.[43]

The Threaders acknowledge that threading poses

---

[30] 37 Tex. Reg. 681, 681 (Feb. 10, 2012), codified at 16 Tex. Admin. Code § 83.10(36).

[31] Tex. Occ. Code § 1602.257 (eligibility for esthetician specialty license).

[32] Id. § 1602.257(a) (setting out the services that the holder of an esthetician license is authorized to perform).

[33] Id. § 1602.257(b)(3).

[34] Id. §§ 1602.254(a) (permitting "any practice of cosmetology"), (b)(3) (required hours).

[35] 16 TEX. ADMIN. CODE § 83.120(b) (esthetician curriculum).

[36] Id. §§ 83.20(a)(6), (b)(6), 83.21; see also Tex. Occ. Code §§ 1602.254(c)(3), 1602.262(a)(2).

[37] Petitioners argue that they could not do so because the examinee is required to "hold the [client's] skin taut" while removing the hair, and the threading technique requires two hands. But the record shows that it is nevertheless necessary that the client's skin be held taut during threading and that the usual practice is to direct the client to hold her own skin taut during the threading [**157] process. The record does not tell us whether or not this would suffice during the examination.

[38] 16 Tex. Admin. Code §§ 83.102(c), (d), (f), 83.104(a), (d), (e), 83.105(a), (c), (e), (f).

[39] Id. § 83.105(b).

[40] Id. § 83.104(g).

[41] Id. §§ 83.102(i), 83.104(e).

[42] Id. § 83.104(c).

[43] Id. § 83.111.

469 S.W.3d 69, *131; 2015 Tex. LEXIS 617, **157

health risks. In the trial court, they offered evidence from a physician, Dr. Patel (no relation to Petitioner Ashish Patel), that removing a hair from its follicle opens a portal through which bacteria or a virus can permeate the skin. Dr. Patel opined that threading may lead to "redness, swelling, itching, inflammation of the hair follicles, discoloration, and . . . superficial bacterial and viral infections." She testified that threading could cause the spread of infections such as flat warts, skin-colored lesions known as molluscum contagiosum, pink eye, ringworm, impetigo, and methicillin-resistant staphylococcus aureus (often called a "staph infection"). She opined that a threader's failure to use appropriate sanitation practices—such as using disposable materials properly, cleaning the work station, using effective hand-washing techniques, and correctly treating skin irritations and abrasions—can expose threading clients to infection and disease. She also testified that these health risks can be fully addressed by giving threaders [**159] one hour's training in sanitation and hygiene.

The Threaders allege that, as applied to them, the cosmetology licensing scheme violates substantive due process—that is, that it deprives them of economic liberty without due course of law in violation of Article I, Section 19 of the Texas Constitution. The Threaders assert that Texas' regulation of cosmetology "places senseless burdens on eyebrow threaders and threading businesses without any actual benefit to public health and safety." But the Threaders acknowledge that Texas' longstanding regulation of cosmetology, including superfluous hair removal, is needed to protect the public health. They argue only that it is excessive.

## II

On our record, Texas' regulation of threading seems excessive and misguided as a matter of policy, though I hasten to add, nothing of what prompted the regulation is before us. We have conducted no

investigations and held no hearings. As in any case, we know what the parties have told us, and nothing more. This distinguishes the Judiciary from the Legislature. We are ill-equipped to set policy because we have no way of summoning the various interests for input or exploring all considerations. But on this record, threading regulation is obviously too much.

[**160] Is it also unconstitutional? Federal and Texas constitutional protections of due process are closely related. The Fifth Amendment to the United States Constitution, adopted by Congress in 1789 and ratified by the states two years later, provides that no person shall "be deprived of life, liberty, or property, without due process of law".[44] The Fourteenth Amendment, ratified in 1868, prohibits the states from violating the same guarantee.[45] In between, in 1845, the first Constitution for the State of Texas provided that "[n]o citizen of this State shall be deprived of life, liberty, [or] property . . . except by [*132] due course of the law of the land."[46] The provision is now Article I, Section 19 of the Texas Constitution.

## A

This Court has recognized that Texas' due course of law guarantee protects both procedural and substantive rights.[47] But we have been mindful that applying substantive due process doctrine to economic regulation has never met with recognized success. The United States Supreme Court has vacillated in its view of the scope of federal due process protection. In *Lochner v. New York*, the Supreme Court famously took a broad view, holding that New York's regulation of bakers' working hours violated the Fourteenth Amendment.[48] Finding an implicit right of contract in the United States Constitution, the Supreme

---

44  U.S. Const. amend. V.
45  U.S. Const. amend. XIV, § 1.
46  Tex. Const. OF 1845, art. I, § 16.
47  Barshop v. Medina Cnty. Underground Water Conservation Dist., 925 S.W.2d 618, 632 (Tex. 1996).
48  198 U.S. 45, 58-59, 25 S. Ct. 539, 49 L. Ed. 937 (1905) [**161] .

Court concluded that whether the state regulation deprived bakers of this right depends on whether it is:

> a fair, reasonable, and appropriate exercise of the police power of the state, or [rather] an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family[.][49]

Justice Oliver Wendell Holmes dissented, warning:

> This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law[.] It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this, and which equally with this interfere with the liberty to contract. Sunday laws and usury laws are ancient examples. . . . Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of *laissez faire*. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel [**162] and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the

United States.[50]

Subsequent cases proved true Holmes' warning that a mere reasonableness standard for substantive due process was unworkable and that judges cannot practically or legally constitutionalize economic theory.[51] *Lochner*'s substantive due process adventure soon ended.

[*133] Thirty-three years later, the Supreme Court recanted *Lochner*, stating matter-of-factly, as if it should always have been obvious:

> regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed, it is of such a character as to preclude the assumption that it rests upon some rational basis . . . .[52]

This requirement that economic regulation need only bear a rational relationship to a legitimate state interest is far more [**164] deferential to state legislatures than *Lochner*'s reasonableness test. Later reflecting on the passing of the *Lochner* era,

---

49 Id. at 56.

50 Id. at 75-76 (Holmes, J., dissenting).

51 See, e.g., New State Ice Co. v. Liebmann, 285 U.S. 262, 278, 52 S. Ct. 371, 76 L. Ed. 747 (1932) (striking down a state law prohibiting the sale of ice without a permit as unreasonable because the sale of ice was not a "public business" that could be so regulated); Louis K. Liggett Co. v. Baldridge, 278 U.S. 105, 113-114, 49 S. Ct. 57, 73 L. Ed. 204 (1928) (prohibition on anyone not a licensed pharmacist owning a pharmacy or drug store struck down because the state had not shown a "reasonable relationship to the public health"); Adams v. Tanner, 244 U.S. 590, 596-597, 37 S. Ct. 662, 61 L. Ed. 1336 (1917) (finding a statute prohibiting employment agencies from demanding or receiving fees from workers "arbitrary and oppressive" and "unduly restrict[ive]"); Bunting v. Oregon, 243 U.S. 426, 433-434, 438, 37 S. Ct. 435, 61 L. Ed. 830 (1917) (law that prohibited employees in factories from working more than 10 hours a day, or 13 hours a day if paid overtime, upheld as a reasonable exercise of the police power). Compare Adkins v. Children's Hosp., 261 U.S. 525, 559, 43 S. Ct. 394, 67 L. Ed. 785 (1923) (minimum wage requirement for women is an unconstitutional intrusion on freedom [**163] of contract, not proper exercise of the police power), with W. Coast Hotel Co. v. Parrish, 300 U.S. 379, 399-400, 57 S. Ct. 578, 81 L. Ed. 703 (1937) (minimum wage requirement for women and children is proper exercise of police power, as a means of protection for those "in an unequal position with respect to bargaining power"); compare Muller v. Oregon, 208 U.S. 412, 416, 423, 28 S. Ct. 324, 52 L. Ed. 551 (1908) (limitation on hours worked in "any mechanical establishment, or factory, or laundry" by women upheld as a valid exercise of the police power aimed at the protection of women), and Holden v. Hardy, 169 U.S. 366, 395, 18 S. Ct. 383, 42 L. Ed. 780 (1898) (limitation on hours worked in underground mines a valid exercise of the police power for the protection of those employed in a dangerous profession), with Lochner, 198 U.S. at 58 (limitation on hours worked in a bakery is not a valid exercise of the police power).

52 United States v. Carolene Prods. Co., 304 U.S. 144, 152, 58 S. Ct. 778, 82 L. Ed. 1234 (1938).

469 S.W.3d 69, *133; 2015 Tex. LEXIS 617, **163

Justice Douglas wrote for the Supreme Court:

> The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. . . . For protection against abuses by legislatures the people must resort to the polls, not to the courts.[53]

## B

The United States Constitution does not, of course, prohibit the states from experimenting with substantive due process based in their own constitutions,[54] and Texas has done a bit of that. Twenty years ago we summarized the case law thusly:

> Texas courts have not been consistent in articulating a standard of review under the due course clause. Our courts have sometimes indicated that section 19 provides an identical guarantee to its federal due process counterpart. Under federal due process, a law that does not affect fundamental rights or interests here—such as the economic legislation at issue here—is valid if it merely bears a rational relationship to a legitimate state interest. [*134] On other [**165] occasions, however, our Court has attempted to articulate our own independent due course standard, which some courts have characterized as more rigorous than the federal standard.[55]

But, in the decades since the federal courts adopted the rational basis test, we have not wandered far from that standard. Even in *State v. Richards*—the case relied on principally by the Threaders to support heightened scrutiny of economic regulation—the Court's reasoning and result were deferential to the legislation at issue. We concluded that a provision authorizing forfeiture of a vehicle that had been used in furtherance of a crime without the owner's knowledge did not contravene the Texas Constitution.[56] We explained:

> A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void.[57]

Though we did not refer to the federal rational basis test, our analysis was consistent [**166] with it.

For the past 20 years, we have consistently adhered to the rational basis test. In *Barshop v. Medina County Underground Water Conservation District*, we upheld water regulations against a substantive due process challenge as "rationally related to legitimate state purposes in managing and regulating this vital resource."[58] In *City of San Antonio v. TPLP Office Park Properties*, we applied the rational basis test to city street regulations.[59] We explained that the proper inquiry "is whether the actions rationally could have been related to a proper exercise of its police power."[60] And in *Mayhew v. Town of Sunnyvale*, we upheld a zoning ordinance, explaining:

> A generally applicable zoning ordinance will survive a substantive due process challenge if it is designed to accomplish an objective within the government's police power and if a rational relationship exists between the ordinance and

---

53  Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 488, 75 S. Ct. 461, 99 L. Ed. 563 (1955) (citations omitted) (quoting Munn v. Illinois, 94 U.S. 113, 134, 24 L. Ed. 77 (1876)).

54  Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 74-78, 21 L. Ed. 394 (1872).

55  Tex. Workers' Comp. Comm'n v. Garcia, 893 S.W.2d 504, 525 (Tex. 1995) (citations omitted) (internal quotation marks omitted); see also Trinity River Auth. v. URS Consultants, Inc., 889 S.W.2d 259, 263 & n.5 (Tex. 1994).

56  State v. Richards, 157 Tex. 166, 301 S.W.2d 597, 599-600, 602-603 (Tex. 1957) (on certified questions from court of civil appeals).

57  Id. at 602.

58  925 S.W.2d 618, 631-633 (Tex. 1996).

59  218 S.W.3d 60, 65 (Tex. 2007) (per curiam).

60  Id.

its purpose. This deferential inquiry does not focus on the ultimate effectiveness of the ordinance, but on whether the enacting body could have rationally believed at the time [**167] of enactment that the ordinance would promote its objective. If it is at least fairly debatable that the decision was rationally related to legitimate government interests, the decision must be upheld. The ordinance will violate substantive due process only if it is *clearly* arbitrary and unreasonable.[61]

Under our precedent, a clearly arbitrary and unreasonable regulation is one that has no rational relationship to its purpose in furthering a legitimate state interest.

[*135] The Court instead opts to concoct an entirely new standard from the differing terminology used in our precedents. To avoid violating substantive due process, a statute must not be "clearly arbitrary and unreasonable", must be sufficiently "rational and reasonable", must "strike [] a fair balance" between the legislative purpose and individual rights, must be "justified", and must not be "oppressive" or "in contravention of common right".[62] Put all these words in a blender and out pours the correct standard: a statute must not be "so unreasonably burdensome that it becomes oppressive". Reasonable burdensomeness is okay. And I think the Court really means *unduly* oppressive, [**168] as distinguished from the oppressiveness of the government in general. The analysis would be laughable if the consequences were not so serious.[63] One cannot distill a single test from common elements of the rational basis and "fair balance" standards; one must choose between them. Instead, the Court breeds a strict, deferential standard with a loose, non-deferential one, and the resulting misbegot is . . . loose and non-deferential.

While substantive due process has been the subject of many cases and much study since *Lochner*, the Court cannot find a Texas case, a case from an American jurisdiction, or a scholarly treatise or article to cite in support of its "oppressive" test.[64] The obvious reason is that it is no standard at all. Oppression is very much in the eye of the beholder. In this case, the Court takes into account the amount, cost, and apparent usefulness of the required training, a threader's lost income-earning opportunity, and the danger [**169] to public health and safety. I suppose the Court would agree that it should also take into account the number and severity of incidents of harm due to poor training and the benefit to threaders and the public. This process is what is generally referred to as legislating. It should be done. It should not be done by judges.

The Court's answer is that a rational basis standard is no better because if, as in the present case, the State could rationally require some training, the State could require an unlimited amount of training.[65] The argument is nonsense. That some training [**170] is rational does not mean that more is. There are no bright lines for setting a permissible training requirement under either test. The difference is that the rational basis standard invokes objective reason as its measure, while the "oppressive" test is nothing more than an appeal to a judge's predilections.

[*136] The subjectiveness of the Court's new test is clear from its response to the fact that Texas is not the only state that has concluded threading should be regulated as part of the practice of cosmetology or esthetics. Eight other states

---

61  964 S.W.2d 922, 938-939 (Tex. 1998) (emphasis in original) (citations omitted).

62  Ante at   .

63  As we recently observed in a different setting, "the test for determining whether something is oppressive will necessarily vary from one context to the next, and thus the term has multiple meanings, depending on the circumstances." Ritchie v. Rupe, 443 S.W.3d 856, 867 (Tex. 2014).

64  Three Lochner-era cases reference the impropriety of "arbitrary or oppressive" legislation, but not one uses the phrase as a formal test for substantive due process. Adams v. Tanner, 244 U.S. 590, 595-596, 37 S. Ct. 662, 61 L. Ed. 1336 (1917); McLean v. Arkansas, 211 U.S. 539, 547, 29 S. Ct. 206, 53 L. Ed. 315 (1909); accord Hous. & Tex. Cent. Ry. Co v. City of Dall., 98 Tex. 396, 84 S.W. 648, 653 (Tex. 1905) (noting that without justification, an "invasion of [] rights under the guise of [the State's police] power" would be properly characterized as "unreasonable, arbitrary, [or] oppressive"). The Court instead focused its Lochner-ian sights on the existence of a "just relation to the protection of the public within the scope of legislative power," and finding none, concluded that the legislature had overstepped its constitutional bounds. Adams, 244 U.S. at 596; McLean, 211 U.S. at 547; cf. Hous. & Tex. Cent. Ry. Co, 84 S.W. at 653.

65  Ante at   .

explicitly regulate threading in this way: Delaware, Hawaii, Illinois, Iowa, Louisiana, Mississippi, Oklahoma, and West Virginia.[66] Two others define cosmetology to encompass any type of superfluous hair removal.[67] These states each require aspiring cosmetologists and estheticians to complete hours of coursework in numbers similar to those required in Texas.[68] This is strong evidence that Texas' regulatory framework has a rational basis; it is common to many states. The Court's response is "so what". The reasoned judgment of multiple state legislatures is irrelevant to the Court because whether the training requirements are excessive and oppressive [**171] depends on what Texas judges think. The Court's "oppressive" test is pure judicial policy.

As long as judicial policy is made in the name of substantive due process, the Court argues, it is judging, not legislating. [*137] But the Court cannot, simply by invoking a constitutional doctrine, mask the true policy-making character of its ruling. One could take the Court's analysis of the costs and benefits of regulating eyebrow threaders and offer it in evidence at a legislative hearing, only there would also be evidence relating to the needs of the public and the cosmetology industry generally, evidence that the Court does not have and cannot weigh. The substantive due process doctrine empowers the Judiciary [**174] to check regulation that is a clearly arbitrary deprivation of economic liberty in violation of due course of law. The rational basis test for making this determination is not a disclaimer of judicial responsibility but a legal and practical recognition that "[t]he wisdom or expediency of the law is the Legislature's prerogative, not ours."[69]

## III

That the Court has gone where no one has gone before is proudly declared by JUSTICE WILLETT'S concurring opinion. Gone are the constraints of the rational basis standard, a standard dismissed as a "rubber stamp" and a "judicial shrug". JUSTICE WILLETT'S rhetorical torrent against economic regulation carries along its ultimate demand: Texas judges must conduct an investigation "asking" what the "government [is] actually up to", weighing "what policymakers *really* had in mind at the time," "scrutin[izing]" "actual assertions with actual evidence."[70] All this *Sturm und Drang* announces a new day. And to be sure, all this "asking" and "scrutiniz[ing]" is not judicial activism. It is merely judicial un-passivism.

I agree with JUSTICE WILLETT about one thing: "[t]his case concerns far more than whether Ashish Patel can pluck unwanted hair with a

---

66  24 Del. Admin. Code § 5100-14.7 (listing "threading" as an example of "hair removal" and providing that "[h]air removal shall be performed by a licensed cosmetologist or licensed aesthetician only"); Haw. Rev. Stat. § 439-1 ("'Esthetician' means any person who, with hands or nonmedically prescribed mechanical or electrical apparatus or devices . . . engages for compensation in . . . [r]emoving superfluous hair about the body of any person."); 225 Ill. Comp. Stat. 410 / 3-1 (cosmetology includes "removing superfluous hair from the body of any person by the use of depilatories, waxing, threading, or tweezers"); id. 410 / 3A-1(A)(3) (esthetics includes "removing superfluous hair from the body of any person"); Iowa Code § 157.1(5)(c) ("'Cosmetology' means . . . [r]emoving superfluous hair from the face or body of a person with the use of depilatories, wax, sugars, threading, or tweezing"); id. § 157.1(12)(c) (esthetics includes "[r]emoving superfluous hair"); La. Rev. Stat. Ann. § 37:563(6) (esthetics includes "hair removal by cosmetic preparations, threading, waxing, or other similar means"); Miss. Code Ann. § 73-7-2(b)(iv) (cosmetology includes "[a]rching eyebrows, to include tweezing, waxing, threading or any other methods of epilation"); [**172] id. § 73-7-2(d)(ii) (esthetics includes the same); Okla. Admin. Code § 175:10-9-55(a) ("Only licensed Facialist/Estheticians, Cosmetologists or Barbers may perform threading."); W. Va. Code § 30-27-3(a)(4) (esthetics includes "[t]he waxing, tweezing and threading of hair on another person's body").

67  63 Pa. Stat. § 507 (cosmetology includes "the removal of superfluous hair"; S.D. Codified Laws § 36-15-2(4) (the practice of cosmetology includes "removal of superfluous hair by nonpermanent means").

68  Like Texas, Illinois and Louisiana require applicants for a cosmetology license to complete 1,500 hours of coursework. 225 Ill. Comp. Stat. 410 / 3-2(1)(c); La. Admin. Code tit. 46 § 301. And, like Texas, they require applicants for a more limited esthetician's license to complete 750 hours of coursework. 225 Ill. Comp. Stat. 410 / 3A-2(c); La. Admin. Code tit. 46 § 303. Delaware, Mississippi, and Oklahoma require applicants for a cosmetology license to complete 1,500 hours of coursework. Del. Code Ann. tit. 24 § 5107; Miss. Code Ann. tit. 24 § 5135; Okla. Code § 175:10-3-34. These states require applicants for an esthetics license to complete 600 hours of coursework. Del. Code Ann. tit. 24 § 5135; Miss. Code Ann. § 73-7-18; Okla. Admin. Code § 175:10-3-39. Hawaii and West Virginia require 1,800 hours of coursework for cosmetology and 600 hours for esthetics. Haw. Rev. Stat. § 439-12(b), (d); W. Va. Code R. §§ 3-1-5.1, [**173] 3-1-9.1. Iowa and South Dakota require 2,100 hours of coursework for a cosmetology license and 600 hours for an esthetics license. Iowa Code § 157.10(1); Iowa Admin. Code r. 645.61.14, S.D. Admin. R. 20:42:06:09, 20:42:06:09.02. Pennsylvania requires 1,250 hours of coursework for a cosmetology license and 300 hours for an esthetics license. 63 Pa. Stat. §§ 510(a)(3), 511(b)(1). Some states allow aspiring cosmetologists and estheticians to complete an apprenticeship in lieu of or in combination with classroom work. See, e.g., Del. Code Ann. tit. 24 § 5107(a)(3)(b)-(c); Haw. Rev. Stat. § 439-12(b), (d); 63 Pa. Stat. §§ 510(a), 510.3, 516; S.D. Admin. R. 20:42:07:06-07.

69  Tex. Workers' Comp. Comm'n v. Garcia, 893 S.W.2d 504, 520 (Tex. 1995) (quoting Smith v. Davis, 426 S.W.2d 827, 831 (Tex. 1968)).
70  Ante at    (emphasis in original).

469 S.W.3d 69, *137; 2015 Tex. LEXIS 617, **174

strand [**175] of thread."[71] It is about a dramatic arrogation of power by the Court. Economic regulation is invalid whenever a majority of this Court feels it is oppressive.

Hair stylists could make the same argument the Threaders do: why should they be required to have instruction and examination in facial treatment, manicuring, massage, and the removal of unwanted hair? Whether to create various licensing classification schemes, and which practices to include within each, have been questions central to cosmetology regulation since 1971. It is the kind of line-drawing that the Legislature and the Department, not courts, are equipped to do. More importantly, the Constitution gives this line-drawing power—this policymaking—to the Legislature and the Executive, not to the Judiciary.

The same issue applies to other occupational regulation. There is an ongoing debate regarding whether law school should have a third year, whether students should be allowed to sit for the bar exam earlier, and whether a lawyer should be allowed to obtain a special, limited-practice license with less instruction. Further, students intent on pursuing a particular area of practice—tax law, for example—question why [**176] they should be required to take other courses, including those, like civil procedure, thought to be part of a fundamental first-year curriculum. Medical education is similarly questioned. Why should students intent on confining their practice to particular areas or specialties be required to take unrelated courses? The answer is often that subjects unrelated to a particular [*138] field of practice are nevertheless part of the background information important to the discipline. But even when this rationale is lacking, substantive due process is not violated merely because medical education is not tailor-made for each student. Our inquiry is whether the cosmetology licensing scheme is unconstitutional, not whether we think the lines chosen by the Legislature are well-placed as a matter of policy.

And while *Lochner* justified judicial invalidation of economic regulation in the name of substantive due process to protect a liberty interest grounded in an implied constitutional right to contract, liberty is not solely, not even primarily, an economic concept. Other constitutional rights have been found by implication in our constitutions.[72] Scholars argue that the right to privacy implied by the [**177] United States Supreme Court in the federal Constitution provides the basis for protecting personal liberty from social regulation.[73] The Court's power grab will not be limited to the "regulation of economic interests",[74] but will be wielded in future cases against all manner of legislation, maybe not by members of this Court, but by others who see today as precedent. The *Lochner* monster, rediscovered and unleashed by the Court, will stray far from the Judiciary's proper sphere of authority—and to places far afield of the economic realm to which the Court is sympathetic. Judicial usurpation of authority over the State's policies may provide protection for the economic liberties on which the concurrence waxes eloquent, but it also gives rise to such decisions as *Roe v. Wade*.[75] JUSTICE WILLETT applauds the Court for "narrow[ing] the difference" between fundamental rights—a varsity team (to use his metaphor) that includes not only rights protected by the First Amendment, but also privacy-based liberty interests discovered solely in the due process clause itself—and the economic interests asserted here.

---

71 Ante at   .

72 For a recent discussion of the development [**178] of substantive due process and the fundamental rights it has been held to protect, see Joshua D. Hawley, The Intellectual Origins of (Modern) Substantive Due Process, 93 Tex. L. Rev. 275, 280, 328-334 (2014) (discussing the demise of the Lochner-era police powers jurisprudence and its replacement with modern fundamental-rights jurisprudence, and arguing that this shift occurred because the Supreme Court came to find "personal moral choice" and "self-development"—such as the "right of privacy" the Court protected in Roe v. Wade, 410 U.S. 113, 153, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973)—to be more "compelling" forms of liberty than the private property protections that were the aim of the Lochner era).

73 See, e.g., David E. Bernstein, Lochner Era Revisionism, Revised: Lochner and the Origins of Fundamental Rights Constitutionalism, 92 Geo. L.J. 1, 60 (2003) (arguing that "Lochnerian fundamental rights analysis returned in mutated form" in modern fundamental-rights decisions striking down laws as violative of "unenumerated due process rights"); David N. Mayer, Substantive Due Process Rediscovered: The Rise and Fall of Liberty of Contract, 60 Mercer L. Rev. 563, 640-642 (2008) (discussing the liberty of contract cases that were used as groundwork for the Supreme Court's later protections of a "right to privacy").

74 Ante at   [**179] .

75 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973).

JUSTICE WILLETT'S concurring opinion fills the Court's sails and sets a *Lochner*-ian course.

# IV

I would apply the test established by our precedent: regulation is unconstitutional only if it lacks a rational relationship to a legitimate government interest.[76] The [*139] parties' evidence, the State's purpose in its regulatory scheme, and the effects of that regulation are all to be considered.[77] But our precedent makes clear that judges are not to weigh the evidence to determine whether the State's purpose and approach are reasonable or whether they will be successful; the role of judges is instead to decide whether, in light of the evidence presented, the enacting body "could have rationally . . . decided that the measure might achieve the objective."[78] Unlike the Court's "oppressive" test, this inquiry is objective, looking not to whether the governmental body subjectively believed the purpose would be accomplished, but to whether a reasonable governmental body could have so believed in light of the evidence. It is not for the Judiciary to correct a mere error in judgment by the policymaking branches.

The Threaders do not dispute that, in general, Texas' long-standing regulation of cosmetology is rationally related to the State's legitimate interest in protecting public health and safety.[79] The Threaders argue only that the regulation as applied to eyebrow threading—specifically, the training and testing required for licensure—is so excessive [**181] as to deprive them of their liberty in choosing an occupation. The State does not dispute that as many as 320 of the required 750 hours are not useful to eyebrow threaders,[80] but it argues that the requirements are not clearly arbitrary, as they must be to violate substantive due process under the correct test.

The health risks of commercial hair removal cannot be minimized. Dr. Patel, the expert offered by the Threaders in the trial court, testified that avulsive hair removal opens a portal through which bacteria can enter the body through the skin. For this reason, she explained, she trains threaders in her medical spa to use an antiseptic on the eyebrow area before beginning the threading process and to apply [**182] [*140] an astringent to the skin after the process is complete. The astringent helps to close up the hair follicle to make it difficult for bacteria to enter. Patel testified that she also trains threaders on methods of keeping their work area clean, keeping the thread sanitary, and on the importance of always using a new piece of thread (and any other single-use items) on each client. She testified that threaders may need to be able to identify skin infections or other conditions that would make threading unsafe for a particular client. Patel recognized that threading may lead to the spread of various contagious bacterial and viral infections and that a threader's failure to utilize appropriate sanitation can further expose threading clients to infection and disease.

Applicants for a general cosmetology license or an esthetician speciality license are instructed in

---

76  See City of San Antonio v. TPLP Office Park Props., 218 S.W.3d 60, 64-66 (Tex. 2007) (per curiam); Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 938-939 (Tex. 1998); Barshop v. Medina Cnty. Underground Water Conservation Dist., 925 S.W.2d 618, 631-633 (Tex. 1996); State v. Richards, 157 Tex. 166, 301 S.W.2d 597, 602-603 (Tex. 1957).

77  In Barshop, we considered the entire record in determining that (1) the State has a legitimate purpose in regulating the use of water in the Edwards Aquifer, which [**180] is a scarce resource; and (2) that the challenged provisions were rationally related to the State's "purposes in managing and regulating this vital resource." 925 S.W.2d at 633. We explained that, because Barshop was a facial challenge, "we should presume" the existence of any facts under which the Act would be constitutional "without making a separate investigation . . . or attempting to decide whether the Legislature has reached a correct conclusion with respect to the facts." Id. at 625. This presumption exists because a facial challenge requires the challenger to show that the challenged regulation is unconstitutional under "any possible state of facts." Id. Although this burden is high, a plaintiff challenging a law on its face nevertheless has the opportunity to put on evidence that the challenged law is unconstitutional in all possible applications.

78  TPLP Office Park Props., 218 S.W.3d at 64-65 (citing Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 834 n.3, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987)).

79  We note that Texas has regulated a related practice, barbering, since 1907. Act of Apr. 18, 1907, 30th Leg., R.S., ch. 141, 1907 Tex. Gen. Laws 273. We have twice held that regulation of barbering is important to public health and safety. Tex. State Bd. of Barber Exam'rs v. Beaumont Barber Coll., 454 S.W.2d 729, 731 (Tex. 1970); Gerard v. Smith, 52 S.W.2d 347, 350 (Tex. Civ. App.—El Paso 1932, writ ref'd).

80  At oral argument, the State agreed that "430 hours of the 750-hour curriculum are addressed to subject matter relevant to eyebrow threading" and explained that it "has not argued that the remaining 320 hours of instruction are [] necessary."

general sanitation and safety practices, and each of the specific procedures they learn incorporates the hygiene and safety practices pertinent to that procedure. If they attend a school that teaches threading, they learn to apply these concepts specifically to that practice, and if instead they attend a school that does not instruct [**183] in threading, they nevertheless learn these safety implications and requirements as applied to other avulsive forms of hair removal. Moreover, although there is evidence that only a few cosmetology schools currently teach threading, the Legislature could reasonably have concluded that more schools will teach it as demand for the procedure grows. Although there is evidence that no more than an hour of sanitation training is necessary for threading, there is other evidence from which the Legislature could reasonably conclude that the required instruction and testing would further its goal of protecting public health and safety through the regulation of cosmetology.

* * * *

Texas' cosmetology regulation as applied to threading is, to quote Justice Holmes, "injudicious", though I would not go so far as to say "tyrannical", and certainly not clearly arbitrary. I would hold that the regulation is rationally related to the State's legitimate interest in protecting the health and safety of the public.

The Court pooh-poohs the *Lochnerian* "monster". A word of caution: those who cannot remember the past are condemned to repeat it.[81]

I would affirm the judgment of the court of appeals. Accordingly, I respectfully dissent.

Nathan L. Hecht

Chief Justice

Opinion delivered: June 26, 2015

JUSTICE GUZMAN, dissenting.

This Court has long maintained that it does not legislate from the bench. Today, it does just that. Worse yet, it does so in the context of revivifying substantive due process, one of the most volatile doctrines in constitutional history.[1] Like the accompanying dissent, I maintain that while the regulation seems excessive as a matter of policy, it is nevertheless not unconstitutional as a matter of law. Further, I harbor doubts that the test propounded by the Court to evaluate issues of this nature will provide any guidance in future cases. Thus, I write separately to underscore my conception of the judicial role. Because I unequivocally believe that policymaking is [*141] a prerogative properly and constitutionally vested in the Legislature, I respectfully dissent.

The Court's opinion ably sets out the facts, and describes the somewhat byzantine web of regulations that apply to cosmetologists, a class that includes eyebrow threaders like the petitioners ("Threaders"). To legally practice cosmetology in Texas, a license is required. Tex. Occ. Code §§ 1602.251(a), .257. A general operator license requires training a minimum of 1,500 hours, whereas an esthetician specialty license requires a minimum of 750 hours.[2] *Id.* §§ 1602.254, .257; *see also* 16 Tex. Admin. Code § 83.20(a), (b). Individuals engaged in the business of eyebrow threading are required to obtain at least an esthetician specialty license. *See* Tex. Occ. Code §§ 1602.002(a)(9), .257(a); *see also* 16 Tex. Admin. Code § 83.10(11).

The record shows that of the 750 hours required for an esthetician license, 40 hours are devoted to sanitation. Sanitation and hygiene issues are also intermittently addressed elsewhere during training, albeit in the context of instruction on other subjects. The fact that health and safety instruction comprises at least part of the required instruction is

---

81 1 George Santayana, The Life of Reason: Reason in Common Sense 284 [**184] (Charles Scribner's Sons, 2d ed. 1929).

1 See, e.g., Slip Op. at 22 (Hecht, C.J., dissenting) ("Judicial usurpation of authority over the State's policies may provide protection for the economic liberties on which the concurrence waxes eloquent, but it also gives [**185] rise to such decisions as Roe v. Wade.").

2 For the operator license, up to 500 hours of public vocational school may be credited toward the 1,500 hours. Tex. Occ. Code § 1602.254(b)(3)(B).

no small matter, given that the Threaders' [**186] own expert observed that improper threading procedures can contribute to the spread of highly contagious bacterial and viral infections, including flat warts, skin-colored lesions known as mulluscum contagiosum, pink eye, ringworm, impetigo, staphylococcus aureus, and other similarly unpleasant maladies.

The central dispute concerns the training requirements, specifically the amount of time they necessarily require. The Threaders contend that as many as 710 of the 750 training hours for an esthetician license are unnecessary, given that they concern procedures unrelated to threading. The State disputes that math, but even its estimate concedes that as many as 320 of the curriculum hours are unrelated to health and safety issues engendered by eyebrow threading. In the Threaders' view, the licensure courses require too much time and feature too much irrelevant material, and by mandating them for eyebrow threading, the State of Texas violates the guarantee of the Texas Constitution that "[n]o citizen of this State shall be deprived of . . . liberty . . . except by the due course of the law of the land." Tex. Const. art. I, § 19.

The Court propounds a novel test in resolving this core dispute. The second [**187] prong of this test holds that an as-applied challenge to an economic regulation statute under section 19's substantive-due-course-of-law requirement will fail to overcome the presumption that the statute is constitutional, unless the challenging party demonstrates that the statute's "actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest." Slip Op. at 27-28. Relying on this element of the test, the Court estimates that approximately 42 percent of the minimum required training hours are "arguably" not relevant to the actual work performed by eyebrow threaders. Id. at 32. While this is not "determinative" of the constitutional question, the Court says that "the percentage must also be considered along with

other factors, such as the quantitative aspect of the hours represented by that percentage and the costs associated with them." Id.

[*142] I have significant doubts that this standard is workable in practice.[3] As the Court itself concedes, "[t]he dividing line is not bright between the number of required but irrelevant hours that would yield a harsh, but constitutionally acceptable, requirement [**188] and the number that would not." Id. at 33. But this concession seems to prove the folly of the enterprise in the first place. Lacking a standard that can be implemented consistently, how can a court be expected to make determinations of this nature in future cases (which, I hasten to add, will surely follow in the wake of this opinion)? I recognize that in many areas of the law, bright-line tests are simply not appropriate nor attainable.[4] But here the Court, with only the information gleaned from the limited record before us, is marching into a fraught area—substantive due process—armed only with an imprecise standard.

The Court agrees with the Threaders' characterization of the regulation as arbitrary, but alas, that same adjective could be applied to the line-drawing necessarily involved here and in future cases. Is 750 hours too much [**189] to require for threading? From the Threaders' perspective, perhaps. But from the vantage of someone injured by these procedures, perhaps not. Some threading techniques reportedly rely on placing one end of the string in the threader's mouth, which would seem to invite a host of bacterial infections (superficial folliculitis, for instance). Different skin sensitivities could be placed at different risks by these procedures. The crucial point is that these considerations, and their relation to training programs, are quintessential legislative inquiries. Thus, I agree with the Court

---

3  Whether a test is "workable" is something this Court has considered before. See, e.g., Trevino v. Ortega, 969 S.W.2d 950, 956 (Tex. 1998) ("The National Tank test is workable in the spoliation context; yet, it must be modified somewhat.").
4  See, e.g., Ohio v. Robinette, 519 U.S. 33, 34, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (noting that "the Court has consistently eschewed bright-line rules" in the Fourth Amendment context, "instead emphasizing the fact-specific nature of the reasonableness inquiry").

when it admits: "Differentiating between types of cosmetology practices is the prerogative of the Legislature and regulatory agencies to which the Legislature properly delegates authority," and likewise with the statement that "it is not for courts to second-guess their decisions as to the necessity for and the extent of training that should be required for different types of commercial service providers." *Id.* at 31. In my view, the plain truth of these statements suggests a contrary approach.

This case involves first principles, and timeless precepts bear repeating. By design, our system of government rests on checks [**190] and balances and separation of powers. The genius of the Founders lay in their prescience. Frankly acknowledging human frailty, they designed a system of government that apportions power among the three branches, allowing a proper balance of interests and ambitions. In order for this equipoise to persist, however, denizens of government's separate branches must properly conceive of their relative roles. For the judiciary, as with the other branches, this means recognizing the limits on its own authority. This is no easy matter, given that human nature tilts to the arrogation of power; as Justice Antonin Scalia once waggishly noted, this enduring trait is why Lord Acton never uttered "'[p]ower tends to purify.'" *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 981, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (Scalia, J., concurring in part and dissenting in part).

Were I a member of the Legislature, there is little question that I would look to [*143] reduce the burden placed on eyebrow threaders, as I agree with the accompanying dissent's sense that "on this record, threading regulation is obviously too much."[5] Slip. Op. at 11 (Hecht, C.J., dissenting). But I am not a legislator; I am a judge. Accordingly, I am duty-bound to apply the law regardless of my policy preferences. The difficult

line-drawing [**191] problems involved in this case are best resolved by the Legislature, which by dint of its experience and competence is better equipped to decide these questions than this tribunal. The question is not whether these regulations are prudent, but whether they violate the Texas Constitution's due-course-of-law provision. That is a different matter entirely. Because I disagree with the Court on this fundamental query, I respectfully dissent.

Eva M. Guzman

Justice

**OPINION DELIVERED**: June 26, 2015

---

5  Assuming, of course, that the record before this Court is complete. As the accompanying dissent wisely observes, "nothing of what prompted the regulation is before us. We have conducted no investigations and held no hearings. As in any case, we know what the parties have told us, and nothing more." Slip Op. at 11 (Hecht, C.J., dissenting).

469 S.W.3d 69, *143; 2015 Tex. LEXIS 617, **191

**Table1** ([Return to related document text](#))

| | |
|---|---|
| orientation, rules and laws | 50 hours |
| sanitation, safety, and first aid | 40 hours |
| anatomy and physiology | 90 hours |
| facial treatment, cleansing, masking, therapy | 225 hours |
| superfluous hair removal | 25 hours |
| electricity, machines, and related equipment | 75 hours |
| makeup | 75 hours |
| chemistry | 50 hours |
| care of client | 50 hours |
| management | 35 hours |
| aroma therapy | 15 hours |
| nutrition | 10 hours |
| color psychology | 10 hours |

**Table1** ([Return to related document text](#))

---

End of Document



Questioned
As of: February 25, 2026 8:25 PM Z

# Spann v. Dallas

Supreme Court of Texas

November 2, 1921, Decided

No. 3090

### Reporter

111 Tex. 350 *; 235 S.W. 513 **; 1921 Tex. LEXIS 106 ***; 19 A.L.R. 1387

John R. Spann v. City of Dallas et al.

**Prior History:** [***1]  Error to the Court of Civil Appeals for the Fifth District, in an appeal from Dallas County.

**Disposition:** *Reversed and remanded*.

## Syllabus

Spann sued the City of Dallas and others, and appealed from a judgment for defendants.  On its affirmance by a divided court he obtained writ of error.

**Counsel:** *Read, Lowrance & Bates*, for plaintiff in error.

A citizen has the right to make any use of his property which is not detrimental to the public peace, health or safety, and to erect any sort of structure thereon for the conduct of any business which is not a nuisance and which does not affect the public peace, health or safety.  Business houses are useful and necessary in every civilized community, and they are in no way detrimental to the public peace, health or safety, nor have they ever been deemed nuisances, and any objection to their erection in residence sections of a city is necessarily grounded purely on aestheticism which in America has never been accepted as a basis for the exercise of the police power.  Milliken v. City of Weatherford, 54 Texas, 388; City of San Antonio v. Salvation Army, 127 S. W., 860; 2 Dillon [***4]  on Municipal Corporations, sec.

695; Freund on Police Power, sec. 181; in re Hong Wah, 82 Fed., 623; People ex rel. Lankton v. Roberts, 153 N. Y. Supp., 143; Willison v. Cooke, 130 Pac., 828, 44 L. R. A. (N. S.) 1030; State v. Whitlock, 63 S. E., 123, 128 Am. St., 670; Fruth v. City of Charleston, 84 S. E., 105, L. R. A., 1915 C, 981; Bran v. City of Chester, 61 Atl., 894; Boyd v. City of Frankfort, 77 S. W., 669; Calvo v. City of New Orleans, 67 So., 338; City of St. Louis v. Dreisoerner, 147 S. W., 998; St. Louis v. Dorr, 41 S. W., 1094, 46 S. W., 976, 42 L. R. A., 686; People ex rel. Friend v. City of Chicago, 261 Ill., 16, 49 L. R. A. (N. S.) 438; Byrne v. Maryland Realty Co., 98 Atl., 547; Haller Sign Works v. Physical Culture Training School, 249 Ill. 436, 34 L. R. A. (N. S.) 998; Curran Bill Posting Co. v. Denver 107 Pac., 261, 27 L. R. A. N. S., 544; Commonwealth v. Boston Advertising Co., 188 Mass., 348, 69 L. R. A., 817; Bill Posting Sign Co. v. Atlantic City, 7 N. J. Law, 72; People ex rel. Dilzer v. Calder, 85 N. Y. Supp., 1015.

To place the property of a citizen subject to the control of his neighbors in property holdings or the building inspector of the city, who are [***5] empowered to permit or refuse to permit its use for business purposes, as this ordinance undertakes to do, is tantamount to depriving him of his property without due process of law and to denying him the equal protection of the law.  Constitution of U.S., 14th amendment; Constitution of Texas, Art. 1, secs. 19 and 28; Freund on Police Power, sec. 643; Eubank v. City of Richmond, 226 U.S., 137; Yick Wo. v. Hopkins, 118 U.S., 356; Barthet v. New Orleans, 24 Fed., 563; Re quong Woo, 13 Fed.,

111 Tex. 350, *350; 235 S.W. 513, **513; 1921 Tex. LEXIS 106, ***5

229; Yates v. Milwaukee, 77 U.S., 497; Re Sam Kee, 31 Fed., 680; Stockton Laundry Case, 26 Fed., 611; Town of Greensboro v. Erenreich, 80 Ala., 579; Willison v. Cooke, 130 Pac., 828, 44 L. R. A. (N. S.) 1030; City of St. Louis v. Russell, 22 S. W., 470; People ex rel. Friend v. Chicago, 261 Ill., 16, 609, 49 L. R. A. (N. S.) 438; St. Louis v. Dorr, 42 L. R. A. 686; State ex rel. Omaha Gas Co. v. Withnell 110 N. W., 680, 8 L. R. A. (N. S.) 978; Ex parte Sing Lee, 96 Calif., 354, 31 Pac., 245, 24 L. R. A., 195; State v. Garibaldi, 44 La. Ann., 809; St. Louis v. Howard, 24 S. W., 770; Chicago v. Gunning System, 73 N. E., 1035, 70 L. R. A., 230; Bostock v. Sams, 95 Md., 400, 52 Atl., 665, 59 L. R. A., [***6] 282; State v. Tenant, 14 S. E., 387, 15 L. R. A., 423; Sioux Falls v. Kirby, 60 N. W., 156, 25 L. R. A., 621; Baltimore v. Radecke, 49 Md., 217; Newton v. Belger, 143 Mass. 598; State v. Fiske, 9 R. I., 94; Richmond v. Dudley, 129 Ind., 112, 13 L. R. A., 587; People v. Roberts, 153 N. Y. Supp., 143; City of Plymouth v. Schultheis, 135 Ind., 339; Clements v. McCabe, 177 N. W., 722.

Section 4 of the ordinance is so connected and interdependent in subject matter, meaning and purpose with the remainder of the ordinance that it can not be presumed that the Board of Commissioners would have passed the ordinance without this section and thereby imposed an absolute prohibition against the erection of business houses in residence sections of the city. Texas & P. Ry. Co. v. Mahaffey, 98 Texas, 392; Western U. Tel. Co. v. State, 62 Texas, 630; 30 Cyc., 976-978; Pollock v. Farmer's Loan & Trust Co., 158 U.S., 601; Poindexter v. Greenhow; 114 U.S., 270; Connolly v. Union Sewer Pipe Co., 184 U.S., 540; Spraigue v. Thompson, 118 U.S., 90.

*James J. Collins, Allen Charlton, Carl B. Calloway, C. F. O'Donnell*, City Attorney, and *Barry Miller*, Special Counsel, for defendants in error.

[***7] Said ordinance was passed in the lawful exercise of the police power of the City of Dallas; the powers conferred upon said city by the terms of said ordinance are neither unreasonable nor arbitrary; and the enforcement of said ordinance is within the constitutional exercise of the police power of the City of Dallas. Thomas Cusack Co. v. City of Chicago, 242 U.S., 526; St. Louis Poster Co. v. St. Louis, 249 U.S., 269; Reinman v. Little Rock, 37 U.S., 171; Welch v. Swasey, 214 U.S., 91; Ex parte Hadachack, L. R. A., 1916, B, 1248; City of Chicago v. Stratton, 35 L. R. A., 84; People Ex rel. Busching v. Ericson, L. R. A., 1915, D, 607; People Ex rel. Friend v. Chicago, 49 L. R. A., (N. S.) 438; Ex Parte Quong Wo, 118 Pac., 714; In re Kene Montgomery, 125 Pac., 1070; Hahser v. Chicago, L. R. A., 1916, D, 95; Hadacheck v. Sebastin, 239 U.S., 394; Lake Shore & M. S. Ry. Co. v. Ohio, 173 U.S., 285; Bacon v. Walker, 204 U.S., 311; Chicago B. & O. Ry. Co. v. Illinois, 200 U.S., 561; Noble State Bk. v. Haskell, 31 Sup. Ct., 186; Sligh & Kirkwood, 237 U.S., 52; People ex rel. Kemp v. D'Oench, 111 N. Y., 359; People ex rel. Keller v. Village of Oak Park, 107 N. E., 636; Sharp and v. City of [***8] Seattle, 109 Pac., 1067; State ex rel. Moore Oil Co. v. Dunham, 124 N. E., 232; Smolensky v. City of Chicago, 118 N. E., 410; State ex rel. Krittenbrink v. Withnell, 40 L. R. A., (N. S.) 898; Lincoln Trust Co. v. Williams Bldg. Corp., 229 N. Y., 313; Biggs v. Steinway & Sons, 229 N. Y., 320.

The provision in said ordinance prohibiting the erection of a business building in a residence section, without the written consent of three-fourths of the property owners within a radius of three hundred feet, works no denial to a property owner of either due process of law or equal protection of the laws guaranteed by the 14th Amendment to the Federal Constitution. Cusack v. City of Chicago, 242 U.S. 526; City of Chicago v. Stratton, 35 L. R. A., 84; People ex rel. Busching v. Ericsson, L. R. A. 1915-D, 607, 105 N. E., 315; People ex rel Keller v. Village of Oak Park, 107 N. E., 636; Shepard v. City of Seattle, 109 Pac., 1067; State ex rel Moore Oil Co. v. Dauben, 124 N. E., 232; Smolensky v. City of Chicago, 118 N. E., 410; St. Louis Poster Co. v. St. Louis, 249 U.S., 269.

111 Tex. 350, *350; 235 S.W. 513, **513; 1921 Tex. LEXIS 106, ***8

**Judges:** Mr. Chief Justice Phillips delivered the opinion of the court.

**Opinion by:** PHILLIPS

# Opinion

[*353] [**513] The [***9] question in the case is the validity of an ordinance of the City of Dallas, prohibiting, under penalty, the construction of any business house within what the ordinance denominates a residence district of the City, except with the consent of three-fourths of the property owners of the district, and on the building inspector's approval of the design of the proposed structure.

The ordiance defines a residence district to be any part of the City where there are more dwelling houses than business houses within a radius of 300 feet from the place where any business house intended for the barter and sale of goods and merchandise of any description or for the conduct of any business, is sought to be constructed.

Any one desiring to erect such a business house at any place within the City outside the fire limits, as designated at the time of the enactment of the ordinance or as may be hereafter designated by ordinance, is by the ordinance required to apply to the Board of Commissioners for a permit for that purpose, showing the location of the proposed building. If the Board is satisfied that there are not more residences than business houses within a radius of 300 feet from the proposed [***10] site, "and that the applicant is entitled to such permit," then, under the ordinance, the permit shall issue.

[**514] If, however, the site of the proposed business house be within "a residence district," that is, a district containing more residences than business houses within a radius of 300 feet from the contemplated site, there must accompany the application the consent of [*354] three-fourths of the property owners owning property within the district. In such event the permit shall issue, provided "that the building for which such permit is granted must be of a design approved by the building inspector."

Where, within "a residence district," there are two or more adjoining business houses which were erected prior to the enactment of the ordinance, and the proposed business house is to be constructed "adjoining, immediately contiguous to or in extension of an existing business house," then the consent of property owners as otherwise required is not necessary.

Violation of the ordinance is made a misdemeanor, subject to a fine of not less than $ 50 nor more than $ 200. Every act done toward the location and erection of a business house without the required permit, [***11] is made a separate offense.

The plaintiff owns a lot at the corner of Ross and Fitzhugh Avenues in the City of Dallas, fronting 80 feet on Ross Avenue, and within "a residence district" as defined by the ordinance. It was purchased by him for the purpose of erecting business houses upon it. As a residence lot it was worth at the time of the trial $ 4500; as a business lot, $ 8500. The ordinance was not in force at the time plaintiff contracted to purchase the lot in May, 1915. It was not enacted until July 19, 1915. Before purchasing the lot the plaintiff was advised by the City Attorney that there was no law prohibiting its use for store houses, but that one might be enacted. Early in June, 1915, the plaintiff sought a permit for the erection of his houses, but it was refused by the Commissioner of Streets and Buildings. He renewed his effort on July 14, by written application, stating that the proposed store houses were to front on Ross Avenue, to be of brick, one story in height, of artistic design, set back at least ten feet from the property line, to cost approximately $ 6500, and to be constructed in accordance with the laws of the City. His application was again denied. [***12] A few days later the ordinance was enacted.

The suit was one to compel the issuance of a building permit and to restrain the City and its

111 Tex. 350, *354; 235 S.W. 513, **514; 1921 Tex. LEXIS 106, ***12

officers from interfering with the plaintiff's erection of store houses on his lot. The ordinance was pleaded as the defense to the action.

A judgment for the defendants was affirmed and the validity of the ordinance sustained by a majority of the Honorable Court of Civil Appeals for the Fifth District, Associate Justice Talbot dissenting from the decision.

The ordinance takes no heed of the character of business to be conducted in the store house which it condemns. It disregards utterly the fact that the business may be legitimate, altogether lawful, in no way harmful and even serve the convenience of the neighborhood. Its prohibition is absolute. No business house of any kind, [*355] for the sale of goods of any character, or for the conduct of any business whatsoever, is its command, shall be permitted within "a residence district" without the consent of three-fourths of the property owners of the district, and, in addition, the building inspector's approval of the design of the structure. Even if the necessary consent of the [***13] property owners be obtained, and though the building is to be one safe and substantial, yet, according to the ordinance, if its architectural design does not accord with the taste of the building inspector, its construction is no less positively interdicted. No rule, no standard, no regulation of any kind is given whereby the applicant may know to what particular design of building he must conform. If the design, whatever its merits, does not suit the inspector, it is within his uncontrolled power to prohibit the building.

The justification for this far-reaching municipal law, as urged on behalf of the City, is that it is but a rightful exercise of its police power, as conferred by a general charter provision granting it the authority to protect by ordinance "health, life and property," abate nuisances, preserve and enforce "the good government, order and security" of the City, and to protect "the lives, health and property" of its inhabitants.

Passing by the question as to whether the specific power to regulate the location of store houses -- limiting rights of property secured to every citizen under the general laws of the State, may be deduced from any such general charter [***14] provision, or may be exercised by a city at all in the absence of express statutory or charter grant, ( Pye v. Peterson, 45 Texas, 312, 23 Am. Rep., 608; People v. City of Chicago, 261 Ill., 16, 4 L. R. A. (N. S.) 438, Ann. Cases, 1915A, 292, 103 N. E., 609; Clements v. McCabe, 210 Mich., 207 177 N. W., 722), we will deal at once with what we consider the larger question in the case, namely: Whether under the authority of the police power the citizen may be denied the right to erect, and in effect the right to own, a store house in a residence portion of a city, for the conduct of a lawful, inoffensive and harmless business.

Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment and disposal. Anything which destroys any of these elements of property, to that extent destroys the property itself. The substantial [**515] value of property lies in its use. If the right of use be denied, the value of the property is annihilated and ownership is rendered a barren right. Therefore a law which forbids the use of a certain kind of property, strips it of an essential attribute and in actual result proscribes its ownership. [***15]

The police power is a grant of authority from the people to their governmental agents for the protection of the health, the safety, the comfort and the welfare of the public. In its nature it is broad and comprehensive. It is a necessary and salutary power, since without [*356] it society would be at the mercy of individual interest and there would exist neither public order nor security. While this is true, it is only a *power*. It is not a *right*. The powers of government, under our system, are nowhere absolute. They are but grants of authority from the people, and are limited to their true purposes. The fundamental rights of the people are inherent and have not been yielded to governmental control. They are not the subjects of governmental

111 Tex. 350, *356; 235 S.W. 513, **515; 1921 Tex. LEXIS 106, ***15

authority. They are the subjects of individual authority. Constitutional powers can never transcend constitutional rights. The police power is subject to the limitations imposed by the Constitution upon every power of government; and it will not be suffered to invade or impair the fundamental liberties of the citizen, those natural rights which are the chief concern of the Constitution and for whose protection it was ordained [***16] by the people. All grants of power are to be interpreted in the light of the maxims of Magna Charta and the Common Law as transmuted into the Bill of Rights; and those things which those maxims forbid cannot be regarded as within any grant of authority made by the people to their agents. Cooley Const. Lim. 209. In our Constitution the liberties protected by the Bill of Rights are; by express provision, "excepted out of the general powers of government." It is declared that they "shall forever remain inviolate," and that "all laws contrary thereto shall be void."

To secure their property was one of the great ends for which men entered into society. The right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody, is a natural right. It does not owe its origin to constitutions. It existed before them. It is a part of the citizen's natural liberty -- an expression of his freedom, guaranteed as inviolate by every American Bill of Rights.

It is not a right, therefore, over which the police power is paramount. Like every other fundamental liberty, it is a right to which the police power is subordinate.

It is a right [***17] which takes into account the equal rights of others, for it is qualified by the obligation that the use of the property shall not be to the prejudice of others. But if subject alone to that qualification the citizen is not free to use his lands and his goods as he chooses, it is difficult to perceive wherein his right of property has any existence.

The ancient and established maxims of Anglo-Saxon law which protect these fundamental rights in the use, enjoyment and disposal of private property, are but the outgrowth of the long and arduous experience of mankind. They embody a painful, tragic history -- the record of the struggle against tyranny, the overseership of prefects and the overlordship of kings and nobles, when nothing so well bespoke the serfdom of the subject as his incapability to own property. They proclaim the freedom of men from those odious [*357] despotisms, their liberty to earn and possess their own, to deal with it, to use it and dispose of it, not at the behest of a master, but in the manner that befits free men.

Laws are seldom wiser than the experience of mankind. These great maxims, which are but the reflection of that experience, may be better [***18] trusted to safeguard the interests of mankind than experimental doctrines whose inevitable end will be the subversion of all private right.

The police power is founded in public necessity, and only public necessity can justify its exercise. The result of its operation is naturally, in most instances, the abridgment of private rights. Private rights are never to be sacrificed to a greater extent than necessary. Therefore, the return for their sacrifice through the exercise of the police power should be the attainment of some public object of sufficient necessity and importance to justly warrant the exertion of the power.

The public health, the public safety and the public comfort are properly objects of this high importance; and private rights, under reasonable laws, must yield to their security.

Since the right of the citizen to use his property as he chooses so long as he harms nobody, is an inherent and constitutional right, the police power cannot be invoked for the abridgment of a particular use of private property, unless such use reasonably endangers or threatens the public health, the public safety, the public comfort or welfare. A law which assumes to be a police [***19]

regulation but deprives the citizen of the use of his property under the pretense of preserving the public health, safety, comfort or welfare when it is manifest that such is not the real object and purpose of the regulation, will be set aside as a clear and direct invasion of the right of property without any compensating advantages.    Cooley Const. Lim., 248.

These established rules provide the test for the validity of this ordinance.

[**516] The ordinance is clearly not a regulation for the protection of the public health or the public safety. It is idle to talk about the lawful business of an ordinary retail store threatening the public health or endangering the public safety. It is equally idle in our opinion to speak of its impairing the public comfort or as being injurious to the public welfare of a community. Retail stores are places of trade, it is true, but as ordinarily conducted they are not places of noise or confusion.   This is particularly true of small stores, such as it appears the plaintiff contemplated erecting.   The ordinary trading that goes on within them is reputable and honorable, and can hurt nobody.    According to common experince it is done in an [***20] orderly manner. It could disturb or impair the comfort of only highly sensitive persons.  But laws are not made to suit the acute sensibilities of such persons.  It is with common humanity -- the average of the people, [*358] that police laws must deal.   A lawful and ordinary use of property is not to be prohibited because repugnant to the sentiments of a particular class. The ordinance visits upon ordinary retail stores, engaged in a useful business, conducted in an orderly manner, frequented and availed of by respectable people, and doubtless serving as a convenience to many, all the proscription visited upon common nuisances In the face of common knowledge that they are ordinarily respectable and peaceable places for the conduct of perfectly lawful pursuits evolved out of recognized customs and habits of the people as old as American life, the ordinance deals with them as though they had all the offensive character of a nuisance. But their treatment, in effect, by the ordinance as a nuisance does not make them so.  It is a doctrine not to be tolerated in this country that either State or municipal authorities can by their mere declaration make a particular use of property [***21] a nuisance which is not so, and subject it to the ban of absolute prohibition.  Yates v. Milwaukee, 10 Wallace, 497, 19 L. Ed., 984.

If the presence of a store in a residence district of the City is a hurtful thing, so much so as to warrant its proscription by law, certainly it is not rendered less harmful by the fact that three-fourths of the property owners of the immediate area -- many of whom may not reside there at all, consent to its presence.  Yet, this ordinance while treating the presence of a store as so injurious to the public as to justify the extreme penalty of its absolute prohibition, recognizes that if a certain number of property owners of the district approve of its presence, all of its injurious properties will disappear.

This feature of the ordinance, in our opinion, reveals its true purpose.  It reveals with reasonable clearness that its object is not to protect the public health, safety or welfare from any threatening injury from a store, but to satisfy a sentiment against the mere presence of a store in a residence part of the City.

It is doubtless offensive to many people for a store to be located within a given area where they own residence property.  [***22] Others would possibly regard the store as a convenience. An aesthetic sense might condemn a store building within a residence district as an alien thing and out of place, or as marring its architectural symmetry.  But it is not the law of this land that a man may be deprived of the lawful use of his property because his tastes are not in accord with those of his neighbors. The law is that he may use it as he chooses, regardless of their tastes, if in its use he does not harm them. Under the Common Law and in a free country a man has the unqualified right to erect upon his land non-hazardous buildings in keeping with his own

111 Tex. 350, *358; 235 S.W. 513, **516; 1921 Tex. LEXIS 106, ***22

taste and according to his own convenience and means, without regard to whether they conform in size or appearance to other structures in the same vicinity, even though they may tend to depreciate [*359] the value of surrounding improved or unimproved property. Bostock v. Sams, 95 Md., 400, 59 L. R. A., 282, 93 Am. St., 394 52 Atl., 665.

It would be tyranny to say to a poor man who happens to own a lot within a residence district of palatial structures and his title subject to no servitude, that he could not erect an humble home upon it suited to his [***23] means, or that any residence he might erect must equal in grandeur those about it. Under his constitutional rights he could erect such a structure as he pleased, so long as it was not hazardous to others. It might proclaim his proverty; it might advertise the humbleness of his station; it might stand as a speaking contrast between his financial rank and that of his neighbors. Yet, it would be his "castle;" and the Constitution would shield him in its ownership and in its use.

If the citizen is not to be left free to determine the architecture of his own house, and the lawful and uninjurious use to which he will put it; if he is not to be permitted to improve his land as he chooses without hurt to his neighbors; if by law he is to be allowed to do these things only as officials or the public shall decree, or as may for the time suit the taste of a part of the community, the law might as well deal candidly with him and assert that he holds his property altogether at public sufferance. It might as well prescribe the kind of clothes he and his family shall wear and the sort of food they shall eat. Some people are as much offended by the clothes and diet of other people as they are [***24] by the style of their houses.

As a great judge has warned, "Such legislation may invade one class of rights to-day and another to-morrow, and if it can be sanctioned by the Constitution, while [**517] far removed in time, we will not be far away in practical statesmanship from those ages when governmental prefects supervised the building of houses, the rearing of cattle, the sowing of seed and the reaping of grain, and governmental ordinances regulated the movement and labor of artisans, the rate of wages, the price of food, the diet and clothing of the people, and a large range of other affiairs long since in all civilized lands recognized as outside of governmental functions." In re Jacobs, 98 N. Y., 98, 50 Am. Rep., 636.

City ordinances of the same kind as this one, seeking to interdict the presence of stores within residence districts of cities, have generally been held unconstitutional by American courts, as an unwarranted invasion of the right of private property and not to be suffered under the guise of the police power. The People v. City of Chicago, 261 Ill., 16, 49 L. R. A., (N. S.) 438, Ann. Cases, 1915-A, 292, 103 N. E., 609; Willison v. Cooke, 54 Col., 320, [***25] 44 L. R. A., (N. S.) 1030, 130 Pac., 828; Calvo v. City of New Orleans, 136 La., 80, 67 So., 338; St. Louis v. Dorr, 145 Mo., 485, 42 L. R. A., 686, 68 Am. St., 575, 46 S. W., 976; 2 Dillion, Munic. Corp. (5Ed.) Sec. 695.

[*360] Like municipal regulations interfering with private property rights and founded upon purely aesthetic considerations, are universally held invalid. Haller Sign Works v. Physical Culture School, 249 Ill., 436, 34 L. R. A., (N. S.) 998, 94 N. E., 920; City of Passaic v. Patterson Bill Posting etc. Co., 72 N. J. L., 285, 111 Am. St., 676, 5 Ann. Cases, 995, 62 Atl., 267; Byrne v. Maryland Realty Co., 129 Md., 202, L. R. A., 1917A, 1216, 98 Atl., 547; Quintini v. Board of Aldermen, Bay St. Louis, 64 Miss., 483, 60 Am. Rep., 62, 1 So., 625; Commonwealth v. Boston Advertising Co., 188 Mass., 348, 69 L. R. A., 817, 108 Am. St., 464, 74 N. E., 601; Fruth v. Board of Affairs, 75 W. Va., 456, L. R. A., 1915-C, 981, 84 S. E., 105; State v. Stahlman, 81 W. Va., 335, L. R. A., 1918 C. 77, 94 S. E., 497; Varney & Green v. Williams, 155 Calif., 318, 21 L. R. A., (N. S.) 741, 132 Am. St., 88, 105 Pac., 867; People v. Murphy, 195 N. Y., 127, 21 L. R. A., (N. S.,) 735, [***26] 88 N. E., 17; Freund on Police Power, Sec. 181.

A further vice in the ordinance is that even with the necessary consent of the property owners of the district, a business house may not be erected within it except upon the building inspector's approval of the design of the building. No rule or standard is givern to govern the applicant in fashioning the design of his building or to govern the inspector in approving or rejecting it. The ordinance leaves it to the unbridled discretion of the inspector to disapprove the design, resulting in a refusal of the permit and the prohibition of the building. This leaves the right to construct the building subject to the arbitrary discretion of the inspector, and of itself renders the ordinance void. The very essence of American constitutions is that the material rights of no man shall be subject to the mere will of another. Yick Wo v. Hopkins, 118 U.S., 356, 30 L. Ed., 220.

Ordinances containing similar provisions have repeatedly been held unconstitutional. Mayor of Baltimore v. Radecke, 49 Md., 217, 33 Am. Rep., 239; Bostock v. Sams, 95 Md., 400, 59 L. R. A., 282, 93 Am. St., 394, 52 Atl., 665; City of Richmond v. Dudley, 129 Ind., [***27] 112, 13 L. R. A., 587, 28 Am. St., 180, 28 N. E., 312; City of Plymouth v. Schultheis, 135 Ind., 339, 35 N. E., 12; State v. Tenant, 110 N. C., 609, 15 L. R. A., 423, 28 Am. St., 715, 14 S. E., 387; City Council of Montgomery v. West, 149 Ala., 311, 9 L. R. A., (N. S.) 659, 42 So., 1000, 123 Am. St. Rep. 33, and Notes; And see Judge Davidson's dissenting opinion in the Broussard Case, 74 Texas Cr., 333, L. R. A., 1918B, 1091, Ann. Cases, 1917E, 919, 169 S. W., 665.

Two decisions of the Supreme Court of the United States are relied on by the Honorable Court of Civil Appeals in support of the validity of this ordinance. They are: Sligh v. Kirkwood, 237 U.S., 52, 59 L. Ed., 835, and Reinman v. Little Rock, 237 U.S., 171, 59 L. Ed., 900. Neither decision is authoritative upon the question [*361] here. The first affirmed the validity of a state law directed at the shipment of citrus fruits which were immature and unfit for consumption. The law was readily sustainable as a regulation for the protection of public health. The other decision upheld the ordinance of a city making it unlawful to conduct the business of a livery stable; likewise sustainable as a regulation in the interest [***28] of public health.

Other decisions upholding the validity of city ordinances interdicting billboards in populous residence districts, such as Cusack Co. v. City of Chicago, 242 U.S., 526, 61 L. Ed., 472, L. R. A., 1918A, 136, Ann, Cases, 1917C, 594, relied upon by the defendants in error, are without any bearing here. In the Cusack Case the court but gave effect to the decision of the State Supreme Court (267 Ill., 344), which had found that billboards in such districts created danger from fire, because of the lodgment of combustible material against them, and that they also afforded protection to disorderly and lawbreaking persons.

Another decision strongly relied on by the defendant in error is In Re Opinion of the Justices, 234 Mass., 597, 127 N. E., 525. The decision sustains the validity of an ordinance segregating manufacturing and commercial buildings from homes and residences. But the ordinance, it appears, was passed under an express amendment to the Constitution of Massachusetts, granting to the legislature [**518] the express power to limit buildings, according to their use or construction, to specified districts of cities and towns. We have in Texas no such constitutional [***29] provision.

The ordinance here is, in our opinion, clearly unconstitutional and void. The judgments of the Court of Civil Appeals and District Court are therefore reversed, and judgment is here rendered for the plaintiff in error awarding him the relief he sought in the trial court.

*Reversed and remanded.*

---

**End of Document**

⚠️ Caution
As of: January 27, 2026 3:43 PM Z

# Tarr v. Timberwood Park Owners Ass'n

Supreme Court of Texas

February 6, 2018, Argued; May 25, 2018, Opinion Delivered

No. 16-1005

**Reporter**

556 S.W.3d 274 *; 2018 Tex. LEXIS 442 **; 61 Tex. Sup. J. 1174; 2018 WL 2372594

KENNETH H. TARR, PETITIONER v. TIMBERWOOD PARK OWNERS ASSOCIATION, INC., RESPONDENT

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS.

Tarr v. Timberwood Park Owners Ass'n, 510 S.W.3d 725, 2016 Tex. App. LEXIS 12245 (Tex. App. San Antonio, Nov. 16, 2016)

**Counsel:** For Kenneth H. Tarr, Petitioner: J. Patrick Sutton, Lead Counsel, The Law Office of J. Patrick Sutton PLLC, Austin, TX.

For Timberwood Park Owners Association, Inc., Respondent: Frank O. Carroll III, Lead Counsel, Amy Magness Vanhoose, Mia B. Lorick, Roberts Markel Weinberg Butler Hailey PC, Houston, TX.

**Judges:** JUSTICE BROWN delivered the opinion of the Court.

**Opinion by:** Jeffrey V. Brown

# Opinion

 [*276] This case requires us to decide whether short-term vacation rentals violate certain restrictive covenants that limit tracts to residential purposes and single-family residences. The trial court concluded that a homeowner violated the restrictions by operating a business on a residential

tract and engaging in multi-family, short-term rentals. The court of appeals affirmed, agreeing with the trial court that the rental agreements contradict the residential-purpose limitation because the renters' stays are merely temporary. We hold that the unambiguous restrictive covenants impose no such limitation and decline to inject restrictions into covenants under the guise of judicial interpretation. Accordingly, summary judgment for the homeowner's association was improper. We reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion.

## I

In 2012, Kenneth Tarr purchased a single-family home in San Antonio's Timberwood Park subdivision. Two years later, after his employer transferred him to [**2] Houston, Tarr began advertising the home for rent on websites such as VRBO (short for Vacation Rentals by Owner). *See Santa Monica Beach Prop. Owners Ass'n v. Acord*, 219 So. 3d 111, 113 n.2 (Fla. Dist. Ct. App. 2017) (describing VRBO as "a website on which owners can advertise their houses and other properties for rent"). He also formed a limited-liability company called "Linda's Hill Country Home LLC" to manage the rental of the home. Between June and October of 2014, Tarr entered into thirty-one short-term rental agreements, ranging from one to seven days each. In the aggregate, the home was rented for 102 days.

Tarr's short-term rental contracts permit various-

sized rental parties but limit the guest count to no more than ten people. And the home was indeed leased to parties of all sizes. For example, the home was booked by parties consisting of three adults and three children, four adults and five children, six adults and four children, seven adults and one child, and nine adults and no children. Nearly one quarter of the rentals were to two adults accompanied by as many as six children. The agreement does not mandate that the guests be members of a single family, and the record contains no evidence of the familial relationships of the individuals to whom the home was leased. [**3] These rental groups came from towns throughout Texas, as well as other states, such as Washington and Indiana.

The short-term rental agreement that Tarr employed leased the entire home, rather than individual rooms, to these various groups. So unlike what one might expect at a hotel, rental groups were alone in Tarr's house, unaccompanied by employees and without services a hotel stay might provide, such as cooked meals or housekeeping. In addition, no business office, leasing office, signage, or other business [*277] activity exists at the home. But Tarr does remit hotel taxes applicable to home rentals of less than thirty days. Specifically, he pays the Texas Hotel Tax, which applies to such rentals statewide, *see* Tex. Tax Code ch. 156, and the San Antonio/Bexar County Hotel/Motel Occupancy Tax.

The dispute that led to this case arose late in 2014. As reflected in a plat recorded in the Bexar County plat records in 1979, Timberwood Park Unit III, which includes Tarr's property, is subject to certain "easements, covenants, conditions, and restrictions." In July and September of 2014, the Timberwood Park Owners Association notified Tarr that the rental of his home violated two deed restrictions: [**4] (1) the residential-purpose covenant, and (2) the single-family-residence covenant. The residential-purpose covenant provides, in part:

> All tracts shall be used solely for residential purposes, except tracts designated . . . for

business purposes, provided, however, no business shall be conducted on any of these tracts which is noxious or harmful by reason of odor, dust, smoke, gas, fumes, noise or vibration . . . .

No one disputes that Tarr's tract is not designated for business purposes. A separate paragraph sets forth the single-family-residence restriction, which provides:

> No building, other than a single family residence containing not less than 1,750 square feet, exclusive of open porches, breezeways, carports and garages, and having not less than 75% of its exterior ground floor walls constructed of masonry, i.e., brick, rock, concrete, or concrete products shall be erected or constructed on any residential tract in Timberwood Park Unit III and no garage may be erected except simultaneously with or subsequent to erection of residence. . . . All buildings must be completed not later than six (6) months after laying foundations and no structures or house trailers of any kind may [**5] be moved on to the property.

Because the leases of Tarr's home were temporary, the association determined short-term rentals did not adhere to the "single family residence" restriction and, instead, rendered the tract "a commercial rental property." So the association sent Tarr a violation notification requesting his compliance. The notification further indicated that the violation would remain in effect until the online advertisements were taken down and the home was no longer used for commercial purposes. Should he not comply within fourteen days, the notification letter warned, the association would assess a fine of $25 per day.

Tarr did not heed the association's warnings. And throughout the dispute, neither the association nor Tarr attempted to amend the deed restrictions to specify a minimum duration for leasing—an option available to both of them under the deed's amendment provisions. Instead, the fines against

Tarr mounted steadily.[1] Tarr appealed the imposition of the fines to the association's board. The board heard and denied the appeal in September 2014, stating it would continue imposing the fines so long as the violations persisted. Five days after the board sent a letter [**6] denying his appeal, Tarr sued for a declaratory judgment and claimed breach of the restrictive covenants.

Tarr sought a declaration that the deed restrictions do not impose a minimum duration on occupancy or leasing. Nor, Tarr contended, do they permit the association to police home-rental advertisements or impose penalties in the form of fines. The [*278] association filed a general denial; both parties sought attorney's fees.

The trial court soon faced competing traditional summary-judgment motions. It granted the association's and denied Tarr's, concluding that Tarr operated a business on his residential lot and engaged in "multi-family," short-term rentals in violation of the unambiguous deed restrictions. In doing so, the trial court noted that it must ascertain the drafters' intent by "balancing the statutory requirement to liberally construe language within restrictive covenants with the common law mandate to strictly construe restrictive clauses in real estate instruments resolving all doubt in favor of the free use of real estate." It reasoned that one's use of a home is not residential unless the occupant is physically present and has an existing intent to physically remain there [**7] for a sufficient duration. The trial court also permanently enjoined Tarr from "operating a business on his residential lot" and from engaging in short-term rentals to "multi-family parties." In a separate order, the trial court awarded attorney's fees to the association. Tarr appealed.

The Fourth Court of Appeals affirmed the trial court, holding that the deed restrictions prevented Tarr from leasing the home for short periods of time to individuals who did not possess an intent to remain in the house. 510 S.W.3d 725, 730 (Tex. App.—San Antonio 2016). First, the court noted that the intent underlying the covenant at issue must be afforded a liberal construction as it is unambiguous, and thus the rule disfavoring restrictions on the free use of property did not apply. Id. at 729-30. The court of appeals relied on its opinion in Munson v. Milton, in which it noted that though "residence" welcomes a variety of connotations, the term usually mandates both a "physical presence and an intention to remain." Id. at 730 (quoting Munson v. Milton, 948 S.W.2d 813, 816 (Tex. App.—San Antonio 1997, pet. denied)). Accordingly, it distinguished between "transient" and "residential" purposes on property subject to such restrictive covenants. Id. at 730-31. And under the facts of this case, especially in light of the short-term rental agreements and Tarr's creation [**8] of an LLC to manage the property, as well as his payment of hotel taxes, the court of appeals held the leasing agreements to be in direct contradiction with its residential-purpose test—that the renter intend to remain at the home with a contemporaneous physical presence. Id. Tarr sought our review.

## II

A trial court's ruling on a motion for summary judgment is reviewed de novo. Joe v. Two Thirty Nine Joint Venture, 145 S.W.3d 150, 156 (Tex. 2004). To prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). Here, Tarr and the association filed cross-motions for summary judgment. When competing summary-judgment motions are filed, "each party bears the burden of establishing that it is entitled to judgment as a matter of law." City of Garland v. Dallas Morning News, 22 S.W.3d 351, 356 (Tex. 2000). In that instance, if "the trial court grants one motion and denies the other, the

---

[1] In its brief, the association now denies ever imposing these fines. However, the record, including the letters the association's board sent to Tarr, indicate otherwise.

reviewing court should determine all questions presented" and "render the judgment that the trial court should have rendered." *Id.; see also Comm'rs Court of Titus Cty. v. Agan, 940 S.W.2d 77, 81 (Tex. 1997)* (requiring appellate courts to "review the summary judgment evidence presented by both sides" when making this inquiry); *Guynes v. Galveston Cty., 861 S.W.2d 861, 862 (Tex. 1993)* (reviewing cross-motions for summary judgment [*279] where the facts were [**9] undisputed by "determining all legal questions presented").

## III

The parties do not dispute that the deed provisions at issue contain restrictive covenants. Like a trial court's summary-judgment ruling, courts review "a trial court's interpretation of a restrictive covenant de novo." *See Buckner v. Lakes of Somerset Homeowners Ass'n, 133 S.W.3d 294, 297 (Tex. App.—Fort Worth 2004, pet. denied)*. Before this Court, Tarr argues that if a deed restriction does not expressly address or restrict a certain property use, that usage must be permitted. Accordingly, short-term rentals must be permitted because the Timberwood Park Unit III's deeds remain silent as to short-term rentals. Tarr further contends that a deed restriction forbidding business purposes and permitting only residential purposes does not alter the permissibility of renting property in Timberwood for short durations of time. Meanwhile, the association interprets the restrictive covenants as prohibiting owners from using their tracts for any purpose other than single-family, residential use, which does not encompass Tarr's short-term rentals as that is a business, transient, multi-family use. It employs a "liberal" reading of the covenants and reasons that short-term rentals are not residential because the individuals occupying the [**10] home do not satisfy the definition of "residence" that it advances: physical presence for a substantial period of time coupled with an intent to remain. Both parties, however, maintain that the restrictive covenants they rely on are unambiguous.

## A

The parties arrive at their divergent interpretations of the restrictive covenants by employing different mechanisms to give effect to the drafters' intent. In Tarr's view, restrictive covenants must be strictly construed as they historically were at common law. The association contends, on the other hand, that the legislature superseded the common-law rule when it adopted Texas Property Code section 202.003(a), calling for restrictive covenants to be liberally construed.

"A 'restrictive covenant' is a negative covenant that limits permissible uses of land." *Restatement (Third) of Prop.: Servitudes § 1.3(3)* (AM. L. INST. 2000). Such covenants limit the use an owner or occupier of land can make of their property. *See id. cmt. e; see also Tex. Prop. Code § 202.001(4)* (defining "[r]estrictive covenant"). "The freedom to restrict the use of land gives individuals the ability to control land in a manner in which they deem to be socially preferable. The use of restrictive covenants to control the use of land has its roots as far back as sixteenth century England." [**11] David A. Johnson, *One Step Forward, Two Steps Back: Construction of Restrictive Covenants After the Implementation of Section 202.003 of the Texas Property Code, 32 Tex. Tech L. Rev. 355, 358 (2001)* (footnote omitted).

"The law recognizes the right of parties to contract with relation to property as they see fit, provided they do not contravene public policy and their contracts are not otherwise illegal." *Curlee v. Walker, 112 Tex. 40, 244 S.W. 497, 498 (Tex. 1922)*. And while our jurisprudence does not favor restraints on the free use of land, we have previously acknowledged that restrictive covenants can enhance the value of real property. *See Davis v. Huey, 620 S.W.2d 561, 565 (Tex. 1981)*. Accordingly, when land is sold, the agreed-to covenants "enter[] into and become[] a part of the consideration." *Curlee, 244 S.W. at 498* (quoting *Hooper v. Lottman, 171 S.W. 270, 272 (Tex. Civ.*

556 S.W.3d 274, *279; 2018 Tex. LEXIS 442, **11

App.—El Paso 1914, no [*280] writ)). "The buyer submits to a burden upon his own land because of the fact that a like burden imposed on his neighbor's lot will be beneficial to both lots." *Id.* (quoting *Hooper, 171 S.W. at 272*). Consequently, the covenant "between the original owner and each purchaser is . . . mutual." *Id.* (quoting *Hooper, 171 S.W. at 272*).

So the courts have always treated unambiguous covenants "as valid contracts between individuals." Johnson, *supra,* at 356; *see also Ski Masters of Tex., LLC v. Heinemeyer, 269 S.W.3d 662, 668 (Tex. App.—San Antonio 2008, no pet.)* ("A restrictive covenant is a contractual agreement between the seller and the purchaser of real property."). Therefore, "restrictive covenants are subject to the general rules [**12] of contract construction." *Pilarcik v. Emmons, 966 S.W.2d 474, 478 (Tex. 1998).* Whether a restrictive covenant is ambiguous is a question of law for the court to decide by looking at "the covenants as a whole in light of the circumstances present when the parties entered the agreement." *Id.; see also Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983).* "Like a contract, covenants are 'unambiguous as a matter of law if [they] can be given a definite or certain legal meaning." *Pilarcik, 966 S.W.2d at 478* (alteration in original) (first quoting *Grain Dealers Mut. Ins. Co. v. McKee, 943 S.W.2d 455, 458 (Tex. 1997)*; and then citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996)).* However, "if the covenants are susceptible to more than one reasonable interpretation, they are ambiguous." *Id.* "Mere disagreement over the interpretation of a restrictive covenant does not render it ambiguous." *Buckner, 133 S.W.3d at 297.*

A paramount concern when construing covenants is giving effect to the objective intent of the drafters of the restrictive covenant as it is reflected in the language chosen. *See Wilmoth v. Wilcox, 734 S.W.2d 656, 658 (Tex. 1987); see also Owens v. Ousey, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied).* Accordingly, "[c]ourts must

examine the covenants as a whole in light of the circumstances present when the parties entered the agreement," *Pilarcik, 966 S.W.2d at 478,* giving the "words used in the restrictive covenant . . . the meaning which they commonly held as of the date the covenant was written, and not as of some subsequent date." *Wilmoth, 734 S.W.2d at 658.* Moreover, the words in a covenant "may not [**13] be enlarged, extended, stretched or changed by construction." *Id. at 657; accord Buckner, 133 S.W.3d at 297.* And courts should avoid any "construction that nullifies a restrictive covenant provision." *Pilarcik, 966 S.W.2d at 479.*

Our courts enforce these private agreements subject to certain well-established limitations. For instance, it must "appear[] that a general building scheme or plan for the development of a tract of land has been adopted, designed to make it more attractive for residential purposes by reason of certain restrictions to be imposed on each of the separate lots sold." *Curlee, 244 S.W. at 498* (quoting *Hooper, 171 S.W. at 272*). Moreover, we have continuously called for a covenant's enforcement if it is "confined to a lawful purpose and [is] within reasonable bounds and the language employed is clear." *Davis, 620 S.W.2d at 565.* But we have also noted that "covenants restricting the free use of property are not favored," *id.,* because "[t]he right of individuals to use their own property as they wish remains one of the most fundamental rights that individual property owners possess." Johnson, *supra,* at 356. As such, we have limited this mandate to enforce restrictive covenants to instances where purchasers of real property buy "with actual or constructive [*281] knowledge of the scheme, and the covenant was part of the subject-matter [**14] of his purchase." *Curlee, 244 S.W. at 498* (quoting *Hooper, 171 S.W. at 272*). If, however, one "purchases for value and without notice," he "takes the land free from the restriction." *Davis, 620 S.W.2d at 566.* Whether the purchaser had notice "is determined at the date of the inception of the general plan or scheme," which is the time at which the restrictions were filed in the county's property records. *Id. at 567.*

For those reasons, courts nationwide have long afforded restrictive covenants a narrow interpretation.[2] For example, the Kansas Supreme Court has explained:

> The rules governing the construction of covenants imposing restrictions on the use of realty are the same as those applicable to any contract or covenant, including the rule that, where there is no ambiguity in the language used, there is no room for construction, and the plain meaning of the language governs. When construction is necessary, the language used will be given its obvious meaning.
>
> Another well-settled rule is that covenants and agreements restricting the free use of property are strictly construed against limitations upon such use. Such restrictions will not be aided or extended by implication or enlarged by construction. Doubt will be resolved in favor of the unrestricted use of property. [**15]

*Sporn v. Overholt*, 175 Kan. 197, 262 P.2d 828, 830 (Kan. 1953) (citation omitted). Thus, the court explained that the construction of a covenant will not preclude any property use that is "not plainly prohibited" by the restriction's clear language. *Id.* (quoting *Bear v. Bernstein*, 251 Ala. 230, 36 So. 2d 483, 484 (Ala. 1948)).

Like those jurisdictions, "the courts in Texas have approached . . . restrictive covenants with some skepticism." Johnson, *supra*, at 356. In 1925, this Court adopted an opinion of the Commission of Appeals, which relayed this interpretative standard:

> Covenants or restrictive clauses in instruments concerning real estate must be construed strictly, favoring the grantee and against the grantor, and all doubts should be resolved in favor of the free and unrestricted use of the premises.
>
> A reservation contained in an instrument of conveyance or lease which favors the grantor or lessor and tends to limit the free use of the premises by the grantee or lessee will not be enlarged by construction, but will be given effect according to the plain meaning and intent of the language used.

*Settegast v. Foley Bros. Dry Goods Co.*, 114 Tex. 452, 270 S.W. 1014, 1016 (Tex. 1925).[3] [*282] Texas jurisprudence steadily adhered to this strict approach for decades. Indeed, fifty-six years after *Settegast v. Foley Bros. Dry Goods Co.*, this Court

---

[2] *See, e.g.*, *Stephenson v. Perlitz*, 532 S.W.2d 954, 956 (Tex. 1976) (recognizing that other courts have found specific covenants ambiguous, and thus applying a "long-standing rule of construction" that adopts the interpretation that "least restricts the free use of land" (quoting *Houk v. Ross*, 34 Ohio St. 2d 77, 296 N.E.2d 266, 275 (Ohio 1973))); *see also* *Wood v. Blancke*, 304 Mich. 283, 8 N.W.2d 67, 69 (Mich. 1943) ("Restrictive covenants in deeds are construed strictly against grantors and those claiming the right to enforce them, and all doubts are resolved in favor of the free use of property."); *1733 Estates Ass'n v. Randolph*, 1 Neb. Ct. App. 1, 485 N.W.2d 339, 340 (Neb. Ct. App. 1992) ("[C]ovenants restricting the use of property are not favored in law. If restrictive covenants are ambiguous, they will be construed in a manner permitting the maximum unrestricted use of the property." (citation omitted)); *Hunt v. Held*, 90 Ohio St. 280, 107 N.E. 765, 766, 12 Ohio L. Rep. 78 (Ohio 1914) ("[I]t is a well-settled rule that in construing deeds and instruments containing restrictions and prohibitions as to the use of property conveyed[,] all doubts should be resolved in favor of the free use thereof for lawful purposes in the hands of the owners of the fee.").

[3] Six years after our 1925 decision, the Amarillo court of civil appeals explained the skepticism with which courts view the application of restrictive covenants:

In this country[,] real estate is an article of commerce. The uses to which it should be devoted are constantly changing as the business of the country increases, and as its new wants are developed. Hence, it is contrary to the well-recognized business policy of the country to tie up real estate where the fee is conveyed with restrictions and prohibitions as to its use; and, hence, in the construction of deeds containing restrictions and prohibitions as to the use of the property by a grantee, all doubts should, [**17] as a general rule, be resolved in favor of a free use of property and against restrictions.

*Ragland v. Overton*, 44 S.W.2d 768, 771 (Tex. App.—Amarillo 1931, no writ) (quoting 4 Thompson on Real Property § 3361). We adopted this statement a decade later and explained: "Being in derogation of the fee conveyed by the deed, if there be any ambiguity in the terms of the restrictions, or substantial doubt of its meaning, the ambiguity and doubt should be resolved in favor of the free use of the land." *Baker v. Henderson*, 137 Tex. 266, 153 S.W.2d 465, 467 (Tex. 1941).

556 S.W.3d 274, *282; 2018 Tex. LEXIS 442, **17

regarded these standards as "fundamental rules," which we linked [**16] with the requirement that a purchaser have notice of the limitations on his title:

> Although covenants restricting the free use of property are not favored, when restrictions are confined to a lawful purpose and are within reasonable bounds and the language employed is clear, such covenants will be enforced. However, a purchaser is bound by only those restrictive covenants attaching to the property of which he has actual or constructive notice. One who purchases for value and without notice takes the land free from the restriction.

*Davis*, 620 S.W.2d at 565-66 (citation omitted). We reasoned that absent such notice, "it cannot be said that they entered into the scheme or assumed the mutual obligation." *See id.* at 567.

Despite these principles being well established, courts have often reached seemingly divergent holdings. These discrepancies initially arose from the factually specific nature of construing covenants and determining if the complained-of conduct was a violation of a specific covenant's prescriptions.[4] But the catalyst for the dissimilarities among cases may have changed in 1987 with the enactment of Texas Property Code section 202.003(a), which has caused many to doubt the common-law principles' vitality. *Cf.* Johnson, *supra*, at 363 ("Th[e] strict construction of restrictive covenants by the Texas courts continued directly up to the Texas Legislature's passage of Texas Property Code section 202.003(a) in 1987.").

In 1987, the legislature enacted House Bill 356 to "allow property owners to withdraw their signatures from a petition to modify" or terminate restrictive covenants "without lengthy and expensive litigation." House Comm. on Judicial Affairs, Bill Analysis, Tex. H.B. 356, 70th Leg., R.S. (1987). Among its provisions was a rule of construction, now codified at Texas Property Code section 202.003: "A restrictive covenant shall be liberally construed to give effect to its purposes and intent." Act [*283] of June 1, 1987, 70th Leg., R.S., ch. 712, § 1, 1987 Gen. Laws 2585, 2585 [**18] (codified at Tex. Prop. Code § 202.003(a)). Its application was given retroactive effect so that it applies to all covenants regardless of when they were created. Tex. Prop. Code § 202.002(a). With Texas Property Code section 202.003(a)'s promulgation, courts suddenly had extreme "difficulty in ascertaining and declaring the controlling general principles of the law," *cf.* Hooper, 171 S.W. at 271, because they began to question whether this legislative enactment was an attempt to contravene our long-adhered-to common-law standards. *See* Johnson, *supra*, at 368, 372. And, unfortunately, "the legislature provided no explanation as to the motivations or necessity for . . . change" to help guide our courts. *Id.* at 370. As a result, Texas' courts of appeals have grappled "with the varying standards established by the passage of section 202.003 and the historical common-law rules of construction" but "have been unable to determine any uniform standard for interpreting ambiguous restrictive covenants." *See id.* at 371-72.

Thirty-one years after the statute's enactment, our courts remain immersed in this debate.[5] And as in

---

[4] *See* Hooper, 171 S.W. at 271 ("[A]s may be anticipated, from the very nature of the topic[ of restrictive covenants,] the cases abound in fine and subtle distinctions. Many of the decisions upon this branch of the law appear to be in hopeless conflict, but are usually reconcilable when the facts peculiar to each are understood. In fact, the courts seem to have had no special difficulty in ascertaining and declaring the controlling general principles of the law, but, in their application to concrete facts, it may well be said that the decisions are in hopeless conflict and confusion, and individual cases are without value as precedents, except as general principles are recognized and declared.").

[5] One court described the hesitation in electing which standard to utilize as follows:

> Some courts of appeals have recognized that the common-law requirement of construing restrictions strictly and section 202.003(a)'s requirement of construing residential covenants liberally to effectuate their purposes and intent might appear contradictory. As a result, some courts of appeals have held or implied that section 202.003(a)'s liberal-construction rule

those courts, the parties here dispute what standard controls our analysis. Unsurprisingly, Tarr contends that section 202.003(a) did not alter the judicial restraint courts have historically exercised when interpreting covenants, [**19] so he advances that the common-law strict-construction requirement still governs.[6] Conversely, the association argues

[*284] that the statute trumps the common-law approach and that section 202.003(a) should be applied to covenants that succumb to the pitfalls of ambiguity. So, although the association contends that the deed restrictions are unambiguous, it argues in the alternative that even if they are ambiguous, section 202.003(a) should still govern this Court's review.[7]

We have not yet deliberated section 202.003(a)'s effect, if any, on the construction principles we have long employed to interpret restrictive covenants.[8] Nor do we [*285] reach that decision

---

concerning residential covenants supersedes the common-law rule of strict construction. In contrast, other courts of appeals, including ours, have concluded that there is no discernable conflict between the common law and section 202.003(a). Even among the courts that believe that the common law and section 202.003(a) can be reconciled, there exists a split in how to apply section 202.003(a). Some of these courts, including ours, have simply continued to apply the common-law rule without [**20] a precise explanation of how to reconcile it with section 202.003(a). Other courts of appeals have held that the common-law rule applies only when there is an ambiguity concerning the drafter's intent, but to determine if such an ambiguity exists, these courts first apply section 202.003(a)'s liberal-construction mandate.

Finally, . . . some courts of appeals since 1987 have simply continued applying the common-law strict-construction rule without referring to section 202.003(a) at all. Others, including ours, have applied section 202.003(a)'s liberal-construction standard without referring to the common-law construction principles at all.

*Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 926-27 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (footnotes omitted). And as exemplified by that passage, the divide is even engrained within single appellate courts, resulting in contradictory standards being applied in various opinions issued by the same court of appeals. *See id.*

[6] Tarr argues that the common-law rule protects property rights against deed restrictions that are either unclear or silent as to the permissibility of certain activities. In addition, he raises concerns pertaining to ambiguity, constitutionality, and homeowners' autonomy. First, Tarr notes that none of the appellate decisions "explain what 'liberal' means." Thus, he argues the statute's use of that term is ambiguous. And he posits that the statute may be unconstitutionally vague as it may violate due process if and when it subjects property owners to unfair enforcement actions. This is so because what constitutes a "liberal" reading of a covenant is too subjective and can potentially deprive an owner of their freedom to make certain uses of their property. In an attempt to illustrate this point, Tarr notes that when purchasing a parcel subject to a residential-use limitation, the buyer would not be able to discern restrictions on their ability to rent the property and the applicable minimum duration of that lease. But he concedes the constitutionality issue may not be ripe for review, so we do not analyze that contention. *See San Antonio Gen. Drivers, Helpers*

*Local No. 657 v. Thornton*, 156 Tex. 641, 299 S.W.2d 911, 915 (Tex. 1957) ("A court will not pass on the constitutionality of a statute if the particular case before it may be decided without doing so."). Finally, Tarr argues that any questions about how restrictions are to be applied should be left to the members of homeowners' associations who can amend their property restrictions. To liberally construe deed restrictions in a way that expands the restrictions' reach and that impairs the free use of property would usurp the property owners' power to self-govern. Such a usurpation, Tarr argues, diminishes both the owners' property rights and their freedom to contract.

[7] Notably, this contravenes many courts' approaches. *Compare Highlands Mgmt. Co. v. First Interstate Bank of Tex., N.A.*, 956 S.W.2d 749, 752 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ("'[T]he covenant should not be hedged about with strict construction, but given a liberal construction to carry out its evident purpose.' This rule of construction . . . applies to all restrictive covenants." (alteration in original) (quoting *Candlelight Hills Civic Ass'n v. Goodwin*, 763 S.W.2d 474, 477 (Tex. App.—Houston [14th Dist.] 1988, writ denied)), *with Jennings v. Bindseil*, 258 S.W.3d 190, 195 (Tex. App.—Austin 2008, no pet.) ("When the language of a restrictive covenant is unambiguous, the Texas Property Code requires that the restrictive covenant be liberally construed . . . . However, if the language is found to be ambiguous, [it] is construed strictly against the party seeking to enforce the restriction, and all doubts must be resolved in favor of the free and unrestricted use of the property." (citation omitted)). But the association notes that section 202.003(a) does not confine its applicability to unambiguous covenants. And nor should it in the association's point of view. Since an unambiguous covenant can be strictly construed according to its plain language, a liberal construction is not required. Instead, it alleges that the legislative mandate to liberally construe restrictive covenants governs the interpretation of *ambiguous* deed restrictions that cannot be strictly construed.

[8] "The Texas Supreme Court has noted, but not yet resolved, the potential conflict between the common law and section 202.003(a)." *Uptegraph*, 312 S.W.3d at 927. House Bill 364 was signed into law on June 18, 1987. *See* Act of June 1, 1987, 70th Leg., R.S., ch. 712,

today. We don't have to reconcile any potential conflict between section 202.003(a) and the common-law principles—or whether those common-law standards can ever again be appropriately employed—because our conclusion today would be the same regardless of which interpretative standard prevails. As explained below, the covenants at issue unambiguously fail to address the property use complained of in this case. No construction, no matter how liberal, [**21] can construe a property restriction into existence when the covenant is silent as to that limitation.[9] A day

may come when we must choose between strictly or liberally construing restrictive covenants. But it is not this day. So we proceed to the merits.

## B

Pertaining to the trial court's "multi-family" use holding, the association argues that the covenants prohibit the use of tracts in the subdivision for any purpose other than single-family residences and for residential purposes. And it maintains the trial court properly concluded that Tarr's use violated the "single-family, residential purpose" restriction because he has leased to parties who are not members of a single family. In response, Tarr argues that the single-family restriction simply limits the type of structure allowed rather than restricting use.[10]

In arguing that the deeds impose a single-family, residential-use restriction, the association has combined two separate covenants. Paragraph one of the Timberwood Park Unit III subdivision's deeds provides:

> 1. All tracts shall be used solely for residential purposes, except [**22] tracts designated on the above mentioned plat for business purposes, provided, however, no business shall be conducted on any of these tracts which is

---

§ 1, 1987 Gen. Laws 2585, 2585 (codified at Tex. Prop. Code § 202.003(a)). A few weeks later, this Court had to interpret restrictive covenants in *Wilmoth v. Wilcox*. See 734 S.W.2d 656. In doing so, however, we did not reference the legislature's recent call for a liberal construction. *See generally id.* Instead, we simply turned to the common-law mandates. *See id. at 657-58* ("[W]e note that covenants restricting the free use of land are not favored by the courts, but when they are confined to a lawful purpose and are clearly worded, they will be enforced. All doubts must be resolved in favor of the free and unrestricted use of the premises, and the restrictive clause must be construed strictly against the party seeking to enforce it." (citations omitted)). On September 16, 1987, two months after the Property Code amendments, we denied rehearing. *Id.* at 656.

Eleven years later, we acknowledged section 202.003(a)'s promulgation. In *Pilarcik v. Emmons*, the parties debated what standards controlled the covenants' interpretation with one side advancing the common-law rules and the other calling for a liberal construction pursuant to section 202.003(a). See 966 S.W.2d at 478. After noting this dispute, we recounted general principles without mentioning the common-law rules. *See id.* We never determined whether the statutory liberal construction or the common-law strict construction controlled the interpretation of restrictive covenants. *See generally id. at 478-79.* Instead, we held the covenants at issue were unambiguous and decided the case by merely analyzing the drafters' intent. *See id.*

[9] See *Waterford Harbor Master Ass'n v. Landolt*, No. 14-13-00817-CV, 2015 Tex. App. LEXIS 622, 2015 WL 393262, at *6 (Tex. App.—Houston [14th Dist.] Jan. 22, 2015, pet. denied) (mem. op.) (declining to rewrite a covenant "or add to its language under the guise of interpretation," and instead electing to "enforce it as written"); *Hollis v. Gallagher*, No. 03-11-00278-CV, 2012 Tex. App. LEXIS 7547, 2012 WL 3793288, at *7 (Tex. App.—Austin Aug. 28, 2012, no pet.) (mem. op.) ("Courts[] . . . may not 'liberally' construe a restrictive covenant to say something that it plainly does not say." (citations omitted)); *Hicks v. Falcon Wood Prop. Owners Ass'n*, No. 03-09-00238-CV, 2010 Tex. App. LEXIS 6804, 2010 WL 3271723, at *7 (Tex. App.—Austin Aug. 19, 2010, no pet.) (mem. op.) ("[T]o say that an unambiguous restrictive covenant is to be 'liberally

construed' does not mean that it necessarily restricts the land use in dispute—the covenant, properly construed, may unambiguously state otherwise."); *Hodas v. Scenic Oaks Prop. Ass'n*, 21 S.W.3d 524, 528 (Tex. App.—San Antonio 2000, pet. denied) ("If a phrase or covenant is so worded that we can give it a certain legal meaning, it is not ambiguous, and we will construe it as a matter of law, giving effect to the objective intent of the drafter as expressed or as is apparent in the provision."); *Permian Basin Ctrs. for Mental Health & Mental Retardation v. Alsobrook*, 723 S.W.2d 774, 776 (Tex. App.—El Paso 1986, writ ref'd n.r.e.) ("A restrictive covenant that is clear and unambiguous[] . . . can be enforced as written, but it cannot be enlarged by interpretation."); *see also Bear*, 36 So. 2d at 484 ("[C]ourts should not extend, by construction, the restraint beyond its proper scope by writing into it what is not clearly inhibited.").

[10] Tarr further notes the lack of evidence that the tenants were members of multiple families. Instead, the evidence concerned only the number of occupants and did not identify how, or even whether, they were related to each other.

noxious or harmful [*286] by reason of odor, dust, smoke, gas fumes, noise or vibration . . . . That covenant does not set forth any provisions pertaining to single-family uses or residences. Instead, that limitation is imposed by paragraph three:

> 3. No building, other than a single family residence containing not less than 1,750 square feet, exclusive of open porches, breezeways, carports and garages, and having not less than 75% of its exterior ground floor walls constructed of masonry, i.e., brick, rock, concrete, or concrete products shall be erected or constructed on any residential tract . . . and no garage may be erected except simultaneously with or subsequent to erection of residence. No less than a 300 lb. per square asphalt or fiberglass shingle shall be used in any construction in Timberwood Park Unit III.

Although the association is correct that the deeds mention both single-family residences and mandate a residential purpose, to combine those provisions into one mega-restriction is a bit of a stretch. Both the context in which those [**23] provisions arise and the case law construing similar covenants demonstrate that those restrictions must be read as separate and distinct.

In discerning the drafters' intent, courts must "consider whether the covenant's restrictions apply to the use of the building or to the nature of the physical structure" to be erected on the property. Thomas F. Guernsey, *The Mentally Retarded and Private Restrictive Covenants*, 25 Wm. & Mary L. Rev. 421, 426 (1984). Accordingly, courts have often distinguished between *use* restrictions and *structural* restrictions and have declined to conflate the two. *See, e.g.,* 1733 *Estates*, 485 N.W.2d at 340-41.

Indeed, in *Stephenson v. Perlitz*, this Court held, "A restriction that property is for residence purposes is quite different from a restriction which additionally provides that only one residence may be erected on the property." 532 S.W.2d at 956. So, we

continued, where tracts are limited to residential uses, the covenants require merely that the property be used for "living purposes"; they did not also impart a prohibition against duplex or apartment housing. *Id.* at 955 (citation omitted). *Stephenson's* holding is particularly relevant in this case as it came just three years before the Timberwood deeds were recorded. [**24] *See Pilarcik*, 966 S.W.2d at 478 (requiring courts to "examine the covenants as a whole in light of the circumstances present when the parties entered the agreement"); *Wilmoth*, 734 S.W.2d at 658 (giving "words used in the restrictive covenant . . . the meaning which they commonly held as of the date the covenant was written, and not as of some subsequent date").

*Permian Basin Centers for Mental Health & Mental Retardation v. Alsobrook* is also instructive. 723 S.W.2d at 774. In that case, the court of appeals interpreted separate covenants, one of which provided the tracts "shall be known and described as residential lots, except[] . . . [those] designated as commercial lots." *Id.* at 775. The second paragraph provided: "No structures shall be erected, altered, placed or permitted to remain on any residential building plot other than one detached single-family dwelling, not to exceed two stories in height[] . . . ." *Id.* The court held that "single-family dwelling" referred "only to the type of structure that may be built on the property," which was the interpretation that was "more reasonable and more in keeping with what was intended by the original grantor." *Id.* at 776. It analyzed the two different paragraphs as follows:

> The paragraph in which the term "single-family dwelling" [**25] appears deals with the character of structures that may be [*287] "erected, altered, placed or permitted to remain on any residential building plot." There is no mention in this or any other paragraph of the covenant that seeks to impose a single-family occupancy requirement. The only "use" provisions in the covenant distinguish between commercial and residential use and prohibit the use of outbuildings as residences.

*Id.* The court concluded the restrictive covenant "limits the use of the property to residential purposes, and the term 'single-family dwelling' limits the residential use to single-family structures—that is, homes designed for single families as opposed to duplexes or apartment buildings." *Id.* at 777.

Likewise, the limitations in Tarr's deeds are set forth in separate paragraphs that speak to distinct restrictions. Like the covenants in *Permian Basin*, paragraph three of the Timberwood deed describes structural or architectural limitations by specifying that the building "erected or constructed" upon a tract must be a "single family residence," specifying the minimum square footage of such a building, and the materials of which it shall be constructed. The only instance in which the deed [**26] imposes the single-family restriction is in this structural limitation. Conversely, paragraph one speaks to how owners in the subdivision may permissibly use their property. It limits their use to "residential purposes" as contradistinguished from "business purposes." It remains silent as to whether so-called "multi-family" use is permitted. Other use provisions in the deed—which speak to dumping garbage and breeding animals on tracts, for example—also fail to restrict owners' use to single-family purposes.

We cannot ignore the context in which these limitations are imposed and conflate the two paragraphs. *See Boatner v. Reitz*, No. 03-16-00817-CV, 2017 Tex. App. LEXIS 7967, 2017 WL 3902614, at *5 (Tex. App.—Austin Aug. 22, 2017, no pet.) (mem. op.) ("The references in the deed restrictions to the terms 'single family' and 'dwelling,' however, are in the context of the building requirements for the main structure on the property as compared with the provision addressing the 'use' of the property."); *see also 1733 Estates, 485 N.W.2d at 340* (defining "residential purposes" as a limit on "the way the property is used" while "[s]ingle-family dwelling" limits "the type of building which may be constructed and not to the use of such building"). The single-family residence

restriction [**27] merely limits the structure that can properly be erected upon Tarr's tract and not the activities that can permissibly take place in that structure.[11] The parties do not dispute that Tarr's tract contains a single-family residence, so he has not violated the single-family-residence restriction. Because the single-family-residence limitation is not relevant to the short-term rentals at issue, we turn to [*288] the question of whether paragraph one—the paragraph restricting use—bars such activity.

## C

The "use" restriction in paragraph one of Tarr's deed provides: "All tracts shall be used solely for residential purposes, except tracts designated on the above mentioned plat for business purposes[] . . . ." The court of appeals held that the covenant unambiguously restricted Tarr's short-term-rental use because use of the word "residence" connotes a "physical presence and an intention to remain." 510 S.W.3d at 730 (quoting *Munson, 948 S.W.2d at 816*). Distinguishing between "residential purposes" and "transient purposes," the court concluded that a homeowner who leases "his home to be used for transient purposes" violates the covenant that limits the [**28] use of his tract to

_____

[11] Notably, by considering the covenant's context and the meaning afforded to such a covenant in 1979, we would reach this interpretation regardless of whether we strictly or liberally construed it. *See Wilmoth, 734 S.W.2d at 657-58* ("[T]he restrictive clause must be construed strictly against the party seeking to enforce it. The words used in the restriction, and the restriction as a whole, may not be enlarged, extended, stretched or changed by construction. . . . The words used . . . must be given the meaning which they commonly held as of the date the covenant was written[] . . . ." (citations omitted)); *Liberal Interpretation*, BLACK'S LAW DICTIONARY (10th ed. 2014) (explaining a liberal interpretation is one that broadly interprets "a text *in light of the situation presented* . . . with the object of effectuating the spirit and broad purpose of the text" (emphasis added)); *see also Stephenson, 532 S.W.2d at 956* (deciding in 1976 that "[a] restriction that property is for residence purposes is quite different from a restriction which additionally provides that only one residence may be erected on the property").

"*solely* . . . residential purposes."[12] *Id.*

Tarr argues that "residential purposes" must be read in comparison to "business purposes," focusing on the activities in which the people in possession of the property partake. So Tarr juxtaposes activities such as eating, sleeping, praying, and watching TV with activities such as blacksmithing, shop-tending, event-hosting, and automobile repair. In addition, Tarr refutes that duration of use can be considered in conjunction with the character of the use; "residential purposes" does not in and of itself differentiate between owner occupancy and tenant occupancy or imply duration limits on either. As for the "business purpose" prohibition in the covenant, Tarr contends that merely renting one's property or realizing a profit therefrom does not convert a homeowner's use into a business use. And if it did, he argues, then long-term leasing arrangements would likewise be forbidden. Because these covenants often remain silent as to the minimum amount of time one must use a home for it to qualify as a residential use, Tarr questions the soundness of cases that impose ninety-day limitations, require physical, permanent occupancy, [**29] or examine an intent to remain. Instead, Tarr urges this Court to conclude that because the covenants are silent as to leasing arrangements or minimum-duration-of-use requirements, such activities are permissible—as what is not expressly proscribed is allowed. This construction, Tarr insists, best effectuates the original grantor's purpose and intent.

The association, on the other hand, focuses on the transient and temporary nature of Tarr's renters' use of the property. Because the tenants have no intent to remain beyond the short term for which they have leased the property, their use is merely transient as opposed to residential. To support this definition of "residential," the association relies upon various Texas and federal regulatory definitions of "residence." So the association not only contrasts "residential purpose[s]" with "business purposes," but also with "transient purposes." And as proof that Tarr's use is a business use, the association notes that he pays hotel taxes and that he formed an LLC to manage the property.

As noted above, when interpreting a restrictive covenant, courts must first determine whether the covenant is ambiguous by looking to the "covenant[] as [**30] a whole in light of the circumstances present when [*289] the parties entered the agreement." *Pilarcik*, 966 S.W.2d at 478. A covenant is ambiguous if it is "susceptible to more than one reasonable interpretation," but it is unambiguous if it can be afforded "a definite or certain legal meaning." *Id.* (citations omitted). Whether a covenant is ambiguous is a question of law for the court to decide. *Id.*

First, we will examine the covenant to determine the relevant activity at issue. As we noted above, "'residential purpose' refers to the way the property is used." *1733 Estates*, 485 N.W.2d at 340. But one must inquire whether the covenant's language focuses upon the owner's use of the property or upon the activity that actually takes place on the land. If the suitable probe is how the owner is using the property, Tarr could be said to have violated the provision by establishing an LLC and generating income from his property. We note, however, the covenant here provides that the tract "shall be used solely for residential purposes, except tracts designated . . . for business purposes, provided, however, no business shall be conducted on any of these tracts which is noxious or harmful." By referring to the activities "conducted [**31] *on*" the tracts, the covenant expressly makes the relevant inquiry the conduct take place on the physical property itself (as opposed to how the owner is using the property). Viewing the use taking place on the property as the relevant measure

---

[12] In doing so, the court of appeals rejected the interpretation the Austin court of appeals afforded a similar covenant. 510 S.W.3d 731 (citing *Zgabay v. NBRC Prop. Owners Ass'n*, No. 03-14-00660-CV, 2015 Tex. App. LEXIS 9100, 2015 WL 5097116, at *3 (Tex. App.—Austin Aug. 28, 2015, pet. denied) (mem. op.)). The Austin court concluded that the covenant was ambiguous and strictly construed it, as the common law requires. *Zgabay*, 2015 Tex. App. LEXIS 9100, 2015 WL 5097116, at *3.

accords with the views adopted by other states' courts that have decided this issue. *See, e.g., Dunn v. Aamodt*, No. 3:10-CV-03119, 2012 U.S. Dist. LEXIS 5323, 2012 WL 137463, at *3 (W.D. Ark. Jan. 18, 2012); *Slaby v. Mountain River Estates Residential Ass'n*, 100 So. 3d 569, 579, 581 (Ala. Civ. App. 2012); *Houston v. Wilson Mesa Ranch Homeowners Ass'n*, 2015 COA 113, ¶¶ 23-24, 360 P.3d 255; *Santa Monica Beach Prop. Owners Ass'n v. Acord*, 219 So. 3d 111, 115 (Fla. Dist. Ct. App. 2017).

Turning to the meaning of "residential purpose," we initially note that the Timberwood covenants do not provide a definition of either "residential purpose" or "business purpose." This lack of direction from the deeds themselves is especially problematic because "residence" is a term "of multiple meanings." 20 AM. JUR. 2D *Covenants* § 179 (2018). Often, however, the appropriate meaning can be discerned from "the context in which it is used." *Id.* Still, even when context is taken into account, ambiguity sometimes rears its head. As a Colorado court explained:

> Although "residential" unambiguously refers to use for living purposes, courts have recognized ambiguity in the term in cases involving short-term rentals or other situations where those residing in the property are living there only temporarily, not permanently. . . .
>
> Other courts have [**32] found no ambiguity, reasoning that, as long as the property is used for living purposes, it does not cease being "residential" simply because such use is transitory rather than permanent.

*Houston*, 2015 COA 113, at ¶¶ 17-18 (citations omitted). Whether a covenant is ambiguous must be determined based upon the plain language set forth in the covenant as seen in light of the circumstances present when it was drafted. *Cf. Pilarcik*, 966 S.W.2d at 478. And courts sometimes too quickly conclude that a term is ambiguous:

> Some words have two or more quite different meanings. . . . More commonly, however, the interpretive issue involves not which of two totally different meanings is intended but what level of generality is to be accorded to a single meaning. In writings on the interpretation of texts, the loose norm is to refer to all uncertainties of meaning as *ambiguities*. [*290] But there is a useful and real distinction between textual uncertainties that are the consequence of verbal ambiguity (conveying two very different senses, as when *table* could refer either to a piece of furniture or to a numerical chart) and those that are the consequence of verbal vagueness (as when *equal protection of the laws* can be given a scope so narrow as to include only protection [**33] from injury, or so broad as to include equal access to government benefits). A word or phrase is ambiguous when the question is which of two or more meanings applies; it is vague when its unquestionable meaning has uncertain application to various factual situations.

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 31-32 (2012). In other words, if a court can assign a meaning to "residential purposes," the term is not rendered ambiguous solely because the application of "its unquestionable meaning" to a certain factual situation is "uncertain" or "vague." *See id.*

We note again that the Timberwood deeds do not provide definitions of "residential" or "business" purpose; so we must give those words "the meaning which they commonly held as of the date the covenant was written." *Wilmoth*, 734 S.W.2d at 658; *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 89 (2012) ("The choice is this: Give text the meaning it bore when it was adopted, or else let every judge decide for himself what it should mean today."). In 1969, in *MacDonald v. Painter*, we construed a clause that forbade using tracts for "mercantile business" and permitted only "residence [**34] purposes." 441 S.W.2d 179, 180 (Tex. 1969). We held: "The terms 'residence

purposes,' and 'residences' require the use of property for living purposes as distinguished from uses for business or commercial purposes." *Id.* at 182.[13] Similarly, *American Jurisprudence* provides this explanation for the phrase:

> Generally speaking, "residential use" is one that involves activities generally associated with a personal dwelling. Similarly, a "residential building" is a building which is used for residential purposes or in which people reside, dwell, or make their homes, as distinguished from one which is used for commercial or business purposes. The phrase "residential purposes" does not mean only the occupying of a premises for the purpose of making it one's "usual" place of abode; a building is a residence if it is "a" place of abode.

20 AM. JUR. 2D *Covenants* § 179 (2018) (footnotes omitted). The use of the phrase "residential purposes" in the Timberwood deeds comports with these interpretations. The restrictive covenant in this case effectively defines "residential purposes" by juxtaposing it to "business purposes"—the use it expressly forbids.

The covenants in the Timberwood deeds fail to address leasing, use as a vacation home, short-term rentals, minimum-occupancy [**35] durations, or the like. They do not require owner occupancy or occupancy by a tenant who uses the home as his domicile. Instead, the covenants merely require that the activities on the property comport [*291] with a "residential purpose" and not a "business purpose." We decline to add restrictions to the Timberwood covenants by adopting an overly

narrow reading of "residential." "Without some indication to the contrary, general words (like all words, general or not), are to be accorded their full and fair scope. They are not to be arbitrarily limited." *Id.* at 101.

For this reason, we disapprove of the cases that impose an intent or physical-presence requirement when the covenant's language includes no such specification and remains otherwise silent as to durational requirements. *See generally Benard v. Humble, 990 S.W.2d 929 (Tex. App.—Beaumont 1999, pet. denied)* (affirming the trial court's interpretation of "single-family residence purposes" as prohibiting "renting for a period of less than ninety days" even though the covenants did "not explicitly contain language covering temporary renting of property"). Even if we were to afford the covenant a liberal construction, we cannot erect limitations on the homeowners' use of property of which they had no notice. *See Davis, 620 S.W.2d at 566* (relieving [**36] property owners of restrictions if they purchased "for value and without notice" of the limitation on their property use); *cf. Mason Family Tr. v. DeVaney, 2009- NMCA 048, 146 N.M. 199, 207 P.3d 1176, 1178 (N.M. Ct. App. 2009)* ("In the context of a residential subdivision, we interpret a dwelling purpose to be use as a house or abode, and once a proper use has been established, we do not attach any requirement of permanency or length of stay."). We do not imbue general phrases with a meaning not even raised by implication. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012) ("Nothing is to be added to what the text states or reasonably implies . . . . That is, a matter not covered is to be treated as not covered."). Nevertheless, we confine this interpretation to the unambiguous language of these particular restrictive covenants. We recognize that another court may reach a different conclusion if the covenant it reviews defines "residential" or "business" uses by specifically enumerating prohibited conduct. *See, e.g., Munson, 948 S.W.2d at 815* (analyzing a covenant that defined "business use" to include "[m]otel, tourist courts, and trailer

---

[13] Likewise, the Galveston court of appeals construed a provision with a residential-use restriction this way: "The word 'residential' as used in a covenant restricting the use of property, is used in contradistinction to 'business' or 'commerce.' A building used as place of abode, and in which no business is carried on, is devoted to a 'residential use' so long as such use continues." *Briggs v. Hendricks, 197 S.W.2d 511, 513 (Tex. Civ. App.—Galveston 1946, no writ)*, *quoted in Vaccaro v. Rougeou, 397 S.W.2d 501, 503 (Tex. Civ. App.—Houston 1965, writ ref'd n.r.e.).*

parks").

Affording these phrases their general meanings and interpreting the restrictions as a whole, we hold that so long [**37] as the occupants to whom Tarr rents his single-family residence use the home for a "residential purpose," no matter how short-lived, neither their on-property use nor Tarr's off-property use violates the restrictive covenants in the Timberwood deeds.[14] [*292] Moreover, Tarr's use

does not qualify as a commercial use.[15] Accordingly, as the association failed to adduce any evidence that Tarr's tenants have used the property in any manner inconsistent with a residential purpose, summary judgment for the association was improper.

* * *

We hold that Tarr has not violated the Timberwood restrictive covenants by entering into short-term vacation rental agreements. Accordingly, the trial court should not have entered summary judgment for the association, and the court of appeals erred in affirming the trial court's judgment. We reverse and remand the case to the trial court for proceedings consistent with this opinion. [**39]

Jeffrey V. Brown

Justice

---

[14] Facing similar questions, other states' courts have reached similar conclusions. For example, in 2003, the Idaho Supreme Court decided *Pinehaven Planning Board v. Brooks*, which implicated covenants providing that residential tracts may only contain one single-family dwelling and forbidding any "commercial or industrial ventures or business." 138 Idaho 826, 70 P.3d 664, 665 (Ida. 2003). The court held that the covenants unambiguously permitted "the rental of residential property for profit" because leasing "the property for residential purposes, whether short or long-term does not fit within" the covenants' prohibitions. *Id.* at 667-68. The short-term renters partook in activities reflecting a residential purpose because they used "it for the purposes of eating, sleeping, and other residential purposes," which was not a use that violated the commercial and business activity proscriptions. *Id.* at 668.

Relying on *Pinehaven* in part, an Alabama court of appeals analyzed analogous covenants and ultimately reached a similar conclusion. In *Slaby v. Mountain River Estates Residential Association*, the property's use was limited to "single family residential purposes only," and "commercial, agricultural or industrial use[s]" were expressly prohibited. 100 So. 3d at 571. In an attempt to give effect to the phrase "single family residence purposes only," the court first noted that "the restrictive covenant does not require that the cabin be exclusively 'owner-occupied' or the like, so they 'are not constrained in the character of their residential use of the property by the deed covenants.'" *Id.* at 577 (citations omitted). Thus, the court adopted the majority view and held that "property is used for 'residential purposes' when those occupying it do so for ordinary living purposes. . . . [S]o long as the renters continue to relax, eat, sleep, bathe, and engage in other incidental activities, . . . they are using the cabin for residential purposes." *Id.* at 579. Holding otherwise, the court recognized, would mean that unless property owners use their property "as their primary residences," they would be violating similar covenants, even where the owners themselves use the residence as a vacation home. *Id.* Consequently, the court decided that "the term 'residential purposes' does not mean only 'occupying of a premises for the purpose of making it one's usual place of abode.'" *Id.*

Moreover, although Tarr did generate revenue off his property in Timberwood, we also agree with our sister courts nationwide and hold that Tarr did not violate the covenants solely by receiving income from using his property to facilitate his short-term-rental

endeavor. However, because the relevant inquiry, under this specific covenant, is the activity taking place on the lot itself, this decision might differ if Tarr furthered his profit-generating-venture on the Timberwood tract itself. As the Alabama court explained:

[N]o mercantile or similar activity occurs at the cabin. The actual renting of the cabin, and any financial transactions associated therewith, occurs off-site. The [owners] do not solicit renters onsite, but do so through the Internet, where potential tenants can view the premises without actually going there. While occupying the cabin, the tenants must cook and clean for themselves and they do not receive any services from the [owners.] Although the [owners] remit a lodging tax, . . . that fact does not detract from the conclusion that no commercial activity takes place [**38] on the premises.

*Slaby*, 100 So. 3d at 580 (citation omitted).

[15] Other state courts have measured the commercial or business purposes, when defined in contradistinction to residential purposes, by examining whether the use involved employees or other indicia of business on the tract itself. *See, e.g.,* **Santa Monica,** 219 So. 3d at 115 (distinguishing another case that involved an inn that "had a number of indicia of a business, such [as] a manager to 'control the guests,' signs located on the property advertising it as a 'Bed and Breakfast Inn,' and five bedrooms each with a separate entrance to the outside of the structure"). Here, there is no evidence that Tarr makes any commercial use upon the tracts themselves, and he concedes that were he to establish a leasing office or similar indicia of business, his property use would then violate the Timberwood covenants.

556 S.W.3d 274, *292; 2018 Tex. LEXIS 442, **38

OPINION DELIVERED: May 25, 2018

---

**End of Document**

⚠️ Caution
As of: January 20, 2026 3:47 AM Z

# Zaatari v. City of Austin

Court of Appeals of Texas, Third District, Austin

November 27, 2019, Filed

NO. 03-17-00812-CV

**Reporter**

615 S.W.3d 172 *; 2019 Tex. App. LEXIS 10290 **; 2019 WL 6336186

Appellants, Ahmad Zaatari, Marwa Zaatari, Jennifer Gibson Hebert, Joseph "Mike" Hebert, Lindsay Redwine, Ras Redwine VI, and Tim Klitch//Cross-Appellants, City of Austin, Texas; and Steve Adler, Mayor of The City of Austin, and the State of Texas v. Appellees, City of Austin, Texas; and Steve Adler, Mayor of The City of Austin//Cross-Appellees, Ahmad Zaatari, Marwa Zaatari, Jennifer Gibson Hebert, Joseph "Mike" Hebert, Lindsay Redwine, Ras Redwine VI, and Tim Klitch

**Subsequent History:** Petition for review denied by City of Austin v. Zaatari, 2021 Tex. LEXIS 501 (Tex., June 11, 2021)

**Prior History:** [**1] FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY. NO. D-1-GN-16-002620, THE HONORABLE TIM SULAK, JUDGE PRESIDING.

**Disposition:** Affirmed in Part; Reversed and Rendered in Part; Remanded.

**Counsel:** For Appellant: Mr. Chance Weldon, Mr. Robert E. Henneke, Texas Public Policy Foundation, Austin, TX.

For Appellee: Mr. Brandon Carr, City of Austin Attorney, Austin, TX; Mr. Frank N. Ikard Jr., Ikard Law PC, Austin, TX; Ms. Laurie Ratliff, Laurie Ratliff LLC, Austin, TX; Ms. Meghan L. Riley, City of Austin Law Department, Austin, TX.

For Appellee - State: Mr. David J. Hacker, Mr. Kyle D. Hawkins, Office of the Attorney General, Austin, TX.

**Judges:** Before Chief Justice Rose, Justices Goodwin and Kelly. Concurring and Dissenting Opinion by Justice Kelly.

**Opinion by:** Jeff Rose

# Opinion

[*179] These cross-appeals arise from challenges to a municipal ordinance amending the City of Austin's regulation of short-term rental properties. *See* Austin, Tex., Ordinance No. 20160223-A.1 (Feb. 23, 2016) (codified in Austin City Code chapters 25-2 and 25-12). Appellants Ahmad Zaatari, Marwa Zaatari, Jennifer Gibson Hebert, Joseph "Mike" Hebert, Lindsay Redwine, Ras Redwine VI, and Tim Klitch (collectively, "Property Owners") own homes in the Austin area and sued the City and its mayor (collectively, "the [*180] City"), asserting that certain provisions in the ordinance are unconstitutional. Specifically, the Property Owners challenged the ordinance provision that bans short-term rentals of non-homestead properties, *see id.* § 25-2-950, and the ordinance provision that controls conduct and types of assembly at short-term rental properties, *see id.* § 25-2-795. The State intervened in the Property Owners' suit to contend that the ordinance's [**2] ban on short-term rentals of non-homestead properties is unconstitutional as a retroactive law and as an uncompensated taking of private property. The Property Owners and the State appeal from the district court's order granting the City's no-evidence motion for summary judgment and

denying the Property Owners' and the State's traditional motions for summary judgment. The City and the State also challenge the district court's orders excluding certain evidence from the summary-judgment record. On cross-appeal, the City challenges the district court's order overruling the City's plea to the jurisdiction.

The ordinance provision banning non-homestead short-term rentals significantly affects property owners' substantial interests in well-recognized property rights while, on the record before us, serving a minimal, if any, public interest. Therefore, the provision is unconstitutionally retroactive, and we will reverse the district court's judgment on this issue and render judgment declaring the provision void. The ordinance provision restricting assembly infringes on Texans' fundamental right to assemble because it limits peaceable assembly on private property. Therefore, because the City [**3] has not demonstrated that the provision is narrowly tailored to serve a compelling state interest, the provision violates the Texas Constitution's guarantee to due course of law, and we will reverse the district court's judgment on this issue and render judgment declaring the provision void. We will affirm the remainder of the judgment and remand the case to the district court for further proceedings consistent with this opinion.

**Background**

In the last decade, individuals have increasingly turned to short-term rentals—typically, privately owned homes or apartments that are leased for a few days or weeks at a time—for lodging while traveling. *See, e.g.*, Donald J. Kochan, *The Sharing Stick in the Property Rights Bundle*, 86 U. Cin. L. Rev. 893, 894-95 (2018) (collecting sources). As short-term rentals have become more common, local governments have looked for ways to balance the rights of short-term rental property owners and tenants against the concerns of neighboring properties. In 2012, the City adopted an ordinance

to regulate Austinites' ability to rent their properties through amendments to the zoning and land-development chapters of its municipal code. *See* Austin, Tex., Ordinance 20120802-122 (Aug. 2, 2012) (codified [**4] at Austin, Tex., Code Chs. 25-2 and 25-12). That ordinance defined short-term rental use as "the rental of a residential dwelling unit or accessory building, other than a unit or building associated with a group residential use, on a temporary or transient basis." *Id.* § 25-2-3(10). The 2012 ordinance also required property owners to satisfy eligibility criteria and obtain a license before being allowed to rent their property on a short-term basis. *Id.* §§ 25-2-788(B), 25-2-789(B).

In 2016, after conducting several studies and holding hearings regarding short-term rentals and their role in the community, the City adopted an ordinance amending its regulations of short-term rentals. *See* Austin, Tex., Ordinance 20160223-A.1. As amended by the 2016 ordinance, the City [*181] Code created three classes of short-term rentals:

• Type 1—single-family residence that is "owner-occupied or is associated with an owner-occupied principal residential unit," Austin, Tex., Code § 25-2-788(A);

• Type 2—single-family residence that "is not owner-occupied and is not associated with an owner-occupied principal residential unit," *id.* § 25-2-789(A); and

• Type 3—residence that is "part of a multi-family residential use," *id.* § 25-2-790(A). [1]

The ordinance immediately suspended the licensing of [**5] any new type-2 short-term rentals and established April 1, 2022, as the termination date for all type-2 rentals. *See id.* § 25-2-950.

The 2016 ordinance also imposed several

---

[1] The parties agree that, as a practical matter, type-1 status is determined based on whether the owner claims the property as a homestead for tax purposes. *See* Austin, Tex., Code § 25-2-788.

615 S.W.3d 172, *181; 2019 Tex. App. LEXIS 10290, **5

restrictions on properties operated as short-term rentals, including:

> • banning all assemblies, including "a wedding, bachelor or bachelorette party, concert, sponsored event, or any similar group activity other than sleeping," whether inside or outside, after 10:00 p.m.;
> • banning outdoor assemblies of more than six adults at any time;
> • prohibiting more than six unrelated adults or ten related adults from using the property at any time; and
> • giving City officials authority to "enter, examine, and survey" the short-term rentals to ensure compliance with applicable provisions of Code.

*See id.* §§ 25-2-795(D)-(G), 25-12-213-1301. Failure to comply with these provisions is punishable by a fine of up to $2,000 and possible revocation of the operating license. *See id.* § 25-1-462.

In response to the ordinance, the Property Owners sued the City for declaratory and injunctive relief, alleging that section 25-2-795's assembly and occupancy restrictions and section 25-2-950's ban on type-2 short-term rentals violate, facially and as applied, constitutional rights to privacy, freedom of assembly and association, [**6] due course of law, equal protection, and freedom from unwarranted searches. *See* Tex. Const. art. I, §§ 3 (equal protection), 9 (searches), 19 (due course of law), 27 (assembly); *Texas State Emps. Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1987) (individual privacy).[2] The Property Owners also sought attorney fees. *See* Tex. Civ. Prac. & Rem. Code § 37.009. The State of Texas intervened in the Property Owners' case, arguing that section 25-2-950's termination of type-2 operating licenses by 2022 is unconstitutional as a retroactive law and an uncompensated taking of

private property. *See* Tex. Const. art. I, §§ 16 (retroactive laws), 17 (takings).

The Property Owners and the State moved for summary judgment on their constitutional challenges to the ordinance, providing evidentiary exhibits in support of those motions.[3] The City filed a plea to the jurisdiction and a no-evidence motion for summary judgment. The State and the City each filed objections to certain aspects [*182] of the evidentiary record. The district court denied the traditional motions for summary judgment, overruled the City's plea to the jurisdiction, granted the City's motion for no-evidence summary judgment, and sustained in part the State's and the City's respective evidentiary objections. The Property Owners and the State appeal from the district court's order denying their motions for summary [**7] judgment and granting the City's motion for summary judgment. The State also appeals from the district court's order sustaining the City's evidentiary objections. The City cross-appeals from the district court's order overruling its plea to the jurisdiction and from the order sustaining the State's evidentiary challenges.

**Jurisdiction**

Because it implicates our authority to reach the merits of this dispute, we begin by addressing the district court's order overruling the City's plea to the jurisdiction. *See Crites v. Collins*, 284 S.W.3d 839, 840 (Tex. 2009) (noting that jurisdictional questions must be addressed before merits). A trial court's jurisdiction is a question of law we review de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id.* at 227 (citing *Bland Indep. Sch.*

---

[2] The Property Owners bring their privacy, assembly, and association claims within the framework of the due-course-of-law and equal-protection clauses of the Texas Constitution.

[3] The Property Owners' motion for summary judgment did not include their request for attorney fees.

615 S.W.3d 172, *182; 2019 Tex. App. LEXIS 10290, **7

*Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)). "[I]n a case in which the jurisdictional challenge implicates the merits of the plaintiffs' cause of action"—as is the case here—"and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists." *Id.* "If the evidence creates a fact [**8] question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227-28.

The City's plea to the jurisdiction challenges the State's standing to intervene in this dispute, the Property Owners' standing to bring claims on behalf of tenants, and the ripeness of the underlying claims. The plea also invokes governmental immunity, arguing that the Property Owners and the State have not pleaded any claim for which the City's immunity is waived or otherwise inapplicable. We address these arguments in turn.

## A. Standing

The City contests the State's standing to intervene in this matter and the Property Owners' standing to bring claims on behalf of their tenants. "Standing is implicit in the concept of subject matter jurisdiction," and is therefore properly challenged in a plea to the jurisdiction. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). In general, to establish standing to seek redress for injury, "a plaintiff must be personally aggrieved." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008) (citing *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996)). In addition, "his alleged injury must be concrete and particularized, actual or imminent, not hypothetical." *Id.* at 304-05 (citing *Raines v. Byrd*, 521 U.S. 811, 819, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997)); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001); *Texas Ass'n of Bus.*, 852 S.W.2d at 444. "A plaintiff does not lack standing simply because he cannot [**9] prevail on the merits of his claim; he lacks standing because his claim of injury is too slight for a court to afford redress." *Inman*, 252 S.W.3d at 305. These [*183] common-law standards, however, are not dispositive if the Legislature has conferred standing by statute. *See In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding) (considering standing under certain provisions of Texas Family Code); *but see Grossman v. Wolfe*, 578 S.W.3d 250, 257 n.4 (Tex. App.—Austin 2019, pet. denied) (noting that U.S. Supreme Court has rejected statutorily created standing).

The State's standing to intervene in this matter is unambiguously conferred by the Uniform Declaratory Judgment Act, which provides:

> In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard.

Tex. Civ. Prac. & Rem. Code § 37.006(b). The Property Owners filed suit in 2016, raising a constitutional challenge to the amendments enacted by ordinance 20160223-A.1. If they prevail, the unconstitutional provisions will be declared void. The suit therefore "involves the validity of a municipal ordinance" such that the State is "entitled to be heard" in this proceeding. [**10] *Id.*; *see Texas Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 433-34 (Tex. App.—Austin 2018, pet. filed) (explaining State's right to intervene in constitutional challenge to municipal ordinance).

The City also contests the Property Owners' right to raise constitutional claims on behalf of their tenants. "Generally, courts must analyze the standing of each individual plaintiff to bring each individual claim he or she alleges." *Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69,

77 (Tex. 2015) (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 152 (Tex. 2012)). "However, 'where there are multiple plaintiffs in a case who seek injunctive or declaratory relief . . . the court need not analyze the standing of more than one plaintiff—so long as [one] plaintiff has standing to pursue as much or more relief than any of the other plaintiffs.'" *Id.* (quoting *Heckman*, 369 S.W.3d at 152 n.64). "The reasoning is fairly simple: if one plaintiff prevails on the merits, the same prospective relief will issue regardless of the standing of the other plaintiffs." *Id.* (citations omitted). Here, at least one of the Property Owners is both an operating licensee and a tenant of short-term rentals. That property owner asks the court to enjoin enforcement of the ordinance and to declare it void in part due to allegedly unconstitutional provisions restricting short-term tenants' rights to association, assembly, freedom of movement, and privacy. As a tenant, [**11] she herself "ha[s] suffered some actual restriction" under the challenged provisions, and she seeks the greatest possible prospective relief the court might afford. *See id.* She therefore has standing to pursue these claims, and "we need not analyze the standing" of the remaining Property Owners with respect to claims brought on behalf of short-term tenants. *See id.*

## B. Ripeness

The City contends that because parts of the ordinance do not take effect until 2022 and because—in the City's view—the Property Owners have not yet suffered any concrete injury, any challenge to the ordinance is not yet ripe. We disagree.

Ripeness is a jurisdictional prerequisite to suit. *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442-43 (Tex. 1998). A claim ripens upon the existence of "a real and substantial controversy involving [*184] genuine conflict of tangible interests and not merely a theoretical dispute." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995) (quoting *Bexar—Medina—Atascosa Ctys. Water Control & Improvement Dist. No. 1 v. Medina Lake Prot. Ass'n*, 640 S.W.2d 778, 779-80 (Tex. App.—San Antonio 1982, writ ref'd n.r.e)). Ripeness requires "a live, non-abstract question of law that, if decided, would have a binding effect on the parties." *Heckman*, 369 S.W.3d at 147 (citing *Brown*, 53 S.W.3d at 305). Ripeness is "peculiarly a question of timing." *Perry v. Del Rio*, 66 S.W.3d 239, 249-51 (Tex. 2001) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S. Ct. 335, 42 L. Ed. 2d 320 (1974)). A case is not ripe if it involves "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Patterson*, 971 S.W.2d at 442 (quoting 13A [**12] Charles A. Wright et al., *Federal Practice & Procedure* § 3532, at 112 (2d ed. 1984)).

This controversy is ripe for adjudication. The Property Owners raise a facial challenge to an ordinance adopted in February of 2016. Some provisions took effect immediately, others were retroactively applied to certain license applications filed in 2015, and others will take effect beginning April 1, 2022. It is undisputed that these provisions limit the Property Owners' rights with respect to their properties, including restricting the number of tenants, the term of tenancy, and the permissible uses of the property during short-term rental tenancy. The ordinance is already in effect, so there is no risk that its impact "may not occur at all." *Id. at 442*. Facial challenges to ordinances are "ripe upon enactment because at that moment the 'permissible uses of the property [were] known to a reasonable degree of certainty.'" *Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50, 60 (Tex. 2006) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 620, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001)) (alteration in original).

And while the City argues the Property Owners have not yet "suffered economic harm" from the provision terminating type-2 operation in 2022, that fact would not forestall adjudication of this dispute even assuming, for the sake of argument, it is an

accurate characterization [**13] of the circumstances. As a general matter, courts have long recognized that an aggrieved plaintiff may seek redress "when a wrongful act causes some legal injury . . . even if all resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) (citing *Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 262 (Tex. 1994); *Quinn v. Press*, 135 Tex. 60, 140 S.W.2d 438, 440 (Tex. 1940)). But more specifically, because the plaintiffs and intervenors allege a facial abridgment of their most fundamental rights under the United States and Texas Constitutions, the City's alleged constitutional overreach itself is an injury from which the Property Owners and the State seek relief. *See Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392-93, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988) (finding jurisdiction over facial challenge where statute had not yet been enforced and no injury in fact had yet occurred); *City of Laredo v. Laredo Merchs. Ass'n*, 550 S.W.3d 586, 590 (Tex. 2018) (allowing constitutional challenge to ordinance where suit filed before effective date); *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 626-27 (Tex. 1996) (rejecting State's argument that plaintiffs "must actually be deprived of their property before they can maintain a [facial] challenge to this statute"). The district court did not err in rejecting the City's ripeness arguments.

[*185]  **C. Jurisdiction over the Subject Matter**

In its final challenge to jurisdiction, the City invokes its immunity from suit. To overcome governmental immunity from suit and thereby establish jurisdiction over this case, the Property [**14] Owners must plead a viable claim for which governmental immunity is waived or otherwise inapplicable. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 475 (Tex. 2012). Governmental immunity does not shield the City from viable claims for relief from unconstitutional acts. *See General Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001) ("[T]he doctrine does not shield the State from an action for compensation under the takings clause." (citations omitted)); *Bd. of Trs. of the Galveston Wharves v. O'Rourke*, 405 S.W.3d 228, 237 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Generally, governmental immunity does not shield a governmental entity from a suit for declaratory relief based on alleged constitutional violations." (citations omitted)). Here, both the Property Owners and the State have raised constitutional challenges to the City's ordinance. As discussed in further detail in our analysis of summary judgment, two of these claims are meritorious—and thus viable—challenges to the constitutionality of the ordinance. Accordingly, the parties have successfully established the district court's jurisdiction over the controversy, and the court did not err in overruling the City's plea to the jurisdiction.

We overrule the City's jurisdictional issues.

**Evidentiary Rulings**

Before turning to the district court's orders granting the City's no-evidence motion for summary judgment and denying the two traditional motions, we must determine [**15] which evidence is properly before the court. *See Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 882 (Tex. 2009) (explaining importance of evidentiary rulings in context of no-evidence summary judgment). The State and the City filed objections to evidence offered on the cross-motions. The district court sustained these objections in part, and two evidentiary exhibits remain at issue on appeal. The State appeals from the district court's order excluding sworn declarations obtained from several owners of short-term rentals in the Austin area, and the City challenges the exclusion of thousands of pages documenting the legislative history of the ordinance, which the district court excluded as unnecessarily voluminous. A district court's decision to exclude evidence is reviewed for abuse

of discretion. *Capital Metro. Transp. Auth v. Central of Tenn. Ry. & Nav. Co.*, 114 S.W.3d 573, 583 (Tex. App.—Austin 2003, pet. denied). "A trial court abuses its discretion if it acts without reference to any guiding rules and principles." *Id.* (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)).

## A. Exclusion of State's Affidavits

The district court excluded several sworn declarations the State had obtained from owners of short-term rentals, accepting the City's argument that the declarations are irrelevant and that the names of the declarants were not timely disclosed by the State. We agree with the State that the district court [**16] abused its discretion in sustaining the objection.

To begin with, this evidence is relevant. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Tex. R. Evid. 401. Relevant evidence must be admitted unless admission is otherwise prohibited by state [*186] or federal law. *Id.* R. 402. The disputed declarations include, for example, evidence of how long short-term rentals have existed in Austin, what makes them profitable, where they are located, how often they are occupied, and the financial impact the owners anticipate from the ordinance. This information is critical to "determining the action"— that is, determining whether the ordinance violates any constitutional rights—and is therefore relevant.

This relevant evidence was not rendered inadmissible by the State's allegedly untimely disclosure of the names of the declarants. "A party must respond to written discovery in writing within the time provided by court order or these rules." Tex. R. Civ. P. 193.1. "When responding to written discovery, a party must make a complete response, based on all information reasonably available to the responding [**17] party or its attorney at the time the response is made." *Id.* "If a party learns that the

party's response to written discovery was incomplete or incorrect when made, or, although complete and correct when made, is no longer complete and correct, the party must amend or supplement the response . . . ." *Id.* R. 193.5. "A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed . . . unless the court finds that: (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties." *Id.* R. 193.6.

Under the circumstances of this case, the State timely disclosed its intent to rely on testimony from these owners. In mid-March 2017, before the close of discovery, the State explained in its response to the City's request for disclosure that "individuals who currently hold, or were previously granted, Short-Term Rental (STR) permits by [the City], and the individuals who testified at any public hearing [**18] on short-term rental regulations" were persons who had knowledge of facts relevant to its case. *See id.* R. 194.2(e) (authorizing party to request disclosure of names "of persons having knowledge of relevant facts"). When the State made this general disclosure, the City had recently—mid-February—provided discovery responses listing the names of all the short-term rental licensees, but the State had not yet had time to identify from that list the specific witnesses that it intended to rely on and the evidence those witnesses would provide. The State's response to the City's request was therefore complete "based on all information reasonably available to [the State] or its attorney at the time the response [wa]s made." *Id.* R. 193.1.

Once the State identified its witnesses and the evidence those witnesses would provide, it disclosed that information to the City in a supplemental disclosure. *See id.* R. 193.5(a) (requiring responding party to amend or

615 S.W.3d 172, *186; 2019 Tex. App. LEXIS 10290, **18

supplement incomplete or incorrect discovery responses "reasonably promptly"). This supplementation occurred in mid-May 2017; three months after the State had received the evidentiary information from the City and approximately six months before [**19] the hearing at which the declarations were offered as evidence. As such, the State's supplementation was reasonably prompt. *See id.*; *see also id.* R. 193.5(b) (amended or supplemental responses made less than 30 days before trial are presumed to not be reasonably prompt). Thus, the district court abused its discretion in sustaining the City's objection and excluding the declarations of Carole Price, Cary Reynolds, Pete Gilcrease, Gregory Cribbs, Rachel Nation, and Travis [*187] Sommerville. *See Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992)* (noting that failure to analyze or apply law correctly constitutes abuse of discretion).

We sustain the State's evidentiary issue.

## B. Exclusion of City's Legislative History

The City complains of the district court's exclusion of its proffered legislative history, which the State had argued was "too voluminous" to be useful. We find it unnecessary to decide whether the exclusion was erroneous, as we may take judicial notice of this history. "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be [**20] question." *Tex. R. Evid. 201*. The City offers this history primarily as evidence of its need to address public concerns regarding the presence of short-term rentals in certain parts of Austin. Setting aside the question of whether the hearing testimony and other legislative history accurately characterize the impact of short-term rentals, the fact that these concerns were previously raised by residents and other stakeholders is a matter of municipal record and "is not subject to reasonable dispute." *Id.* We therefore

will incorporate the aspects of this history that the City relies on in our analysis of the merits of this dispute.

## Summary Judgment

The district court granted the City's no-evidence motion for summary judgment and denied the traditional motions filed by the Property Owners and the State. "When . . . parties move for summary judgment on overlapping issues and the trial court grants one motion and denies the other[s], we consider the summary-judgment evidence presented by both sides and determine all questions presented." *Texas Ass'n of Acupuncture & Oriental Med. v. Texas Bd. of Chiropractic Exam'rs, 524 S.W.3d 734, 738* (citing *Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005))*. "If we determine that the trial court erred, we render the judgment the trial court should have rendered." *Id.* We make this determination de novo. *Id.*

The State [**21] and the Property Owners filed traditional motions for summary judgment on their claims regarding the constitutionality of the ordinance. The City filed a cross-motion for summary judgment challenging those constitutionality claims on no-evidence grounds. "Summary judgment is proper when the summary-judgment evidence shows that there are no disputed issues of material fact and that the movant is entitled to judgment as a matter of law." *Texas Ass'n of Acupuncture, 524 S.W.3d at 738* (citing Tex. R. Civ. P. 166a(c)). "A movant seeking traditional summary judgment on its own cause of action has the initial burden of establishing its entitlement to judgment as a matter of law by conclusively establishing each element of its cause of action." *Id.* (citing *Trudy's Tex. Star, Inc. v. City of Austin, 307 S.W.3d 894, 905 (Tex. App.— Austin 2010, no pet.))*. "To obtain traditional summary judgment on an opposing party's claims, the movant must conclusively negate at least one element of each of the claims or conclusively establish each element of an affirmative defense."

*Id.* (citing *Lakey v. Taylor*, 435 S.W.3d 309, 316 (Tex. App.—Austin 2014, no pet.)).

A party may move for no-evidence summary judgment when, "[a]fter adequate time for discovery[,] . . . there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at [*188] trial." Tex. R. Civ. P. 166a(i). "The motion must state the elements [**22] as to which there is no evidence." *Id.* "The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact." *Id.* When reviewing a no-evidence summary judgment, we "review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009) (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581-82 (Tex. 2006)).

## A. The State's Retroactivity Claim

The State argues that section 25-2-950 of the Austin City Code, which terminates all type-2 rentals by 2022, is unconstitutionally retroactive. We agree.

The Texas Constitution prohibits the creation of retroactive laws. *See* Tex. Const., art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). The prohibition against retroactive laws has two fundamental objectives: "[I]t protects the people's reasonable, settled expectations"—i.e., "the rules should not change after the game has been played"—and it "protects against abuses of legislative power." *Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 139 (Tex. 2010) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265-266, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994)).

A retroactive law is one that extends [**23] to matters that occurred in the past. *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014) (citing *Robinson*, 335 S.W.3d at 138). "A retroactive statute is one which gives preenactment conduct a different legal effect from that which it would have had without the passage of the statute." *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 60 (Tex. 2014) (quoting Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv. L. Rev. 692, 692 (1960)). The State contends that the ordinance provision terminating all type-2 operating licenses is retroactive because it "tak[es] away th[e] fundamental and settled property right" to lease one's real estate under the most desirable terms. The City disagrees with the State's characterization of the ordinance's effect, but it does not dispute that the ordinance is retroactive. We agree that section 25-2-950 operates to eliminate well-established and settled property rights that existed before the ordinance's adoption. *See Robinson*, 335 S.W.3d at 139 (noting that "[m]ost statutes operate to change existing conditions"); Hochman, 73 Harv. L. Rev. at 692.

But not all retroactive laws are unconstitutional. *Robinson*, 335 S.W.3d at 139. ("Mere retroactivity is not sufficient to invalidate a statute."). To determine whether a retroactive law violates the Texas Constitution's prohibition against retroactive laws, we must consider three factors in light of the prohibition's objectives [**24] of protecting settled expectations and of preventing legislative abuses: (1) "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings;" (2) "the nature of the prior right impaired by the statute;" and (3) "the extent of the impairment." *Id.* at 145. This three-part test acknowledges the heavy presumption against retroactive laws by requiring a compelling public interest to overcome the presumption. *Tenet*, 445 S.W.3d at 707 (citing *Robinson*, 335 S.W.3d at 145). But it also appropriately encompasses the notion that "statutes are not to be set aside lightly." *Id.*

[*189]  We begin by considering the first *Robinson* factor, "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings," to determine if there is a compelling public interest. *Robinson*, 335 S.W.3d at 145; *see Tenet*, 445 S.W.3d at 707. Here, as was the case regarding the statute deemed unconstitutionally retroactive in *Robinson*, the City made no findings to justify the ordinance's ban on type-2 rentals. Based on the legislative record before us and the other facts relevant to determining the reasons for the City's actions, *see Robinson*, 335 S.W.3d at 145 (considering entire legislative record and additional related information in applying its three-prong [**25] test), the City's purported public interest for banning type-2 rentals is slight. The City contends that it enacted short-term rental regulations to address the following public-interest issues relating to short-term rentals:

• Public-health concerns about over-occupancy affecting the sewage system and creating fire hazards and about "bad actor" tenants who dump trash in the neighborhood and urinate in public;

• public-safety concerns regarding strangers to neighborhoods, public intoxication, and open drug use;

• general-welfare concerns about noise, loud music, vulgarity, and illegal parking; and

• the negative impact on historic Austin neighborhoods, specifically concerns of residents that that short-term rentals alter a neighborhood's quality of life and affect housing affordability.

The City does not explain which of these public-interest issues supports a ban on type-2 short-term rentals, and notably, there is nothing in the record before us to show that any of these stated concerns is specific to or limited to type-2 short-term rentals. Type-2 short-term rentals are simply single-family residences that are not owner-occupied or associated with an owner-occupied principal residential [**26] unit—i.e., they are not designated as the owner's homestead for tax purposes. *See* Austin, Tex., Code § 25-2-789(A).

More importantly, nothing in the record supports a conclusion that a ban on type-2 rentals would resolve or prevent the stated concerns. In fact, many of the concerns cited by the City are the types of problems that can be and already are prohibited by state law or by City ordinances banning such practices. *See* Tex. Penal Code §§ 42.01 (disorderly conduct), 49.02 (public intoxication); Austin, Tex., Code §§ 9-2-1-9-2-65 (noise ordinance), 9-4-15 (prohibiting public urination and defecation), 10-5-42-10-5-45 (littering ordinance), 12-5-1-12-2-44 (parking ordinance). Relatedly, nothing in the record shows that these issues have been problems with or specific to short-term rentals in the past. To the contrary, the record shows that, in the four years preceding the adoption of the ordinance, the City did not issue a single citation to a licensed short-term rental owner or guest for violating the City's noise, trash, or parking ordinances. And during this same four-year period, the City issued notices of violations—not citations—to licensed short-term rentals only ten times: seven for alleged overoccupancy, two for failure to [**27] remove trash receptacles from the curb in a timely manner, one for debris in the yard, and none for noise or parking issues. And the City has not initiated a single proceeding to remove a property owner's short-term rental license in response to complaints about parties. Further, the record shows that short-term rentals do not receive a disproportionate number of complaints from neighbors. In fact, as the City acknowledges, "short- [*190] term rental properties have significantly fewer 311 calls and significantly fewer 911 calls than other single-family properties."

We also note that a ban on type-2 short-term rentals does not advance a zoning interest because both short-term rentals and owner-occupied homes are residential in nature. *See Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 291 (Tex. 2018) (declining to interpret "residential" as prohibiting short-term rentals). And, in fact, the City treats short-term rentals as residential for purposes of its own laws. *See* Austin, Tex., Code § 25-2-4(B).

In sum, based on the record before us, we conclude that the purported public interest served by the ordinance's ban on type-2 short-term rentals cannot be considered compelling. The City did not make express findings as to the ordinance. Nothing in the record before [**28] us suggests that the City's reasons for banning type-2 rentals address concerns that are particular to type-2 rentals or that the ban itself would actually resolve any purported concerns. See *Tenet*, 445 S.W.3d at 707 (holding that retroactive provision of legislation that "was a comprehensive overhaul of Texas medical malpractice law" served compelling public interest); *Synatzske*, 438 S.W.3d at 58 (holding that retroactive legislation aimed at resolving asbestos-related litigation crisis and supported by legislative fact findings served compelling public interest); *Robinson*, 335 S.W.3d at 143-44 (holding that retroactive legislation ostensibly enacted for sole benefit of one entity and not supported by legislative fact findings did not serve compelling public interest).

But even if we were to determine that the City's ban on type-2 rentals advances a compelling interest, our consideration of the remaining *Robinson* factors, which require that we balance the purpose against the nature of the prior right and the extent to which the statute impairs that right, would still require us to conclude that the ban is unconstitutionally retroactive. See *Robinson*, 335 S.W.3d at 147-48. Regarding the nature of the prior right, we consider not whether the impaired right was "vested," but the extent to which [**29] that right was "settled." *Id.* at 142-43, 147, 149. In *Robinson*, for example, the Court held that the plaintiffs had a settled expectation that the Legislature would not extinguish their already filed common-law personal injury suit. *Id.* at 147-49. By

---

[4] Ignoring recent precedent from our high court, the City incorrectly engages in a vested-rights analysis to determine whether the ordinance is unconstitutionally retroactive. See *Robinson*, 335 S.W.3d at 143 ("What constitutes an impairment of vested rights is too much in the eye of the beholder to serve as a test for unconstitutional retroactivity.").

---

contrast, the supreme court held in *Synatzke* that plaintiffs asserting a statutory cause of action after the Legislature altered certain aspects of that statute had no settled expectation in the previous version of the statute because "the Legislature may repeal a statute and immediately eliminate any right or remedy that the statute previously granted.".

Private property ownership is a fundamental right. *Hearts Bluff*, 381 S.W.3d at 476 (citing *Severance v. Patterson*, 370 S.W.3d 705 (Tex. 2012)). "The right of property is the right to use and enjoy, or dispose of the same, in a lawful manner, and for a lawful purpose." *Id.*; see *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435-36, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982) (noting that property owners have "rights to possess, use and dispose of" their property). The ability to lease property is a fundamental privilege of property ownership. See *Terrace v. [*191] Thompson*, 263 U.S. 197, 215, 44 S. Ct. 15, 68 L. Ed. 255 (1923) (noting that "essential attributes of property" include "the right to use, lease and dispose of it for lawful purposes"); *Calcasieu Lumber Co. v. Harris*, 77 Tex. 18, 13 S.W. 453, 454 (Tex. 1890) ("The ownership of land, when the estate is a fee, carries with it the right to use the land in any manner not hurtful to others; [**30] and the right to lease it to others, and therefore derive profit, is an incident of such ownership."); see also Ross, Thomas, *Metaphor and Paradox*, 23 Ga. L. Rev. 1053, 1056 (1989) (noting that "rights to sell, lease, give, and possess" property "are the sticks which together constitute" the metaphorical bundle). Granted, the right to lease property for a profit can be subject to restriction or regulation under certain circumstances, see *Loretto*, 458 U.S. at 436 (noting in physical-takings case that "deprivation of the right to use and obtain a profit from company is not, in every case, independently sufficient to establish a taking"); *Severance*, 370 S.W.3d at 709-10 (noting few limitations on property rights), but the right to lease is nevertheless plainly an established one, see *Tenet*, 445 S.W.3d at 708 (analyzing whether claim was established).

615 S.W.3d 172, *191; 2019 Tex. App. LEXIS 10290, **30

And as for the specific right at issue here—i.e., to lease one's property on a short-term basis—the City acknowledges that Austinites have long exercised their right to lease their property by housing short-term tenants. In fact, the City admits, and the record establishes, that short-term rentals are an "established practice" and a "historically . . . allowable use." The record also shows that property owners, including some of the appellants here, [**31] who rented their individual properties as type-2 short-term rentals before the City's adoption of the provision eliminating those types of rentals did so after investing significant time and money into the property for that purpose. The record also shows that the City's ban on type-2 short-term rentals will result in a loss of income for the property owners.

Accordingly, based on the record before us and the nature of real property rights, we conclude that owners of type-2 rental properties have a settled interest in their right to lease their property short term.

The City emphasizes that the ban does not go into effect until 2022, suggesting that the grace period would allow property owners to adjust their investment strategy to prepare for the discontinuance of type-2 short-term rentals. *See Tenet, 445 S.W.3d at 708-09* (discussing grace period afforded by retroactive legislation); *City of Tyler v. Likes, 962 S.W.2d 489, 502 (Tex. 1997)* (determining that applying immunity provisions of Texas Tort Claims Act was not unconstitutionally retroactive when the plaintiff had two months to sue before it became effective). But the issue here is not about property owners' right to use their property in a certain way—it is about owners of type-2 short-term rentals retaining [**32] their well-settled right to lease their property.

We now turn to the third *Robinson* factor, which directs us to consider the extent of the ordinance's impairment to these settled rights. *See Robinson, 335 S.W.3d at 145.* The effect of the ordinance on the property right at issue here is clear—the City's

ordinance eliminates the right to rent property short term if the property owner does not occupy the property. The elimination of a right plainly has a significant impact on that right. *See id. at 148* (concluding that statute that extinguished plaintiff's claim in Texas had a "significant[] impact[]").

Because the record before us shows that the ordinance serves a minimal, if any, public interest while having a significant [*192] impact on property owners' substantial interest in a well-recognized property right, we hold that section 25-2-950's elimination of type-2 short-term rentals is unconstitutionally retroactive. *See id. at 150; see also Texas Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC, 363 S.W.3d 192, 204 (Tex. 2012)* (noting that preservation of property rights is "one of the most important purposes"—in fact, "[t]he great and chief end"—of government). Accordingly, we affirm the State's first issue on appeal. And having determined that section 25-2-950 is unconstitutionally retroactive, we need not address the State's and the Property Owners' [**33] remaining constitutional challenges to that same section. *See* Tex. R. App. P. 47.1 (requiring appellate court to hand down "opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").

## B. Property Owner's Assembly Clause Claim

The Property Owners assert that section 25-2-795 of the Austin City Code, which bans types of conduct and assembly at short-term rental properties, violates the Texas Constitution's due-course-of-law provision. *See* Tex. Const. art. I, § 19 (due course of law); Austin, Tex., Code § 25-2-795 (forbidding property owner or tenant from using short-term rental for assemblies of any kind between 10pm and 7am and for outside assemblies of more than six adults between 7am and 10pm; and banning more than six unrelated adults (or ten related adults) from being present on the property at any time). The Texas Constitution provides: "No

citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. Similarly, the federal due-process clause provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive [**34] any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," Texas courts regard these terms as without substantive distinction unless and until a party demonstrates otherwise. *See University of Tex. Med. Sch. at Hous. v. Than, 901 S.W.2d 926, 929 (Tex. 1995)* (citing *Mellinger v. City of Houston, 68 Tex. 37, 3 S.W. 249, 252-53 (Tex. 1887)).* Under federal and state guarantees of due process, the government may not infringe certain "fundamental" liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest. *Reno v. Flores, 507 U.S. 292, 301-02, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993).* The Property Owners contend that section 25-2-795 is subject to this strict-scrutiny review because it infringes on and limits short-term rental tenants' fundamental, constitutionally secured rights to freedom of assembly, association, movement, and privacy. *See id.* We conclude that section 25-2-795 fails to pass muster under strict-scrutiny review for violation of the Property Owners' freedom of assembly.[5]

### 1. The "Assembly" Clause

Both the U.S. and Texas constitutions contain assembly clauses as follows, respectively:

> Congress shall make no law respecting an establishment of religion, or prohibiting

[*193] the free exercise thereof; or abridging the freedom [**35] of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.

> The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance.

Tex. Const. art. 1, § 27. The Texas assembly clause differs from its federal counterpart in that it includes a "common good" requirement. The First Congress of 1789 considered including a requirement that the assembly be for "the" or "their" "common good"—e.g., James Madison offered "The people shall not be restrained from peaceably assembling and consulting for their common good."—but it ultimately rejected such text. *See* John D. Inazu, *Liberty's Refuge: The Forgotten Freedom of Assembly* 22 (2012) (citing *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 140 (Neil H. Cogan ed., 1997)).

### 2. History of the Federal Assembly Clause

In the nineteenth century, the United States Supreme Court concluded that the First Amendment did not protect the right to assemble unless "the purpose of the assembly was to petition the government for a redress of grievances." *Presser v. Illinois, 116 U.S. 252, 267, 6 S. Ct. 580, 29 L. Ed. 615 (1886)* (relying on dicta in *United States v. Cruikshank, 92 U.S. 542, 23 L. Ed. 588 (1875)). Presser [**36]* is the only Supreme Court opinion that has limited the right of assembly in this way, and commentators suggest that the limitation was the result of a judicial misreading of the text of the First Amendment's assembly language. *See* Inazu, at 22. Otherwise, the right to

---

[5] We therefore do not address the Property Owners' remaining challenges to this provision.

assemble featured prominently in the Supreme Court's First Amendment jurisprudence. For example, in his concurrence in *Whitney v. California*, Justice Brandeis treated free speech and assembly rights as coequal for the purposes of First Amendment analysis:

> Those who won our independence . . . believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.

274 U.S. 357, 375, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring). Soon thereafter, the Assembly Clause was incorporated against the states via the Due Process Clause of the Fourteenth Amendment. *De Jonge v. Oregon*, 299 U.S. 353, 364, 57 S. Ct. 255, 81 L. Ed. 278 (1937). And in more than one hundred subsequent opinions, the Court continued to recognize the assembly clause as [**37] a right related to, but nonetheless independent from, free speech. *See* Inazu, 26, 50 ("The Court had linked these two freedoms [speech and assembly] only once before; after *Whitney*, the nexus occurs in more than one hundred of its opinions."); *see, e.g., Thomas v. Collins*, 323 U.S. 516, 530, 65 S. Ct. 315, 89 L. Ed. 430 (1945) ("It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are [*194] cognate rights, and therefore are united in the First Article's assurance." (citation omitted)).

Commentators have indicated that the federal right to assemble has since fallen to the wayside. In the 1950s, the Supreme Court introduced an atextual

right of the First Amendment, the "freedom of association." Nicholas S. Brod, *Rethinking a Reinvigorated Right to Assemble* 63 Duke L. J. 155, 159 (2013) (citing *e.g., American Commc'ns Ass'n v. Douds*, 339 U.S. 382, 409, 70 S. Ct. 674, 94 L. Ed. 925 (1950)). At first, the "freedom of association" only sporadically replaced the right to assemble. *See id.* at 159 (*comparing Douds*, 339 U.S. at 400 ("In essence, the problem is one of weighing the probable effects of the statute upon the free exercise of the right of speech and assembly . . . ."), with *Douds*, 339 U.S. at 409 ("[T]he effect of the statute in proscribing beliefs— like [**38] its effect in restraining speech or freedom of association—must be carefully weighed by the courts . . . .")). But eventually the right to association generally displaced the right to assemble. *Id.* (noting that Supreme Court has identified as "indispensable liberties" the rights of "speech, press, [[and] association") (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958)). And, for better or worse, both assembly and association came to be treated by the Supreme Court as secondary rights enabling speech rather than coequal rights independent of speech. *See id.* (citing *NAACP*, 357 U.S. at 460 ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly.")).

Nevertheless, the United States Supreme Court case law continued to affirm the independence and importance of the federal right to assemble. In *Coates v. City of Cincinnati*, the high court considered an ordinance making it a criminal offense for "three or more persons to assemble" on sidewalks "in a manner annoying to persons passing by." 402 U.S. 611, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971). The Supreme Court held that the word "annoying" is unconstitutionally [**39] vague and that "[t]he ordinance also violates the constitutional right of free assembly and

association" because "[o]ur decisions establish that mere public intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms." *Id.* at 615. In support of its holding, the Supreme Court quoted a municipal court decision striking down a similar ordinance:

"Under the [ordinance provisions], arrests and prosecutions, as in the present instance, would have been effective as against Edmund Pendleton, Peyton Randolph, Richard Henry Lee, George Wythe, Patrick Henry, Thomas Jefferson, George Washington and others for loitering and congregating in front of Raleigh Tavern on Duke of Gloucester Street in Williamsburg, Virginia, at any time during the summer of 1774 to the great annoyance of Governor Dunsmore and his colonial constables."

*Id.* (quoting *City of Toledo v. Sims*, 84 Ohio Law Abs. 476, 169 N.E.2d 516, 520 (Toledo Mun. Ct. 1960)).

In *Richmond Newspapers, Inc. v. Virginia*, the Supreme Court noted that "[f]rom the outset, the right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment Rights with which it was deliberately linked by the draftsmen." 448 U.S. 555, 577, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980). The Court also noted that the First Congress [*195] debated [**40] whether there was a "need separately to assert the right of assembly because it was subsumed in freedom of speech," but that the motion to strike "assembly" was defeated. *Id.* at n.13. The Supreme Court quoted Mr. Page of Virginia as asserting during the debate:

[A]t times "such rights have been opposed," and that "people have . . . been prevented from assembling together on their lawful occasions": "[T]herefore it is well to guard against such stretches of authority, by inserting the privilege in the declaration of rights. If the people could be deprived of the power of assembling under any pretext whatsoever, they might be deprived

of every other privilege contained in the clause."

*Id.* (quoting 1 Annals of Cong. 731 (1789)). Thus, notwithstanding some outside commentary, the U.S. Supreme Court's case law supports a vibrant and historically grounded constitutional right to assemble.

### 3. Texas's Right to Assemble

In Texas, so far, the right to assemble has received little attention. The few cases that involve assembly claims under Texas's constitution recognize the existence and importance of the right; however, as far as we have found, none address the scope of the right to assemble. *See, [**41] e.g., City of Beaumont v. Bouillion*, 896 S.W.2d 143, 147 (Tex. 1995) (holding that there is no private right of action for damages arising under free speech and assembly sections of Texas Constitution because "anything done in violation of [Texas's bill of rights] is void"); *Bell v. Hill*, 123 Tex. 531, 74 S.W.2d 113, 119-20 (Tex. 1934) (recognizing that citizens' right to form political associations is protected by the U.S. Constitution's First Amendment and by Texas Constitution's assembly clause); *Faulk v. State*, 608 S.W.2d 625, 630-31 (Tex. Crim. App. 1980) (holding that Texas's riot statute did not violate right to assemble because it prohibited participation in "unlawful" assembly); *Ferguson v. State*, 610 S.W.2d 468, 470 (Tex. Crim. App. 1979) (holding that Texas riot statute did not violate right to assemble because right is limited to "peaceable assembly"); *Young v. State*, 776 S.W.2d 673, 679 (Tex. App.—Amarillo 1989, no pet.) (noting that state's ability to prohibit assemblies "must be limited in nature, be strictly construed, and must concern only assemblies . . . which, beyond cavil, threaten public peace and well being," and holding that Texas's organized-crime statute did not violate right to assemble because that right protects "the right of association for peaceful purpose" and organized-crime statute prohibits conduct that harms or disrupts the

615 S.W.3d 172, *195; 2019 Tex. App. LEXIS 10290, **41

common good).

Possibly accounting for the lack of assembly-clause cases in Texas, the Texas Supreme Court has adopted the judicially created "right of association" as a right that is [**42] "instrumental to the First Amendment's free speech, assembly, and petition guarantees." *Osterberg v. Peca*, 12 S.W.3d 31, 46 (Tex. 2000). But, in contrast to the U.S. Supreme Court, the Texas Supreme Court has never limited the application of Texas's assembly clause to situations where the purpose of the assembly was to petition the government for a redress of grievances. *See Presser*, 116 U.S. at 267. Nor has the Texas Supreme Court expressly held, or even considered whether, the judicially created "right of association" has subsumed the text of Texas's assembly clause, as some commentators have indicated has occurred with the federal assembly clause. We therefore rely on the plain text of the Texas Constitution to conclude that its assembly clause is not limited to protecting only petition-related assemblies and the judicially created "right of association" does not subsume [*196] the Texas Constitution's assembly clause in its entirety.

Our conclusion is also supported by significant textual differences in the two assembly clauses. First, the Texas Constitution grants an affirmative right to its citizens: "The citizens shall have the right . . . ." Tex. Const. art. I, § 27. The federal constitution, on the other hand, is prohibitive: "Congress shall make no law . . . ." U.S. Const. amend. I. Further, unlike the First Amendment's grouping [**43] of rights regarding religion, speech, the press, assembly, and petition, *see id.*, the Texas Constitution separates these and other rights across several sections in its Bill of Rights. *See* Tex. Const. art. I, §§ 1-34 ("Bill of Rights"). And while the grammatical structure of the First Amendment arguably tethers the right to assemble to the right to petition, Texas's assembly clause plainly creates two distinct rights by using a semicolon to separate the right to assemble from the right to petition: "The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance." Tex. Const. art. I, § 27; *see* U.S. Const. amend. I (prohibiting the abridgment of "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances"); *Cruikshank*, 92 U.S. at 552 (concluding that First Amendment protected "'the right of the people to assemble and to petition the government for a redress of grievances'" (misquoting U.S. Const. amend. I)); Jason Mazzone, *Freedom's Associations*, 77 Wash. L. Rev. 639, 713 (2002) (arguing that grammatical structure of First Amendment means that assembly right can be exercised only insofar as it is used to petition the government); *cf.* Inazu, at 23 (criticizing Mazzone and arguing "the comma preceding [**44] the phrase 'and to petition' is residual from the earlier text that had described the 'right of the people peaceably to assemble and consult for their common good, and to petition the government for a redress of grievances'").

But what rights does the Texas assembly clause grant? Using the common and ordinary meaning of the text of the clause, it affirmatively grants the right to "meet together" or "to congregate" for "their" "shared or joint" "welfare or benefit." *American Heritage Dictionary of the English Language* 107, 372, 757 (5th ed. 2011) (defining "assemble," "common," and "good" respectively); *Assemble, The Compact Edition of the Oxford English Dictionary* (1994) (establishing that since at least the fourteenth century, "assemble" has meant "to come together into one place or company, to gather together, congregate, meet"); *see Assembly, The Compact Edition of the Oxford English Dictionary* (establishing that since at least the sixteenth century, "assembly" has included "gathering of persons for purposes of social entertainment"); *see also Bouillion*, 896 S.W.2d at 148 ("To interpret [the Texas] Constitution, we give effect to its plain language. We presume the language of the Constitution was carefully [**45] selected, and we interpret words as they are

generally understood."). The use of "their" versus "the" to modify "common good" implies that the assembly must be for the common good of the citizens who assemble rather than the common good of the state. *See American Heritage Dictionary* at 1803-04 (defining "the" and "their" respectively); Inazu, at 22-23.[6] In other words, under the plain [*197] language of the Texas Constitution, citizens have the right to physically congregate, in a peaceable manner, for their shared welfare or benefit.

We must also determine whether the right granted in the Texas assembly clause is fundamental. *See Washington v. Glucksberg, 521 U.S. 702, 720, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)* (noting that due-process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests"); *Reno, 507 U.S. at 301-02* (noting that U.S. Constitution's substantive due-process guarantee "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest"). The Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's [**46] history and tradition,'" *Washington, 521 U.S. 720-21* (citing *Moore v. East Cleveland, 431 U.S. 494, 503, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977)*, and *Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S. Ct. 330, 78 L. Ed. 674*

(1934)), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," *Palko v. Connecticut, 302 U.S. 319, 325, 326, 58 S. Ct. 149, 82 L. Ed. 288 (1937)*; *Spring Branch I.S.D. v. Stamos, 695 S.W.2d 556, 560 (Tex. 1985)* ("Fundamental rights have their genesis in the express and implied protections of personal liberty recognized in federal and state constitutions.").

The Texas Constitution's Bill of Rights, as discussed above, expressly recognizes and protects the right of assembly. It also provides, "To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto . . . shall be void." Tex. Const. art. I, § 29. Relying on section 29, the Texas Supreme Court has held:

> The privileges guaranteed by the Bill of Rights, however, cannot be destroyed by legislation under the guise of police control. Wherever the Constitution makes a declaration of political privileges or rights or powers to be exercised by the people or the individual, it is placed beyond legislative control or interference, as much so as if the instrument had expressly declared that the individual citizen should not be deprived of those powers, privileges, and rights: and [**47] the Legislature is powerless to deprive him of those powers and privileges.

*Bell, 74 S.W.2d at 120* (holding that First Amendment and Texas's assembly clause protect right to form political associations); *cf. Douds, 339 U.S. at 399* ("The high place in which the right to speak, think, and assemble as you will was held by the Framers of the Bill of Rights and is held today by those who value liberty [*198] both as a means and an end indicates the solicitude with which we must view any assertion of personal freedoms."). Similarly, the Texas Supreme court has held that other rights found in the Texas Bill of Rights are fundamental rights for purposes of constitutional

---

[6] The dissent argues that the Assembly Clause's use of the word "citizen" limits the right to matters of public discourse. *See post* at 11. But the word "citizen," as it is used in this clause and in thirteen other clauses of the Texas Constitution, simply describes the class of persons to whom the right applies; it does not delineate the substantive scope of the right itself. *See* Tex. Const. art I, §§ 19 (due course of law), 20 (outlawry), 23 (right to bear arms), 25 (quartering of soldiers), 27 (assembly and petition);art. 3, §§ 6-7 (qualifications for senators and representatives), 49-b (veterans' land board); art. 4, § 4 (qualifications for governor); art. 5, §§ 1-a (state commission on judicial conduct), 2, 7 (qualifications for judiciary); art. 5, § 2 (voter qualification); art. 9, § 9 (hospital districts); *American Heritage Dictionary* at 339 (defining "citizen" as "person owing loyalty to and entitled . . . to the protection of a state or nation").

analysis. *See In re Bay Area Citizens Against Lawsuit Abuse, 982 S.W.2d 371, 375 (Tex. 1998)* (orig. proceeding) ("Freedom of association for the purpose of advancing ideas and airing grievances is a fundamental liberty guaranteed by the First Amendment.") (citing *NAACP, 357 U.S. at 460*); *Stamos, 695 S.W.2d at 560* (noting that "right to free speech [and] free exercise of religion . . . have long been recognized as fundamental rights under our state and federal constitutions"). And the United States Supreme Court has explicitly described the peaceable right to assemble, along with other First Amendment rights, as a fundamental right:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities [**48] and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and *assembly, and other fundamental rights* may not be submitted to vote; they depend on the outcome of no elections.

*West Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943)* (emphasis added); *see De Jonge, 299 U.S. at 364* ("The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."); *Whitney, 274 U.S. at 375-76* (J. Brandeis, concurring) ("But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction proposed is required in order to protect the state from destruction or from serious injury, political, economic or moral.").

Based on its prominence in the Texas Bill of Rights, its history in the founding of our country, and its early, and still valid, treatment by the U.S. Supreme Court, we hold that the right to assemble granted by the Texas Constitution is a fundamental

right.[7]

### 4. *Texas's Right to Assemble and the City of Austin's Ordinances*

[*199] What is at stake, then, is the authority of the City, through its ordinances, to prohibit or restrict the [**49] peaceable assembly of citizens on private property with respect to the purpose, time, and number of people. The Property Owners here argue that review of the alleged violation of their fundamental right to assemble by Austin's City Code must be examined under strict scrutiny. We agree.

Section 25-2-795 of Austin's short-term rental regulations provides that:

> (B) Unless a stricter limit applies, not more than two adults per bedroom plus two additional adults may be present in a short-term rental between 10:00 p.m. and 7:00 a.m.
> (C) A short-term rental is presumed to have two bedrooms, except as otherwise determined through an inspection approved by the director.
>
> (D) A licensee or guest may not use or allow another to use a short-term rental for an

---

[7] The dissent suggests that we have overstepped our role as an intermediate court "by declaring a fundamental right to congregate without fully analyzing peaceableness or the advocacy of a matter of public welfare." *See post* at 16. But the fact that we have rejected the dissent's view that the Texas Assembly Clause is limited to advocacy of a matter of public welfare does not mean that we have not taken that argument into account—to the contrary, we address the matter at length. And we note that even if Texas' assembly clause is so limited, the City's ordinance bans assemblies without regard to their content or purpose. We likewise acknowledge that non-peaceable assemblies are not protected by the Assembly Clause, but the City's short-term rental ordinance forbids assemblies whether peaceable or not. Finally, the dissent states that we should leave the determination of fundamental rights to Texas's high courts because doing so is "a novel and big step into [a] weighty area." *Post* at 16. But our duty as a court requires us to address those matters that are properly before us, including the identification and protection of fundamental constitutional rights. *See* Tex. R. App. P. 47.1 (requiring appellate courts to "hand down a written opinion that . . . addresses every issue raised and necessary to final disposition"); *Obergefell v. Hodges, 135 S. Ct. 2584, 2598, 192 L. Ed. 2d 609 (2015)* ("The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution.").

**assembly** between 10:00 p.m. and 7:00 a.m.

(E) A licensee or guest may not use or allow another to use a short-term rental for an outside **assembly** of more than six adults between 7:00 a.m. and 10:00 p.m.

(F) For purposes of this section, an **assembly** includes a wedding, bachelor or bachelorette party, concert, sponsored event, or any similar group activity other than sleeping.[8]
(G) A short-term rental use may not be used by more than:

(1) ten adults at one time, unless [**50] a stricter limit applies; or (2) six unrelated adults.

Austin, Tex., Code, § 25-2-795 (emphases added). This section plainly restricts the right to assemble and does so without regard to the peaceableness or content of the assembly—as emphasized above, the word "assembly" is used to describe what is being banned or severely restricted temporally, quantitatively, and qualitatively. Even if it the ordinance did not expressly use the word "assembly," section 25-2-795 represents a significant abridgment of the fundamental right to peaceably assemble—i.e., to get together or congregate peacefully. It forbids owners (i.e., "licensees" in the ordinance) and tenants from gathering outdoors with more than six persons, at any time of day, even if the property is licensed for occupancy of six or more. And it prohibits use by two or more persons for any activity "other than sleeping" after 10:00 p.m. *Id.*

Moreover, in contrast to traditional cases that invoke the right to assemble on *public* property,

here the right concerns the freedom to assemble with the permission of the owner on *private* property, implicating both property and privacy rights.[9] *Cf. Members of City Council of [*200] City of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 811, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984)* ("So here, the validity of the esthetic interest in the elimination [**51] of signs on public property is not compromised by failing to extend the ban to private property. The private citizen's interest in controlling the use of his own property justifies the disparate treatment."); *Stanley v. Georgia, 394 U.S. 557, 565, 89 S. Ct. 1243, 22 L. Ed. 2d 542 (1969)* ("Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the

---

[8] Because the word "including" is a term of enlargement and not of limitation or exclusive enumeration, the ordinance applies to assemblies other than "wedding, bachelor or bachelorette party, concert, sponsored event, or any similar group activity." *See Republic Ins. Co. v. Silverton Elevators Inc., 493 S.W.2d 748, 752 (Tex. 1973)* (reasoning that it is a "well settled rule that the words 'include,' 'including,' and 'shall include' are generally employed as terms of enlargement rather than limitation or restriction").

[9] Because we conclude that section 25-2-795 violates the constitutional right to assemble, we do not reach the challenges based on the constitutional rights of association, movement, and privacy. But here privacy rights are implicated in our right-of-assembly analysis. The Texas Constitution "guarantee[s] the sanctity of the individual's home and person against unreasonable intrusion." *Texas State Emps. Union, 746 S.W.2d at 205; see* Tex. Const., art. I. §§ 9 (prohibiting unreasonable searches and seizures), 25 (prohibiting quartering of soldiers in houses). State and federal courts have consistently held that the right to privacy within the home extends to temporary lodging, including hotels, motels, and boarding houses. *See, e.g., Minnesota v. Olson, 495 U.S. 91, 96-97, 110 S. Ct. 1684, 109 L. Ed. 2d 85* (l990) (holding that overnight guest had expectation of privacy); *Stoner v. California, 376 U.S. 483, 490, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964)* (concluding that "a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures"); *State v. Rendon, 477 S.W.3d 805. 810-11 (Tex. Crim. App. 2015)* (noting that Fourth Amendment protections against warrantless searches extend to "other dwelling place, including apartment"); *Luna v. State, 268 S. W.3d 594, 603 (Tex. Crim. App. 2008)* ("An 'overnight guest' has a legitimate expectation of privacy in his host's home."). Included in the right to privacy is the right to be free from "government action that is intrusive or invasive." *City of Sherman v. Henry, 928 S. W.2d 464. 468 (Tex. 1996)*. A violation of this privacy interest turns not on the conduct undertaken by the individual, but on whether the "government impermissibly intruded on [his] right to be let alone," as the Property Owners allege here. *Id.* As the city concedes, enforcement of section 25-2-795 requires visual monitoring by the City or its agents of private activities to detect whether the property owners or tenants are violating the restrictions on how many people are in a bedroom or whether there is a prohibited assembly. *See* Austin, Tex., Code § 25-2-792 (requiring City to notify neighbors in writing of short-term rental's operation and to provide contact information to report any violations).

First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch."); *Texas State Emps. Union, 746 S.W.2d at 205* ("While the Texas Constitution contains no express guarantee of a right of privacy, it contains several provisions similar to those in the United States Constitution that have been recognized as implicitly creating protected 'zones of privacy.'"); *Kopplow Dev., Inc. v. City of San Antonio, 399 S.W.3d 532, 535 (Tex. 2013)* ("One of the most important purposes of our government is to protect private property rights."); *Spann v. City of Dallas, 111 Tex. 350, 235 S.W. 513, 515 (Tex. 1921)* ("To secure their property was one of the great ends for which men entered into society. The right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody, is a natural right. It does not owe its origin to constitutions. It existed before them. It is a part of the citizen's natural [**52] liberty—an expression of his freedom, guaranteed as inviolate by every American Bill of Rights.").

Surely the right to assemble is just as strong, if not stronger, when it is exercised on private property with the permission of the owner, thereby creating a nexus with property and privacy rights. *Cf. Jones v. Parmley, 465 F.3d 46, 56 (2d Cir. 2006)* ("First Amendment protections, furthermore, are especially strong where an individual engages in speech activity from his or her own private property." (citing *City of Ladue v. Gilleo, 512 U.S. 43, 58, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994))*. But if Thomas Jefferson, Patrick Henry, and other revolutionary patriots had lived in this modern day and chosen a short-term rental instead of the Raleigh Tavern—as they may well have given the nature of modern society—to assemble and discuss concepts of freedom and liberty, the City [*201] of Austin's ordinance would impose burdensome and significant restrictions on their abilities to do so. The City of Austin's restriction of this fundamental right to physically congregate on private property, in a peaceable manner, for the citizens' shared welfare or benefit requires strict

scrutiny. *See Washington, 521 U.S. at 720* (explaining that due-process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests"); [**53] *Reno, 507 U.S. at 301-02* (same); *cf. Barnette, 319 U.S. at 639* ("The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds."); *De Jonge, 299 U.S. at 365* ("If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge.").

We do not suggest that the City of Austin is powerless to regulate short-term rentals or to address the possible negative effects of short-term rentals—in fact, it already does so with various nuisance ordinances. *See, e.g.,* Austin, Tex., Code §§ 9-2-1 to 9-2-65 (noise ordinance), 9-4-15 (prohibiting public urination and defecation), 10-5-42-10-5-45 (littering ordinance), 12-5-1-12-2-44 (parking ordinance); *see also [**54]* Tex. Penal Code §§ 42.01 (disorderly conduct), 49.02 (public intoxication). But here the City has not identified a compelling interest that might justify section 25-2-795's restrictions on the right to peaceably assemble on private property. *See Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 71, 101 S. Ct. 2176, 68 L. Ed. 2d 671 (1981)* ("[W]hen the government intrudes on one of the liberties protected by the Due Process Clause of the Fourteenth Amendment, 'this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation.'" (quoting *Moore, 431 U.S. at 499*)). The City's stated concerns in enacting this section

were to reduce the likelihood that short-term rentals would serve as raucous "party houses" in otherwise quiet neighborhoods and to reduce possible strain on neighborhood infrastructure. These are certainly valid concerns, but compelling interests in the constitutional sense are limited to "'interests of the highest order.'" *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)). These interests may include, for example, reduction of crime, protection of the physical and psychological well-being of minors, parental rights, protection of elections, and tax collection. *See, e.g., Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 763-64, 114 S. Ct. 2516, 129 L. Ed. 2d 593 (1994) (public safety and order); *Burson v. Freeman*, 504 U.S. 191, 198-99, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992) (integrity of elections); *Ginsberg v. New York*, 390 U.S. 629, 639-640, 88 S. Ct. 1274, 20 L. Ed. 2d 195 (1968) (protecting minors). Further, the City must show a compelling interest in imposing the burden [**55] on the right to assemble in the particular case at hand, not a compelling interest in general. *See Westchester Day Sch.*, [*202] 504 F.3d at 353 (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 432, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006)).

The regulation of property use is not, in and of itself, a compelling interest. *See Barr v. City of Sinton*, 295 S.W.3d 287, 305 (Tex. 2009). As the Texas Supreme Court has explained, "Although the government's interest in the public welfare in general, and in preserving a common character of land areas and use in particular, is certainly legitimate when properly motivated and appropriately directed . . . courts and litigants must focus on real and serious burdens to neighboring properties" when determining whether a compelling interest is at issue. *Id.* at 305-07; *see Bell*, 123 Tex. at 545 (noting that "police or governmental powers may be exerted where the object of legislation is within the police power," but "the privileges guaranteed by the Bill of Rights . . . cannot be

destroyed by legislation under the guise of police control"). We must "not assume that zoning codes inherently serve a compelling interest, or that every incremental gain to city revenue (in commercial zones), or incremental reduction of traffic (in residential zones), is compelling." *Barr*, 295 S.W.3d at 307. Here, the City has not provided any evidence of a serious burden on neighboring properties sufficient to justify section 25-2-795's encroachment [**56] on owners' and their tenants' fundamental right to assemble on private property.

Additionally, the City's restrictions on the right to assemble would still fail strict scrutiny because the ordinance is not narrowly tailored and can be achieved by less intrusive, more reasonable means, such as enforcement of the already-existing ordinances regulating noise, parking, building codes, and disorderly conduct that we discuss above in our analysis of the State's retroactivity claim. *See Reno*, 507 U.S. at 302 (substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest").

In sum, we hold that section 25-2-795 infringes on short-term rental owners' and their tenants' constitutionally secured right to assembly because it limits assembly on private property without regard to the peacefulness of or reasons for the assembly. And because the infringement of the fundamental right to assemble is not narrowly tailored to serve a compelling government interest, it violates the Texas Constitution's guarantee to due course of law. *See id.* Accordingly, it was error for the district [**57] court to grant the City's no-evidence motion for summary judgment and to deny the Property Owners' motion for summary judgment on the Property Owners' constitutional challenge to this provision.

## C. Unreasonable Search and Seizure

The Property Owners contend that another provision of the short-term rental ordinance place owners and tenants of short-term rentals at risk of unconstitutional search and seizure. Specifically, they challenge the provision that added short-term rentals to the enumerated list of types of property that officials must inspect "to ensure compliance with this chapter and other applicable laws." Austin, Tex., Code § 25-12-213(1301). That provision, however, was modified to allow the licensee or occupant to deny the inspector's entry and to seek pre-search administrative review. *See* Austin, Tex., Ordinance No. 20171012-SPEC001 (Oct. 12, 2017). Thus, although the parties have not briefed this Court on the repeal of the more onerous inspection provisions, we [*203] take judicial notice of the ordinance repealing this section and conclude this claim is now moot. *See* Tex. R. Evid. 204 (allowing judicial notice of municipal law); *Trulock v. City of Duncanville, 277 S.W.3d 920, 929 (Tex. App.—Dallas 2009, no pet.)* (dismissing case as moot where challenged provisions of ordinance had been [**58] repealed).

**Conclusion**

Because Austin City Code sections 25-2-795 (restricting assembly) and 25-2-950 (banning type-2 rentals) are unconstitutional, we reverse that part of the district court's judgment granting the City's no-evidence motion for summary judgment and denying the Property Owners' and the State's motions for summary judgment. We render judgment declaring sections 25-2-795 and 25-2-950 of the City Code void. We affirm the remainder of the judgment and remand the case to the district court for further proceedings consistent with this opinion.

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Goodwin and Kelly Concurring and Dissenting Opinion by Justice Kelly

Affirmed in Part; Reversed and Rendered in Part;

Remanded

Filed: November 27, 2019

**Dissent by:** Chari L. Kelly

# Dissent

## DISSENTING OPINION

The majority opinion expands fundamental-rights jurisprudence to strike down policy decisions properly left to Austin's City Council under their zoning power. Its approach leads to a misapplication of Retroactivity Clause precedent, creating tension with opinions of our sister courts of appeals; disregards Texas and U.S. history; and is an atextual expansion of the Assembly Clause. I respectfully dissent.

## I. The Retroactivity Clause

The Texas Constitution provides that "[n]o bill of attainder, ex post [**59] facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." Tex. Const. art. I, § 16. The Property Owners' retroactivity challenge to Section 25-2-950—the ban on non-homestead short-term rentals that would go into effect in April 2022—is a facial constitutional challenge instead of an as-applied one. They "cannot . . . assert that the [ordinance] is unconstitutional 'as applied' because [it] has never been applied to anyone." *See Barshop v. Medina Cty. Underground Water Conservation Dist., 925 S.W.2d 618, 626 (Tex. 1996)*. Therefore, they "must establish that the [ordinance], by its terms, always operates unconstitutionally." *Id. at 627*. And we must interpret the ordinance "to avoid constitutional infirmities" under the Retroactivity Clause. *See id. at 629; see also Union Carbide Corp. v. Synatzske, 386 S.W.3d 278, 313, 317 (Tex. App.—Houston [1st Dist.] 2012)* (en banc) (Bland, J., dissenting from retroactivity reasoning) ("A court must not hold a legislative enactment to be

615 S.W.3d 172, *203; 2019 Tex. App. LEXIS 10290, **59

unconstitutional unless it is absolutely necessary to so hold. . . . If a statutory reading . . . springs constitutional doubt, and another reasonable interpretation exists, then it is not the interpretation that the legislature intended."), *rev'd*, 438 S.W.3d 39 (Tex. 2014).

"'Mere retroactivity is not sufficient to invalidate a statute. . . . Most statutes operate to change existing conditions, and it is not every retroactive law that is unconstitutional.' . . . [N]ot [**60] all retroactive legislation is bad." *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 139 (Tex. 2010) (quoting *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex. 1971)).

In its entire history, the Supreme Court of Texas has held a law unconstitutionally retroactive only four times. *See Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 708 (Tex. 2014). Those four instances involved [*204] amendments to statutes of limitations and a new choice-of-law rule that extinguished a mature tort claim. *Id.* at 708 & n.34 (citing *Robinson*, 335 S.W.3d at 148-49; *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999); *Wilson v. Work*, 122 Tex. 545, 62 S.W.2d 490, 490-91 (Tex. 1933) (per curiam) (orig. proceeding); *Mellinger v. City of Hous.*, 68 Tex. 37, 3 S.W. 249, 254-55 (Tex. 1887)).

Since 2014, the Court has addressed only two retroactivity challenges and has upheld the challenged law both times. In one instance, the Court concluded that "a charter school's charter is not a vested property right to which the . . . prohibition on retrospective laws appl[ies]." *See Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54, 68 (Tex. 2018). In the other, the Court concluded that "a statute authorizing property owners to petition [the Supreme Court] directly to determine which county is owed the [ad valorem] taxes" imposed on the owners by multiple counties was "not constitutionally retroactive." *See In re Occidental Chem. Corp.*, 561 S.W.3d 146, 150, 162 (Tex. 2018) (orig. proceeding).

Never has the Court struck down a zoning or property-use law as unconstitutionally retroactive, though Texas municipalities have been zoning and regulating property for decades.

### A. Section 25-2-950 *(type-2 rentals) is not retroactive*.

A statute is not retroactive merely because it is applied [**61] in a case arising from conduct that existed before the statute's enactment or if it "upsets expectations based in prior law." *Mbogo v. City of Dall.*, No. 05-17-00879-CV, 2018 Tex. App. LEXIS 4912, 2018 WL 3198398, at *4 (Tex. App.—Dallas June 29, 2018, pet. denied) (mem. op.) (applying and quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994)). This is true particularly in the area of zoning regulations, for, there, "strong policy arguments and a demonstrable public need" support municipalities' "fair and reasonable termination of nonconforming property uses." *Mbogo*, 2018 Tex. App. LEXIS 4912, 2018 WL 3198398, at *4 (quoting *City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972)).

The majority opinion asserts that Section 25-2-950 "does not advance a zoning interest because both short-term rentals and owner-occupied homes are residential in nature." *See ante* at 20. However, ordinances differentiating one type of residential property from another are just as much exercises of the zoning power as are ordinances differentiating between residential property and commercial property. *See, e.g., Barr v. City of Sinton*, 295 S.W.3d 287, 289-91, 296-308 (Tex. 2009) (addressing ordinance that differentiated solely within "residential area" category and nevertheless treating it as zoning-related); *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 674-81 (Tex. 2004) (treating ordinance that restricted number of residences that could be built on undeveloped property as zoning ordinance even though it applied only to residential property).

Section 25-2-950 is a zoning ordinance. It is found in the Code of Ordinances [**62] chapter titled "Zoning." See Austin, Tex., Code of Ordinances ch. 25-2. The majority opinion's conclusion that Section 25-2-950 is retroactive therefore creates tension with the Fifth Court of Appeals' opinion in *Mbogo*. In that case, when the City of Dallas rezoned a portion of Ross Avenue to prohibit automobile-related businesses from operating there, the rezoning was not "retroactive" even though an affected business owner, who would have to discontinue his chosen business, had been operating his automobile-related business in the area since before the rezoning. *Mbogo*, 2018 Tex. App. LEXIS 4912, 2018 WL 3198398, at *1, *4. "The ordinance did [*205] not change any use in the property thereby attaching a new legal consequence or upset any expectations based in prior law. Rather, it *prospectively* altered a property owner's future use of the property by setting a date by which to come into compliance." 2018 Tex. App. LEXIS 4912, [WL] at *4 (emphasis added).

So too here. But the majority opinion holds otherwise, leaping from the fundamental right of property ownership to what it deems within the "fundamental privilege[s] of property ownership"— "leas[ing] one's property on a short-term basis." *See ante* at 22. Surely the *Mbogo* business owner's use of his own property is no less important than a tenant's use [**63] of a short-term-rental owner's property. But, by expanding the scope of fundamental property rights to include a tenant's use of a non-homestead property for a lease term of less than 30 days, the majority opinion wields fundamental-rights jurisprudence in a way that cannot comport with what the Fifth Court of Appeals held in *Mbogo*. And it finds no support in Texas Supreme Court jurisprudence or that of this Court's 127 year history.

**B. Even if retroactive, Section 25-2-950 (type-2 rentals) is not unconstitutionally retroactive, under Robinson.**

Even if Section 25-2-950 is retroactive, it is not unconstitutionally so. Retroactive laws may still be constitutional under the *Robinson* three-factor test. *See* 335 S.W.3d at 145-50. Under that test, a retroactive law is unconstitutionally retroactive only so long as three factors weigh against the challenged law: (1) "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings," (2) "the nature of the prior right impaired by the statute," and (3) "the extent of the impairment." *Id.* at 145.

*1. Section 25-2-950 serves a strong public interest.*

Zoning is a sufficiently strong public interest under the Retroactivity Clause: "strong policy arguments and a demonstrable public need" support [**64] "the fair and reasonable termination of nonconforming property uses," and "[m]unicipal zoning ordinances requiring the termination of nonconforming uses under reasonable conditions are within the scope of the police power." *Benners, 485 S.W.2d at 778*, *cited in Mbogo*, 2018 Tex. App. LEXIS 4912, 2018 WL 3198398, at *6; *accord Caruthers v. Board of Adjustment of the City of Bunker Hill Vill.*, 290 S.W.2d 340, 350 (Tex. App.—Galveston 1956, no writ). "[T]he supreme court has not overruled *Benners*, and . . . we are bound to follow supreme court precedent." *Mbogo*, 2018 Tex. App. LEXIS 4912, 2018 WL 3198398, at *6.

More broadly, efforts to "safeguard the public safety and welfare" are sufficiently strong public interests under the Retroactivity Clause. *See Barshop*, 925 S.W.2d at 634; *Texas State Teachers Ass'n v. State*, 711 S.W.2d 421, 424 (Tex. App.—Austin 1986, writ ref'd n.r.e.). In addition to zoning, public-welfare interests as varied as property-tax relief and testing teacher competence are sufficiently strong public interests under the Clause. *See White Deer Indep. Sch. Dist. v. Martin*, No. 07-18-00193-CV, 2019 Tex. App. LEXIS 9694, 2019 WL 5850378, at *7 (Tex. App.—Amarillo Nov. 5, 2019, no pet. h.) (op., designated

615 S.W.3d 172, *205; 2019 Tex. App. LEXIS 10290, **64

for publication); *Texas State Teachers Ass'n, 711 S.W.2d at 422, 424-25*.

The City of Austin's stated interests in enacting Section 25-2-950 are within the wide zone of strong public interests. The City says that short-term rentals are particularly susceptible to over-occupancy, which affects "fire safety" and "overwhelm[s] existing wastewater systems," and to tenants' "dump[ing] trash in the neighborhood"; "engag[ing] in public urination" [*206] and public intoxication; and "open drug use." The City also heard complaints about illegal parking, "noise, [**65] loud music, vulgarity, and other negative impacts of having a 'party house'" environment at short-term rentals.

The majority opinion faults the City for issuing notices of violation "to licensed short-term rentals only ten times." *Ante* at 20. Why is ten not enough? The majority opinion questions whether the ordinance is necessary to respond to ten notices of violation, "[b]ut the necessity and appropriateness of legislation are generally not matters the judiciary is able to assess." *Robinson*, 335 S.W.3d at 146. We need not determine whether the law is "the only, the best, or even a good way" to achieve the stated public interest. *See id.* If the public interest is sufficiently strong, we need go no further—the "nature and strength of the public interest" is enough under *Robinson. See id.* at 145. Section 25-2-950 rests on strong, public-welfare interests.

## 2. The right that Section 25-2-950 impairs is narrow.

The strength of a municipality's zoning interest is mirrored by the weakness of property owners' rights in zoning-burdened property: "an individual has no protected property interest in the continued use of his property for a particular purpose just because such use has commenced or a zoning classification has been made." *Mbogo*, 2018 Tex. App. LEXIS 4912, 2018 WL 3198398, at *5 (citing *Benners*, 485 S.W.2d at 778); *accord City of La*

*Marque v. Braskey*, 216 S.W.3d 861, 863 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (also citing [**66] *Benners*). The majority opinion's distinction between using property and leasing it is, for these purposes, of no material difference. An owner's lease of his or her property is a use of the property, and the tenant is leasing the property so he or she can use it. In fact, the Assembly Clause portion of the majority opinion bears this out when it considers the tenant-affecting ordinance to be "[t]he regulation of property use." *See ante* at 41 ("The regulation of property use is not, in and of itself, a compelling interest.").

But even if the two uses are distinct, it is possible to interpret Section 25-2-950 as constitutional under this factor. Under Section 25-2-950 property owners may still lease their property. They must simply lease it for 30 days or more or make it their homestead. Therefore, the right that Section 25-2-950 impairs is narrow.

## 3. Section 25-2-950 only lightly impairs the short-term-rental right because of the grace period until 2022.

"[I]mpairment of . . . a right may be lessened when a statute affords a plaintiff a grace period," *Tenet Hosps.*, 445 S.W.3d at 708, "or a reasonable time to protect his investment," *Mbogo*, 2018 WL 3198398, at *7. The Fifth Court of Appeals resolved this third factor against unconstitutionality because, though the business owner "did not believe that he could get a fair price" [**67] in selling his business, "despite *never* listing his property on the market," that did not equate to an "abus[e of] legislative power" by the city. *Id.* (emphasis in original).

In contrast here, the majority opinion relies simply on "a loss of income for the property owners." *See ante* at 23. Though no doubt important, loss of income is not enough under *Robinson*. Loss of investment is the touchstone. *See Mbogo*, 2018 WL 3198398, at *7; *Village of Tiki Island v. Ronquille*,

463 S.W.3d 562, 587 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (lack of "avenue for recoupment" of "existing investment" was relevant). There is no showing that the Property Owners cannot [*207] recoup their investments in their rental properties before April 2022. Also, even shorter grace periods than three years have been sufficient elsewhere. *See Tenet Hosps.*, 445 S.W.3d at 708. Time allowed to mitigate investment loss makes any impairment "slight." *See White Deer Indep. Sch. Dist.*, 2019 WL 5850378, at *8. Just because the property owners are not making as much profit as they could with unfettered rights to short-term rentals does not mean their property right has been unconstitutionally impaired.

In sum, under *Robinson*, Section 25-2-950 is not a retroactive law, and, even if it were, it is constitutional under the three-factor test.

## II. The Assembly Clause

I also disagree with the majority opinion's holding that Section 25-2-795—the ordinance establishing certain occupancy limits for short-term [**68] rentals—must withstand heightened due-process scrutiny, instead of simply rational-basis review. It purports to reach this holding based on the Assembly Clause in the Texas Bill of Rights, which says: "The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance." Tex. Const. art. I, § 27.

### A. The text-informing history of the Assembly Clause

The majority opinion formulates the rights granted by the Assembly Clause by importing dictionary definitions of "assemble," "common," and "good." It uses those definitions to conclude that the Assembly Clause protects citizens' "right to

physically congregate, in a peaceable manner, for their shared welfare or benefit." *Ante* at 33.

"When identifying fundamental rights, . . . an exacting *historical and textual* analysis" is required. *In the Interest of J.W.T.*, 872 S.W.2d 189, 211 (Tex. 1994) (Cornyn, J., dissenting from denial of reh'g) (emphasis added). And when we seek to understand constitutional history, "it is important to get that history right before engaging in the complex and separate task of judging how such insights might or might not be applied to contemporary legal problems." Saul Cornell, *"To Assemble Together for Their Common [**69] Good": History, Ethnography, and the Original Meanings of the Rights of Assembly and Speech*, 84 Fordham L. Rev. 915, 934 (2015).

Historically, Texas is not the only state whose constitution has a bill of rights like that of the U.S. Constitution. And Texas's Assembly Clause is not the only one to limit its state constitutional right of assembly to the purpose of furthering the "common good." Such language was common in many of the early state constitutions. Similar language can be found in the constitutions of Pennsylvania (1776), Vermont (1777), North Carolina (1776), Massachusetts (1780), and New Hampshire (1783). *See id.* at 931-32. Although individuals are the holders of the right to assemble, its exercise is framed as a civic enterprise. *Id.* at 932. Hence, there is a historical difference between the right to gather to "inflame passions" and the right to gather to "promote reasoned discourse." *See id.*

It is also important to note that a limitation of the right to assemble to matters involving "the common good" was initially included in the U.S. Constitution's Bill of Rights. *See* John D. Inazu, *The Forgotten Freedom of Assembly*, 84 Tulane L. Rev. 565, 571-72 (2010). During House debates, there was much discussion over whether the right to assemble should be limited to [*208] matters involving "the common good." As one representative told another, if he "supposed that [**70] the people had a right to consult for the

common good" but "could not consult unless they met for the purpose," he was in fact "contend[ing] for nothing." *Id.* at 572 (quoting 1 *Annals of Cong.* 760-61 (Joseph Gales ed., 1834)). In other words, though there was concern that the state would interpret the "common good" limitation to oppress minority or dissenting political viewpoints, none disputed that the right of assembly was focused on promoting open, civic discourse and deliberations on matters of public welfare. *See* Cornell, *"To Assemble Together for Their Common Good": History, Ethnography, and the Original Meanings of the Rights of Assembly and Speech, supra* at 932 & n.154. While the language limiting the right to assemble was initially retained by both the House and the Senate, it ultimately was removed before passage. Inazu, *The Forgotten Freedom of Assembly, supra* at 573 (citing S. Journal, 1st Cong., 77 (Sept. 9, 1789)).

The Texas Constitution was established in 1876 with this wealth of history to draw upon. It did not recognize an unfettered right to assemble for whatever purpose and in whatever manner at whatever time of day, as the majority opinion suggests. It instead limited that right to assemble in two important ways: it must be peaceable, and it must be for the citizens' common good. The majority opinion distinguishes [**71] "*their* common good" from "*the* common good" but ignores that the assembly right is granted to "citizens" rather than to "people" more broadly. *Compare* Tex. Const. art. I, § 27 (assembly right for "citizens"), *with id.* §§ 9 (protecting "people" from unreasonable searches and seizures), 34 (granting "[t]he people" certain rights to hunt, fish, and harvest wildlife). The drafters' specific use of "citizens" implies a link to public discourse that using "people" does not.[1]

Historically and textually, the Assembly Clause assures Texans the fundamental right to peaceably gather for purposes of meaningful civic discourse without fear of retribution. The Clause goes hand in hand with freedom of speech; it ensures that those who speak may have an audience. This is why, as the majority opinion recognizes, the Supreme Court of the United States regularly addresses speech and assembly jointly. *See* Inazu, *The Forgotten Freedom of Assembly, supra* at 597.

The City of Austin has passed limitations on certain short-term rentals that on their face have nothing to do with assembling for the common good to participate in civic discourse. The City believes it has evidence to support that short-term rentals give rise to non-peaceable assemblies disconnected from citizens' common good. [**72] The City's restrictions, then, are assembly-neutral zoning regulations that have a rational [*209] basis. To reach a contrary conclusion could lead to a challenge to every statute or ordinance regulating conduct that involves people "assembling" together, including trespass and anti-camping statutes. Instead, such enactments should be susceptible to assembly challenge only as enactments targeting non-"common good," non-peaceable assemblies.

The majority opinion also does not give due weight to the phrase "in a peaceable manner" in its analysis. As the Court of Criminal Appeals recognized, the Assembly Clause "specifically limits its protection to 'peaceable assembly.'" *Ferguson v. State*, 610 S.W.2d 468, 470 (Tex.

---

[1] The majority opinion's response on this point—that only "citizens" are granted the Texas Assembly Clause's rights—introduces another problem. *See ante* at 35 n.7. The majority opinion's position *must* be that the "citizens" protected by the Texas Constitution are unlimited—citizens of Texas; of Oklahoma; of Virginia, like Messrs. Jefferson and Henry in the majority opinion's hypothetical, *see ante*

at 39; etc. For if only Texans are clothed with the Texas Constitution's assembly rights, then Section 25-2-795 is not unconstitutional in every respect as is required to sustain a facial constitutional challenge. The City of Austin could still constitutionally apply the ordinance to short-term rentals made to non-holders of Texas assembly rights—non-Texans. In this way, the majority opinion's holding reaches beyond what its reasoning supports: either it invalidates Section 25-2-795 even for people who have not been shown to be holders of Texas assembly rights, or it atexutally conflates the constitution's use of the distinct terms "citizens" and "people," despite the drafters' considered choice to use the two different terms.

Crim. App. 1979).[2] This matters because the City relies on evidence of (i) short-term rentals' harms to "public health, public safety, the general welfare, and preservation of historic neighborhoods" and (ii) "concerns . . . about short-term rental properties that were poorly maintained, that had code violations, and that generated police and fire reports." The City says that it uncovered evidence of over-occupancy in short-term rentals, which affects "fire safety" and "overwhelm[s] existing wastewater systems." It heard complaints about short-term tenants' [**73] "dump[ing] trash in the neighborhood"; "engag[ing] in public urination"; public intoxication; and "open drug use, including at one rental next door to a home with a five-year old child." It heard complaints about illegal parking, "noise, loud music, vulgarity, and other negative impacts of having a 'party house'" environment. And even when City code personnel have cited short-term tenants for misconduct, the misconduct often continues because "[s]ome short-term rental operators completely ignore the concerns of neighbors, and do not regulate tenant misconduct."

All this and more may bear on an inquiry into peaceable assembly for citizens' common good. But the majority opinion never undertakes such an inquiry, despite the plain constitutional text. Instead, it sets up the strawman that the City's concerns are limited to "reduc[ing] the likelihood that short-term rentals would serve as raucous 'party houses' . . . and . . . reduc[ing] possible strain on neighborhood infrastructure," overlooking the City's other public-health and public-safety concerns. *See ante* at 40. In doing so, it considers Section 25-2-795 to be mere "regulation of property use." *See ante* at 41. [**74]

Analyzing peaceableness requires a broader view. The concept's role in Texas jurisprudence suggests why. The Court of Criminal Appeals once struck down as unconstitutional a statute proscribing "any collection of more than two picketers either within fifty feet of any entrance to picketed premises or within fifty feet of each other" in part because the statute failed to consider "the peacefulness of the group, the lack of obstruction to the flow of traffic, or the level of noise, if any, generated by the picketers." *Olvera v. State*, 806 S.W.2d 546, 552 (Tex. Crim. App. 1991); *cf. De Jonge v. Oregon*, 299 U.S. 353, 365, 57 S. Ct. 255, 81 L. Ed. 278 (1937) ("[C]onsistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime."). Relatedly, driving while intoxicated is "a breach of the peace," for purposes of a [*210] warrantless arrest. *See Banda v. State*, 317 S.W.3d 903, 912 n.4 (Tex. App.—Houston [14th Dist.] 2010, no pet.). And so is "curs[ing] and creat[ing] a disturbance" when a peace officer is investigating a complaint. *See Johnson v. State*, 481 S.W.2d 864, 865-66 (Tex. Crim. App. 1972).

Loud noise. Obstructing infrastructure. Flouting law enforcement. Public disturbances. Threats to public safety. All these may make an assembly non-peaceable and have nothing to do with civic discourse. And the City believes that it has evidence of short-term rentals causing all these. To determine whether the City is right, we should examine [**75] what ties all these examples together as breaches of the peace disconnected from the common good. The majority opinion eschews a full peaceableness or "common good" analysis, however, sidestepping what the plain constitutional text requires.

## B. Texas courts conceive of fundamental rights much more narrowly.

The majority opinion is also out of step with Texas "fundamental right" precedent. When litigants plead constitutional violations of allegedly

---

[2] Inazu, whom the majority opinion relies on, recognizes the peaceableness limitation. He describes the First Amendment "text handed down to us" as "convey[ing] a broad notion of assembly in two ways. First, it does not limit the purposes of assembly to the common good, thereby implicitly allowing assembly for purposes that might be antithetical to that good (although constraining assembly to peaceable means)." *See* John D. Inazu, *The Forgotten Freedom of Assembly*, 84 Tulane L. Rev. 565, 576 (2010).

fundamental rights, Texas courts are typically more circumspect than the majority opinion is in defining the scope of the right at issue. By not giving due weight to the concepts of peaceableness and citizens' common good in its holding that "the right to assemble granted by the Texas Constitution is a fundamental right," thereby requiring strict scrutiny, the majority opinion sweeps too broadly. *See ante* at 35.

It has no limiting principle. The effect of the majority opinion's view is that any regulation affecting any activity, anywhere in Texas, is subject to strict-scrutiny review so long as more than one person is involved. This view will have exactly the kind of far-reaching effects that the Retroactivity Clause would have had if the Supreme Court had not [**76] prevented it from being interpreted overly literally. *Cf.* Robinson, 335 S.W.3d at 138-39 (quoting *Texas Water Rights Comm'n, 464 S.W.2d at 648*).

Consider how the majority opinion's sweeping approach might undermine other common-sense results. When a student's parent challenged a statute prohibiting students from participating in extracurricular activities, no matter where they take place, unless the student maintained a 70% grade average, the Supreme Court of Texas considered the right at issue to be "the right to participate in extracurricular activities." *See Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 557-60 (Tex. 1985). But what if the Court, like the majority opinion here, couched the right more generally as the right "to get together or congregate"? That would encompass extracurricular activities on campus or elsewhere. The Supreme Court then would have analyzed the parent's challenge under heightened scrutiny. Instead, it disposed of the challenge on rational-basis review. *See id.*

Elsewhere, this Court upheld a Travis County park rule restricting access to a park known for nude sunbathing to people over 18 years old. *See Central Tex. Nudists v. County of Travis*, No. 03-00-00024-CV, 2000 Tex. App. LEXIS 8136, 2000 WL 1784344, at *1, *4, *8 (Tex. App.—Austin Dec. 7, 2000, pet. denied) (not designated for publication). Nudist parents who wanted to bring their children to the park challenged the rule, but this Court held that the [**77] rule did not infringe on any fundamental right and did not "affect the ability of the [parents] or other naturist parents to associate with their children, but regulate[d] only where such associations may occur." *See* 2000 Tex. App. LEXIS 8136, [WL] at *3-4, *6. The parents could not congregate with their children anywhere they pleased. But, here, the majority opinion seems to say [*211] that assembly rights are fundamental no matter where they are exercised.[3]

The majority opinion is inconsistent with "fundamental right" precedent because it couches the right at issue far more broadly than Texas courts traditionally would.

### C. Neither of Texas's high courts have taken the novel [**78] step that the majority opinion takes today.

Finally, the majority opinion oversteps our Court's

---

[3] The majority opinion relegates to a footnote the "privacy rights [that] are implicated in [its] right-of-assembly analysis." *See ante* at 37 n.9. The majority opinion does not divine a difference between federal and state privacy rights and relies on opinions from the Supreme Court of the United States. *See id.* But the footnote fails to consider the similar ordinance upheld in *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S. Ct. 1536, 39 L. Ed. 2d 797 (1974). There, the ordinance

restricted land use to one-family dwellings excluding lodging houses, boarding houses, fraternity houses, or multiple-dwelling houses. The word "family" as used in the ordinance means, "(o)ne or more persons related by blood, adoption, or marriage, living and cooking together as a single housekeeping unit, exclusive of household servants. A number of persons but not exceeding two (2) living and cooking together as a single housekeeping unit though not related by blood, adoption, or marriage, shall be deemed to constitute a family."

*Id.* at 2. The Court upheld the ordinance, holding that the suit "involve[d] no 'fundamental' right guaranteed by the Constitution, such as . . . the right of association . . . or any rights of privacy." *Id.* at 7 (internal citations omitted). The majority opinion's footnote does not attempt to distinguish *Village of Belle Terre*.

615 S.W.3d 172, *211; 2019 Tex. App. LEXIS 10290, **78

role as an intermediate court by declaring a fundamental right to congregate without fully analyzing peaceableness or the advocacy of a matter of public welfare. We should instead leave this function to our state's two high courts.

Declaring rights fundamental, and thus beyond ordinary democratic give-and-take, is a weighty matter. *See, e.g., Obergefell v. Hodges*, 135 S. Ct. 2584, 2604-06, 192 L. Ed. 2d 609 (2015) (holding that federal Due Process and Equal Protection Clauses forbid denying fundamental right to marry to same-sex couples and noting that that holding places right "beyond the reach of majorities and officials"). Declaring fundamental the right to congregate, without any real qualification, is a novel and big step into this weighty area because "[e]conomic regulations, including zoning decisions, have traditionally been afforded only rational relation scrutiny." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998).[4]

The majority opinion recognizes that neither the Supreme Court of Texas nor the Court of Criminal Appeals of Texas has declared an unbounded right to congregate to be fundamental. As noted above, the Court of Criminal Appeals considers the Assembly Clause to be "specifically limit[ed] . . . to [**79] 'peaceable assembly.'" *Ferguson*, 610 S.W.2d at 470. And history provides the important context that peaceable assemblies are only protected to the extent they implicate the common good, whether advocating majority or minority viewpoints.

[*212] Because the high courts have not yet taken this step, we should refrain from doing so. *Cf. Ex parte Morales*, 212 S.W.3d 483, 490-93 (Tex. App.—Austin 2006, pet. ref'd) (refusing to declare "adult consensual sexual activity" to be fundamental right); *In re Living Ctrs. of Am., Inc.*, 10 S.W.3d 1, 6 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding [mand. denied]) (refusing to declare "the fair administration of justice" to be fundamental right). We should refrain even more because the two interpretations of assembly rights advanced by the majority opinion—that "the purposes of assembly" are not limited "to the common good" or to "petitioning the government"—have not "been readily acknowledged in legal and political discourse." *See* Inazu, *The Forgotten Freedom of Assembly, supra* at 576-77. Indeed, the majority opinion's view is called into question by hundreds of years of historical and legal precedent.

For these reasons, I dissent from the majority opinion regarding due process. I would review Section 25-2-795 under the rational-basis test because it is a zoning law supported by the City of Austin's inherent police powers, is supported by a lengthy record, and does not impinge upon any citizen's [**80] right to peaceably assemble to advocate for the common good.

I would affirm the trial court's grant of the City's no-evidence motion for summary judgment.

Chari L. Kelly, Justice

Before Chief Justice Rose, Justices Goodwin and Kelly

Filed: November 27, 2019

---

[4] The majority opinion considers Section 25-2-795 to be a zoning ordinance because, in holding Section 25-2-795 unconstitutional, it relies on authority instructing that "[w]e must 'not assume that zoning codes inherently serve a compelling interest, or that every incremental gain to city revenue (in commercial zones), or incremental reduction of traffic (in residential zones), is compelling." *See ante* at 41 (quoting *Barr v. City of Sinton*, 295 S.W.3d 287, 307 (Tex. 2009)). *Barr* involved the fundamental right of free exercise of religion, which is not at issue here. *See* 295 S.W.3d at 305-06. The majority opinion does not explain how Section 25-2-795 can be a zoning ordinance while Section 25-2-950 "does not advance a zoning interest." *Compare ante* at 20 (no zoning interest), *with ante* at 41 (zoning).

**End of Document**